# EXHIBIT C

to HarVest Bank of Maryland's
Motion for Leave to Take Corporate Depositions

Excerpts of the testimony of Mr. Adam Gadsby on February 4, 2010

Page 26

1  Exhibit No. 2, Notice of Deposition, marked.)
2      BY MR. CARITHERS:
3      Q. Have you seen Exhibit 2 before,
4  Mr. Gadsby?
5      A. I believe I have.
6      Q. That would be additional, an additional
7  document other than the purchase confirmation,
8  trade confirmation, complaint, and what was the
9  fourth, underlying agreement?
10     A. I would have thought this would have
11 been the underlying complaint, but correct. They
12 look very similar.
13     Q. So you have seen Exhibit Number 2
14 before, and it is our understanding that you are
15 here as a topic witness on number 1 and number
16 2.
17     Do you see topics 1 and 2 before you?
18     A. I do.
19     Q. Let me read those topics into the
20 record.
21     You are here as a topic witness with

Page 27

1  respect to number 1, "the Mortgage Loan Purchase
2  and Servicing Agreement (the "Agreement") between
3  Countrywide and HarVest Bank, including its
4  negotiation and execution."
5      Do you see that?
6      A. I do.
7      Q. Let me ask you, Mr. Gadsby, were you
8  involved in the negotiation and execution of the
9  agreement personally?
10     A. I was not personally involved in the
11 negotiation, execution of the agreement.
12     Q. Do you know who signed the agreement on
13 behalf of Countrywide?
14     A. I do.
15     Q. When I say Countrywide, Countrywide
16 Home Loans, Inc.
17     A. Understood.
18     Q. Who signed the agreement?
19     A. Jordan Cohen.
20     Q. Have you spoken with Mr. Cohen before
21 this deposition about this lawsuit?

Page 28

1      A. I have not.
2      Q. Topic number 2 in Exhibit 2 reads as
3  follows:
4      "Internal and external communications
5  and correspondence, in all forms, initiated or
6  received by Countrywide relating to the Agreement
7  and the portfolio of loans sold by Countrywide to
8  HarVest Bank (the "Portfolio")."
9      Do you see topic 2, Mr. Gadsby?
10     A. I do.
11     Q. It is our understanding this is going
12 to be on the internal which is within Countrywide
13 and external communications of correspondence,
14 external being outside of Countrywide related to
15 two things, the agreement and to the portfolio.
16     Do you see that, sir?
17     A. I do.
18     Q. Do you understand what we mean by
19 portfolio?
20     A. Yes.
21     Q. That would mean the portfolio of loans

Page 29

1  that HarVest Bank of Maryland purchased over the
2  course of time after executing the agreement in
3  March of 2006?
4      A. Understood.
5      Q. Do you actually know how many loans
6  were purchased that comprised the portfolio?
7      A. Not off the top of my head, no.
8      Q. Would those separate purchases be what
9  you referred to earlier as the trade
10 confirmations?
11     A. The trade confirmations. There would
12 have been a trade confirmation for each deal.
13 They would have been attached thereto, and then
14 depending on how many are actually purchased
15 would aggregate for the total amount.
16     Q. For the portfolio, there would be deals
17 making up the portfolio leading to the loans in
18 the portfolio. There would be more than one loan
19 perhaps in each deal?
20     A. Correct.
21     Q. Now, in terms of topic number 2 still,

8 (Pages 26 to 29)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 3 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 62

1  messaging, if you know?
2      A. She did.
3      Q. You are saying some of the ways you
4  would communicate internally in terms of what is
5  being said to investors like HarVest Bank of
6  Maryland would include instant messaging?
7      A. I believe that would be correct.
8      Q. Does instant messaging work where you
9  come in, you are on the computer screen, and you
10 communicate almost immediately with whoever you
11 are trying to communicate with internally?
12     A. Yes.
13     Q. So it's back and forth?
14     A. (Witness nods head in the affirmative.)
15     Q. That is a yes?
16     A. I'm sorry. Correct. Yes.
17     Q. Are those communications recorded or
18 saved in any way?
19     A. I have no idea.
20     Q. Do you know whether they can't be saved
21 or recorded?

Page 63

1      A. I have no idea.
2      Q. From your personal experience with
3  instant messaging, what happens when you are done
4  with the communication?
5      A. You close out the window, and you're
6  done.
7      Q. And it is gone?
8      A. It is gone.
9      Q. If you have situations in your personal
10 professional experience in the 2006 time frame
11 where you have communicated with a colleague
12 internally by instant messaging and you want to
13 recall what was said, how do you do that after
14 the window is closed out?
15     A. I am not certain.
16     Q. Before you close the instant messaging
17 window, can you print the communication so you
18 may have a way of saving it and referring back to
19 it later?
20     A. I think you can.
21     Q. In your personal professional

Page 64

1  experience, you have never done that?
2      A. I don't think I have ever printed an
3  instant message.
4      Q. Let me ask you another name, if I
5  could. Angela Chen, C-H-E-N, do you recognize
6  that name?
7      A. I do.
8      Q. Was she an employee of Countrywide back
9  in 2006?
10     A. She was an employee of Countrywide Home
11 Loans in 2006.
12     Q. As opposed to Securities, she is part
13 of Home Loans?
14     A. That's correct.
15     Q. What part of Home Loans, if you know,
16 was she employed?
17     A. She was also part of the data
18 management team.
19     Q. So she is part of the data management
20 team under the Countrywide Home Loans entity
21 whereas Gabriela Santiago is data management

Page 65

1  under Countrywide Securities?
2      A. No. She is also a member of CHL
3  Countrywide Home Loans.
4      Q. So are they in the same office or part
5  of the same department, Gabriela Santiago and
6  Angela Chen?
7      A. They are part of the same office.
8  Gabby might even report in to Angela.
9      Q. Do you know if Angela Chen had direct
10 contact with investors like HarVest Bank of
11 Maryland?
12     A. She would have, yes.
13     Q. The same kind of way that you indicated
14 for Ms. Santiago?
15     A. Correct. Very similar capacity.
16     Q. Rachel Meza, M-E-Z-A, do you recognize
17 that name?
18     A. I do.
19     Q. Was she employed by Countrywide back in
20 2006?
21     A. Countrywide Home Loans, correct.

17 (Pages 62 to 65)

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 4 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 98

why we didn't because, again, they weren't offered out, servicing released.

Q. You indicated there were occasions when for nonconforming flow purchase agreements that servicing was released.

A. It would have been on one-off occasions that would have had to go back and get internal management approval at the time, and they were few and far between.

Q. Is there any other circumstance where a nonconforming flow purchase agreement servicing was released?

A. Again, just all on one-off occasions.

Q. When you say one-off occasions, what do you mean? Once?

A. Again, it would have been infrequent, at best. It would not have been our -- our focus was, again, to keep servicing for every loan we sold.

Q. I understand that was your goal. There were exceptions to that goal. I am trying to ask

Page 99

questions about those exceptions, okay?

A. Understood.

Q. You indicated there were one-off occasions where internal management was consulted?

A. There would have been, yes.

Q. And would those be situations where as with HarVest Bank of Maryland, I think you indicated, service released was not offered as part of the negotiations?

A. Let me clarify. Just to clarify also, the broker-dealer owned the loans for the most part that we sold to -- again, I have to go back and look, but if we were selling the loans, either we were acting in the broker capacity and pulling them out of Countrywide or we were acting from a principal role and selling directly from our position.

In either case, Countrywide Securities was not the owner of the servicing asset. The mortgage company or CHL, Inc. would have been the

Page 100

owner of the servicing asset. Countrywide Securities transacted under Countrywide Home Loans, but we had an investor number, a book of business for us. We were never -- our particular group was never the owner of servicing. The outside exception is, again, with the scratch and dent. The scratch and dent traders owned the servicing.

MR. SCOTT: Why don't we take a break.

(Recess taken -- 11:18 a.m.)
(After recess -- 11:31 a.m.)

BY MR. CARITHERS:

Q. Turning back to Exhibit Number 1 and the part of Exhibit Number 1 that begins with the Mortgage Loan Purchase and Servicing Agreement between Countrywide Home Loans, Inc. and HarVest Bank of Maryland beginning on CHL33377, we were asking about this document in terms of the form.

A. Correct.

Q. You indicated this is one of one type of form for nonconforming residential mortgage

Page 101

loans?

A. Well, this document is not the form obviously because it is fully executed, but we have forms of, correct.

Q. As you look at this document, and look through the whole document which goes until CHL33417, I am assuming that, correct me if I have the assumption wrong, that the terms and the basic format of this document without signatures and without executing parties is contained as a form document somewhere in your files, 2006?

A. Correct.

Q. And, therefore, my question would be in the negotiation of these types of forms and agreements, are there ever any changes made to the terms therein?

A. Yes.

Q. And how do those changes come about? Is it through a negotiation with lawyers involved or is it between just the principals, if you know?

26 (Pages 98 to 101)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 5 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 102

1    A.  It would be negotiation between the two
2  parties.
3    Q.  Without lawyers?
4    A.  It could be with lawyers. It could be
5  without lawyers.
6    Q.  Either way. Okay.
7       Do you recall in the case of HarVest
8  Bank of Maryland whether there were negotiations
9  regarding the terms and conditions of this
10 Mortgage Loan Purchase and Servicing Agreement?
11   A.  I believe there were negotiations to
12 the agreement.
13   Q.  Do you recall whether there were any
14 changes made to the form document to the extent
15 we now have the executed document before us?
16   A.  I believe there were some changes to
17 the form document.
18   Q.  Do you recall what changes there were?
19   A.  I do not recall specifically.
20   Q.  What is behind your belief that there
21 were some changes made?

Page 103

1    A.  Just from my recollection from looking
2  at the black line from the master that we had in
3  the file.
4    Q.  So what you have in your file is a
5  black line version of the master?
6    A.  From the final changes, correct.
7    Q.  And if I can visualize this, this black
8  line document has literally black lines crossing
9  out terms and conditions and inserting new terms
10 and conditions?
11   A.  Technically it would just be from
12 Microsoft Word. You would be comparing the final
13 document to what we have in our master form.
14   Q.  You say you reviewed that yourself,
15 that document?
16   A.  I do on the deals that I sign off on,
17 correct.
18   Q.  Do you recall for HarVest Bank of
19 Maryland you actually reviewed the black line
20 version?
21   A.  Again, recently. Not at the time of

Page 104

1  the negotiation.
2       MR. CARITHERS: Mr. Scott, we are going
3  to ask for the production of that document.
4       MR. SCOTT: I think you have it.
5    A.  It would have been in the files.
6       MR. CARITHERS: We will check to see.
7  I haven't seen it. We will check to confirm if
8  we don't have it. Mr. Gadsby indicated he
9  recently reviewed it. I will get back to you on
10 that. It would be easy to do if we don't have
11 it, don't you agree?
12      MR. SCOTT: I don't know. My
13 understanding is that we provided all of the
14 documents related to the negotiation of the
15 agreement.
16   A.  But I was not -- again, that black line
17 was not part of the negotiation. I would agree
18 with that because that would have been something
19 internally for us. We would not have provided
20 the black line, again, to HarVest.
21   Q.  I thought you indicated -- if I can

Page 105

1  make a record, I thought you indicated that there
2  was the form.
3    A.  Correct.
4    Q.  And then the final version we have
5  before us has changes made from the form --
6    A.  Correct.
7    Q.  -- because of negotiations leading to
8  the executed version.
9    A.  Uh-huh.
10   Q.  I thought you indicated that the
11 changes that were made, you reviewed those
12 changes because there is a black line version.
13   A.  Again, there should be a black line
14 version in the file. When I say "should", again,
15 unless things have changed, there should be a
16 black line version in the file. Again, you are
17 saying part of the negotiation. We would not
18 have prepared and sent that black line. That was
19 an internal document for us, for managers to
20 review in connection with signing off on the
21 document.

27 (Pages 102 to 105)

Page 106

1  Q. I understand. So you are saying that
2  black line version should have been in the file
3  for HarVest Bank of Maryland?
4  A. Correct.
5  MR. CARITHERS: I am simply from that
6  record asking, Mr. Scott, for us to receive or
7  get a copy of that black line version. In
8  preparation for that request, I will double-check
9  with my team to make sure we don't have it. I
10 think it is clearly relevant to our discovery
11 request, so I will get back to you soon.
12 Q. You indicated, Mr. Gadsby, that you
13 recently reviewed that black line version?
14 A. I want to go back to the file itself.
15 We archive things, so what I see in the folder
16 itself might be different from what was
17 archived. I want to make certain that we are
18 providing you what was actually put in the deal
19 folder meaning I should be able to assist counsel
20 in providing the document, or if not, somebody
21 else who is assisting counsel should be able to

Page 107

1  provide that document.
2  Q. My question simply, sir, is you
3  indicated a few moments ago you recently reviewed
4  something. What did you recently review?
5  A. I recently reviewed a black line that
6  was in the folder.
7  MR. CARITHERS: That is all I am
8  asking, and I am asking that what you recently
9  reviewed, that black line document that was in
10 the folder, we are going to check to see if we
11 have it. If we don't have it, we want the
12 production of what Mr. Gadsby indicated on the
13 record he recently reviewed. That's it.
14 Q. During the negotiation phase of this
15 agreement before us for HarVest Bank of Maryland,
16 what did Countrywide tell HarVest Bank of
17 Maryland about the quality or types of loans that
18 were being sold pursuant to this agreement?
19 A. I don't know. Again, if you could
20 rephrase or be more specific. I was not involved
21 in selling the loans. We are involved in

Page 108

1  negotiating the contracts of the loans itself.
2  Q. I am referring to the negotiation of
3  this agreement before you that starts at
4  CHL33377, and I am asking you as a 30(b)(6)
5  witness for topics 1 and 2 which include
6  communications relating to the agreement, what
7  was told to HarVest Bank of Maryland regarding
8  the quality and types of loans that were being
9  purchased pursuant to this agreement?
10 A. We could have sold any number of types
11 of loans pursuant to this agreement, so this
12 would have been a master form controlling all
13 sort of different types of loans.
14 Q. Are you indicating that is what was
15 told to HarVest Bank of Maryland? I am asking
16 for what was communicated to HarVest Bank of
17 Maryland.
18 A. I am telling you, again, I wasn't on
19 those communications. I can tell you from what
20 should have been said. This is just a master
21 form agreement that would have encapsulated all

Page 109

1  different variations of loan products outside of,
2  again, certain ones, certain ones being scratch
3  and dent, so this would have encapsulated all
4  sorts of different types of products.
5  Q. I am specifically asking you as a
6  30(b)(6) witness on behalf of the company, what
7  was said to HarVest Bank of Maryland during the
8  negotiations leading to the execution of this
9  contract?
10 A. There wouldn't have been the discussion
11 in terms of the product being sold outside of --
12 again, they would have said at the time of the
13 trade, it could have happened one of two ways.
14 Either we knew they were selling ARM loans or
15 fixed rate loans or any other types of loans. We
16 would have sent over a contract, or prior
17 thereto, we would have been informed that we want
18 to sell loans to an investor, in this case
19 HarVest, and we would have gone through and said
20 this is the agreement that will cover the loans
21 that were being discussed at the time.

28 (Pages 106 to 109)

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 7 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 110

Again, this contract covers the majority of the loan products out there, so we would not have needed to know outside of a few questions what we were trying to sell in order to send out the contract. The contract does not need to be -- outside of sort of the special cases like the scratch and dent, you don't need a separate type of contract to transact as long as all the terms are covered within the base agreement.

Q. The answer to my question in terms of what was told to HarVest Bank of Maryland before this document was signed on March 23, 2006 regarding the product types and the quality of the loans to be purchased by HarVest Bank of Maryland, there were no communications in that area at that time?

A. You are saying in relation to the agreement negotiation. That would have probably been correct.

Q. After execution on March 23, 2006 going

Page 111

forward from that date, there were different trades that would have occurred at various times, and pursuant to those trades, there would have been conversations or communications to HarVest Bank of Maryland regarding the quality of the loans they were purchasing and the product types?

A. Again, there would have been discussions about the product types and characteristics of the loans itself.

Q. So the answer to my question is yes?

A. You are saying quality. Again, I will say fixed and attached thereto to each trade confirmation and beforehand, there were loan characteristics.

Q. Apart from the documents at issue for each given trade, would there be communications?

A. Communications with loans itself, yes.

Q. With HarVest Bank of Maryland?

A. That is correct.

Q. Between HarVest Bank of Maryland and

Page 112

probably your traders?

A. Traders and sales force, correct.

Q. And those communications would be on what areas? It wouldn't be on quality, according to your testimony?

A. It would be based on, again, the product itself, right. Some would be inquiring about buying a specific set of whole loans, or depending on how they were inquiring about loans, either we showed them loans or they would be inquiring about loan products for sale.

Q. To close the loop a little bit, those type of communications in your testimony as a 30(b)(6) witness did not occur before March 23, 2006 leading to the signing of this agreement on March 23, 2006?

A. I don't know. The assumption is right with the agreement we would have had probably prior to the discussions necessitated the negotiation of the agreement. There would be no need to have an agreement if there was no intent

Page 113

to have a relationship with HarVest.

Q. What I am trying to ask you now is what specifically was said during that part of the chronology? The part of the chronology is prior to March 23, 2006, as you indicated, to facilitate the relationship with HarVest Bank of Maryland, what specifically was said by a representative of Countrywide to HarVest Bank of Maryland regarding product loan types, anything?

A. Again, probably discussing product and loan types, what they were looking for to buy.

Q. When you say "probably", I am asking as a 30(b)(6) -- I am asking you this question to you in your capacity as a 30(b)(6) witness for us to understand on behalf of the company what was said to HarVest Bank of Maryland before they signed this document on March 23, 2006.

MR. SCOTT: I am going to object. You have asked the question several times. He has already answered it several times. As you know, Counsel, many of the communications you are

29 (Pages 110 to 113)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 8 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 114

1  asking about were between people who no longer
2  work at Countrywide including Mr. McGehee. If
3  you want to ask Mr. McGehee what he may have told
4  HarVest Bank about these loans before they
5  entered into the contract, you can ask him next
6  week.
7      Mr. Gadsby is doing the best he can to
8  answer your questions based on the information
9  that is available to us today. You have got
10 extensive written documentation documenting all
11 of the transactions and the communications about
12 the loans when they were purchased by your
13 client, and you are free to show him those and
14 ask him about them, if you want to, but he can't
15 sit here and tell you from memory what every
16 communication was nor can he sit here and tell
17 you what Mr. McGehee may have said on behalf of
18 Countrywide and HarVest Bank at the time because
19 he wasn't there.
20     Q. How long did the negotiation take place
21 leading to the execution of this agreement?

Page 115

1      A. I don't know.
2         MR. CARITHERS: I am going to put an
3  objection on this record that you have provided
4  the wrong corporate designee on the issue of
5  communications regarding the negotiations --
6  excuse me.
7      A. I haven't said --
8      Q. Let me finish, sir.
9         MR. CARITHERS: -- regarding the
10 negotiations of the agreement leading to the
11 March 23, 2006 execution.
12        There's two employees already
13 identified by Mr. Gadsby who are, in fact, still
14 with the company, Paul Womble and Jason Portman
15 who were involved in the negotiation.
16     Q. Mr. Gadsby, you are shaking your head
17 no. Give me some professional courtesy. Let me
18 make my record.
19     A. But you are not even saying it right.
20     Q. Let me finish. Then you can correct
21 me, if you need to, when a question is pending,

Page 116

1  okay?
2      A. I don't like the way you are responding
3  to me. It is not professional.
4      Q. Let me finish.
5      A. It is not professional.
6      Q. Let me finish.
7      A. It is not professional.
8      Q. Let me finish.
9      A. I'm saying it is not professional.
10     Q. Let me finish.
11     A. I will continue to maintain. Again,
12 please.
13     Q. Let me finish.
14     A. Please.
15     Q. I am making a record. Let me finish.
16     A. You are very antagonistic.
17     Q. Let me finish.
18        MR. CARITHERS: Mr. Womble and
19 Mr. Portman are still with the company. They are
20 the two people --
21     Q. Mr. Gadsby, you are still shaking your

Page 117

1  head. You're the one being unprofessional. I am
2  talking to your counsel.
3      A. Jason Portman doesn't even work here
4  anymore. You are not even doing it correctly.
5      Q. You can correct me.
6         MR. CARITHERS: Mr. Womble then,
7  because Mr. Gadsby has insisted on injecting,
8  Mr. Womble still works with the company.
9  Mr. Gadsby indicated that he was involved in the
10 negotiations firsthand.
11        We have asked for the appropriate
12 designee to be brought before us who can tell us
13 what was said to HarVest Bank of Maryland leading
14 to the execution of this agreement. That is
15 critical information. In the discrete period of
16 time you do have at least one witness who is
17 available for that topic, and you have not
18 presented him.
19        MR. SCOTT: We don't have an obligation
20 to produce a specific person in response to a
21 30(b)(6).

30 (Pages 114 to 117)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Page 118

1  MR. CARITHERS: We disagree.
2  MR. SCOTT: You can take Mr. Womble's
3  deposition, if you would like. That is your
4  right.
5  MR. CARITHERS: I would like to go
6  forward. I have made my record. You have made
7  yours. We are at odds. We make the objection
8  that we have the wrong designee for topics 1 and
9  2.
10  MR. SCOTT: I disagree.
11  MR. CARITHERS: And obviously we
12  disagree. The record is made on both sides.
13  Let's put before Mr. Gadsby answers to
14  interrogatories.
15  (Whereupon, Gadsby Deposition
16  Exhibit No. 3, Defendant's Answers To Plaintiff's
17  Second Set Of Interrogatories, marked.)
18  BY MR. CARITHERS:
19  Q. Now, sir, take a look at the Exhibit 3,
20  and when you are ready for questions, let me
21  know.

Page 119

1  A. Okay.
2  Q. In your answer I think about 10 minutes
3  ago regarding the agreement which is in Exhibit
4  Number 1, I think you indicated, and correct me
5  if I have it wrong, that this agreement between
6  Countrywide Home Loans and HarVest Bank of
7  Maryland covered the majority of the loan
8  products. Do you recall that testimony?
9  A. You are saying for the HarVest Bank
10  agreement?
11  Q. Yes.
12  A. That is correct.
13  Q. What are the loan products this
14  agreement covers?
15  A. Again, it would be almost every whole
16  loan product you could sell.
17  Q. Such as?
18  A. Such as it would be jumbo. Again,
19  nonconforming, and it also would be any other
20  types of loans for us, too, if we were selling.
21  It could also be subprime.

Page 120

1  Q. I see you are looking through the
2  agreement again? What are you looking for?
3  A. Nothing. I just continue to look.
4  Q. We have a question pending. Are you
5  answering the question from something you can see
6  in front of you?
7  A. No. I thought I answered the question.
8  Q. Let me make sure. The majority of the
9  loan products, you have named two things. I
10  heard jumbo and subprime.
11  MR. SCOTT: And nonconforming.
12  A. And nonconforming.
13  Q. And nonconforming. All right. All
14  right.
15  Now, let me ask you to take a look at
16  page 3 of Exhibit 3. If you need to look at the
17  question that led to the answer, the question is
18  at the bottom of page 2.
19  A. Okay. I am looking at page 3.
20  Q. Now, listed on page 3 is a list of loan
21  types. Do you see that?

Page 121

1  A. I do.
2  Q. Do you recognize that list?
3  A. It looks -- yes. For the most part.
4  Q. What do you mean when you say "for the
5  most part"?
6  A. Again, I don't know what EC stands for
7  but, again, nonconforming ARM LIBOR, I understand
8  what most of the terms are here.
9  Q. What do you understand nonconform ARM
10  LIBOR mean?
11  A. Again, a nonconforming adjustable rate
12  mortgage loan index to the LIBOR.
13  Q. How do you define nonconforming?
14  A. Something that would not be agency
15  eligible.
16  Q. Not be what?
17  A. Agency eligible. Agency would be a
18  conforming product, something that you would be
19  able to sell to Fannie or Freddie.
20  Q. You referred to your traders earlier.
21  Would all the traders who would interact with

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 10 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 298

1    Q. As of 2008, who was in charge of the
2  post-closing risk management group?
3    A. That was Michael Ladew. Debbie Brown
4  actually was the one who was leading it at that
5  point if you want the top person.
6    Q. Let's look at the first page of
7  Exhibit 11. Do you see where it says "pending
8  discussion, Adam Gadsby, on how to respond"?
9    A. Yes.
10   Q. I guess this is -- I am trying to see
11 who said this. Rachel Meza?
12   A. Yes.
13   Q. Do you recall looking at this
14 communication whether you had a discussion with
15 Rachel Meza regarding this issue?
16   A. I probably did.
17   Q. You don't recall it?
18   A. Not exactly, but, again, if I look at
19 the email, I probably did.
20   Q. So if you look at the specific
21 communication of this email, for example,

Page 299

1  "explanation for collection activities on
2  deficiency specific from one loan (a CHL reo
3  liquidated loan). Pending discussion, Adam
4  Gadsby, on how to respond. Current scheduled
5  meetings and reporting to HarVest Bank; A,
6  meetings, B, reporting", you don't recall whether
7  you had a discussion with Rachel Meza regarding
8  HarVest Bank of Maryland in terms of meetings and
9  reporting on loans?
10   A. I don't think that's what she was
11 referring to for me. What she was looking for me
12 to respond to was the first A and B under
13 deliverables to HarVest Bank.
14   Q. Just to make it clear for the record,
15 "current deliverables due to HarVest Bank. Time
16 line of the delinquent loans. Ad hoc request.
17 Purpose was to provide time line (from breach
18 letter to current status) for all delinquent
19 LOANS." ALL is in capitalized.
20       Do you see that, Mr. Gadsby?
21   A. I do.

Page 300

1    Q. Did you have a discussion with Rachel
2  Meza as to the time line of the liquid loans?
3    A. I believe I did.
4    Q. What was communicated in that
5  discussion?
6    A. To be candid, I don't know.
7    Q. Do you know whether that information
8  was ever provided to HarVest Bank after you just
9  had the discussion with Rachel Meza?
10   A. You know, I don't know. If it was, it
11 would be in one of the emails that you have, and
12 I wouldn't be surprised if it was. I am assuming
13 that something was delivered.
14   Q. The second part is "explanation for
15 collection activities on deficiency specific for
16 one loan", and then it says, paren, "CHL reo
17 liquidated loan".
18       Is that something that she was going to
19 discuss with you?
20   A. That was another one, yes.
21   Q. As you look at this communication, do

Page 301

1  you recall actually having a discussion with
2  Ms. Meza about that loan?
3    A. I don't recall because it is hard to
4  just look at a loan number and remember. Sorry.
5    Q. Is it typical for these kind of
6  concerns to be expressed from the data management
7  group and then for you to be involved in
8  discussions which is why you don't remember
9  because investors commonly have this kind of
10 complaint?
11   A. Commonly have this complaint? No. I
12 don't think that is a correct statement at all.
13   Q. This is atypical?
14   A. This is atypical. Again, we were more
15 involved on this deal with the HarVest Bank
16 relationship based on, again, how many inquiries
17 we were getting into the group.
18   Q. I am asking you as a 30(b)(6) witness
19 on communications related to the portfolio.
20   A. Yes.
21   Q. I am asking you for the nature of what

76 (Pages 298 to 301)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Case 8:09-cv-00176-RWT   Document 59-4   Filed 04/20/10   Page 11 of 11
Adam Gadsby 2/4/2010
Harvest Bank of Maryland v. Countrywide Home Loans

Page 302

1  is indicated here as communications between you
2  in particular and Rachel Meza.
3     A.  Yes.
4     Q.  I am asking you to tell us what those
5  communications were about.
6     A.  The same thing. This is back in '08.
7  I don't recall. I would hope I would have an
8  email follow-up or she would have an email
9  follow-up that would help refresh the memory. I
10 honestly don't know.
11        MR. CARITHERS: I am going to put on
12 the record at least for A which is a very big
13 topic, not one loan, but it says here, and I will
14 quote, "time line of the delinquent loans - ad
15 hoc request. Purpose was to provide a time line
16 (from breach letter to current status) for ALL,
17 ALL is in caps, delinquent loans." We are
18 entitled to have the appropriate designee on
19 communications in that area, and Mr. Gadsby is
20 not that designee for that topic.
21        MR. SCOTT: I disagree. He has

Page 303

1  testified that he was involved in this
2  communication. He doesn't recall the specific
3  communication. If there was a written
4  communication, we have provided it, and if you
5  want to show it to him, I am sure it would
6  refresh his recollection.
7        MR. CARITHERS: Communication includes
8  oral. We are entitled to have the proper
9  witness.
10        MR. SCOTT: He doesn't recall the
11 conversation.
12        MR. CARITHERS: Let me finish. We
13 talk. You talk. I talk. Then we are done.
14 It's my turn.
15        Communication in our notice was not
16 limited to written communications. This is just
17 one example. We have had several examples in
18 several hours today where Mr. Gadsby has
19 absolutely no recollection on any oral
20 communication, and as a designee as far as
21 communications on oral communications, he is

Page 304

1  completely unacceptable and inappropriate.
2        MR. SCOTT: Well, I disagree. Is it
3  your position, Counsel, that a corporate designee
4  is supposed to know about every single oral
5  communication that took place between Countrywide
6  and HarVest Bank concerning subject matters of
7  the agreement or the servicing of the loans and
8  the like? If that is your position, I think it
9  is completely unreasonable.
10        MR. CARITHERS: It certainly was not
11 what I said. I said that Mr. Gadsby doesn't
12 remember any oral communications.
13        MR. SCOTT: That is completely
14 incorrect as he has testified about oral
15 communications extensively today. He doesn't
16 remember this one.
17        MR. CARITHERS: What I will do then is
18 move on because I don't want to take up too much
19 time. I made my statement. You made yours. I
20 will review the transcript. We will come back to
21 this. I will see exactly what oral

Page 305

1  communications we got for our designee on
2  communications.
3        BY MR. CARITHERS:
4     Q.  For Exhibit 11, let me just indicate
5  for the record that, Mr. Gadsby, part B in terms
6  of the pending discussion between Ms. Meza and
7  yourself, we did A and B, part B on that first
8  page, that one loan refers to the Stern loan.
9        Does that help you recall whether there
10 were any communications regarding the Stern loan?
11    A.  No.
12        (Whereupon, Gadsby Deposition
13 Exhibit No. 12, String of Emails Bates stamped
14 CHL029656 through CHL029659, marked.)
15        BY MR. CARITHERS:
16    Q.  I apologize. Exhibit 12 is a string of
17 emails stapled together from CHL29656 through
18 29659. I see you straining a little bit. I'm
19 straining as well. I apologize for the small
20 print.
21        Let me know when you're ready for