# EXHIBIT E

to HarVest Bank of Maryland's
Motion for Leave to Take Corporate Depositions

Excerpts of the testimony of Mr. Christian Ingerslev on February 2, 2010

Case 8:09-cv-00176-RWT   Document 59-6   Filed 04/20/10   Page 2 of 6
Christian Ingerslev 2/10/2010
Harvest Bank of Maryland v. Countrywided Home Loans

Page 6

1  modification world as well as coordinating,
2  reporting up the chain through to the Board of
3  Directors as far as the loans we are originating
4  today and the performance of the portfolio of
5  today.
6      Q.  Now, for the time indicated today,
7  February of 2010, how long have you been in that
8  position, sir?
9      A.  Since the merger with Bank of America,
10 I was in the enterprise function that I
11 described.  My scope of responsibility has varied
12 over the last year and a half since the merger.
13 Originally it was over origination functions, and
14 then it was over both, origination functions and
15 loss mitigation functions, and now it is loss
16 mitigation functions.
17     Q.  And the previous work you indicated is
18 before the merger?
19     A.  No.  Sorry.  From the merger day to
20 today is what I just described.
21     Q.  Prior to the merger -- for the record,

Page 7

1  you are referring to the merger between
2  Countrywide everything?
3      A.  Countrywide everything and Bank of
4  America, yes.
5      Q.  Prior to the merger, did you work for
6  Bank of America or Countrywide?
7      A.  Countrywide.
8      Q.  How long did you work with Countrywide
9  before the merger?
10     A.  Since February of 2002.
11     Q.  And with Countrywide -- first of all,
12 in terms of the actual corporate entity of
13 Countrywide, what part of Countrywide did you
14 work for?
15     A.  Countrywide Home Loans.
16     Q.  From February of 2002 until the merger?
17     A.  Yes.
18     Q.  Which is June of 2008?
19     A.  July 1st, 2008, right.
20     Q.  And Countrywide Home Loans, --
21     A.  Yes.

Page 8

1      Q.  -- Inc.?
2      A.  Yes.
3      Q.  And did you have the same position with
4  them from February 2002 until July 1st of 2008,
5  more or less?
6      A.  More or less, yes.  I was in the same
7  area the entire time.  The area was called
8  product management by its name, but we were
9  really a credit risk function.
10     Q.  The same kind of credit risk functions
11 you described in your capacity at Bank of
12 America?
13     A.  Similar except, as I described, there
14 was an enterprise function at Bank of America
15 versus a line of business function.  There was no
16 really equivalent enterprise function at
17 Countrywide, so all the risk was embedded within
18 the line of business, and it's very similar
19 except I was there almost exclusively focused on
20 originations and not on servicing, and so I was
21 involved in the process by which we added new

Page 9

1  loan programs or changed underwriting guidelines
2  for the company for home loans as well as did
3  what we call surveillance and reporting on the
4  portfolio, its performance and types of loans we
5  were originating.
6      Q.  Now, for the purpose of today's
7  deposition we are going to be asking you
8  questions in your capacity or in your background
9  prior to the merger, approximately speaking I
10 would say the 2005, 2006 time period regarding
11 origination.
12         MR. CARITHERS:  If I may, let me have
13 the deposition notice.
14         Let me mark, have Madam Court Reporter
15 mark for me Exhibit 1 for your deposition,
16 Mr. Ingerslev.
17         (Whereupon, Ingerslev Deposition
18 Exhibit No. 1, Notice of Deposition, marked.)
19         BY MR. CARITHERS:
20     Q.  Now, Mr. Ingerslev, take a look at what
21 has been marked as Exhibit 1 and the *full*

Case 8:09-cv-00176-RWT   Document 59-6   Filed 04/20/10   Page 3 of 6
Christian Ingerslev 2/10/2010
Harvest Bank of Maryland v. Countrywided Home Loans

Page 10

1  document, if you would, sir.
2      A.  Okay.
3      Q.  Now, have you ever seen this document
4  before, Exhibit Number 1?
5      A.  No, sir.
6      Q.  This notice?
7      A.  No, sir.
8      Q.  Let me just represent for the record
9  that this is a notice of deposition for several
10 topics.  You will see at the bottom of Exhibit 1
11 the first page 1 and 2.  If you turn to the
12 second page of Exhibit 1, you will see 3, 4, 5
13 and 6 and 7.
14     A.  Uh-huh.
15     Q.  Do you see that, sir?
16     A.  Yes, sir.
17     Q.  Now, it is my understanding that you
18 are here as a witness on number 6, and could you
19 just read number 6 to yourself, sir.  Let me know
20 when you've read it.
21     A.  I have read it.

Page 11

1      Q.  Just to put this on the record, you are
2  here as a witness on topic number 6 which states,
3  for the record, "Countrywide policies, practices,
4  procedures and guidelines in effect from the year
5  2000 to the year 2009 that set out or address
6  policies or procedures to be followed or
7  standards, goals or requirements to be met by
8  Countrywide, its agents or persons from whom
9  Countrywide purchases mortgage loans, when
10 underwriting or originating residential mortgage
11 loans."
12         Do you see that, sir?
13     A.  Yes, sir.
14     Q.  Now, the time frame says 2000 to the
15 year 2009, but we have already established that
16 we go up to 2008 for the merger.
17     A.  Okay.
18     Q.  From the time frame of February 2002
19 until the merger, which was July of 2008, you
20 would be able to testify as to origination
21 practices as set forth in topic number 6 as to

Page 12

1  Countrywide?
2         MR. SCOTT:  Counsel, just for the
3  record, we are designating Mr. Ingerslev with
4  respect to policies that were in effect in 2006.
5         MR. CARITHERS:  Okay.
6         MR. SCOTT:  I believe and to the extent
7  there were loans originated in 2007, he is also
8  going to be prepared to address that, but I
9  believe we have objected to designating anybody
10 on policies and procedures that were in effect
11 prior to that period of time or after the period
12 of time when the loans that were sold to HarVest
13 Bank were originated.
14        MR. CARITHERS:  Okay.
15        BY MR. CARITHERS:
16     Q.  With that qualification on the time
17 frame, is it your understanding that you are here
18 to provide testimony on the topic set forth in
19 number 6 before you in Exhibit 1 for the time
20 frame of 2006 and 2007?
21     A.  Yes, but a few sort of comments back or

Page 13

1  questions or caveats.  The word "procedures" is
2  pretty broad, and so I am more engaged and
3  knowledgeable to the policies and guidelines, but
4  the precise procedures that might go on in the
5  field I will have some knowledge of but I am not
6  necessarily an expert on.
7         And then, secondly, you used the term
8  "purchased" mortgage loans rather than
9  "originated", so I just want to be clear as to
10 what purchase means, so if you are speaking about
11 correspondent lending purchases, I am familiar
12 with that, but I noticed the term Countrywide is
13 defined as Countrywide Home Loans, so the
14 purchases that are done from the Capital Markets
15 area I assume is not included as they are not
16 part of Home Loans, but if that's what you meant,
17 I am not familiar with the Capital Markets
18 activities and policies and procedures there.
19        MR. SCOTT:  We are going to be
20 producing somebody else on that subject area.
21     Q.  There's also two other areas, if I am

Case 8:09-cv-00176-RWT   Document 59-6   Filed 04/20/10   Page 4 of 6
Christian Ingerslev 2/10/2010
Harvest Bank of Maryland v. Countrywided Home Loans

Page 38

1  required". CLUES is an automated underwriting
2  system developed by Countrywide, and the
3  automated underwriting system would have to give
4  it a pass as well as the rules that you see here
5  on the page would have to be passed, and that
6  would be the filter by which it would be eligible
7  for those documentation waivers.
8      Q. Was CLUES, C-L-U-E-S, the automated
9  underwriting system that was in place in the
10 2006, 2007 time frame?
11     A. Yes.
12     Q. For Countrywide?
13     A. For Countrywide originated loans. It
14 was also made available to correspondents, though
15 not all correspondents utilized CLUES, so they
16 wouldn't be eligible then to use it for this
17 program if they didn't.
18     Q. By the way, part of the guidelines I
19 neglected to ask, and I apologize. If you need a
20 break, feel free to let us know, a water break,
21 restroom break. Just if a question is pending,

Page 39

1  you need to give an answer before the break.
2      Do you understand?
3      A. Yes.
4      Q. Let me ask you to take a look at
5  Exhibit 5 turning maybe I guess four, five pages
6  in there to CHL19203, the lower right-hand column
7  or corner.
8      A. Okay.
9      Q. Do you see at the bottom of that page
10 it indicates documentation requirements? Do you
11 see that, Mr. Ingerslev?
12     A. Yes.
13     Q. Underneath that heading it has full/alt
14 doc?
15     A. Yes.
16     Q. Presumably reading below full/alt doc,
17 those would be the documentation requirements for
18 that document type, full/alt doc?
19     A. Well, the first few bullets here are
20 speaking to CLUES and notes about CLUES.
21     Q. Right.

Page 40

1      A. The following page there is an Excel
2  spreadsheet it looks like that is attached
3  there. The details of what is precisely defined
4  as full, alt is in that spreadsheet.
5      Q. You are a very good witness. That is
6  where I was going with my questions.
7      MR. CARITHERS: Counsel, just to put
8  this on the record, we don't have that document.
9      MR. SCOTT: The spreadsheet?
10     MR. CARITHERS: Yes. We are missing
11 some information in there which was going to be
12 my line of questions, but I think I can't really
13 go there because I don't have that document.
14     Let me make sure it is clear on the
15 record. It's CHL19204.
16     MR. SCOTT: I see it.
17     MR. CARITHERS: For the record to make
18 that clear, it's the back of CHL19203. All we
19 have is a depiction of the icon without the
20 actual document.
21     MR. SCOTT: Right. Well, I would have

Page 41

1  to inquire, which I'm happy to do, to see if that
2  can be made available. I suspect just based on
3  what is on the next page that there are going to
4  be other documents where there are icons noted on
5  these guidelines.
6      Are you asking for all of them or just
7  this one?
8      MR. CARITHERS: Well, we are asking for
9  just this one for the time being. We will have
10 to take a look at how burdensome it is to produce
11 all of them, but we really had our questions set
12 on this particular page or two pages, CHL19203
13 and 19204, and just to make it a little bit
14 clearer, let me ask Mr. Ingerslev another
15 question to make it clear what we are looking for
16 here.
17     BY MR. CARITHERS:
18     Q. Mr. Ingerslev, looking at CHL19204
19 which is the back of 19203, for document type
20 fast and easy, at the top of that page do you see
21 that?

Case 8:09-cv-00176-RWT   Document 59-6   Filed 04/20/10   Page 5 of 6
Christian Ingerslev 2/10/2010
Harvest Bank of Maryland v. Countrywided Home Loans

Page 42

1  A. Yes.
2  Q. Below it we see income indicated for
3  that document type whereas on the reverse page,
4  19203, under full/alt doc, we don't see income.
5  So the question would be whether that missing
6  information perhaps would have been in the icon
7  that we don't have, if you know?
8  A. Yes. It would be in there.
9      MR. CARITHERS: I hope that makes it a
10 little clearer, Mr. Scott.
11     MR. SCOTT: As I say, I am happy to ask
12 and see what would be involved in producing that,
13 whether it's possible to produce it, and I will
14 let you know. This is the first time I have been
15 asked about it.
16 Q. Mr. Ingerslev, in terms of your
17 physical office, are you in this area, in the
18 Maryland area?
19 A. I'm in Los Angeles.
20 Q. I am going to indicate on this record
21 that we need to keep the deposition open at least

Page 43

1  for this line of inquiry. If we need to
2  accommodate you and come out to California, we
3  will work on that behind the scenes with counsel,
4  but I just put that on the record.
5      MR. CARITHERS: Let me go off the
6  record real quick.
7      (Recess taken -- 10:42 a.m.)
8      (After recess -- 10:48 a.m.)
9      MR. CARITHERS: Thank you for your
10 patience. I want to make sure in terms of the
11 discovery related to Exhibit 5, Robert, that I
12 was clear.
13     I think we are going to have to ask for
14 all of the icons. I just don't know how many of
15 them there are, and I guess as we go through
16 them, if it becomes a burden, we can talk through
17 it. For the record, we are going to make a
18 request for all of the icons.
19     MR. SCOTT: I will find out what would
20 be involved, and then we can discuss it.
21     MR. CARITHERS: I think it undercuts us

Page 44

1  to say without seeing them that we don't need
2  them.
3      MR. SCOTT: Right. I will find out
4  what will be involved to generate those, and then
5  we can talk about what to do.
6      MR. CARITHERS: Okay.
7      BY MR. CARITHERS:
8  Q. Mr. Ingerslev, let me try to go back
9  over some of your testimony because I want to
10 make sure that it is clear that I think it came
11 out. This is on the document types, full and
12 alt. If we can, can we testify or can you
13 testify to them separately? I know you said they
14 came together, but can you talk about separate
15 document types?
16 A. I will try, to the best of my
17 recollection, yes.
18 Q. Just so we are clear, we are referring
19 to the 2006, 2007 time frame, Countrywide.
20 A. Yes.
21 Q. So first for full, what type of

Page 45

1  verification of income -- well, what is meant by
2  verification of income?
3  A. So for a salaried borrower -- you know,
4  I am not recalling very well, especially this
5  distinction between the two. Again, it didn't
6  really matter to us, so that's why it is not
7  crisp in my memory.
8      It may have been that full referenced a
9  full VOI, or verification of income, which would
10 have been filled out by an employer versus alt
11 where it would have been pay stubs instead of
12 that verification note income filled out by an
13 employer.
14     For a self-employed borrower, I
15 couldn't tell you the difference between the
16 two. One or the other is going to be tax returns
17 and year-to-date profit and loss statements for
18 the self-employed borrower. I can't recall the
19 distinction between full and alt for that.
20 Q. Would full require more documentation
21 or verification than alt? Is that a fair

Case 8:09-cv-00176-RWT   Document 59-6   Filed 04/20/10   Page 6 of 6
Christian Ingerslev 2/10/2010
Harvest Bank of Maryland v. Countrywided Home Loans

Page 154

1  don't remember exactly what they were.
2    Q.  When you say changes made or rigor
3  added, are you referring to changes in the
4  underwriting guidelines?
5    A.  No.  I am referring to guidance to
6  underwriters.
7    Q.  Not changes to the guidelines
8  themselves, as far as you can recall?
9    A.  That is not what I was referring to.
10   Q.  So you were referring to --
11   A.  Guidance provided to underwriters to
12 help them better assess the reasonableness of the
13 income that was stated.
14   Q.  So from an underwriter's perspective,
15 they have, such as Exhibit 5, written
16 underwriting guidelines that are available to
17 them, but there is also something separate that
18 they are sort of mindful of which would be oral
19 or verbal guidance as you are indicating here?
20   A.  No.  It's written guidance, yes.
21   Q.  So would there be some written guidance

Page 155

1  in response to the overstatement of income by
2  borrowers in 2007 that was given to
3  underwriters?
4    A.  Yes.
5    Q.  But that written format would not be
6  changed in the underwriting guidelines?
7    A.  It wouldn't be part of the underwriting
8  guidelines you see here, correct.
9    Q.  Are these like internal memos?  What
10 form do they take?
11   A.  There is another section of the
12 guidelines which are more voluminous which get
13 into a lot of the details of underwriting loans,
14 so what types of income are eligible, how do you
15 calculate debt, so if you've got a home equity
16 line, do you count the line or do you count the
17 draw amounts on the existing loan when you are
18 calculating DTI, what are the requirements for
19 condo project approvals.  It's hundreds of pages
20 long.
21       Included in there would be what we were

Page 156

1  talking about earlier, the guidance with respect
2  to assessing the reasonableness of stated income,
3  and at the same time, you didn't ask this, but I
4  will offer it up, that we were looking at
5  occupancy.
6    Q.  Same thing?
7    A.  Statements of occupancy, same thing.
8    Q.  So looking at Exhibit 5 as sort of a
9  reference point, applying or looking at the time
10 frame of 2006 and 2007 for nonconforming
11 programs, and Exhibit 5 represents one set of
12 written documentation, you are saying that there
13 is another set of written documentation that
14 would apply to nonconforming programs in 2006,
15 2007 that's more voluminous here that has, for
16 example, income, stated income, additional
17 parameters or instruction as to those areas?
18   A.  Yes.
19       MR. CARITHERS:  We will work through
20 this, but I want to put on the record the request
21 if we haven't gotten that yet.  We are going to

Page 157

1  ask for that to be produced.
2        MR. PARKER:  We don't have that.
3        MR. CARITHERS:  This is for counsel.
4  You are standing mute on that.  I will put on the
5  record that we will discuss it later.
6        MR. SCOTT:  We will discuss it later.
7        BY MR. CARITHERS:
8    Q.  Moving on, let's move to some other
9  documents.
10       MR. CARITHERS:  Exhibit 8.
11       (Whereupon, Ingerslev Deposition
12 Exhibit No. 8, Countrywide Pool Summary, marked.)
13       BY MR. CARITHERS:
14   Q.  Exhibit 8, take a look at it,
15 Mr. Ingerslev.  Let me know when you are ready
16 for questions.
17   A.  I'm ready.
18   Q.  Have you ever seen this?  I will
19 represent for the record it is a one-page
20 document, CHL26605.  At the top it says Pool
21 Summary.