# EXHIBIT F

to HarVest Bank of Maryland's
Motion for Leave to Take Corporate Depositions

Excerpts of the testimony of Ms. Kelly Darraugh on February 3, 2010

Page 6

1  A. That was a response to the --
2  Q. You did review that report?
3  A. Yes, I did.
4  Q. And then you indicated that you
5  reviewed documentation regarding loans purchased
6  by the correspondent lending division?
7  A. Correct.
8  Q. And let's mark as an exhibit the
9  deposition notice.
10      While we are getting that document,
11 Ms. Darraugh, can you tell me which documentation
12 regarding which particular loans, which borrowers
13 that you reviewed?
14  A. You want to know which documents?
15  Q. No. Not documents yet. The names of
16 the borrowers for the loans that you reviewed.
17  A. I don't remember.
18  Q. Okay.
19  A. I don't remember the names.
20  Q. Do you remember how many loans -- when
21 you say documentations for loans, it's one loan

Page 7

1  that we are talking about for the given set of
2  documents; is that correct?  There would be one
3  loan?  You would read documents related to that
4  one loan?
5  A. Correct.
6  Q. How many loans did you review in terms
7  of that documentation?
8  A. I reviewed pieces of 11 loans.
9  Q. And you don't recall the names of the
10 borrowers for the 11 loans right now?
11  A. Correct.
12      MR. CARITHERS:  Let's mark as Exhibit 1
13 the notice.
14      (Whereupon, Darraugh Deposition
15 Exhibit No. 1, Notice of Deposition, marked.)
16      BY MR. CARITHERS:
17  Q. Ms. Darraugh, before you is Exhibit
18 Number 1, and it is a three-page document. You
19 can take a look at all three pages if you want
20 to.
21      It's our understanding that you have

Page 8

1  been designated as a witness on topic number 4
2  which is on the second page of Exhibit 1. Do you
3  see topic number 4, Ms. Darraugh?
4  A. Yes, I do.
5  Q. Topic number 4 states: "The
6  underwriting and origination of the defaulted
7  loans including, without limitation, the asset
8  and income verifications and creditworthiness
9  evaluation of each borrower."
10      Do you see that, Ms. Darraugh?
11  A. Yes, I do.
12  Q. It is our understanding that you are
13 here as a witness to testify as to that topic
14 number 4 insofar as it relates to underwriting
15 and origination through correspondent lenders --
16  A. Correct.
17  Q. -- regarding defaulted loans purchased
18 by HarVest Bank of Maryland?
19  A. Correct.
20      MR. SCOTT:  Counsel, just for the
21 record, she is also designated on topic number 7

Page 9

1  to the extent that you have questions that relate
2  to pleadings, portions of pleadings that relate
3  to the topic in number 4 that she has been
4  designated on.
5      MR. CARITHERS:  Thank you for that
6  clarification, Mr. Scott.
7  Q. Let's just make it clear on the record,
8  number 7 is, quote, "all pleadings filed or
9  served in the lawsuit", end quote.
10      So it's our understanding then with
11 Mr. Scott's addition that, Ms. Darraugh, you will
12 also be testifying insofar as your understanding
13 of documents filed in this lawsuit, pleadings
14 that relate to the 11 defaulted loans, I think
15 you said 11, --
16  A. Correct.
17  Q. -- 11 defaulted loans through the
18 correspondent lending division?
19  A. Correct.
20  Q. For HarVest Bank of Maryland, loans
21 purchased by them?

Page 10

1  A. (Witness nods head in the affirmative.)
2  Q. Okay. I would like to see if I can
3  address, at least preliminarily, the particular
4  loans we are talking about when we say 11. If I
5  say names perhaps, would that help you remember
6  which loans we're talking about?
7  A. Perhaps.
8  Q. I'm going to do last names here.
9     Cala, C-A-L-A, does that ring a bell?
10 A. Yes.
11 Q. That is one of the loans of the 11?
12 A. I think so.
13 Q. Carberg, C-A-R-B-E-R-G?
14 A. Yes.
15 Q. Douglas, D-O-U-G-L-A-S?
16 A. Yes.
17 Q. Hweyhua? And I will spell that.
18 H-W-E-Y-H-U-A.
19 A. I believe so.
20 Q. Does that ring a bell? Okay.
21    Karimi, K-A-R-I-M-I?

Page 11

1  A. Yes.
2  Q. Mangieri, M-A-N-G-I-E-R-I?
3  A. Yes.
4  Q. Melgar, M-E-L-G-A-R?
5  A. Yes.
6  Q. Perera, P-E-R-E-R-A?
7  A. Yes.
8  Q. Martin Reyes, R-E-Y-E-S?
9  A. Yes.
10 Q. Stern, S-T-E-R-N? Stern?
11 A. I can't say if that one rings a bell.
12 Q. Did you review any documentation that
13 was through the correspondent lender by the name
14 of Mason Dixon? Does Mason Dixon ring a bell?
15 A. Mason Dixon rings a bell.
16 Q. Related to your review for this
17 testimony today of documents?
18 A. Yes.
19 Q. We will see if we can refresh you later
20 on for the Stern loan documentation.
21    How about Ahmed, A-H-M-E-D?

Page 12

1  A. Yes.
2  Q. I think that makes up 11.
3     When you said you reviewed loan
4  documentation, Ms. Darraugh -- we need to wait
5  for Mr. Scott.
6     MR. SCOTT: Go ahead.
7     MR. CARITHERS: Okay.
8  Q. Just in a general sense so we can get
9  an idea of what you reviewed, what particular
10 documentation did you review for those loans,
11 those 11 loans?
12 A. 1003s.
13 Q. Say that again.
14 A. The loan application also known as a
15 1003.
16 Q. Okay. All right.
17 A. Credit reports, income and asset
18 documentation if it was present.
19 Q. Okay.
20 A. AUS certs if they were present.
21 Q. Say that again.

Page 13

1  A. AUS certs if they were present.
2  Q. Okay.
3  A. And various pieces within our Ruby
4  system.
5  Q. Ruby is spelled R-U-B-Y?
6  A. Yes.
7  Q. What is your Ruby system?
8  A. Ruby is a module that was utilized, is
9  utilized by correspondent lending for the
10 purchasing of loans through correspondent
11 lending.
12 Q. A computer system?
13 A. Correct.
14 Q. So that is an acronym? R-U-B-Y stands
15 for whatever it stands for?
16 A. It is not an acronym.
17 Q. It's just called Ruby?
18 A. Yes.
19 Q. When you say various pieces of your
20 Ruby system, what do you mean by various pieces?
21 A. I went to particular screens within

4 (Pages 10 to 13)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Page 14

1  Ruby to look at what had occurred.
2     Q. And when you'd go to those particular
3  screens, what kind of things were you able to
4  see?
5     A. Submission of the loans, loan
6  parameters, any actions potentially taken prior
7  to purchase, if the loans had been reviewed prior
8  to purchase, and if so, any comments or notes
9  that our underwriters had made on these loans.
10    Q. So this Ruby system, computer system,
11 it stays online -- maybe it's not online, but it
12 stays on the computer system where you can only
13 access it by going onto the computer and through
14 the system if you have authorization to be on the
15 system?
16    A. Correct.
17    Q. In other words, this information is not
18 necessarily reduced to writing or printout unless
19 you requested it to be printed out?
20    A. Correct.
21    Q. If you don't request it to be printed

Page 15

1  out, it is only accessible through information by
2  looking on the computer --
3     A. Correct.
4     Q. -- with authorization on the system?
5     A. Correct.
6     Q. And the information that you would see,
7  just as a summary, would be it sounds like
8  communications or notes by the actual workers,
9  underwriting staff on these particular loans in
10 the origination process?
11    A. In part, that's what would be housed in
12 Ruby.
13    MR. CARITHERS: Robert, we're going to
14 request all information related to our 11 loans
15 through the correspondent division that would be
16 accessible in the Ruby system or through the Ruby
17 system. My understanding is that there is no
18 request to print out all that information. We
19 haven't gotten it because all we have gotten is
20 written materials reduced to CDs.
21    MR. SCOTT: First of all, I am happy to

Page 16

1  inquire. My understanding is that, and I'm going
2  to verify this, is that information is included
3  in the AS400 printouts, but I'm going to verify
4  that. I'm going to double-check on that and
5  verify that.
6       Assuming that it is not, I will find
7  out -- or if it is not, I will find out what
8  would be entailed in producing it.
9     MR. CARITHERS: Okay.
10    MR. SCOTT: Regarding the electronic
11 data, I think we had an agreement early on in the
12 case that documents were going to be produced by
13 PDF, so to the extent it needs to be converted to
14 that, that's how we would produce it --
15    MR. CARITHERS: That's fine.
16    MR. SCOTT: -- if it exists or if we
17 can get it.
18    MR. CARITHERS: Okay. That's fine.
19    BY MR. CARITHERS:
20    Q. Ms. Darraugh, let me go through the
21 ground rules of a deposition.

Page 17

1       Let me first ask you have you been
2  deposed before?
3     A. Yes.
4     Q. How many times before have you been
5  deposed?
6     A. Approximately four.
7     Q. Have you ever been deposed as what we
8  call here a 30(b)(6) witness or a witness on a
9  topic rather than a fact witness, if you
10 understand that distinction?
11    A. I don't understand that distinction.
12    Q. Okay. If you were deposed as a fact
13 witness, you would actually have firsthand
14 knowledge of different events and testify as to
15 what you may have done in a given transaction or
16 deal, you, Ms. Darraugh.
17       It is our understanding that you had no
18 contact with HarVest Bank of Maryland and you
19 didn't personally work with any HarVest Bank of
20 Maryland loans.
21    A. That is correct.

5 (Pages 14 to 17)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Page 58

1  Q. Say that again.
2  A. Pulte.
3  Q. P-U --
4  A. L-T-E.
5  Q. Okay.
6  A. Home Loan Centers, Home American,
7  Capital One Home Loans, WR Starkey. I believe we
8  have approximately 1,200 approved correspondents.
9  Q. But the ones that you have just named
10 are the ones that do frequent or consistent
11 business with Countrywide Home's correspondent
12 loan division which is why you named them off the
13 top of your head?
14 A. Yes.
15 Q. Are you familiar with Mason Dixon as a
16 correspondent lender?
17 A. Yes.
18 Q. Let me ask you to take a look at
19 Exhibit 3. I understand that you haven't seen
20 this particular document before. Can you still
21 look at it and tell us from this document,

Page 59

1  Exhibit 3, the product type and document type of
2  the Perera loan, if you can?
3  A. Are you indicating there's something on
4  here called product type?
5  Q. No. I am asking you can you from this
6  document tell what the product type or document
7  type is as you look to the middle of the document
8  perhaps?
9  A. Doc type indicates stated income.
10 Q. Okay. Are you familiar with the
11 document type stated income?
12 A. Yes.
13 Q. What is that?
14 A. Stated income would indicate that an
15 employment is disclosed, the length of
16 employment, the number of years in the industry,
17 the borrower's position within that company and a
18 phone number are disclosed on the first page of
19 the loan application, and income is stated. The
20 file is prohibited from containing verification
21 of that income.

Page 60

1  Q. What do you mean when you say the file
2  is prohibited?
3  A. The program requirements surrounding
4  any type of stated documentation indicate that
5  verification of income in the file is a program
6  violation.
7  Q. And when you refer to program, you are
8  referring to what?
9  A. Stated income, reduced doc, NINA, SISA,
10 no ratio.
11 Q. When you say violation, you are
12 referring to violation of what?
13 A. The program requirements.
14 Q. So it is not a violation where there is
15 going to be a penalty? You just don't follow the
16 program with what the program requires? That is
17 what you mean by violation?
18 A. The penalty could be repurchase.
19 Q. So you are saying that for the stated
20 income program, the requirement of that stated
21 income program prohibits verification of income?

Page 61

1  A. Correct.
2  Q. And that if a correspondent lender,
3  nonetheless, tried to verify income, that is
4  subject for that particular loan to repurchase?
5  A. Correct.
6  Q. Is that written down in any kind of
7  guideline or any agreement with the correspondent
8  lender?
9  A. The Platinum guidelines in place at the
10 time all spoke and contain the same verbiage.
11 Q. Regarding violation and repurchase?
12 A. Repurchase is cited earlier in
13 Platinum. Violation resulting from verification
14 of income was in each of the loan program
15 guidelines.
16 Q. Loan program guidelines and then
17 Platinum guidelines, are you using those
18 interchangeably, same thing?
19 A. Yes, I am.
20 Q. Let me see if I can get an example of a
21 loan program guideline to make sure we're talking

Page 62

1  about the same thing.
2      MR. CARITHERS: Exhibit 4.
3      (Whereupon, Darraugh Deposition
4  Exhibit No. 4, Countrywide Loan Program Guide,
5  marked.)
6      MR. SCOTT: Just for the record, this
7  is a confidential document, so this portion of
8  the transcript will need to be confidential.
9      BY MR. CARITHERS:
10     Q. I am not sure if you had a chance. If
11  you haven't, please, by all means, skim through
12  the documents.
13     For the record, Exhibit 4 has on the
14  first page Countrywide Loan Program Guide. It
15  runs from CHL19434 through CHL19446. That's
16  Exhibit 4.
17     We left off, Ms. Darraugh, on, if you
18  recall, on the Platinum guidelines synonymous
19  with loan program guidelines. Is Exhibit 4 an
20  example of the loan program guidelines that you
21  are referring to?

Page 63

1      A. This appears to be from the tech
2  manuals.
3      Q. What are the tech manuals?
4      A. Those were the guidelines issued by
5  corporate utilized by wholesale and retail.
6      Q. So external to Countrywide publications
7  when you say utilized by wholesale and retail?
8      A. I am not sure how wholesale and retail
9  used them.
10     Q. Wholesale and retail would not be
11  inside of Countrywide; is that fair? They are
12  entities outside of Countrywide? Oh, no.
13  Actually you are talking about wholesale and
14  retail within the company?
15     A. Yes.
16     Q. Divisions or groups?
17     A. Divisions.
18     Q. I see. All right.
19     In what format have you seen the loan
20  program guidelines?
21     A. Correspondent utilize the guidelines in

Page 64

1  platinum. We would use these intermittently if
2  verification or some additional consultation was
3  required. Correspondent really is going to rely
4  on the guidelines in Platinum.
5      Q. Terminology. So is Platinum a
6  database?
7      A. Platinum is the website that was made
8  available to our correspondents. It is currently
9  called the Correspondent Lending Website. Housed
10  within that site is the seller's guide. Those
11  are the guidelines made available to our
12  correspondent and utilized by correspondent
13  lending.
14     Q. Back in the 2006, 2007 time frame, was
15  the website back then called Platinum?
16     A. Yes.
17     Q. And sort of like the Ruby, you can only
18  access information or typically information was
19  accessed off of Platinum back then just by going
20  on the computer and looking on the screen?
21     A. Correct.

Page 65

1      Q. From the website, unless you
2  specifically asked for materials to be printed,
3  it would not necessarily be in hard copy format,
4  the seller guidelines --
5      A. Correct.
6      Q. -- that are utilized by the
7  correspondent lenders when they are going through
8  the origination process for residential loans --
9      A. Correct.
10     Q. -- in 2006?
11     You indicate on that website, Platinum
12  website in the earlier part of the guidelines
13  there is instruction or communication to the
14  correspondent lenders that prohibit them from
15  verifying income for document types, for loan
16  document types that are stated income?
17     A. No. You asked me if the guidelines
18  specifically cite a repurchase issue if income is
19  verified.
20     Q. Yes.
21     A. What I indicated was that a

17 (Pages 62 to 65)

Page 66

1  repurchase -- the terms of repurchase are cited
2  in an earlier section of the Platinum
3  guidelines. Each loan program or doc type
4  section spoke to the prohibition against
5  verifying income for reduced, stated, no ratios,
6  NINAs, SISA doc types.
7      MR. CARITHERS: Counsel, we are going
8  to ask for production on both levels, the
9  repurchase standards that Ms. Darraugh just got
10 finished summarizing for us that were in place in
11 2006 that were communicated to correspondent
12 lenders in the 2006, 2007 time frame and then the
13 specific standards that were available to the
14 correspondent lenders on the Platinum website in
15 2006, 2007 which include by document type SISA,
16 NINA, all that, prohibitions with respect to
17 verification, period.
18     I know that is going to have the same
19 response, but that is our request in terms of
20 getting that reduced to writing. If there is
21 some way that you can get that to us in

Page 67

1  discovery.
2      MR. SCOTT: I will have to look into it
3  and see what it is. I was unaware of it until
4  now.
5      MR. CARITHERS: Okay.
6      BY MR. CARITHERS:
7  Q. Ms. Darraugh, let's look at -- let's go
8  back to Exhibit 3. Are you with me? Okay.
9      On Exhibit 3, Ms. Darraugh, I think you
10 indicated that you could see on this document
11 where it indicates document type for Jack
12 Perera's loan? Do you see it?
13 A. Stated income.
14 Q. Could you repeat again for us your
15 understanding of stated income document type?
16 A. Stated income would indicate that
17 employment information is disclosed, income is
18 stated.
19 Q. Now, if you look further down
20 Exhibit 3, you will see a section that states,
21 quote, "income documentation requirements,

Page 68

1  general".
2  Q. Do you see that?
3  A. Yes.
4  Q. Let me read into the record the
5  following part of that section.
6      "This loan was submitted under stated
7  income guidelines. Income stated on the
8  application must be reasonable for the profession
9  and consistent with the borrower's assets and be
10 verified for a minimum of two years. No income
11 documentation may be included in the loan file.
12 No payroll deposits on bank statements. No
13 documentation in the file may contain income that
14 is different from the stated income under this
15 approval."
16     Do you see that, Ms. Darraugh?
17 A. Yes.
18 Q. What I read to you, does that comport
19 with your understanding or agree with your
20 understanding as to stated income guidelines?
21 A. Yes.

Page 69

1  Q. Are you familiar with the second
2  sentence with the terms, with the clause "must be
3  reasonable for the profession and consistent with
4  the borrower's assets", that part in the second
5  sentence?
6  A. Yes.
7  Q. What does that mean, to be reasonable
8  for the profession and consistent with the
9  borrower's assets?
10 A. Reasonable for the profession would
11 require looking at the type, length and location
12 of the borrower's employment versus established
13 standards for what could be earned.
14 Q. As well as -- I'm sorry -- required
15 standards for what could be earned? Was that
16 what you said?
17 A. Yes.
18 Q. Required standards for what can be
19 earned, what does that mean, please?
20 A. I guess an example would be a certified
21 nursing assistant in California and a certified

18 (Pages 66 to 69)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years
award-winning service

Page 86

1  VOE."
2  Q. That is the bottom of 10360 underneath
3  the heading of "underwriting conditions".
4      Just to ask you, underwriting
5  conditions, is that what CLUES -- or can we say
6  it's CLUES this time? Is it Countrywide's
7  conditions?
8  A. This is CLUES, yes.
9  Q. We have established now that for the
10 Perera underwriting and origination by Ryland, as
11 correspondent lender they were applying or had
12 received from CLUES Countrywide's guideline
13 database underwriting conditions which we see on
14 10360?
15 A. I think it is incorrect to refer to it
16 as the guideline database.
17 Q. How would you refer to it?
18 A. What an AUS cert allows is for limited
19 condition or documentation to be provided.
20 Q. Okay.
21 A. And this would go for a CLUES, a DU or

Page 87

1  an LP.
2  Q. Okay.
3  A. Manual guidelines might require two
4  years of W-2s. An AUS may allow for one year's
5  most recent W-2, one month's bank statements
6  versus manual requirements of two months bank
7  statements, so after a loan is run through the
8  system, a risk model is created regarding the
9  loan. It then comes back with what it wants to
10 see on that loan, and that may be less than what
11 a manual guideline requirement would be.
12 Q. Okay. The manual guideline requirement
13 is referring to earlier testimony when you talked
14 about the Platinum guidelines?
15 A. Correct.
16 Q. Those areas?
17 A. Correct. So Platinum might cite a
18 maximum debt-to-income ratio of say 45 percent.
19 CLUES or DU or LP may approve at 52 percent, and
20 that would be acceptable, and the loan is
21 sellable accordingly.

Page 88

1  Q. Whatever CLUES does approve, though, it
2  is a subset of what was on the Platinum
3  guidelines; is that fair? There's more
4  conditions if there would be -- go ahead. Did I
5  say that wrong? You were shaking your head.
6  A. CLUES may or DU or LP may go absolutely
7  outside guidelines. It may -- for example, asset
8  documentation, you could input that my borrower
9  has $50,000 in assets, and AUS may come back and
10 say we don't want any asset documentation to be
11 provided.
12 Q. Okay. Let me just -- I know you had
13 one point. We will get you back to that point in
14 a second.
15     Turn to the next page, 10361, where it
16 says "general loan conditions", and right
17 underneath that it says: "Loan must meet all
18 other published requirements based on occupancy,
19 loan type, borrower characteristics and
20 documentation type."
21     Do you see that?

Page 89

1  A. Yes.
2  Q. Would published requirements include
3  the Platinum guidelines?
4  A. That is exactly what it is referring
5  to, yes.
6  Q. We can go back to 10360. We have on
7  that page what is called underwriting
8  conditions. Do you see that?
9  A. Yes.
10 Q. What does that mean, underwriting
11 conditions?
12 A. This is the documentation that CLUES is
13 requiring to be provided in this file for this
14 cert to be valid.
15 Q. For Mr. Perera's loan to be approved
16 according to Countrywide's underlying guidelines,
17 these are the conditions. Is that a fair
18 statement?
19 A. The loan already was approved and
20 closed.
21 Q. Okay.

Page 94

1  any consequence or penalty if a correspondent
2  lender does not follow through, in this example
3  does not make a reasonableness determination with
4  respect to what income was stated?
5      A. Repurchase could be a potential
6  penalty.
7      Q. And is that penalty or consequence --
8  in this case you indicated repurchase. Is that
9  spelled out in any which kind of written manual,
10 on the website? Is that spelled out anywhere?
11     A. It is spelled out in the loan purchase
12 agreements that we have with each of our
13 correspondents. Repurchase is referenced in one
14 of the earlier sections of the Platinum.
15     Q. That is what you referred to earlier in
16 terms of going onto the computer?
17     A. Yes.
18     Q. The website? Okay.
19         The loan purchase agreements that
20 Countrywide and I guess it may be the
21 correspondent lending division has with its

Page 95

1  correspondent lenders, would Countrywide itself
2  retain the documents in its own files, to your
3  knowledge?
4      A. Yes.
5      MR. CARITHERS: Counsel, we are going
6  to ask for the loan purchase agreement in effect
7  for the Ryland correspondent lender in the 2006
8  time frame for the Perera loan to be produced to
9  us. I am assuming we haven't gotten it in
10 discovery.
11     MR. SCOTT: I don't think you have
12 asked for it, but I will have it look back at
13 your request and see.
14     MR. CARITHERS: Just to move it along,
15 we will put it on the record. We will work
16 together. I am assuming we did ask for it, and I
17 can point you to the request and follow up later.
18     MR. SCOTT: That's fine.
19     BY MR. CARITHERS:
20     Q. Let me ask you, Ms. Darraugh -- thank
21 you for your patience. Let me ask you about your

Page 96

1  testimony when you indicated that one of the
2  things, one of the possibilities for a
3  determination of whether the income stated was
4  reasonable for the profession maybe would be a
5  letter of explanation or clarification. Do you
6  remember that testimony?
7      A. Yes.
8      Q. Wouldn't that be verifying income by
9  way of documentation if that letter was
10 obtained? Wouldn't that be a verification by
11 documentation?
12     A. No. Verification of income is a
13 statement that says this person earns this much
14 money per month.
15         The clarification that I was referring
16 to would be some sort of indication that this
17 person is performing duties or has attained a
18 level of education, has seasoning in the industry
19 or specializes in the industry to a degree that
20 they command a salary that is commensurate with
21 what was claimed in the file.

Page 97

1      Q. And the last part would not be
2  verification income? What would be verification
3  income would be, as you said, a statement that
4  the person earns $8,250 a month, a statement from
5  another source?
6      A. Correct. Verification of income is
7  going to come in the form of pay stubs, W-2s, tax
8  returns, a completed Form 1005 or verification of
9  employment form.
10     Q. Okay.
11     A. I see here Ryland is indicating payroll
12 deposits as evidence of income. There's two
13 schools of thought on that, but that appears to
14 be what they are indicating here on their form.
15     Q. What form are you talking about?
16 What's the Bates stamp number?
17     A. Exhibit 3.
18     Q. Okay. Exhibit 3. You are looking at
19 the same paragraph that we quoted earlier. The
20 second to last sentence says, quote, "no payroll
21 deposit on bank statements".

25 (Pages 94 to 97)

Page 114

1  A. It interferes with that asset piece.
2  Interferes is an incorrect word. It does suspend
3  that asset piece because the AUS will be the
4  ruling document.
5  Q. Okay. For the sentence that I read, it
6  only suspends the asset piece. In other words,
7  income stated on the application must be
8  reasonable for the profession and consistent with
9  the borrower's assets, so that last part -- let
10 me let you catch up. Are you with me?
11 A. Yes.
12 Q. So that last part where income stated
13 on the application must be consistent with the
14 borrower's assets, it is that last part that is
15 suspended by the assets' condition under the
16 underwriting condition section of the AUS cert
17 reflected on CHL10361?
18 A. Yes.
19 Q. So the first part is still important,
20 "income stated on the application must be
21 reasonable for the profession", as far as you can

Page 115

1  tell?
2  A. If I look at CHL10360, the only thing
3  that CLUES is requiring is a two-year employment
4  history which from the review of this file I
5  believe is verified at least two different ways,
6  and then the top of 10361 finishes the income and
7  employment section indicating "note, when
8  verifying employment, no income may be
9  disclosed."
10 Q. So under income and employment under
11 the underwriting conditions, it says verify a
12 two-year employment history of Jack Perera by
13 obtaining a verbal VOE, and that is in the loan
14 file? Did they obtain a verbal VOE?
15 A. It appeared that Ryland obtained one,
16 and then it looks like Countrywide obtained one
17 also.
18 Q. What can you tell from -- or how can
19 you tell from the loan file that Countrywide also
20 obtained a verbal VOE?
21 A. CHL10366.

Page 116

1  Q. Okay. For the record, CHL10366 says at
2  the top "RVU review". I don't know what that
3  means. Let me ask you.
4  A. RVU stands for reverification unit.
5  Q. Okay. That is a unit within -- I'm
6  sorry. I cut you off.
7  A. Actually I think it was reverification
8  unit for quite a long time. Countrywide spoke in
9  acronyms. "You have to learn to speak
10 Countrywide" was a joke when you joined the
11 company.
12    RVU kind of became the name for this
13 review that was completed. I think I am probably
14 the only one left who even remembers what RVU
15 stands for.
16    This was a group that if the loan was
17 selected would verify various pieces of
18 information in the file through third-party
19 sources. One of the verifications that they
20 would complete would be employment. This is a
21 printout confirming their reverification of

Page 117

1  employment.
2  Q. The reverification unit, would it also
3  do reverifications or verifications of income and
4  assets?
5  A. Not on a reduced doc loan.
6  Q. Just in general, though, for loan types
7  or document types, other than reduced docs, would
8  it do verifications of income and employment,
9  income and assets of borrowers?
10 A. The reverification unit would reverify
11 employment.
12 Q. Okay.
13 A. It would reverify income if that was
14 appropriate to do so. It would reverify assets
15 if it was specifically asked to do so meaning
16 that an underwriter reviewed a loan, saw some red
17 flags perhaps on a bank statement, and then they
18 would contact the depository.
19 Q. The depository, what is that?
20 A. Who issued the statement.
21 Q. The reverification unit would contact

Page 118

1  the depository?
2      A.  Yes.
3      Q.  But the first part of that
4  communication the underwriter would contact the
5  reverification unit to help them on that issue?
6      A.  Correct.
7      Q.  The underwriter could be correspondent
8  lenders, that kind of thing?
9      A.  For an RVU to be completed, it would be
10 the correspondent lending underwriter who would
11 ask for it or the loan in 2006, 2007 could have
12 been automatically selected for an RVU.
13     Q.  And you have one sample of a written
14 documentation.  Is there documentation as to what
15 loans are selected and what review occurs?  Do
16 they document all of that in written format, to
17 your knowledge?
18     A.  I believe that there was a PAP around
19 what they were doing.
20     Q.  What is a PAP?
21     A.  A policy and procedure document.

Page 119

1      Q.  More acronyms.  The policy and
2  procedure document would be for the RVU unit for
3  the review process when they review loans and
4  outlines how to go about that process?  Yes?
5      A.  Yes.
6      Q.  Would there also be such as what we
7  have in front of us which is CHL -- help me with
8  the number.
9      A.  10366.
10     Q.  10366.  Would there also be a paper
11 trail or a written confirmation of the actual
12 review that occurs for the given loan once they
13 are following that policy and procedure manual
14 for what they are verifying are reverifying?
15     A.  They would document -- verification of
16 employment would have been done on Ruby.  I
17 believe all notes regarding the RVU and what
18 occurred would be housed in Ruby.
19     Q.  Okay.  All right.
20         MR. CARITHERS:  Counsel, we are going
21 to make a request on this record for all HarVest

Page 120

1  Bank of Maryland loans, all of the portfolio at
2  issue in this lawsuit that in any way, shape or
3  form were requested by or submitted to the RVU,
4  reverification unit, and if that is another Ruby
5  situation, we will have do address that.  When I
6  say Ruby situation, where there is a database
7  that contains that information but hasn't been
8  printed as in the case of the Perera situation
9  where we don't have a written file or a file that
10 has written documents.
11        Am I being clear?
12        MR. SCOTT:  You're not.
13        MR. CARITHERS:  Let me say that again.
14 We would like to request on this record
15 production of all information, if it is in
16 document form, copies of those documents.  If
17 it's in the Ruby database, then we will have to
18 work how we can get those documents reduced to
19 PDF or whatever works for discovery that
20 discloses all communication and all work or
21 reviews done on HarVest Bank of Maryland mortgage

Page 121

1  loans and their portfolio that they purchased
2  from Countrywide regarding verifying information
3  from borrowers in the underwriting process.
4      MR. SCOTT:  All right.  Well, I will
5  see what else exists, if there is anything other
6  than what has already been provided.
7      MR. CARITHERS:  Okay.  Let's go off the
8  record.
9      (Discussion off the record.)
10     BY MR. CARITHERS:
11     Q.  Ms. Darraugh, let's take a look at
12 Exhibit Number 3.  I want to ask you a couple of
13 questions in terms of the nomenclature.  I know
14 you have a lot of documents in front of you.
15        Do you have Exhibit 3?
16     A.  Yes, I do.
17     Q.  Again, I understand you haven't seen
18 this document before.  If you can't answer
19 because of that reason, just let me know, but at
20 the top of the document in the right-hand corner
21 it says "current underwriter".  Do you see that,

Page 126

1  audit.
2     Q. I was going to say audit. Okay.
3     A. Audit might be a strong word.
4     Q. All right. Why would a loan be
5  selected for a pre-purchase review, if you know?
6     A. In '06, '07, generally loans were
7  selected for PPR review due to the net worth of
8  the correspondent. Our selection levels were
9  very focused on the seller's ability to
10 repurchase meaning how much money did they have,
11 so for some reason with Ryland -- in addition to
12 that, it could be that when the loan goes through
13 the system, there are risk factors that the loan
14 would be bumped up against. If there were -- if
15 the system identified risk factors or more than
16 one risk factor being present, that could also
17 put the loan into a PPR review.
18    Q. When you said when a loan goes through
19 the system, what system are you referring to?
20    A. Ruby.
21    Q. Is there a way -- if it is on Ruby, let

Page 127

1  us know. Is there a way we could find out why
2  the Perera loan was selected for a pre-purchase
3  review?
4     A. I don't believe so.
5     Q. So there would be nothing on Ruby or
6  any other database that would at least tell us
7  when the pre-purchase review occurred or when the
8  loan was selected?
9     A. Ruby would tell us that the loan was
10 selected. It wouldn't tell us why it was
11 selected.
12    Q. And apart from Ruby, there is no way we
13 can know what kind of pre-purchase review
14 occurred for the Perera loan and what came out of
15 the pre-purchase review?
16    A. The pre-purchase review is the same
17 review regardless of why a loan is selected.
18    Q. The same review being what?
19    A. It is a review by an underwriter. It
20 was basically an abbreviated underwriting loan.
21 I thought you were asking me why it was selected

Page 128

1  for PPR, though.
2     Q. I was.
3     A. Okay. We would not know why it was
4  selected, just that it had been selected.
5     Q. And then after the why question, I want
6  to know what happened in this particular
7  pre-purchase review for the Perera loan. I think
8  you were indicating that Ryland, the
9  correspondent lender, would do another review of
10 what they had already reviewed?
11    A. Ryland would have already performed
12 their underwrite and closed the loan. They would
13 have submitted the loan to us for potential
14 purchase. At that point the loan is run through
15 Ruby and then potentially selected for a PPR
16 review.
17    Q. By who?
18    A. By correspondent lending.
19    Q. So in this case we can tell because we
20 have this underwriting sheet that would suggest
21 that the Perera loan was or confirm that the

Page 129

1  Perera loan was selected for pre-purchase
2  review?
3     A. Correct.
4     Q. This is after Ryland has gone through
5  the underwriting process.
6        Who for the Perera loan would then
7  conduct a pre-purchase review?
8     A. One of our correspondent lending
9  underwriters.
10    Q. Now, are these correspondent lending
11 underwriters, Countrywide correspondent lending
12 underwriters part of the quality assurance group
13 that you named earlier in the 2006 time frame?
14    A. No, they are not.
15    Q. They are a separate group?
16    A. Yes.
17    Q. Is it called the correspondent lending
18 underwriting group?
19    A. I think they are just called
20 underwriting.
21    Q. Called underwriting, period?

Page 130

1  A. I believe so, yes.
2  Q. This is 2006, and that group itself
3  would have records of what it does, what they do
4  in terms of the file review, the loan review, if
5  you know?
6  A. Yes, they would.
7  Q. Would those files be on the Ruby
8  database or, if you know, would they be in paper
9  format?
10  A. If you are looking for loan level
11  activity, it would be in Ruby.
12  Q. Okay. How about pre-purchase review
13  activity? If that is the right nomenclature for
14  it?
15  A. I am not sure where they would house or
16  how they would house their policies and
17  procedures.
18  MR. CARITHERS: Counsel, I am going to
19  make a request on this record for whatever
20  materials, whether it is through the Ruby system,
21  hopefully it is easier to obtain by way of

Page 131

1  written documentation, confirming reviews,
2  pre-purchase reviews conducted on all HarVest
3  Bank loans in the portfolio. We know at least
4  one has gone through that process from the
5  testimony of Ms. Darraugh. That is the Jack
6  Perera loan. Okay? That is just making it for
7  the record. We will talk about it later.
8  Counsel is nodding. Counsel is
9  nodding. He is nodding affirmatively.
10  BY MR. CARITHERS:
11  Q. That was Exhibit 6. Ms. Darraugh, for
12  Exhibit 6, this, again, is called the
13  Underwriting Worksheet, and this confirms that
14  there was a pre-purchase review on the Perera
15  loan in what way? Is it because there wouldn't
16  be an underwriting worksheet otherwise?
17  A. Yes.
18  Q. So this document, this form,
19  underwriting worksheet, is a Countrywide form?
20  A. Yes.
21  Q. So to the extent we see this form in

Page 132

1  other loan files, underwriting worksheet,
2  Countrywide correspondent lending, that would
3  suggest or confirm for that loan there was a
4  pre-purchase review done as well?
5  A. Yes.
6  Q. I am looking at Exhibit 6 where we can
7  see what happened as a result of the pre-purchase
8  review. We can't, can we? We cannot tell from
9  this document what occurred, what kind of review
10  it was, what was looked at and what was the
11  result of it? We can't find out any detail about
12  the pre-purchase review from this underwriting
13  worksheet document, can we?
14  A. What's on this document appears to be
15  information that was input into Ruby, so we know
16  what the underwriter saw. We know who the
17  underwriter was. And you're right. They have
18  not put any comments on this, so in terms of
19  anything beyond that, no, we couldn't tell.
20  Q. Potentially had a Countrywide
21  underwriter completed this form, we would have

Page 133

1  additional information that would potentially
2  tell us what happened or what was the result of
3  the pre-purchase review?
4  A. The form does appear to be completed.
5  Q. All right.
6  A. If I go through this, I see loan
7  parameters, loan amounts, principal and
8  interest. There's DTI calculations on here
9  signed by the underwriter with a date.
10  Q. So this is exactly what it says by way
11  of a worksheet. This is a worksheet that goes
12  into the process of a pre-purchase review, but it
13  would not on the worksheet documentation show us
14  what happened or what is the conclusion of the
15  pre-purchase review; is that fair?
16  A. Correct.
17  MR. CARITHERS: Let's do Exhibit 7.
18  (Whereupon, Darraugh Deposition
19  Exhibit No. 7, Collection of Documents Bates
20  stamped CHL10428 through CHL10432, marked.)
21  BY MR. CARITHERS:

34 (Pages 130 to 133)

Page 174

1  Q. Anything else?
2  A. From the employment profile?
3  Q. Right.
4  A. No. Those are pretty much the three
5  established.
6  Q. Again, I don't mean to cut you off. Is
7  there anything else besides those three?
8  A. No.
9  Q. Again, this is in the Platinum I want
10 to say website? Is that right?
11 A. That's fine.
12 Q. This is in the Platinum website in
13 place in 2006 that is accessible on your desktop
14 through the computer?
15 A. Platinum will speak to determining
16 reasonability. The idea of doing that through
17 employment, asset, credit profile was training
18 that was offered to our underwriters. I don't
19 believe that Platinum ever spelled out any of
20 that detail.
21 Q. So --

Page 175

1  A. There may have been some additional
2  documentation. I would argue that there were
3  announcements also that went to our
4  correspondents that probably expanded on that so
5  that they could share with their underwriters as
6  well.
7  Q. So --
8  A. But I believe Platinum itself just
9  spoke to the reasonability test.
10 Q. So communications to your correspondent
11 lenders would include something called
12 announcements?
13 A. Yes.
14 Q. What are announcements?
15 A. Information that was needed to be
16 distributed to our correspondents regarding
17 program changes, pricing changes.
18 Q. Underwriting program changes?
19 A. Yes.
20 Q. And focusing on the 2006, 2007 time
21 frame, what is the frequency of when these

Page 176

1  announcements would be disseminated to
2  correspondent lenders?
3  A. Rather frequently. I believe they have
4  always gone out rather frequently.
5  Q. Once a month? Once a week?
6  A. Once a week at minimum.
7  MR. CARITHERS: Counsel, we are going
8  to ask for production of all the announcements
9  that went to the correspondent lenders on
10 underwriting program changes, just that topic in
11 the 2006, 2007 time frame.
12 MR. SCOTT: I will have to look at your
13 request, but I don't believe that that was
14 covered by what you asked for, but we can talk
15 about that after the deposition if you would
16 like.
17 MR. CARITHERS: All right.
18 BY MR. CARITHERS:
19 Q. Now, going back to reasonableness, you
20 gave me two parts of it, the employment profile
21 and then the credit. One time you said credit

Page 177

1  profile. Then another time you said credit asset
2  profile.
3  A. What happened was I think in the '06,
4  '07 period, the guidelines, I believe, spoke to
5  credit and employment profiles, and at some point
6  asset profile got built into it, but I believe
7  that did not come out until a little bit later.
8  Q. Okay.
9  A. But at this point, I believe that
10 Platinum did reference the credit profile, so
11 credit profile would be the borrower's FICO
12 score, the length of time that they held credit,
13 the depth of the credit, number of trades, limits
14 versus available balances, does it appear that we
15 have somebody who is living off their credit
16 cards or do we have somebody in a primarily cash
17 driven industry who has shallow credit where it
18 would be reasonable to assume that they would be
19 paying cash for the majority of their purchases,
20 different employment profiles, what you begin to
21 realize create different credit profiles.

45 (Pages 174 to 177)

Page 210

1  you remember that testimony?
2      A. Yes.
3      Q. I focused my question on the year
4  2007. I would like to now ask you for any time
5  period at all, ever, are you aware of any study,
6  any written study by the quality assurance group
7  regarding evidence of borrowers lying about their
8  income and assets?
9      A. I am not aware of a study, no.
10     Q. Let me ask you does there have to be
11 any kind of submission in writing regarding
12 evidence of borrowers lying about their income
13 and assets?
14     A. We would have our loan level audit
15 results.
16     Q. What are loan level audit results? Are
17 they something in writing?
18     A. Yes.
19     Q. You do recall in your loan level audit
20 results which were in writing information or
21 evidence of borrowers lying regarding their

Page 211

1  income and assets?
2      A. We would have the audit details
3  regarding the verification of misrepresented
4  income.
5      Q. Say that again. Say that again, if you
6  remember.
7      A. Our audit detail would include, if it
8  had been verified, the details around
9  misrepresentation of income. I am not sure we
10 would ever say borrowers lying.
11     Q. Fair enough. Misrepresentations of
12 income and assets would be in what you are
13 calling your audit details?
14     A. Correct.
15     Q. Those are written documents?
16     A. Yes.
17     Q. How frequently are they generated in
18 the 2006, 2007 time frame?
19     A. At the completion of every loan level
20 audit that we would do.
21     Q. So your group would generate audit

Page 212

1  details for a particular loan, and some of those
2  details would include information, evidence of
3  borrowers misrepresenting their income and
4  assets?
5      A. Of the file containing verified
6  misrepresentation of assets or income, yes.
7      Q. For a given month?
8      A. Who perpetrated the misrep would not be
9  included in that writeup.
10     Q. But the loan detail or the audit detail
11 regarding a given loan would identify the
12 correspondent lender who handled the
13 origination?
14     A. Yes.
15     Q. Which involved the misrepresentation by
16 the borrower, and it would include -- let me just
17 ask you this question. Strike that.
18         In those written audit details that
19 have evidence of a borrower misrepresenting
20 income and/or assets, did those audits lead to
21 the loan being repurchased by the correspondent

Page 213

1  lender?
2      A. Loss mitigation would have the end
3  result of the repurchase.
4      Q. So you wouldn't know. Okay.
5          And in terms of the loans reviewed for
6  today's submission, the 11 that were purchased by
7  HarVest Bank of Maryland, you don't know whether
8  there is an audit of any of those loans?
9      A. I don't.
10     Q. There could be, but you don't know?
11     A. There could be, but I don't know.
12         MR. CARITHERS: To the extent,
13 Mr. Scott, that we are keeping this deposition
14 open, I would ask between round one today and
15 round two in the future that there could be a
16 review of whatever it is you can review for your
17 quality assurance group to see whether any of the
18 HarVest Bank of Maryland loans have been
19 audited.
20         MR. SCOTT: Audited by whom?
21         MR. CARITHERS: The quality assurance

Page 214

1  group, the origination issues. Loss mitigation I
2  understand has the end result. They decide what
3  is going to happen after the audit. Let's first
4  start with the audit information.
5      THE WITNESS: All right.
6      BY MR. CARITHERS:
7   Q. Are there any other written materials
8  that would contain information as to borrowers
9  misrepresenting their income and/or assets that
10 you are aware of, not necessarily a study,
11 anything written beyond what you told us in terms
12 of the audit details, anything else you can think
13 of?
14  A. Not that I am aware of.
15  Q. Let me ask you a final topic for
16 today.
17     In the period of 2004 through 2007,
18 have you or were you aware of any critiques or
19 criticisms of Countrywide's underwriting
20 practices such as the underwriting practices were
21 causing unexpected credit risk or loan losses?

Page 215

1   A. Yes. I am aware of critiques.
2   Q. Please identify what critiques you are
3  aware of.
4   A. When the market turned in August of
5  2007, Countrywide became the poster child for
6  everybody's woes at that point.
7   Q. At that time you became aware of
8  critiques?
9   A. Yes.
10  Q. What critiques did you become aware of?
11  A. The complaints made that our quality
12 had loosened to the point that we were dangerous
13 or reckless in our approach to underwriting, that
14 we had all but given up on manufacturing quality
15 and investment quality. Pick something. We
16 were, you know -- we just kind of got dragged
17 through the mud unbelievably.
18  Q. Do you recall the sources of critiques
19 and criticisms? Let me ask you this.
20     Were they external or internal or both?
21  A. External primarily.

Page 216

1   Q. Let me first start with internal. Were
2  you aware of any internal to Countrywide
3  critiques or criticisms regarding the
4  underwriting process in the 2004 through 2007
5  time period?
6   A. I am not, no.
7   Q. None internal. How about external?
8   A. Any major newspaper or magazine, news
9  broadcasts. We were all over the place.
10  Q. Other than the media, were you aware of
11 any critiques, criticisms in the 2004 through
12 2007 time period regarding underwriting for
13 Countrywide?
14  A. I believe that Fannie and Freddie
15 expressed some concerns in that period.
16  Q. Fannie Mae and Freddie Mac expressed
17 concerns?
18  A. Correct. I don't remember exactly when
19 it all started. I think it -- I think it was
20 like early 2007 there would be a little blurb
21 here, a little blurb there. Somebody expressed

Page 217

1  some kind of a concern, and that would lead to
2  other people kind of jumping on the bandwagon,
3  that kind of thing.
4   Q. Is this with Fannie Mae, Freddie Mac?
5   A. It could start with them. It kind
6  of -- you know, when it all started, I don't know
7  how much people would think Countrywide was
8  really paying attention to the different claims
9  because we knew how hard we were working, and
10 then it really started to snowball, and at that
11 point I think there were just too many of them.
12 You couldn't keep track of where it was coming
13 from.
14  Q. The Fannie Mae and Freddie Mac
15 criticism that you are remembering, was that in
16 the form of oral communications to you directly
17 or how did you become aware of those criticisms?
18  A. Not to me directly. Those would have
19 been made to our corporate offices, and then
20 corporate would have disseminated Countrywide's
21 business.

55 (Pages 214 to 217)