DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

_____

                                    )

HARVEST BANK OF MARYLAND,           )        Case Number:

                                    )

        Plaintiff,                  )        8:09-CV-00176-RWT

                                    )

vs.                                 )

                                    )

COUNTRYWIDE HOME LOANS, INC.,       )

                                    )

        Defendant.                  )

_____)


Volume 1


DEPOSITION OF

TERRY R. MENDENHALL

Baltimore, Maryland

Thursday, August 19, 2010

10:06 a.m.


Job No.: 1-184363

Pages 1 through 247

Reported by:   John L. Harmonson, RPR

EXHIBIT 3

1

2

3                    Deposition of

4               TERRY R. MENDENHALL

5

6

7    Held at the offices of:

8            BALLARD SPAHR, LLP

9            300 East Lombard Street

10           18th Floor

11           Baltimore, Maryland  21202

12

13

14

15       Taken pursuant to the Federal Rules of Civil

16    Procedure, by notice, before John L. Harmonson,

17    Registered Professional Reporter, Notary Public in and

18    for the State of Maryland, who officiated in

19    administering the oath to the witness.

20

21

22

Case 8:09-cv-00176-RWT  Document 138-5  Filed 02/09/11  Page 3 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 3

```
1                    APPEARANCES

2

3    ON BEHALF OF PLAINTIFF:

4            MICHAEL R. CARITHERS, JR., ESQUIRE

5            DAVID P. PARKER, ESQUIRE

6            Liles Parker, PLLC

7            4400 MacArthur Boulevard, N.W.

8            Suite 203

9            Washington, D.C.  20007

10           (202) 298-8750

11

12   ON BEHALF OF DEFENDANT:

13           ROBERT A. SCOTT, ESQUIRE

14           Ballard Spahr, LLP

15           300 East Lombard Street

16           18th Floor

17           Baltimore, Maryland  21202

18           (410) 528-5600

19

20   ALSO PRESENT:

21           ALAN J. BLOCHER

22           MIDDLETON THOMPSON (Via telephone)
```

```
1    same one that issued the graduate key, the second

2    bullet from the bottom.

3         Q.    And were these similar courses that you

4    took during the summer or something different?

5         A.    No, they were during the year.  People

6    would sign up and take these courses at night at one

7    of the local institutions.  There might be 15 or 20

8    people in the class and a textbook and teacher who was

9    from the business.

10        Q.    And how many hours were these courses?

11        A.    I don't know that they -- I guess they did

12   give credit hours.  I can't remember.

13        Q.    Other than those courses, have you taken

14   any formal courses in residential mortgage loan

15   underwriting?

16        A.    No.

17        Q.    How about residential mortgage loan

18   servicing?

19        A.    No.

20        Q.    Do you hold any professional licenses?

21        A.    No.

22        Q.    Have you ever held any professional
```

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 27

1    licenses?

2         A.    No.

3         Q.    Do you have any experience appraising

4    residential real estate?

5         A.    As an underwriter of residential real

6    estate appraisals, yes.

7         Q.    What do you mean by an underwriter of

8    residential real estate appraisals?

9         A.    There is a process in underwriting where

10   you look at the appraisal and you underwrite and

11   accept or reject that appraisal.

12        Q.    And what's involved in that process?

13        A.    Reading the appraisal.

14        Q.    What else?

15        A.    Making judgments about it.

16        Q.    Do you look at any other information other

17   than the appraisal?

18        A.    Maybe.  Sometimes you do.

19        Q.    Like what?

20        A.    Information about the marketplace.

21        Q.    What kind of information?

22        A.    Home sales, home starts.

Case 8:09-cv-00176-RWT  Document 138-5  Filed 02/09/11  Page 6 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 28

1      Q.    Have you ever had any training in the

2   appraisal of residential real estate?

3      A.    How do you define "training"?

4      Q.    You don't understand the term "training"?

5      A.    Well, I do.  Yes, I've had training in

6   residential real estate appraisal.

7      Q.    Okay.  When and where?

8      A.    From the time I started in the business in

9   1970.

10      Q.    What kind of training did you have?

11      A.    A supervisor one-on-one teaching me what I

12   needed to know.

13      Q.    When you say teaching you what you needed

14   to know, are you talking about with respect to the

15   underwriting of appraisals or actual appraisals?

16      A.    Both.

17      Q.    Have you ever issued -- Well, you're not a

18   licensed appraiser?

19      A.    No.

20      Q.    And you never have been?

21      A.    No.

22      Q.    Have you ever taken any courses or formal

1    seminars on the appraisal of residential real estate?

2        A.    I can't remember.  I may have.  I can't

3    recall.  It could have been another one of those

4    Institute of Financial Education courses, but I just

5    don't recall.

6        Q.    So going back to what you said about the

7    training that you received in underwriting residential

8    appraisals, you said that began in the 1970s?

9        A.    That's correct.

10       Q.    All right.  And you said a supervisor

11   teaching you what you needed to know.  What did the

12   supervisors teach you about that subject matter?

13       A.    Everything that he thought was important in

14   his experience of reviewing and underwriting

15   appraisals.

16       Q.    And do you recall what those things were?

17       A.    Well, the very basics of it is that there

18   are three approaches to value, income approach, market

19   approach and cost approach, and where that information

20   comes from and how it's calculated and what kinds of

21   assumptions can be made by the appraiser, and what

22   underwriters need to look for as they make judgments

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 8 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 30

1    about that appraisal.

2        Q.    And what do underwriters need to look for

3    as they make judgments about an appraisal?

4        A.    What those assumptions are and whether they

5    agree with them or not.

6        Q.    Whether the underwriter agrees with the

7    assumptions?

8        A.    Right, the assumptions of the appraiser.  I

9    can give you an example if you would like an example.

10       Q.    Okay.

11       A.    And we can fast-forward.  This case in

12   Denver, I talked about one of the aspects of the

13   appraisal process is that these were all income

14   properties, commercial real estate income properties.

15   One of the underwriting flaws, in my opinion, is that

16   they only made market value approaches to the value.

17            That's one of the no-nos.  If you're

18   appraising income property, you need an income

19   approach to value.  Had they had that, I'm not sure

20   they would have appraised at the amount they appraised

21   for.

22       Q.    Are there established standards for the

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 31

1    appraisal of residential real estate?

2         A.    Yes.  There's different institutes and

3    certifications that appraisers get.

4         Q.    Do you know what they are?

5         A.    MAI is one, Master Appraisal Institute, I

6    believe it stands for.

7               SRPA is another, Senior Residential -- I

8    don't know what the -- SRPA, I don't know what the P

9    stands for.

10              And then there's an SRA.  That's Senior

11   Residential Appraisal.

12        Q.    And these organizations that give out these

13   designations have established standards for how to

14   appraise residential real estate?

15        A.    They do.

16        Q.    And those are accepted in the industry?

17        A.    They're accepted in the industry.  But

18   lenders continue to make judgments about their

19   opinions.

20        Q.    Are you familiar with the standards that

21   are used to appraise residential real estate?

22        A.    Not at this moment.

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

1      Q.    So your experience with evaluating

2   appraisals of residential real estate is as part of

3   the residential loan mortgage underwriting process?

4      A.    That's correct.

5      Q.    And as part of that process, you would

6   review appraisals and determine whether you agree with

7   them or not; is that right?

8      A.    That's correct.  And decide which

9   appraisers to use.

10      Q.    As part of that process, would you ever

11   assign a value, an alternate value, if you disagreed

12   with an appraisal?

13      A.    On occasion, yes.

14      Q.    And what would you base that on?

15      A.    On my judgment and my experience.

16      Q.    But not applying the established standards

17   of residential real estate appraisal?

18      A.    I might or might not.  It depends on what

19   the facts are.

20      Q.    All right.  Because I thought you just

21   testified that you weren't familiar with what the

22   standards are?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 11 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 33

1      A.    I said not currently.  I don't know

2    currently today what those standards are.  Currently

3    this minute, I'm not presented with an appraisal where

4    I can see what issues I might need to cover.

5      Q.    Were you familiar with the standards that

6    were in effect in 2006?

7      A.    Generally.

8      Q.    In Maryland?

9      A.    I've done some research on Maryland real

10   estate values.

11     Q.    Okay.  My question is:  Are you familiar

12   with what the established standards were for the

13   appraisal of residential real estate in Maryland

14   in 2006?

15           MR. CARITHERS:  Objection to the question.

16           THE WITNESS:  Repeat that question again.

17           MR. SCOTT:  Could you read it back, please.

18       (Whereupon, the requested portion was read back

19   by the Reporter.)

20           THE WITNESS:  No.

21   BY MR. SCOTT:

22     Q.    Are you familiar with what the established

1    standards are for the appraisal of residential real

2    estate in Maryland in 2010?

3            MR. CARITHERS:  Same objection.

4            THE WITNESS:  No.

5    BY MR. SCOTT:

6        Q.    What was your first job after you graduated

7    from Florida State?

8        A.    This job right here on the bottom of the

9    résumé, page 2.

10       Q.    Western Federal Savings?

11       A.    Correct.

12       Q.    You were a loan officer and assistant

13   manager?

14       A.    Right.

15       Q.    What were your duties?

16       A.    Well, as assistant manager, I had

17   responsibilities initially on the deposit side of the

18   business, teller supervision, new accounts, as well as

19   the loan officer responsibilities for lending, which

20   became the full-time job over time.

21       Q.    I'm sorry, what became the full-time job

22   over time?

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

1        A.      The loan officer.

2        Q.      What did you do as a loan officer?

3        A.      Took loan applications.

4        Q.      For all types of loans?

5        A.      Residential mortgage loans.

6        Q.      Just residential?

7        A.      Right.

8        Q.      And you say you took the applications?

9        A.      Took the applications, processed the

10   application, prepared an underwriting package for an

11   underwriter to approve or reject the loan, scheduled

12   the closing, coordinated the closing, coordinated the

13   funding of the loan.

14       Q.      So the underwriting decision would be made

15   by somebody else?

16       A.      Correct.

17       Q.      And was that consistent throughout your

18   employment at Western Federal Savings?

19       A.      That's correct.

20       Q.      That you did not make underwriting

21   decisions?

22       A.      That's correct.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 14 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 36

```
 1        Q.    And then you left Western Federal Savings

 2   in 1972; is that correct?

 3        A.    That's correct.

 4        Q.    And you went to Fidelity Federal Savings?

 5        A.    That's correct.

 6        Q.    Why did you make that change?

 7        A.    My wife and I were both from Florida

 8   originally.  We had an opportunity with this

 9   particular company to go back.  I was recruited by the

10   new CEO of that company, and so we went to

11   Jacksonville, Florida.

12        Q.    And what was your job at Fidelity?

13        A.    My job initially was as a branch manager.

14        Q.    And that changed over time?

15        A.    That changed over time.  I eventually

16   became the senior vice president of branch operations,

17   I think it was called.

18        Q.    And what were your duties?

19        A.    They involved both deposit duties as well

20   as lending duties.

21        Q.    What were your lending duties?

22        A.    Residential mortgage lending.
```

1    Q.    Did you do any underwriting?

2    A.    Yes.

3    Q.    When did you start doing that?

4    A.    I can't recall.

5    Q.    But it was when you were at Fidelity?

6    A.    Yes.  Eventually, I became the senior vice

7    president and chief lending officer.

8    Q.    When did that happen?

9    A.    I'm going to guess here.  I would guess

10   about 1976.  It's about the middle of the time I was

11   there.

12   Q.    And at some point during your employment

13   with Fidelity you began performing the underwriting

14   tasks?

15   A.    As senior vice president and chief lending

16   officer, I was responsible for the quality of all

17   loans.  I underwrote every loan that originated that

18   was a residential mortgage loan.

19   Q.    And you left Fidelity in 1981?

20   A.    That's correct.

21   Q.    To go to Gibraltar Savings?

22   A.    That's correct.

Case 8:09-cv-00176-RWT Document 138-5 Filed 02/09/11 Page 16 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 38

1     Q.     And why did you make that change?

2     A.     I was recruited.

3     Q.     And what were your duties at Gibraltar?

4     A.     Secondary marketing.

5     Q.     What does that mean?

6     A.     That's the purchase and sale of whole loans

7     or participations.

8     Q.     What do you mean by "participations"?

9     A.     Participations in whole loans.  Someone can

10    buy or sell at 90 percent, 10 percent, 50 percent.

11    That was a participation in the loan.  So if the whole

12    loan balance is $100,000, 50 percent participation is

13    a 50 percent interest or $50,000.

14           They were sold in packages usually.  There

15    were whole loan sales as well as participation sales.

16    Q.     And these loans were sold by Gibraltar to

17    various investors?

18    A.     They were purchased by Gibraltar, too.

19    Q.     So Gibraltar both sold whole loans and also

20    purchased whole loans?

21    A.     And sold participations and purchased

22    participations.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 17 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 39

1      Q.     And your responsibility was to oversee

2    that?

3      A.     Oversee that, yes.

4      Q.     All right.  And these were residential

5    mortgage loans?

6      A.     Yes.

7      Q.     And where were the properties located?  Was

8    there any particular area or was it nationwide?

9      A.     Texas.

10     Q.     Exclusively?

11     A.     Let me think.  There were some packages

12   that were purchased that were outside of Texas.  There

13   were some that I sold outside of Texas.

14     Q.     What would your involvement be in a typical

15   loan purchase transaction for Gibraltar?  What would

16   you do?  What tasks would you perform?

17     A.     Negotiate the purchase with the seller.

18   Usually initiated a commitment letter and either a

19   participation agreement or a whole loan purchase and

20   sale agreement.  Coordinated that with lawyers,

21   corporate lawyers and the other party.

22     Q.     Anything else?

1      A.    Screening loans for sale or reviewing loans

2    that had been purchased to see if we wanted to

3    purchase them.  Going through a quality control

4    process on loans that were sold, going through a due

5    diligence process for loans that were purchased.

6      Q.    You would be involved in that?

7      A.    Right.

8      Q.    Would you be the one actually reviewing the

9    loan files?

10     A.    I was supervising a group of people who

11   were reviewing loan files, bringing me problems and

12   making decisions and judgments about those, including

13   underwriters, including closers and funders.

14     Q.    And you said you were involved with the due

15   diligence of loans that Gibraltar was purchasing.

16     A.    That's correct.

17     Q.    All right.  In a whole loan transaction,

18   how does that due diligence process typically work?

19     A.    It depends on the standards of the

20   institution.

21     Q.    The purchasing or the selling institution?

22     A.    Both.

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 41

1          Q.     Well, what kind of standards for due

2    diligence review of purchased loans did Gibraltar have

3    when you were working there?

4          A.     The loan packages were requested or came

5    into our operation.  We had underwriters that looked

6    at them and made decisions about those loans.  We may

7    or may not require a visit to the property to see what

8    we thought or didn't think about the property.  And it

9    depended and was guided by the investment policy of

10   the organization.

11         Q.     The purchasing organization?

12         A.     The purchasing organization.

13         Q.     Which would be Gibraltar bank in this

14   instance?

15         A.     Right.

16         Q.     So they would have underwriters review the

17   loan files for the loans that they were considering

18   purchasing?

19         A.     That's correct.

20         Q.     All right.  And why is that an important

21   thing to do?

22         A.     To establish the quality of the loans that

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 20 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 42

1     are there.

2          Q.    And you would agree, wouldn't you, that

3     it's prudent for an institution that's purchasing a

4     residential mortgage loan to review the loan file?

5          A.    Yes.

6               MR. CARITHERS:  Objection to the question.

7     You can answer.

8     BY MR. SCOTT:

9          Q.    I'm sorry, I didn't get your answer.

10         A.    Yes.

11         Q.    And what kinds of things should the

12    purchasing institution look for in the loan file?

13         A.    It depends on what they look for in other

14    loans that they make on their own and what their

15    investment policy is.

16         Q.    All right.  Well, when you worked at

17    Gibraltar, what kind of things were the underwriters

18    looking for in the files of loans that Gibraltar was

19    considering purchasing?

20         A.    We would look at it just like any other

21    loan that we would make.  Look at the application,

22    look at the credit report, look at the appraisal,

Page 43

1    recalculate debt to income ratios.

2        Q.    Did you look for income verification in the

3    file?

4        A.    Yes, we did.

5        Q.    Asset verification?

6        A.    Correct.

7        Q.    So at the time that you were doing this,

8    Gibraltar was also making residential mortgage loans

9    on its own; is that correct?

10       A.    Correct.

11       Q.    Yes?

12       A.    Correct.

13       Q.    So it would apply those same standards that

14   it used to underwrite or originate loans on its own to

15   the loans that it purchased?

16       A.    That's correct.  And I would add, those

17   were the standards at the time.

18       Q.    What were the standards?

19       A.    All of those components of underwriting.

20       Q.    When you say --

21       A.    Verification of income, verification of

22   assets, reviewing the credit report, reviewing

Page 44

1    appraisals.

2        Q.    When you say those were the standards at

3    the time, you mean generally, or the standards of

4    Gibraltar at the time?

5        A.    Generally.

6        Q.    Has that changed over time?

7        A.    For some institutions.

8        Q.    And how has it changed?

9        A.    As evidenced by the loans in this case,

10   Countrywide changed those standards in a fairly recent

11   time period.

12       Q.    We'll get into that in detail later.  I was

13   referring to the standards that were used by

14   institutions that were purchasing mortgage loans when

15   they would review them to determine whether they

16   wanted to purchase them.  Did those standards change

17   over time?

18       A.    What time are you talking about?

19       Q.    Well, you made a statement that you were

20   telling me about the standards that were in effect at

21   the time you were doing due diligence review of loans

22   for Gibraltar, which was the early 1980s.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 23 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 79

1      A.    The complaint.  The funding reports.  There

2   were letters that were -- Let me see.  Trade

3   confirmation letters, the purchase and servicing

4   agreement.

5           I asked was there a commitment letter

6   written.  I have always -- In 40 years, every time a

7   purchase or sale transaction was performed, the seller

8   first provides a commitment letter, which is the

9   initial contract by which we're going to follow to

10  then draw up agreements, fund the loans, those types

11  of things.  There was no commitment letter.

12     Q.    But you did get the purchase and sale

13  agreement?

14     A.    I did.  Purchase and servicing agreement, I

15  think it's titled.

16     Q.    I think you're right.

17           And what were you asked to do?

18     A.    To review those and have a call and talk

19  about them.

20     Q.    Okay.  And did you do that?

21     A.    I did.

22     Q.    All right.  And who was the call with?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 24 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 80

1        A.    Mr. Parker.

2        Q.    And what did you discuss?

3        A.    We've had hundreds of calls.  I can't tell

4    you what we discussed in the very first call.  But I

5    can remember that I was concerned about the

6    underwriting from the very start, and I wanted to

7    resolve that issue.  And we kept digging on that

8    issue.  I did.

9        Q.    All right.  So you told Mr. Parker right

10   off the bat that you were concerned about the

11   underwriting?

12       A.    That I wanted to make that a part of my

13   analysis.

14       Q.    Why did you want to make it a part of your

15   analysis?

16       A.    Because these loans had serious default

17   rates.  My experience says there is an underwriting

18   problem when that occurs, and especially when the

19   default rates are far in excess of anything

20   experienced in the industry at that point.

21       Q.    Did you take any notes of this conversation

22   you had with Mr. Parker?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 25 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 81

1      A.    I'm sure I did.

2      Q.    Do you have them with you?

3      A.    No.  My process is I accumulate notes for a

4  while and then at some point I throw them away and

5  they become the next document in the chain or the next

6  draft or whatever.

7      Q.    Well, I'm talking about handwritten notes.

8  Did you take --

9      A.    From that conversation?

10      Q.    Yes.

11      A.    No.  Yes, I took them.  No, I don't have

12  them.

13      Q.    So you disposed of them?

14      A.    Yes.

15      Q.    When was that?

16      A.    A year ago.  Usually when I write the first

17  report, I will use some notes, some recollection,

18  things I've collected.  Then I start cleaning out

19  files and filing that.  That's done.

20      Q.    So you did generate notes regarding your

21  conversations with Mr. Parker, but you disposed of

22  them?

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 82

```
1        A.    That's correct.  That's my process.

2        Q.    And you said about a year ago you got rid

3   of those.

4        A.    Well, the first version of the report was

5   July the 20th.  Somewhere around that, before or

6   after, probably after, within 15 to 30 days, I started

7   purging files.  That's just what I do.  I don't have

8   all the room in the world.

9        Q.    All right.  So I take it there were

10  handwritten notes of multiple conversations that you

11  had with Mr. Parker?

12       A.    Probably, yes.

13       Q.    And you got rid of all of them?

14       A.    Yes.

15       MR. CARITHERS:  Wait a minute.  There's

16  some notes you've kept, more recent.

17       THE WITNESS:  Yes, more recent.  I mean, if

18  you want to see notes, I've got notes.

19       MR. CARITHERS:  To sort of clarify the

20  record, I personally was not aware that he was

21  disposing of notes.  When we became aware of that, we

22  instructed him to retain all his notes.  That process
```

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 27 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 104

1        Q.     Such as?

2        A.     Documentation standards and underwriting

3   standards.

4        Q.     Are those terms used in the document?

5        A.     No, they are not.

6        Q.     So what definitions are missing?

7        A.     What documentation standards will be used

8   and what underwriting standards will be used.

9        Q.     So you're saying that the agreement does

10  not set forth what documentation and underwriting

11  standards are going to be used?

12       A.     Correct.

13       Q.     All right.  And do agreements of this kind,

14  in your experience, typically have that information in

15  them?

16       A.     Yes, they do.

17       Q.     I take it from your earlier testimony that

18  you've never been involved in the purchase of any

19  mortgage loans from Countrywide in the past.  Is that

20  right?

21       A.     That's correct.

22       Q.     Have you been involved in the purchase of

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 28 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 105

1      any loans from Wells Fargo?

2            A.    No.

3            Q.    Washington Mutual?

4            A.    No.

5            Q.    Chase?

6            A.    No.

7            Q.    Citibank?

8            A.    No.

9            Q.    Have you ever seen a whole loan mortgage

10     purchase agreement from any of those entities?

11           A.    No.

12           Q.    What was your understanding of how Harvest

13     Bank selected the loans that it purchased under this

14     agreement?

15           A.    They selected based on loan-to-value ratio

16     and credit score.

17           Q.    All right.  Those are the criteria.  My

18     question may have been a little unclear.

19                 Can you explain to me logistically how

20     Harvest Bank selected the loans?

21           A.    No, I can't.

22           Q.    You don't know?

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 127

1      borrowers that are paying the payments for the debt

2      that I'm borrowing.

3           Q.    That you're purchasing?

4           A.    That I'm purchasing, I'm sorry.

5           Q.    Is it your opinion that stated income loans

6      were not customary in the residential mortgage

7      origination business in 2006?

8           A.    I don't know what was customary.

9           Q.    You don't know?

10          A.    I know that there were stated income loans.

11     I can't tell you that every lender was or wasn't

12     making stated income loans.  All I know is what

13     Countrywide did and what this case provides, and what

14     my historical experience is.

15          Q.    Are you familiar with the underwriting

16     policies and practices of Wells Fargo in 2006-2007?

17          A.    No, I'm not.

18          Q.    Are you familiar with the underwriting

19     policies and practices of Chase in 2006-2007?

20          A.    No, I'm not.

21          Q.    Are you familiar with the underwriting

22     policies and practices of Citibank in 2006-2007?

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

1        A.    No, I'm not.

2        Q.    Are you familiar with the underwriting

3   policies and practices of Washington Mutual

4   in 2006-2007?

5        A.    No, I'm not.

6        Q.    Are you familiar with the underwriting

7   policies and practices of any residential mortgage

8   lender in 2006?

9        A.    Yes.

10        Q.    Countrywide?

11        A.    Countrywide.  The credit union that I'm on

12   the board of.

13        Q.    Any others?

14        A.    Some of the clients that I've worked for

15   during that time period.

16        Q.    Who would that be?

17        A.    Security Service Federal Credit Union.

18   First Community Bank of Corpus Christi.  I'm trying to

19   think.  There's a bank in Temple, Texas.  All of

20   those, I've looked at their underwriting and

21   origination practices.

22        Q.    That were in effect in '06?

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 129

```
 1          A.    Yes.  '05, '06, that time period.

 2          Q.    All right.  The first one you mentioned was

 3     a federal credit union?

 4          A.    Security Service.

 5          Q.    Security Service.

 6          A.    Right.

 7          Q.    Where is that located?

 8          A.    San Antonio, Texas.

 9          Q.    And is that a credit union for people who

10     work in the security industry?

11          A.    No.  It's an open-to-the-public credit

12     union with offices in Texas and Colorado.

13          Q.    Do you know how many residential mortgage

14     loans they make per year?

15          A.    I would have go back to records.  They're

16     one of the larger credit unions in the United States.

17          Q.    Do they make stated income loans?

18          A.    No.

19          Q.    Did they make them in '06?

20          A.    I don't know.  I don't think so.

21          Q.    First Community Bank of Corpus Christi,

22     that's in Corpus Christi, Texas, I take it.
```

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 130

```
 1          A.    Right.

 2          Q.    How many branches do they have?

 3          A.    I think seven or eight.

 4          Q.    And do you know how many mortgage loans

 5     they make a year?

 6          A.    No.  I don't have those off the top of my

 7     head, no.

 8          Q.    Do they loan exclusively in Texas?

 9          A.    Yes.

10          Q.    And do they make stated income loans?

11          A.    Not to my knowledge.

12          Q.    And then you mentioned the credit union

13     that you're on the board of, which is --

14          A.    I mentioned there is a bank in Temple,

15     Texas, that I can't recall the name of right now.

16          Q.    How many branches do they have?

17          A.    Oh, they had five or six branches.

18          Q.    All in Texas?

19          A.    All in Texas.

20          Q.    Do you know how many mortgage loans they

21     make per year?

22          A.    I'm sorry, it's not Temple, Texas, it's
```

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

1    Cameron, Texas.

2        Q.    Do you know how many mortgage loans they

3    make per year?

4        A.    No.  Not off the top of my head, no.

5        Q.    Do they make stated income loans?

6        A.    No.

7        Q.    And then the credit union that you're on

8    the board of, you're familiar with their underwriting

9    policies and practices as of 2006; is that correct?

10       A.    That's correct.

11       Q.    And how many branches does that credit

12   union have?

13       A.    Only one.

14       Q.    And how many mortgage loans does it make

15   per year, roughly?

16       A.    Oh, a few hundred.

17       Q.    And does it make stated income loans?

18       A.    No.

19       Q.    So I take it, then, that you don't know how

20   Countrywide's underwriting policies and practices

21   in 2006 differed from those of Washington Mutual?

22       A.    No.

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 132

```
1          Q.    Or of Chase?

2          A.    No.

3          Q.    Or of Wells Fargo?

4          A.    No.

5          Q.    Or of Citibank?

6          A.    No.

7          Q.    Is it your opinion that stated income loans

8    are not legal?

9          A.    I don't know if they're legal or not.  I'm

10   not an attorney.  But to the extent that fraud has

11   been created, that's a legal violation of law.

12         Q.    Is it your opinion that stated income loans

13   are not customary, or weren't customary in 2006?

14         A.    No, that's not my opinion.  No.

15         Q.    They were customary?

16         A.    I don't know whether they were or not.

17         Q.    You don't know.  Okay, fair enough.

18               And I'm asking specifically about 2006.

19         A.    Right.

20         Q.    And your answer is the same?

21         A.    The answer is the same.

22         Q.    Is it your opinion that stated income loans
```

Case 8:09-cv-00176-RWT  Document 138-5  Filed 02/09/11  Page 35 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 141

1              And the fact that there was a second

2    mortgage on the house and it was 100 percent financed?

3         A.    Correct.

4         Q.    And that's it?

5         A.    That's it.

6         Q.    With respect to Mangieri?

7         A.    Correct.

8         Q.    All right.  Is it your opinion that

9    100 percent financing was not customary in the

10   mortgage business in 2006?

11        A.    100 percent with second mortgage financing

12   was not customary in the mortgage business.

13        Q.    It was not?

14        A.    It was not.

15        Q.    And what's your basis for that statement?

16        A.    Experience.

17        Q.    How many loans did you underwrite or review

18   in 2006?

19        A.    Not many.

20        Q.    You would agree that what's customary in

21   the mortgage industry has evolved over time, wouldn't

22   you?  It's changed over time?

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 144

1    that property?

2         A.    If it stays up, it does.  You're making a

3    mortgage for 30 years.

4         Q.    But whatever the value of the property is

5    at a particular point in time impacts the value of the

6    mortgage loan that is secured by that property,

7    correct?

8         A.    Correct.

9         Q.    So with respect to Mr. Mangieri, what was

10   the sales price for his property?

11        A.    Sales price was $490,000.

12        Q.    And that was in August of '06, right?

13        A.    Contract date is 7/14/06, closing date was

14   8/14/06.

15        Q.    And if that value of that property had gone

16   up and, say, in 2008 it was worth $550,000, then the

17   value of that loan would be more, correct?

18        A.    The loan to value of that loan would be

19   less.  The value of that loan, I don't know what it's

20   going to be.

21        Q.    Have you reviewed the underwriting on any

22   of the loans in the portfolio that are not in default?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 37 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 145

1      A.    No.

2      Q.    So you don't know whether you believe there

3   are any problems with the underwriting on those loans?

4      A.    I don't have any idea.

5      Q.    Do you know why Mr. Mangieri defaulted on

6   his mortgage?

7      A.    No, I don't.

8      Q.    Did the approval of Mr. Mangieri's loan

9   comply with the underwriting guidelines of Countrywide

10   at the time?

11      A.    It depends on what part of the underwriting

12   guidelines you read.

13      Q.    Well, which parts did you look at?

14      A.    Let's see.  It probably complied with their

15   low doc loan guidelines.

16      Q.    Do you know who the originating lender was

17   for the Mangieri loan?

18      A.    It doesn't look like I collected that

19   information.  No.

20      Q.    Okay.  Do you know whether the Mangieri

21   loan was underwritten to Countrywide's guidelines or

22   whether it was underwritten to some other lender's

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 38 of 132
DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 174

1    for.

2    BY MR. SCOTT:

3         Q.    Well, did they know what to look for?

4                MR. CARITHERS:  Objection.

5                THE WITNESS:  I don't know.

6    BY MR. SCOTT:

7         Q.    Do you have an opinion about whether or not

8    the approval of this loan complied with Countrywide's

9    underwriting guidelines?

10        A.    No, I don't.

11        Q.    Do you have an opinion about whether the

12   underwriting of the Reyes loan complied with

13   Countrywide's underwriting guidelines?

14        A.    No, I don't.

15        Q.    Do you have an opinion about whether the

16   underwriting of any of the loans at issue in the case

17   complied with Countrywide's underwriting guidelines?

18        A.    No, I don't.

19        Q.    Okonkwo, O-k-o-n-k-w-o.

20        A.    Okonkwo, I think it is.

21        Q.    Columbia, Maryland.  What, if anything,

22   about the underwriting of this loan, in your opinion,

DEPOSITION OF TERRY R. MENDENHALL
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 231

1    debt-to-income ratio?

2         A.    Correct.

3         Q.    And that was apparent from a review of the

4    file?

5         A.    Correct.

6         Q.    And again, you don't know what caused this

7    borrower to default on this loan?

8         A.    No.

9         Q.    The next one is the Kang loan, K-a-n-g,

10   Ellicott City.  What, in your opinion, about the

11   underwriting of this loan was not legal, proper,

12   prudent or customary?

13        A.    Co-owner without being a co-borrower.

14   Stated income.  High debt-to-income ratios based on

15   stated income.

16        Q.    Again, what is your opinion about an

17   appropriate debt-to-income ratio?

18        A.    Housing expense-to-income ratio 28.  Total

19   debt-to-income ratio 36.  That's what a prudent lender

20   would do.

21        Q.    And where do those numbers come from?

22        A.    Experience.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 40 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 248

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

_____
                                  )
HARVEST BANK OF MARYLAND,         )        Case Number:
                                  )
        Plaintiff,                )        8:09-CV-00176-RWT
                                  )
vs.                               )
                                  )
COUNTRYWIDE HOME LOANS, INC.,     )
                                  )
        Defendant.                )
_____ )


                    Volume 2


                 DEPOSITION OF

              TERRY R. MENDENHALL

              Baltimore, Maryland

             Friday, August 20, 2010

                  10:02 a.m.


Job No.:  1-184364

Pages 248 through 462

Reported by:   John L. Harmonson, RPR

1

2

3                    Deposition of

4              TERRY R. MENDENHALL

5

6

7    Held at the offices of:

8              BALLARD SPAHR, LLP

9              300 East Lombard Street

10             18th Floor

11             Baltimore, Maryland  21202

12

13

14

15       Taken pursuant to the Federal Rules of Civil

16   Procedure, by notice, before John L. Harmonson,

17   Registered Professional Reporter, Notary Public in and

18   for the State of Maryland, who officiated in

19   administering the oath to the witness.

20

21

22

```
 1                    APPEARANCES

 2

 3    ON BEHALF OF PLAINTIFF:

 4              MICHAEL R. CARITHERS, JR., ESQUIRE

 5              DAVID P. PARKER, ESQUIRE

 6              Liles Parker, PLLC

 7              4400 MacArthur Boulevard, N.W.

 8              Suite 203

 9              Washington, D.C.  20007

10              (202) 298-8750

11

12    ON BEHALF OF DEFENDANT:

13              ROBERT A. SCOTT, ESQUIRE

14              Ballard Spahr, LLP

15              300 East Lombard Street

16              18th Floor

17              Baltimore, Maryland  21202

18              (410) 528-5600

19

20    ALSO PRESENT:

21              ALAN J. BLOCHER

22              MIDDLETON THOMPSON (Via telephone)
```

```
 1    agreement?

 2              MR. CARITHERS:  Objection.

 3              THE WITNESS:  When did they discover that

 4    the underwriting didn't comply?  I don't know.

 5    BY MR. SCOTT:

 6         Q.   Okay.  Do you know when Harvest Bank

 7    discovered that the underwriting on the Stern loan did

 8    not comply with Section 3.02(p) of the agreement?

 9              MR. CARITHERS:  Objection.

10              THE WITNESS:  No.

11    BY MR. SCOTT:

12         Q.   Do you know when Harvest Bank discovered

13    the underwriting of any of the loans at issue in this

14    case did not comply with Section 3.02(p) of the

15    agreement?

16         A.   No.

17              MR. CARITHERS:  Objection.

18    BY MR. SCOTT:

19         Q.   So your answer is no?

20         A.   The answer is no.

21         Q.   When did Harvest Bank provide written

22    notice to Countrywide of its contention that the
```

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 44 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 255

1      underwriting of the Karimi loan did not comply with

2      Section 3.02(p) of the agreement?

3                  MR. CARITHERS:  Objection.

4                  THE WITNESS:  I'm not sure.

5      BY MR. SCOTT:

6          Q.    Do you know when Harvest Bank provided

7      written notice to Countrywide with respect to its

8      allegation that the underwriting of any of the loans

9      in the lawsuit did not comply with Section 3.02(p) of

10     the agreement?

11                 MR. CARITHERS:  Objection.

12                 THE WITNESS:  I think it's the third

13     amended complaint.

14     BY MR. SCOTT:

15         Q.    The third amended complaint is what?  Is

16     the written notice?

17         A.    I believe so.

18         Q.    And when --

19         A.    That's my interpretation.  I don't know.

20     I'm not a lawyer.

21         Q.    All right.  So other than the complaint,

22     are you aware of any other written notice --

Page 256

```
 1      A.    No.

 2      Q.    -- that was provided?

 3            MR. CARITHERS:  Let me make my objection.

 4   Then you can answer.

 5   BY MR. SCOTT:

 6      Q.    I am going to start over because I want to

 7   get the entire question out.

 8            Other than the third amended complaint, are

 9   you aware of any other written notice that was

10   provided by Harvest Bank to Countrywide that the

11   underwriting of any of the loans at issue in this case

12   did not comply with Section 3.02(p) of the agreement?

13            MR. CARITHERS:  Objection.

14            THE WITNESS:  Not that I recall.

15   BY MR. SCOTT:

16      Q.    Right now you're not aware of any such

17   notice?

18      A.    I don't recall any such notice.  And I

19   modify my early responses to say I don't recall.  I

20   received thousands of documents on this case.

21      Q.    I understand that.  But right now you can't

22   identify any written notice for me other than the
```

```
 1    third amended complaint; is that right?

 2              MR. CARITHERS:  Objection.

 3              THE WITNESS:  That's correct.  Right now I

 4    cannot identify.

 5    BY MR. SCOTT:

 6         Q.    In your most recent supplemental report,

 7    the one that's marked as Exhibit 5, you have a section

 8    starting on page 2 that talks about portfolio default

 9    results.

10         A.    Correct.

11         Q.    And you have some statistics in here.  And

12    you say that "As of March 31, 2009" --

13              MR. CARITHERS:  Where are you at?  On

14    page 2?

15              MR. SCOTT:  Correct.

16              MR. CARITHERS:  I think right in the

17    middle.

18    BY MR. SCOTT:

19         Q.    -- "that 21 of the remaining 65 loans still

20    owned by Harvest Bank were delinquent 30 days or

21    more."

22         A.    In bankruptcy, foreclosure, REO and post
```

1          MR. CARITHERS:  Objection.

2          THE WITNESS:  The focus of the AS400 notes

3   was the collection procedures of Countrywide for those

4   loans, primarily in the history.

5   BY MR. SCOTT:

6      Q.    Well, let me ask you this:  Are you

7   familiar with the procedures that were employed by

8   Countrywide in servicing the loans at issue in this

9   case?

10     A.    What servicing procedures?

11     Q.    The servicing procedures that were used to

12  administer the loans.

13     A.    Did they send a payment every month, yes or

14  no, is that the kind of procedure?

15     Q.    Let me ask you, did you review any written

16  procedures?

17     A.    No, I did not.

18     Q.    All right.  Do you know whether Countrywide

19  has any written servicing procedures?

20     A.    No, I do not.  I would guess they do.

21     Q.    But you haven't seen them?

22     A.    I have not seen them.

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 264

1      Q.    All right.  Do you have any opinions about

2   whether the procedures that were used by Countrywide

3   to service and administer the loans at issue in this

4   case were in accordance with the customary and usual

5   standard of practice of prudent mortgage servicers?

6      A.    Yes.

7      Q.    And what are those opinions?

8      A.    That there were unreasonably long delays.

9      Q.    In what?

10      A.    In the collection process and the

11   resolution process.  The follow-up process.

12      Q.    Well, we can go through the loans one at a

13   time.  Before we do that, are you familiar with the

14   servicing procedures for residential mortgage loans

15   for the period 2006 through 2010 that were used by

16   Wells Fargo?

17      A.    No.

18      Q.    Are you familiar with the servicing

19   procedures for residential mortgage loans for the

20   years 2006 through 2010 that were used by Chase?

21      A.    No.

22      Q.    Citibank?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 49 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 265

 1      A.    No.

 2      Q.    Washington Mutual?

 3      A.    No.

 4      Q.    Are you familiar with the servicing

 5  procedures for residential mortgage loans for the

 6  years 2006 through 2010 for any nationwide residential

 7  mortgage servicer?

 8      A.    No.

 9      Q.    Are you familiar with the servicing

10  procedures for residential mortgage loans between the

11  years 2006 and 2010 used by any lender?

12      A.    Any specific lender?

13      Q.    Any lender at all.

14      A.    No.

15      Q.    So I take it from that that you don't know

16  how Countrywide's procedures for servicing residential

17  mortgage loans during the time period 2006 to 2010

18  differ from those of other lenders?

19      A.    I know how they differ from prudence.

20      Q.    Well, do you know how they differ from

21  those employed by other lenders?

22      A.    No.

1       Q.    Let's talk about the individual loans.

2             The Karimi loan, what, if anything, about

3    the servicing of that loan, in your opinion, did not

4    comply with the customary and usual standards of

5    practice of prudent mortgage servicers?

6       A.    It took 553 days from the date of default

7    to the date of foreclosure, which was far in excess of

8    the average of all of the foreclosed properties which

9    was 317 days.

10      Q.    What are you referring to there?

11      A.    I'm referring to Table A in my addendum.

12      Q.    Which report?

13      A.    The one you just --

14            MR. CARITHERS:  Exhibit 5, August 13th.

15            THE WITNESS:  Exhibit 5, August 13th.

16   BY MR. SCOTT:

17      Q.    Table --

18      A.    A.

19      Q.    All right.  And the 553 days is the time

20   period from the default date to the foreclosure date?

21      A.    Correct.

22      Q.    And what date are you using for the

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 51 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 267

1    foreclosure date?

2        A.    7/15/09.

3        Q.    But what is that?  Is that the ratification

4    of the sale?  Is that the auction?

5        A.    That's the date that was given me from

6    footnote here from Harvest Bank report, which came

7    from Countrywide information originally, I'm told.

8        Q.    Do you have that Harvest Bank report?

9        A.    I have it.  I can't put my hands on it

10   right this second.  But you copied it yesterday

11   because you copied these whole files.

12       Q.    Why don't you see if you can find it.

13       (Off the record.)

14   BY MR. SCOTT:

15       Q.    You were able to locate it?

16       A.    Yeah.

17       Q.    Thank you.

18            All right.  So according to this, it looks

19   like the foreclosure date that you used was from the

20   column that says "Foreclosure Auction," right?

21       A.    Correct.

22       Q.    Do you know what collection efforts

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 52 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 268

1    Countrywide made prior to filing the foreclosure with

2    respect to the Karimi loan?

3        A.    From AS400 notes I would.  And I went

4    through all those.  Let me see if I can find some of

5    my notes there.

6            I could not tell from the AS400 notes of

7    any attempts to resolve.  Payments were brought

8    current numerous times from 8/2/06 through 1/7/08 in

9    the customer contact history.  It was referred for

10   foreclosure on 6/27/08.  On 12/16/08 it went into

11   bankruptcy.  And that was all the key information I

12   could discern out of the AS400 notes I looked at.

13       Q.    And let me go back to the dates on your

14   chart.  Table A, right?

15       A.    Table A.

16       Q.    And so the default date was January 2 of

17   '08.

18       A.    Right.

19       Q.    And you're saying that the payments were

20   not brought current after that date?

21       A.    According to the log, payments kept being

22   brought current until 1/7/08.

1      Q.     All right.

2      A.     This says the default date was 9/1/07.  And

3  the payments were brought current from various months

4  from 8/2/06 through 1/7/08.  So in between there they

5  defaulted, according to these records.

6      Q.     But you would agree that once the customer

7  brings the payments current, that foreclosure is no

8  longer appropriate, correct?

9      A.     Correct.

10      Q.     So foreclosure was not appropriate with

11  respect to this loan until, at the soonest, January --

12  or 30 days from January 7, '08, when they were last

13  brought current?

14      A.     No.  The default date is 30 days after the

15  last payment was due and not received.

16      Q.     And when was that?

17      A.     It would have been 8/1/07, 30 days earlier

18  than that.  That's when they failed to make a payment.

19  They're in default when you expect the next payment

20  and it's not there.

21      Q.     We're talking about the Karimi loan.  You

22  have a default date of January 2, '08.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 54 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 270

1        A.      Say that again.

2        Q.      I thought you said that the payments were

3   brought current on January 7, '08.  Right?

4        A.      That's what the notes indicate.

5        Q.      So let's assume that's correct.  If that's

6   correct, then what's the soonest that a foreclosure

7   could have been filed after that date?

8        A.      These dates came from two different places.

9        Q.      I understand that.  I'm asking you to

10   assume --

11        A.      The default date was recorded by

12   Countrywide, I'm assuming, for this information.

13   These are notes by people on a servicing log.

14        Q.      I understand that.  I'm asking you to

15   assume that the date of January 7, '08, was the date

16   that the payments were brought current.

17        A.      Okay.

18        Q.      What was the soonest date that a

19   foreclosure could have been filed after that?

20        A.      Probably February 2nd of '08.

21        Q.      Why do you say probably?  You don't know?

22        A.      It's usually 30 days later.

 1      Q.    Do you know?

 2      A.    I would have to review the loan documents

 3    to see, and then the records of what was going on at

 4    the time.

 5      Q.    You haven't done that?

 6      A.    No.

 7      Q.    So do you know what happened between -- and

 8    you said the foreclosure was filed.  When was the

 9    foreclosure actually filed?

10      A.    The foreclosure date that's recorded here

11    is 7/15/09.

12      Q.    That's the auction date, right?

13      A.    Yes.

14      Q.    So my question is:  When was the

15    foreclosure action actually commenced?

16      A.    I can't tell you without going back to the

17    records.  But foreclosures can be threatened, ready to

18    go almost to the courthouse steps, withdrawn for some

19    reason, and it goes on and on and on.

20      Q.    Right.  Do you know what happened with

21    respect to that in this case?

22      A.    I have no idea.  I know it took 553 days.

1    From one day to the next.

2        Q.    And there was a bankruptcy in there

3    somewhere too, right?

4        A.    There were bankruptcies on many of these

5    files.

6        Q.    But I'm asking about this one, Karimi.

7        A.    Yes, there was a bankruptcy.

8        Q.    And that would have delayed the foreclosure

9    as well, correct?

10       A.    It always delays foreclosures.  In most

11   cases there's bankruptcies.

12       Q.    And do you know when the bankruptcy was

13   filed?

14       A.    According to the log, 12/16/08 it was

15   referred to the bankruptcy attorney.  When it was

16   filed, I can't tell you.

17       Q.    The AS400 indicates that on 12/16/08 the

18   file was referred to a bankruptcy attorney?

19       A.    I believe so.

20       Q.    And do you know how long it was before the

21   bankruptcy attorney obtained an authorization to

22   proceed with the foreclosure?

Case 8:09-cv-00176-RWT  Document 138-5  Filed 02/09/11  Page 57 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 273

1        A.     No.

2        Q.     Do you know how long it typically takes to

3   obtain a lift stay order or other relief from the

4   bankruptcy court in order to proceed with a

5   foreclosure?

6        A.     No.

7        Q.     You don't know whether it takes three

8   months, six months, nine months?

9        A.     It takes the time that it takes.  And

10  sometimes it's better than others.  On some portfolios

11  it's better than others.  But I believe there's an

12  opinion you have on how long that takes from another

13  expert in the state of Maryland.

14       Q.     Of bankruptcy?

15       A.     Of foreclosure.

16       Q.     What about bankruptcy?

17       A.     Most foreclosures do involve bankruptcies.

18       Q.     Well, the opinion is what it is.  My

19  question to you is:  You don't know, sitting here

20  today, how long it typically will take in order to

21  obtain a lift stay order to proceed with foreclosure

22  when a borrower files for bankruptcy?

 1      A.    I know it's a factor in the time period it

 2   takes to get your hands on the property.

 3      Q.    But you don't know how long it typically

 4   takes?

 5      A.    No.

 6      Q.    You're not a bankruptcy lawyer?

 7      A.    No, I'm not.

 8      Q.    And you don't know how long it took in this

 9   case?

10      A.    No, I don't.

11      Q.    Is there anything else about the servicing

12   of the Karimi loan other than the fact that it took

13   553 days between the date of default and the

14   foreclosure auction that you believe indicates that

15   the servicing of this loan was not in accordance with

16   the customary and usual standards of practice?

17      A.    It took another 199 days to get from

18   foreclosure to REO sale.

19      Q.    199 days?

20      A.    Right.

21      Q.    And you believe that's an excessive period

22   of time?

Page 275

```
 1        A.    It's slightly excessive to this group of

 2   loans because the average was 191.

 3        Q.    Are you familiar with how long it typically

 4   took to sell a residential property in Maryland

 5   in 2009?

 6        A.    Well, some it took 90 days.

 7        Q.    I'm asking you whether you know --

 8        A.    Some it took zero.

 9             MR. CARITHERS:  Let him finish the

10   question.  Slow down.

11   BY MR. SCOTT:

12        Q.    I'm asking if you know generally how long

13   it took during that period of time for a residential

14   property to sell.

15        A.    No.

16        Q.    You're not a real estate broker?

17        A.    No.

18        Q.    You don't have knowledge of the real estate

19   market in Maryland?

20        A.    No.

21        Q.    So your opinion that the 199 days is

22   slightly excessive is based solely on the fact that
```

Page 276

```
1     it's longer than the average of the amount of time it

2     took for the 11 loans on Table A?

3          A.    Correct.

4          Q.    And is your opinion that the 553 days it

5     took to take the loan from default to foreclosure, is

6     that based solely on the fact that that number is

7     greater than the average of the same time period for

8     the 11 loans on Table A?

9          A.    That plus my experience.

10         Q.    Your experience in what?

11         A.    Being responsible for a servicing operation

12    that had to do foreclosures on property and sell REO.

13         Q.    Have you ever been in charge of servicing

14    residential mortgage loans in Maryland?

15         A.    No.

16         Q.    Do you have any experience servicing

17    mortgage loans in Maryland?

18         A.    No.

19         Q.    Do you know how long a foreclosure takes in

20    Maryland?

21         A.    There is an expert opinion on that topic.

22         Q.    So what is it?  What is the expert opinion?
```

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 61 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 277

1          A.      You've got it.

2          Q.      Do you know what it says?

3          A.      No, not off --

4              MR. CARITHERS:  Take your time to find it.

5      Don't rush.

6              If you want him to do that, that's fine.

7      But don't rush, Terry.  Just take your time.

8          (Off the record.)

9              MR. CARITHERS:  He's looking for Jackson's

10     report.

11         (Off the record.)

12     BY MR. SCOTT:

13         Q.      Have you reviewed Mr. Jackson's report?

14         A.      I did at one time.  I don't know that I do

15     have that with me.  I have Nadel's expert report.

16             MR. CARITHERS:  That's theirs.

17             THE WITNESS:  That's yours.  I noticed that

18     as I went to it, but I don't know that I have

19     Jackson's with me.

20             MR. CARITHERS:  Would you like me to

21     arrange to have it sent to your fax number?  You said

22     you reviewed it but don't have it physically here with

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 62 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 278

1    you.  Is it at your home office?

2              THE WITNESS:  It may be there.  This was a

3    year ago.  It may be gone.  But I don't have it here

4    in the place that it should be.

5    BY MR. SCOTT:

6         Q.    Well, let me ask you this:  Is your

7    understanding of how long it should take for a

8    residential foreclosure in Maryland based entirely on

9    Mr. Jackson's report?

10        A.    No.

11        Q.    What else is it based on?

12        A.    Based on my experience and this list here,

13   which is an internal benchmark in my view.  We're

14   internally benchmarking one loan against the other and

15   against the average.

16        Q.    When you say "here," you're talking about

17   Table A?

18        A.    Table A.

19        Q.    All right.  So other than the data on Table

20   A and Mr. Jackson's report, what else do you base your

21   understanding of how long a residential foreclosure in

22   Maryland should take?

 1        A.    My experience.

 2        Q.    But you're not experienced in overseeing or

 3    handling residential foreclosures in Maryland,

 4    correct?

 5        A.    No.

 6        Q.    That is not correct?

 7        A.    I'm currently not responsible for handling

 8    foreclosures and servicing of foreclosures in

 9    Maryland, no.

10        Q.    Have you ever done so?

11        A.    I would have to think back.  I mean, I've

12    invested in loans all over the country, and at one

13    time in my life I did buy loans in this area.  They

14    were serviced by someone else.  But as an investor, I

15    would have monitored their performance.  That's 30

16    years ago.

17        Q.    All right.  Well, let's talk about the time

18    period --

19        A.    But you want my experience, and my

20    experience is yes, I did invest in loans in Maryland

21    and the D.C. area at one time in my career.

22        Q.    30 years ago?

Page 280

1      A.    30 years ago at USAA.  My most recent

2  experience, we were involved in 50 states.  We looked

3  at servicing reports in 50 states, delinquencies in 50

4  states.  It affected our income when there were

5  foreclosure delays.  We asked questions.  So in that

6  respect, I was responsible for servicing in the state

7  of Maryland.

8      Q.    All right.  Well, you would agree, wouldn't

9  you, that foreclosure laws are different in each

10 state?

11     A.    I would agree with that.

12     Q.    And each state has a different period of

13 time that's a typical period of time for a residential

14 foreclosure?

15     A.    Yes.  Some states are what's called

16 judicial foreclosure states, and they can take longer

17 than other foreclosure states.

18     Q.    And the length of time that it will take

19 for foreclosure in a particular state depends on the

20 laws in that state in part, correct?

21     A.    Correct.

22     Q.    Are you familiar with the laws in Maryland

1      regarding residential foreclosures?

2          A.     No.

3          Q.     Did you service or own any loans that were

4      secured by property in Maryland during the 2000s?   The

5      period of time from 2000 to the present.

6          A.     Yes.   I was at USAA until 2003.

7          Q.     And you had loans in Maryland?

8          A.     We had loans in Maryland and in the D.C.

9      area.

10         Q.     And were you responsible for servicing

11     those?

12         A.     I was responsible for the servicers and

13     their accountability to us.

14         Q.     Were you involved in the day-to-day

15     servicing?

16         A.     Well, how do you define "day to day"?

17         Q.     Who was doing the servicing on these loans?

18         A.     Who was doing what servicing?

19         Q.     Who was servicing them?

20         A.     They were being serviced by various

21     mortgage bankers around the country.

22         Q.     Not by the institution that you worked for?

1        A.      The institution I worked for was the master

2    servicer.  We owned the servicing.  We hired

3    subservicers to collect the payments, provide the

4    payment cards, foreclose on the property.  But we were

5    the master servicers and we were responsible to the

6    investor ultimately for the loans.

7        Q.      Based on that experience, do you recall how

8    long it typically takes for residential foreclosure in

9    Maryland?

10       A.      No.

11       Q.      Based on any of your past experience, do

12   you recall how long it typically takes for a

13   residential foreclosure in Maryland?

14       A.      No.

15       Q.      Anything else about the servicing of the

16   Karimi loan that you believe was not in accordance

17   with the customary and usual standards of practice?

18       A.      No.

19       Q.      Let's go on to the Stern loan.  What is it

20   about the servicing of the Stern loan that you believe

21   is not in accordance with customary and usual

22   standards of practice?

1      A.    The notes have similarities; in fact, all

2   of them do.  There was a time period from 9/19/06 to

3   4/23/07 where payments were delinquent and payments

4   were brought current.

5              On 9/5/07, which is -- now we're going from

6   4/23/07 to 9/5/07, it was finally referred to

7   foreclosure.

8              Then later, at 10/22/07, there was

9   something labeled as workout short sale.

10             And for most of the loans, that's the only

11  mitigation that was indicated as a strategy for

12  dealing with borrowers that were delinquent.

13     Q.    Was modification --

14     A.    Short sale.

15     Q.    Short sale.

16     A.    And in most cases, as I followed the notes,

17  it was "Bring me a contract," which further delayed

18  the process.  There was no preauthorized level that

19  somebody could offer the property for sale.  It's

20  "Bring me a contract."

21             A contract comes in.  Log notes indicate we

22  got a contract.  On another loan, it will say, "Did

Page 284

```
1    anyone contact the investor?"  A month or two later,

2    "Did anybody contact the investor?"

3        Q.   Well, let's stick with the Stern loan.  And

4    according to your Table A, the default date on that

5    was May 1 of '07?

6        A.   Correct.

7        Q.   And you said there was a period after that

8    when the payments continued to be brought current?

9        A.   Just a minute.  No.  9/19/06 through

10   4/23/07 was this period when payments were brought

11   current.  The default date was then recorded at

12   5/1/07.

13       Q.   All right.  And then the foreclosure took

14   place on October 24 of '07, according to Table A?

15       A.   According to Table A.  The notes indicate

16   it was referred to foreclosure on 9/5/07.  So the

17   actual foreclosure, probably auction just like the

18   other one, was the 10/24/07.

19       Q.   203 days?

20       A.   203 days.

21       Q.   And do you have an opinion about whether or

22   not that's an excessive period of time?
```

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 285

```
 1        A.    Not excessive to this list of properties.

 2        Q.    Is it excessive, in your opinion?

 3        A.    That's probably not excessive.

 4        Q.    All right.  So what is it about the

 5    servicing of the Stern loan that you believe was not

 6    in accordance with the customary and usual standards

 7    of practice of prudent mortgage servicers?

 8        A.    The time wasted between refer to

 9    foreclosure and this workout short sale.

10        Q.    And how much time was that?

11        A.    It took about three -- No, it took longer

12    than that.  Yeah, about three months.

13        Q.    And that was from when to when?

14        A.    That was from 10/22/07, and then there is a

15    bankruptcy indicated on 1/25/10.  So that, in my

16    estimation, would have delayed any ability to sell the

17    property.

18        Q.    I don't understand your answer, because the

19    foreclosure took place on October 24, '07, right?

20        A.    You're correct, yes.  You're right, there

21    was no -- It looks like they just started the workout

22    on 10/22 and then the foreclosure occurred.
```

1      Q.      So there wasn't any time wasted on that?

2      A.      I don't think so.

3      Q.      So what was it about the servicing of the

4   Stern loan, in your opinion, that was not in

5   accordance with the customary and usual standards of

6   practice?

7      A.      I don't have anything.

8      Q.      Nothing?

9      A.      Not from my notes, no.

10      Q.      Is there anything in your report about

11   that?

12      A.      No.

13      Q.      The Melgar loan, M-e-l-g-a-r.  What was it

14   about the servicing of the Melgar loan that was not in

15   accordance with the customary and usual standards of

16   practice?

17      A.      This was a case, and there were about three

18   of these, that all of a sudden in the system I was

19   looking at, I was no longer looking at the AS400

20   system but a loss mitigation system that had very

21   cryptic information in it.  So all I was able to see

22   in that system, there was not an entire custom contact

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 71 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 287

1   history like in the AS400 system.

2           There was a promise to pay on 8/29/08.  And

3   this may have been because -- at least one of these

4   loans I knew was being serviced elsewhere.  So maybe

5   that's the reason.

6           Maybe Countrywide was entering information

7   they were getting from someplace else on this system.

8   But 8/29/08 there was a promise to pay for one month.

9   9/20/07 it says the account is in foreclosure.  And

10  10/20/08 there is a short sale offer.

11          So the dates even bounced around the place.

12      Q.    All right.  Well, my question is:  What was

13  it about the servicing of the Melgar loan that, in

14  your opinion, did not comply with the --

15      A.    I don't have an opinion.  I don't have

16  enough information.

17      Q.    So you don't have any opinion about the

18  servicing of the Melgar loan?

19      A.    No, I don't.

20      Q.    How about the Herr loan?  Well, let's stick

21  to Table A.  The next one on Table A is the Reyes

22  loan; is that correct?

Page 288

1        A.    Yes.  There are two Reyeses, right?

2        Q.    It's the fourth one on your Table A.  It

3   says Reyes.

4        A.    I don't know if that's Martin or --

5        Q.    Why don't you take a moment to look through

6   your documents.  Maybe you can determine that.  I'll

7   be right back.

8        (Off the record.)

9        MR. SCOTT:  Before we go back to the Reyes

10  loan, yesterday Mr. Mendenhall provided some data from

11  his computer which we downloaded onto a flash drive.

12  Some of the files are password protected.  So if you

13  could be so kind, I'm giving you a list of the files.

14  I don't know whether they're all the same password,

15  but right now we can't access them.

16        THE WITNESS:  Yeah, these are things that

17  came from you all.

18        MR. PARKER:  It must be your password.

19  There must have gotten something bled through from --

20  you remember that there were things that Countrywide

21  sent in that were password protected?  I have never

22  heard of anybody in our group using a password.

1          THE WITNESS:  They were attachments to

2     e-mail.  My computer doesn't have a password.

3          MR. CARITHERS:  It does not?

4          THE WITNESS:  No.

5          MR. CARITHERS:  Can you access that

6     material when you go on your flash drive?

7          THE WITNESS:  I haven't tried.  I just

8     filed this stuff after I reviewed it.

9          MR. PARKER:  I can ask.  I can ask our

10    client if they have any --

11          THE WITNESS:  Are these attachments to

12    e-mails?  Is that what you're --

13          MR. SCOTT:  I'm not sure.  I was not

14    involved.  There are other people who are trying to

15    open this stuff, and they're being blocked.  So let's

16    not spend a lot of time on it.  We'll figure out a way

17    to deal with it later.

18          MR. PARKER:  Why don't you make a copy of

19    that, and I can send that and find out if that

20    triggers something.

21          MR. SCOTT:  But in the event we need a

22    password from Mr. Mendenhall or from your office,

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 290

1    you'll be willing to provide it?

2            MR. PARKER:  Sure.  Absolutely.

3    BY MR. SCOTT:

4        Q.    We were talking about the Reyes loan.  Were

5    you able to determine which one this is, the first one

6    on Table A?

7        A.    Yes.

8        Q.    Which one is it?

9        A.    It's Elna.

10       Q.    So that's the 132 Foxhall Drive in Silver

11   Spring?

12       A.    I don't know if that's the right address,

13   but if that's what you have for them.

14       Q.    Elna Reyes, E-l-n-a.

15       A.    Yes.

16       Q.    What was it about the servicing of that

17   loan that in your opinion was not in accordance with

18   the customary and usual standards of practice?

19       A.    Let me state here, and I started to give

20   you some general overview comments before.  As I went

21   through these AS400 notes, it wasn't what impressed me

22   most that was in the notes, it's what wasn't in the

1    notes.

2          I mean, there is no information about the

3    customer situation, which is what you usually see in a

4    servicing log.  It will say, "talked to customer."  It

5    doesn't say what the customer said.  It doesn't

6    usually say what the customer's problem was.

7          And then I read in Mr. Blocher's latest

8    report that every one of them had a different and

9    expansive resolution proposal.  I didn't see that in

10   those notes.  So something is missing from the notes I

11   looked at.

12         So the judgments I made were about time.

13   They were about more what was not in the notes that I

14   remarked, "Gee, this is a lot of stuff about nothing.

15   A lot of dates.  A lot of stuff that people are

16   doing."

17         And the other thing I noticed is a lot of

18   change of people that are responsible.  I mean, there

19   was a change of six different people to resolve the

20   loan within less than a four-month period on one of

21   the loans I remember.  It's hard to keep people

22   accountable when that's going on.  And in my

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 292

1    estimation, that accounts for some of the time delays

2    that are going on.

3              It's a call center, and over time, my

4    experience is somebody has to be responsible for

5    resolving the loan one way or the other and the time

6    period in which they do it.  And I didn't see

7    indication of any of that in the system.  It could be

8    I'm not looking at what Mr. Blocher looked at, but

9    that's my judgment.

10         Q.    And you looked at the servicing notes?

11         A.    I looked at the servicing notes that were

12    given me on the AS400 system.

13         Q.    Given to you by Liles Parker?

14         A.    Correct.

15         Q.    Did you look at anything else?

16         A.    Some were not AS400 notes.  Some of them,

17    as I say, were this mitigation resolution system.

18         Q.    Did you look at anything else?

19         A.    No.

20         Q.    So let's go back to the Reyes loan.  What

21    was it about the servicing of the Reyes loan

22    specifically that you believe was not in accordance

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 293

1    with the customary and usual standards of practice?

2        A.   469 days to get from default to foreclosure

3    and another 199 days to get from foreclosure to REO

4    sale.

5        Q.   All right.  So the default date was 5/1/07;

6    is that correct?

7        A.   Correct.

8        Q.   And the foreclosure date was August 20,

9    '08?

10       A.   Correct.

11       Q.   That's 469 days.  You believe that's an

12   excessive period of time?

13       A.   Correct.

14       Q.   And why?  What do you base your opinion on

15   that that's excessive?

16       A.   My experience, and then the comparison to

17   the average here.

18       Q.   The comparison of the average of the loans

19   on Table A?

20       A.   Right.

21       Q.   Anything else?

22       A.   My experience.

Page 294

```
1          Q.    Other than your experience and the average?

2          A.    Nothing else.

3          Q.    And do you know whether there was any

4    bankruptcy filed after the default on the Reyes loan?

5          A.    Yes, there was.

6          Q.    There was?  Do you know how long the

7    borrower was in bankruptcy before the foreclosure

8    attorney obtained authority to proceed?

9          A.    According to the notes here, bankruptcy was

10   filed 10/17/07.  And it was foreclosed 8/20/08.

11         Q.    Do you know how long it took the bankruptcy

12   court to issue a lift stay order?

13         A.    I do not.

14         Q.    And then you also said that the amount of

15   time it took to sell the property at REO.

16         A.    199 days, I believe.

17         Q.    And you believe that's excessive?

18         A.    It's a long time.

19         Q.    Compared to what?

20         A.    Compared to the average.  Compared to my

21   experience.  Compared to the Rizvi loan that was

22   actually sold at foreclosure.
```

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 79 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 295

1      Q.    Well, you say it's a long time compared to

2    the average.  What's the average?

3      A.    191.

4      Q.    So it's eight days longer than the average?

5      A.    Eight days longer than the average.

6      Q.    And you believe that makes it excessive?

7      A.    And those other factors I mentioned.

8      Q.    Your experience?

9      A.    My experience.

10      Q.    Have you ever sold a residential property

11    in Maryland?

12      A.    Personally, have I ever sold a property?

13      Q.    Have you ever been involved with the sale

14    of a residential property?

15      A.    I'm sure I have.

16      Q.    Do you remember the details?

17      A.    No.

18      Q.    Do you know how long a typical residential

19    property was on the market in Maryland during 2008

20    and 2009 before it was sold?

21      A.    No.

22      Q.    Anything else about the Reyes loan that you

1    believe was not in accordance with the usual and

2    customary standards?

3         A.    I don't think so.

4         Q.    The Rizvi loan, R-i-z-v-i.  What was it

5    about the servicing of that loan that you believe was

6    not in accordance with the usual and customary

7    standards of prudent mortgage servicers?

8         A.    That was fully outlined in my October

9    report, the problems that were created with the sale

10   of foreclosure versus an offer that was made prior.

11   Poor decision-making.

12        Q.    Tell me what it was that was poor

13   decision-making.

14        A.    Page 50 of my report.

15        Q.    You're looking at your October 30th report?

16        A.    Correct.

17        Q.    Exhibit 9 -- No, not Exhibit 9.  Exhibit 2?

18        A.    That sounds right.

19        Q.    What page?

20        A.    50.  Bottom of the page.

21        Q.    All right.  So tell me what's your

22   understanding of what happened with respect to the

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 81 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 297

1    Rizvi loan.

2        A.    A third party made a short sale offer on

3    the Rizvi property for $486,000 prior to the

4    foreclosure auction.  Harvest Bank and Countrywide

5    communicated that the property's value exceeded the

6    offer and the offer should be declined.

7            Later at the foreclosure auction,

8    Countrywide entered a lender's protective bid of

9    $382,500 and sold it for $383,000, knowing that they

10   had a previous offer for $486,000.

11       Q.    All right.  Are you aware of what Harvest

12   Bank's position was on the short sale offer?

13       A.    It's stated right here.

14       Q.    They declined it?

15       A.    They said decline it.

16       Q.    Do you know why they did that?

17       A.    They didn't think it was enough.

18       Q.    And what was that based on?

19       A.    It was based on their knowledge of the

20   market, as I understand it.  Apparently it wasn't

21   enough by $16,000, because the winning party later

22   resold the property shortly after foreclosure for

1    $470,000.

2         Q.    But you agree that Harvest Bank instructed

3    Countrywide to decline the short sale offer of

4    $486,000?

5         A.    Yes.  I don't agree that they instructed

6    them to accept a bid at foreclosure of $383,000.

7         Q.    What should Countrywide have done?

8         A.    They should have set a price before they

9    ever came to foreclosure at what they were willing to

10   sell the property for, consult with Harvest Bank about

11   what they were willing to let the property go at at

12   foreclosure.  That's typically done, and that's

13   standard practice.

14        Q.    Well, do you know what Harvest Bank's

15   minimum price was for this property?

16        A.    I don't, no.

17        Q.    Do you know that they communicated to

18   Countrywide that they would only accept an amount

19   which would make them whole on the loan?

20             MR. CARITHERS:  Objection.

21             THE WITNESS:  I don't know that.

22   BY MR. SCOTT:

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 83 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 299

1        Q.    If that were true, would that be prudent on

2    their part, in your opinion?

3                MR. CARITHERS:  Objection.

4                THE WITNESS:  I don't know.

5    BY MR. SCOTT:

6        Q.    You don't know why?  Because you don't know

7    what the value of the property was at that time?

8        A.    I don't know what Harvest Bank did, and I

9    don't know what was on their mind.  I do know what

10   Countrywide did.  I can't understand why they did it.

11       Q.    All right.  Anything else about the

12   servicing of the Rizvi loan that you believe is not in

13   accordance with the customary and usual standards of

14   practice?

15       A.    I have a note here, "Workout assignees

16   changed 78 times between 3/27/08 and 10/6/08."

17       Q.    And you believe that that's not in

18   accordance with the customary and usual standards of

19   practice?

20       A.    I do believe that.  And I don't believe

21   it's prudent.

22       Q.    Why not?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 84 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 300

1        A.      Nobody is accountable.

2        Q.      But again, you're not familiar with what

3    the standards that are employed by -- Well, skip that.

4            Anything else about the servicing of the

5    Rizvi loan?

6        A.      No.

7        Q.      So it's the short sale and the bidding of

8    the foreclosure and the fact that there was high

9    turnover among the people who were working on the

10   file?

11       A.      Correct.

12       Q.      And is there nothing else?

13       A.      Not based on what I looked at.

14       Q.      The Stern loan.  What was it about the

15   servicing of the Stern loan, in your opinion, that was

16   not in accordance with the customary and usual

17   standards of practice of prudent mortgage servicers?

18       A.      From the limited information I looked at, I

19   don't see anything.  It's again what was not there.

20       Q.      All right.  So you can't point to any

21   specific --

22       A.      I can't point to any specifics based on

Case 8:09-cv-00176-RWT  Document 138-5  Filed 02/09/11  Page 85 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 301

1    what I looked at.

2         Q.    So you don't have an opinion about the

3    servicing of the Stern loan?

4         A.    No, I don't.

5              MR. CARITHERS:  Hold on.  Let me put an

6    objection.

7    BY MR. SCOTT:

8         Q.    Your answer was no?

9         A.    After his objection, my answer was no.

10        Q.    The next loan is the Yi loan, Y-i.  Do you

11   have an opinion about whether the servicing of that

12   loan was in accordance with the customary and usual

13   standards of practice of prudent mortgage servicers?

14        A.    Time, both from default date to foreclosure

15   date and number of days from foreclosure to sale.

16        Q.    Anything else?

17        A.    No.

18        Q.    The time issue, the default date was

19   September 1 of '07.

20        A.    Correct.

21        Q.    Foreclosure date was August 6 of '08?

22        A.    Correct.

Page 302

```
 1          Q.   For a time of 335 days, correct?

 2          A.   Yes.

 3          Q.   And you believe that's excessive?

 4          A.   And this one, I have no indication this one

 5     went into bankruptcy.

 6          Q.   You believe that 335 is excessive?

 7          A.   I do.

 8          Q.   And that's based on what?

 9          A.   My experience.

10          Q.   Anything else?

11          A.   Compared to the other loans on this list.

12          Q.   The average was what, three --

13          A.   317.

14          Q.   So you believe 335 is excessive if the

15     average is 317?

16          A.   Well, especially if the 317 included loans

17     with bankruptcy, and I don't know that this one was in

18     bankruptcy.

19          Q.   You don't know whether it was?

20          A.   I don't know whether it was.  I don't have

21     it in the notes that it went into bankruptcy.

22          Q.   All right.  And the time for the REO sale
```

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 87 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 303

1    was 254 days?

2         A.    Correct.

3         Q.    All right.  And that's 254 days from when

4    to when?

5         A.    From the foreclosure date to the REO sale

6    date.

7         Q.    All right.  And do you know how long it

8    typically takes between the foreclosure date and the

9    date that the court ratifies the foreclosure sale in

10   Maryland?

11        A.    No, I don't.

12        Q.    Do you know that a deed to the property is

13   not issued until after the sale is ratified by the

14   court?

15        A.    No.  But didn't all these loans have to go

16   through this?

17        Q.    I'm not the one being deposed here today,

18   sir.

19        A.    That's my judgment, is that they all went

20   through the same process.

21        Q.    Right.  But do you know how long it takes

22   for a sale to be ratified by a court in Maryland

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 88 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 304

1    typically?

2        A.    No, I don't.

3        Q.    And do you know whether a property can be

4    sold before the court ratifies the foreclosure sale?

5        A.    I do not.

6        Q.    And so your judgment that the 254 days for

7    the REO sale is excessive is based on what?

8        A.    My experience.

9        Q.    And the average?

10       A.    And the average.

11       Q.    And the average was what, 191?

12       A.    191.

13       Q.    So you believe 254 is excessive based on

14   that average?

15       A.    I do.

16       Q.    Anything else about the Yi loan?

17       A.    No.

18       Q.    Karimi we already talked about.

19              Okonkwo.  What was it about the servicing

20   of the Okonkwo loan that in your opinion was not in

21   accordance with the customary and usual standards of

22   practice of prudent mortgage servicers?

1      A.    This is another one that I have no record

2   of bankruptcy on the history I looked at.  The

3   information was very sketchy.  I believe this one came

4   off that loss mitigation system also.

5           Foreclosure letter was written on 5/16/08.

6   Foreclosure occurred 7/16/08.  Or was referred on

7   7/16/08, and then foreclosure posting I believe was

8   7/25/10.  What does this say the foreclosure date was?

9      Q.    January 20, '09.

10     A.    Yeah.  So that was the auction.

11     Q.    So 289 days from default to auction?

12     A.    Right.

13     Q.    You believe that's excessive?

14     A.    As with the earlier file, since there was

15  no indication of bankruptcy, it looks excessive.

16     Q.    All right.  It's less than the average,

17  right?

18     A.    It's less than the average, but the average

19  has in it bankrupt loans, as we talked about.

20     Q.    Right.

21           And again, you don't know how long

22  typically it takes to get an order from the bankruptcy

1    court allowing the foreclosure to proceed, do you?

2        A.    I don't.

3        Q.    Anything else about the servicing of the

4    Okonkwo loan?

5        A.    277 days to sale of REO is far in excess of

6    the average, far in excess of the last loan we looked

7    at.

8        Q.    Do you know why?

9        A.    I don't have any idea.

10       Q.    All right.  Have you looked at the REO

11   file?

12       A.    No, I have not.

13       Q.    Have you looked at any of the REO files?

14       A.    No.

15       Q.    You would agree, wouldn't you, that an

16   opinion about how long it should take to sell a

17   residential property depends on the specific facts

18   related to the sale of that property?

19       A.    And the property itself and the person

20   responsible for managing it.

21       Q.    What neighborhood it's in, what condition

22   it's in, where it's located, all of those things,

1    right?

2         A.    And how aggressive the person is who is

3    managing the sale of the REO.

4         Q.    How good the broker is, how good the

5    broker's connections, all those facts would be

6    relevant, right?

7         A.    Yeah.

8         Q.    And you don't know any of those factors --

9         A.    How qualified the Countrywide person is in

10   picking the right broker.

11        Q.    And you don't know who the broker was on

12   this case?

13        A.    I do not.

14        Q.    And you don't know who the broker was on

15   any of these REO sales?

16        A.    No, I don't.

17        Q.    And you don't know what the property

18   condition was on any of these properties?

19        A.    I do not.

20        Q.    And you don't know what the asking price

21   was?

22        A.    No.

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 308

1      Q.    Do you know how Countrywide selected

2   brokers to sell REO properties?

3      A.    I have no idea.

4      Q.    Anything else about the Okonkwo loan?

5      A.    No.

6      Q.    Rodrigues.  What was it about the servicing

7   of the Rodrigues loan that, in your opinion, was not

8   in accordance with the customary and usual standards

9   of practice?

10      A.    355 days from default to foreclosure

11   exceeds the average.  This was a short sale.  This is

12   the one I mentioned earlier.  Foreclosure letter was

13   issued on 8/22/08.  Referred to foreclosure on

14   2/23/09.  2/5/09 there was a short sale offer.  By

15   4/8/09 there is a note in the file, "This has got to

16   go to an investor."

17          So an offer comes in on 2/5, I believe.

18   That's what the notes indicate.  They waited that long

19   to know that they needed to go to an investor.  During

20   that time --

21      Q.    How long?

22      A.    From 2/5 to 4/8, it appeared by the notes.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 93 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 309

1      Q.    So about 60 days?

2      A.    Right.  Then two times, by 5/31, they had

3    changed the person responsible for working this thing

4    out.  5/27/08 there is a note, "Still has not gone to

5    the investor to get authorization."  That's two months

6    after the first note.

7      Q.    I thought the first note was in --

8      A.    4/8.

9      Q.    Of '09, is what you said.

10     A.    I wrote that down wrong.  It's '09.

11     Q.    So there is another note in the file on

12   May 27, '09?

13     A.    Yes.  That is the note.  It's '09, because

14   these followed consecutively.

15     Q.    So what was the 5/27/09 note?

16     A.    "Still no investment authorization?"

17     Q.    Do you know if the notice had been sent and

18   not responded to?

19     A.    No, I don't.

20     Q.    What else about the --

21     A.    No, it didn't indicate that they had sent a

22   notice to the investor.  The question was being asked,

1    "Has anybody asked the investor yet?"  And that was

2    asked twice.

3         Q.    I thought that's what you said was asked on

4    April 8th.

5         A.    That's what was asked.  And it was asked

6    again on 5/27/08, as I read the notes.

7         Q.    What did the notes say on 5/27/09?

8         A.    It says, "Still no investor authorization?"

9         Q.    So my question to you was:  Do you know

10   whether prior to that note authorization was sought

11   from Harvest Bank and that Countrywide was still

12   waiting for a response, or whether they hadn't sought

13   authorization?

14        A.    The indication was they hadn't yet sought

15   authorization still.

16        Q.    And that's based --

17        A.    Because they were asking, "Have you sought

18   authorization?"

19        Q.    I thought you said they were asking whether

20   there was authorization.

21        A.    No, they were asking whether they had

22   sought it yet.

Page 311

1      Q.    What exactly did it say?

2      A.    I don't know what exactly it said.

3      Q.    Okay.

4      A.    Not from my notes.

5      Q.    Is there anything about the servicing of

6   the Rodrigues loan that you believe is not in

7   accordance with customary and usual standards?

8      A.    Unusual to this list is that it was

9   eventually a short sale.

10     Q.    On July 27th?

11     A.    Correct.

12     Q.    And did Harvest Bank approve the short

13  sale?

14     A.    They must have.  Because it closed.

15     Q.    So your only complaint about this

16  particular file is this delay between the short sale

17  coming in on February 5 of '09 and the time it took to

18  get Harvest Bank's approval for the short sale?

19     A.    Standard procedure in people that really

20  want to accept short sale offers is you authorize an

21  amount in advance, and you tell the real estate agent,

22  "We'll sell it for this amount."

Case 8:09-cv-00176-RWT  Document 138-5  Filed 02/09/11  Page 96 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 312

```
 1            To say "Bring us an offer" is going to

 2    cause this kind of delay.  So that's not standard and

 3    customary, and it's not prudent.

 4       Q.    All right.  Other than the delay associated

 5    with seeking approval for the short sale, is there any

 6    other thing about the servicing of the Rodrigues loan

 7    that you believe was not in accordance with the

 8    customary and usual standards?

 9       A.    Not from what I saw.

10       Q.    Chharbra.  What was it about the servicing

11    of the Chharbra loan that you believe was not in

12    accordance with the customary and usual standards of

13    practice of prudent mortgage servicers?

14       A.    Chharbra.  493 days is excessive.

15       Q.    493 days is what?

16       A.    Default to foreclosure.

17       Q.    So the default was April 1st, '08?

18       A.    Correct.

19       Q.    And foreclosure was August 14 --

20       A.    8/14/09.

21       Q.    We have to try to not speak at the same

22    time.
```

Page 313

```
1                    Do you know whether there was a bankruptcy?

2         A.    Let me look here.  There ultimately was a

3    bankruptcy on 1/25/10.

4         Q.    After the foreclosure sale?

5         A.    After it was posted, reposted, referred

6    back to foreclosure.  There finally was a bankruptcy

7    indicator on 1/25/10.

8         Q.    But the foreclosure sale took place before

9    that?

10        A.    According to this.

11        Q.    Do you know when the sale was ratified by

12   the court?

13        A.    No.

14        Q.    Do you know if the bankruptcy delayed

15   ratification of the foreclosure sale after August 14,

16   '09?

17        A.    I do not.

18        Q.    Do you know what efforts were being made by

19   Countrywide after April 1st, 2008, until the

20   foreclosure sale to try to resolve the deficiency?

21        A.    Collecting past due payments for a number

22   of months, as with many of the previous loans.  Here
```

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 98 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 314

1    we do have some indication of feedback from the

2    borrower asking for an extension of payment due date

3    for a week on 3/28/08.  Payment brought current on

4    3/31/08.  Referred to foreclosure on 6/28/08.

5    Borrower requested assistance on 2/19/09.

6            Short sale request, and again change in

7    people here to something called the Homesaver Program.

8    Short sale request on 3/4/09.  Foreclosure reinstated

9    on 4/2/09.  4/14/09, short sale still active.

10    6/18/09, insufficient offer.  8/14/09, return to

11    foreclosure.

12            On 8/13/09 they referred a foreclosure

13    amount for a bid to Harvest Bank.  And on 1/25/10 it

14    went into bankruptcy.

15        Q.    Do you know what the Homesaver Program is?

16        A.    I read about it in some of the Countrywide

17    literature.  I read about many programs they were

18    using.

19        Q.    Do you have an understanding of what the

20    Homesaver Program is?

21        A.    Not as I sit here, no.

22        Q.    So other than the 493-day period from

1    default to the foreclosure auction, is there anything

2    else about the servicing of the Chharbra loan that you

3    believe is not in accordance with the customary and

4    usual standards of practice?

5         A.    Only that the Homesaver Program didn't

6    work.

7         Q.    But you don't know what the Homesaver

8    Program is?

9         A.    They list many programs.  Obviously none of

10   them worked.  They didn't save the home for the

11   borrower.

12        Q.    Does that mean that they shouldn't have

13   pursued it?

14        A.    If you're going to help somebody, you ought

15   to help them.  If not, you shouldn't.

16        Q.    And it shouldn't take any time?

17        A.    If it's leading to resolution, yes.

18        Q.    So in hindsight, you can say that it didn't

19   work.  But at the time, before there was a resolution,

20   do you believe that pursuing something like the

21   Homesaver Program is not appropriate?

22        A.    I believe you look for every opportunity to

Page 316

1    work out the loan if it's feasible.  But you have to

2    know what is feasible and what's not pretty early and

3    not pass it to somebody else and somebody else and

4    somebody else.

5        Q.    Do you know whether Countrywide knew

6    whether it was feasible early on?

7        A.    No, I don't.

8        Q.    Is there anything else about the servicing

9    of the Chharbra loan that you believe is not in

10   accordance with the customary and usual standards?

11       A.    No.

12       Q.    The Gooding loan is the last one on Table

13   A.

14       A.    Yes.

15       Q.    What is it about the servicing of that loan

16   that you believe was not in accordance with the usual

17   and customary standards of prudent mortgage servicers?

18       A.    It was not reported to Harvest Bank.  It

19   appeared only after it had been foreclosed by US Bank,

20   who was servicing the loan, never tracked on any

21   delinquency report, servicing report or anything else,

22   is my understanding.

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

```
 1              It appeared to them after everything was

 2     already done, all decisions were made, and it had been

 3     serviced by US Bank.

 4         Q.    Okay.  Other than that, anything else?

 5         A.    No.

 6         Q.    So it's the fact that Countrywide didn't

 7     provide information to --

 8         A.    404 days --

 9         Q.    You have to let me finish my question.

10         A.    Okay.

11         Q.    Is there anything else about the servicing

12     of the Gooding loan that you believe was not in

13     accordance with the customary and usual standards of

14     practice?

15         A.    The number of days it took from default to

16     foreclosure.

17         Q.    Which was 404?

18         A.    Yes.

19         Q.    The default was on October 1, '08; is that

20     right?

21         A.    Right.

22         Q.    And you have an estimated foreclosure date?
```

1      A.    We found out since that it's four days from

2    this date.

3      Q.    What is it?

4            THE WITNESS:  David, you may recall.  You

5    and I talked about that.

6            I estimated it to finish this report.  But

7    he since discovered it and told me about it, and it

8    was within four days of this.

9    BY MR. SCOTT:

10     Q.    Of November 15, '09?

11     A.    Correct.

12     Q.    You don't know the exact date?

13     A.    I think it was the 19th.

14     Q.    And do you know whether there was any

15   bankruptcy filed?

16     A.    I do not.

17     Q.    Do you know what efforts Countrywide made

18   in between the default date and the foreclosure date?

19   Strike that.

20           Do you know what efforts were made by

21   Countrywide or US Bank between the default date and

22   the foreclosure date in order to resolve the

1    deficiency?

2         A.    We know nothing.

3         Q.    Now, those are the 11 loans that you looked

4    at the AS400s for; is that right?

5         A.    That's correct.

6         Q.    All the ones on Table A?

7         A.    The AS400s and the mitigation system as a

8    substitute in three or four of the loans.

9         Q.    And that's all the loans on Table A?

10        A.    That's correct.

11        Q.    Of Exhibit 5?

12        A.    That's correct.

13        Q.    There are other loans which are at issue in

14   the case which have not been foreclosed.  And you have

15   not reviewed the AS400 notes for those loans; is that

16   correct?

17        A.    That's correct.

18        Q.    Do you have any opinion about the servicing

19   of those loans?

20        A.    Yeah.  The servicing time in the days to

21   default just counted through 8/1/10 is extremely

22   excessive.

1      Q.    What are you looking at?

2      A.    Table B.

3      Q.    We're still on Exhibit 5?

4      A.    That's correct.

5      Q.    This is your August 13th report?

6      A.    That's right.

7            MR. CARITHERS:  Terry, let him finish his

8      questions, please.

9            THE WITNESS:  Okay.

10            MR. SCOTT:  Why don't we take a

11      couple-minute break.

12      (A recess was then taken.)

13      BY MR. SCOTT:

14      Q.    We were talking about Table B before we

15      took the break.

16      A.    Correct.

17      Q.    Tell me what Table B is.

18      A.    Table B is the remaining defaulted loans

19      that have not been foreclosed.

20      Q.    And do you have any opinion about the

21      servicing of these loans?

22      A.    I have not reviewed any servicing notes on

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 321

1    these loans.

2         Q.    All right.

3         A.    Yes, I do.

4         Q.    Well, let's take them one at a time.  The

5    first one on the chart is the Herrera loan, right?

6         A.    Yes.

7         Q.    Do you have an opinion about the servicing

8    of that loan?

9         A.    No.  I have read no servicing notes about

10   specific loans.  I told you that.

11        Q.    So you don't have an opinion about the

12   servicing of that loan?

13        A.    Not at this point, no.

14        Q.    Do you have an opinion about the servicing

15   of the Song loan?

16        A.    No, not at this point.

17        Q.    The Brickley loan?

18        A.    No, not at this point.

19        Q.    Kang?

20        A.    No.

21        Q.    Malate?

22        A.    No.

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 322

1      Q.   Watson?

2      A.   No.

3      Q.   Lee?

4      A.   No.

5      Q.   Cala?

6      A.   No.

7      Q.   Carberg?

8      A.   No.

9      Q.   Espinal?

10     A.   No.

11     Q.   Medina Sic-Rodrigues?

12     A.   No.

13     Q.   Or is that two different loans?

14          Yeah, Medina.  You do not have an opinion

15   about Medina?

16     A.   No.

17          MR. CARITHERS:  On servicing?

18          MR. SCOTT:  On servicing.

19   BY MR. SCOTT:

20     Q.   Do you have a servicing opinion about

21   Sic-Rodrigues?

22     A.   No.

Page 323

1     Q.   Do you have a servicing opinion about

2  Ahmed?

3     A.   No.

4     Q.   A servicing opinion about Reyes?  This is

5  the other Reyes loan.

6     A.   No.

7     Q.   Let me just for the record make sure we're

8  clear about which one that is.

9     A.   It should be Martin.

10     Q.   Yeah, Martin.  You do not have an opinion

11  about the servicing of that loan?

12     A.   No.

13     Q.   Do you have an opinion about the servicing

14  of the Perera loan?

15     A.   No.

16     Q.   An opinion about the servicing of the

17  Hweyhua loan?

18     A.   No.

19     Q.   Do you have an opinion about the servicing

20  of the Douglas loan?

21     A.   No.

22     Q.   Do you have an opinion about the servicing

Page 324

1    of the Hussein loan?

2         A.    No.

3         Q.    Do you have an opinion about the servicing

4    of the Guzman loan?

5         A.    No.

6         Q.    Do you have an opinion about the servicing

7    of the Hirunyakes loan?

8         A.    No.

9         Q.    Do you have an opinion about the servicing

10   of the Villatoro loan?

11        A.    No.

12        Q.    Do you have an opinion about the servicing

13   of the Flores loan?

14        A.    No.

15        Q.    Do you have an opinion about the servicing

16   of the Main loan?

17        A.    No.

18        Q.    Do you have an opinion of the servicing of

19   the Diakite loan?

20        A.    No.

21              You missed one.

22        Q.    I did?  Oh, the Dam loan.  You're right.

1          Do you have an opinion about the servicing

2     of the Dam loan?

3          A.    No.  I have an opinion about all the loans,

4     and it's in this report.

5          Q.    An opinion about the servicing of all the

6     loans?

7          A.    Correct.

8          Q.    And what is that?

9          A.    It has taken 523 days, on average, and

10    we're not to foreclosure on all of these loans.  It

11    took a total of 508 days to get through the sale of

12    REO, through foreclosure to sale of REO on the

13    previous foreclosed properties.  That's extremely

14    excessive.

15         Q.    Compared to what?

16         A.    Compared to previous experience.

17         Q.    Your previous experience?

18         A.    The previous experience of Table A

19    foreclosed properties by the same servicer.

20         Q.    So you're saying that because the length of

21    time between default and foreclosure on the loans on

22    Table B exceeds the average on Table A that it's

Page 326

1      excessive?

2           A.    No, that's not what I said.  I said the

3      total time from default to sale of REO took less time

4      than default to today on these loans on Table B.

5           Q.    But you don't know what is happening with

6      the servicing of the loans on Table B, correct?

7           A.    I know that it's taking too long.

8           Q.    Do you know if any of these borrowers have

9      brought their loans current since the default?

10          A.    Not as of 8/1/10, they have not.

11          Q.    And how do you know that?

12          A.    Because they're still in default.

13          Q.    According to who?

14          A.    According to the records that I used that

15     came from Harvest Bank, that they got from Countrywide

16     as of this cutoff date of 8/1/10.

17          Q.    Where did the information on this chart

18     come from, Table B?

19          A.    I just told you.

20          Q.    You got it from Harvest Bank who got it

21     from Countrywide?

22          A.    Correct.

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 327

1          Q.    Did Harvest Bank give you a document that

2    they got from Countrywide that supplied this data?

3          A.    Did they gave me a document that came from

4    Countrywide?

5          Q.    Right.

6          A.    No.

7          Q.    They gave the information to you verbally?

8    How did they give it to you?  How did Harvest Bank

9    give you the information that's in Table B?

10         A.    They gave it to me in the form of a

11   spreadsheet.

12         Q.    And that's a spreadsheet that they got

13   where?

14         A.    They prepared from data that was given to

15   them by Countrywide.

16         Q.    Do you have that spreadsheet here?

17         A.    I do.  You've copied it.

18         Q.    I did?  What, yesterday?

19         A.    Yes.

20         Q.    Was it marked as an exhibit?

21         A.    No.

22               MR. CARITHERS:  It's in the binders.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 112 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 328

1          MR. SCOTT:  Oh, okay.

2     BY MR. SCOTT:

3          Q.    Can you find it in your binders?

4          A.    It's the one titled "37 Borrowers."  We may

5     have to dig for it at lunch.

6          Q.    We'll get back to that.

7          A.    Okay.

8          Q.    So other than the length of time between

9     the default date and today as reflected on Table B, is

10    there anything else about the servicing of the loans

11    on Table B that you contend was not in accordance with

12    the usual and customary standards?

13         A.    No.

14         Q.    And you don't know whether there have been

15    any bankruptcies filed with respect to any of the

16    loans on Table B?

17         A.    No.

18         Q.    And you don't know whether Countrywide has

19    been negotiating loan modifications with any of the

20    borrowers listed on Table B?

21         A.    No.

22         Q.    Do you know if there have been any changes

Page 329

```
 1    in Maryland law that increase the amount of time that

 2    it takes to conduct a foreclosure in Maryland?

 3         A.    No.

 4         Q.    Do you know whether any of the borrowers on

 5    Table B have made any partial payments?

 6         A.    No.

 7         Q.    Do you know what Countrywide has done or

 8    has not done with respect to the servicing of any of

 9    the loans on Table B?

10         A.    No.

11              MR. SCOTT:  All right.  Let's take a lunch

12    break now and come back at 12:30.

13         (A recess was then taken.)

14    BY MR. SCOTT:

15         Q.    I want to go back and talk a little bit

16    more about underwriting.  Yesterday you told me about

17    your opinions about the aspects of the underwriting of

18    the loans that you believe was not legal, proper,

19    prudent or customary.

20              Do you remember that testimony?

21         A.    Yes.

22         Q.    You told me with respect to each loan what
```

Page 332

1      Q.    As part of Exhibit 5?

2      A.    Correct.

3      Q.    So with respect to the Mangieri loan, in

4    what amount was the value impacted by the alleged

5    breach of Section 3.02(p)?

6      A.    The value of all the loans ranges somewhere

7    between 46.01 and 51.28 percent of par.

8      Q.    That's the total portfolio, right?

9      A.    That's correct.

10     Q.    Or is that just the defaulted loans?

11     A.    That is the defaulted remaining portfolio

12   of loans.

13     Q.    Which is 25, right?

14     A.    That's correct.

15     Q.    And that's what you believe to be the value

16   of all of those loans combined?

17     A.    Right.

18     Q.    My question to you is:  In what amount did

19   the breach of the underwriting warranty in Section

20   3.02 affect the value of the Mangieri loan?

21     A.    Between 46.01 percent of par, is the

22   current value, to 51.28 percent of par.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 115 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 333

1      Q.     That's for the total portfolio?

2      A.     That's correct.

3      Q.     I'm only asking about the Mangieri loan.

4      A.     They're all treated equally.

5      Q.     Well, what's the dollar amount that the

6   Mangieri loan was impacted by the breach of the

7   warranty of Section 3.02(p)?

8      A.     Between 53.99 percent of the principal

9   balance and 48.72 percent of the principal balance.

10     Q.     So you don't have a dollar figure?

11     A.     We can calculate it if you would like.

12     Q.     So you're saying it's a percentage?

13     A.     It's a percentage of the principal balance.

14     Q.     It's a range?  It's between 43.9 and

15   53.99 percent?

16     A.     Correct.

17     Q.     So you can't put a specific dollar figure

18   on it?

19            MR. CARITHERS:  Objection.

20            THE WITNESS:  One can.

21   BY MR. SCOTT:

22     Q.     Okay.  Tell me what that is.

1      A.    There is a midpoint between those two

2   numbers.

3      Q.    Right.  And what is it?

4      A.    Do you want me to calculate it?

5      Q.    Yeah, please.

6      A.    All right.  Does anybody have a calculator

7   that's handy?

8      (Off the record.)

9          THE WITNESS:  51.36 percent of the

10  principal balance.

11  BY MR. SCOTT:

12     Q.    And what does that figure represent?

13     A.    That's the loss associated with these

14  loans, the fair market value of this loan.

15     Q.    What factors impact the fair market value

16  of a mortgage loan?

17     A.    What factors influence fair market value of

18  a mortgage loan?

19     Q.    Right.

20     A.    Economic conditions.  The default record on

21  the loan or loans.  Interest rates.

22     Q.    How about the value of the collateral?

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 117 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 335

1          A.     The value of the collateral.

2          Q.     That would affect the fair market value of

3     the loan?

4          A.     Yes.

5          Q.     So with respect to the Mangieri loan, when

6     you say par value with respect to the Mangieri loan,

7     what are you referring to?

8          A.     All of these loan note amounts totaled

9     $8,462,709.10.  That's par.

10         Q.     The note amount is par?

11         A.     The note amount is par of a mortgage.

12         Q.     Did you calculate the fair market value of

13    the 25 defaulted loans that haven't been foreclosed?

14         A.     That is what I did.  That's what the whole

15    exercise is.

16              MR. CARITHERS:  Hold on a second.  I think

17    that's what he just gave you, the earlier answer was

18    on Table B.  I'm not sure if that's what you were

19    asking him.

20    BY MR. SCOTT:

21         Q.     So the value that you came up with in Table

22    C is what you believe is the fair market value of the

1    entire 25 defaulted loans that have not been

2    foreclosed?

3        A.    Correct.

4        Q.    And when you calculated that, how did you

5    do it?

6        A.    I started with some basic assumptions.

7        Q.    Okay.  What were they?

8        A.    The first is as of 8/1/10, that date.  The

9    next assumption is that the performance of all the

10   current defaulted loans will equal all the liquidated

11   loans to date.

12       Q.    All right.

13       A.    That it would have a five-year life of the

14   investment by whomever is buying all these loans, and

15   all the properties will be disposed of by the end of

16   five years through an even amortization of that

17   amount.

18       Q.    Anything else?

19       A.    That the return on investment that the

20   investor would demand would range somewhere between 20

21   and 35 percent.

22       Q.    What do you mean by "the return on

1    investment"?

2         A.    This is an investment that somebody would

3    make to purchase these loans.  That's how I arrived at

4    the fair market value.  And I outline in the report

5    that's how I approached it.

6         Q.    It's a hypothetical investor?

7         A.    Correct.

8         Q.    And why do you assume that the investor is

9    going to want a return of 20 to 35 percent?

10        A.    Experience.

11        Q.    Why do you assume that the performance of

12   the loans will remain equal to the performance of the

13   loans that were already foreclosed?

14        A.    Because we've already on these loans,

15   without a foreclosure, exceeded the amount of time

16   that the other loans took to get all the way through

17   foreclosure and sale of REO.

18        Q.    All right.  Is the value of the collateral

19   that secures these loans subject to fluctuation over

20   time?

21        A.    Of course.

22        Q.    And have you made any accounting for that?

Page 338

1       A.    That it will not change from what it is

2   today.

3       Q.    And why do you assume that the value of the

4   collateral will not change?

5       A.    Because it hasn't.

6       Q.    Well, do you know what the value -- You

7   told me yesterday you don't know what the value of

8   these properties are; is that correct?

9       A.    I told you I made assumptions that that

10  will not change from what the experience was in Table

11  A for the foreclosed loans.

12      Q.    Right.  You told me that you made that

13  assumption when you did the analysis in Table C?

14      A.    Right.

15      Q.    My question is:  Why did you make that

16  assumption?

17      A.    Because those are the assumptions an

18  investor would make.

19      Q.    So an investor wouldn't account for

20  fluctuation in the value of the collateral?

21      A.    No.  They would assume nothing will get

22  better than it is today.

Page 339

1      Q.    And why do you say that?  What do you base

2    that statement on?

3      A.    Experience.

4      Q.    Experience in what?

5      A.    Experience in investments.  Experience with

6    people who buy foreclosed real estate.  Experience

7    with people buying distressed types of properties or

8    collateral.

9      Q.    Do you have any experience with investors

10   buying defaulted mortgage loans?

11     A.    Yes.

12     Q.    What's your experience in that area?

13     A.    I was at San Antonio Savings when the

14   assets of that institution, many of which were

15   defaulted, were valued and purchased by another

16   institution.

17     Q.    And when was that?

18     A.    1983 through 1990.

19     Q.    And were you involved in the valuing of

20   those assets?

21     A.    I didn't work for the investor.

22     Q.    Is that a no?

Page 340

1     A.    No.  I provided opinions on value.

2     Q.    To who?

3     A.    To the management of that institution.  To

4  the RTC.

5     Q.    And how did you prepare those opinions?

6     A.    From experience.

7     Q.    Is there an established methodology for

8  valuing mortgage loans?

9     A.    Not mortgage loans that are in default.

10     Q.    So there is no established methodology for

11  doing that?

12     A.    Not that I'm aware of.

13     Q.    And when you did these value opinions in

14  the 1980s, what methodology did you use?

15     A.    I can't recall.

16     Q.    The analysis that you did in Exhibit C

17  assumes that the value of the collateral of the loans

18  will not change over time, correct?

19     A.    Correct.

20     Q.    Anything else that you assume?

21     A.    No changes in the weighted average coupon

22  of the loans that are or may eventually perform.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 123 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 341

1        Q.    Are there any other assumptions?

2        A.    That there's a present value of annuity

3    discount of 6 percent that's used.

4        Q.    Why did you use that percentage?

5        A.    Well, because some of the income and

6    expense items take place over a five-year period; some

7    are a one-time item.  And investment methodology is

8    you have to put those all at the same point in time,

9    and you do that through present value tables.

10       Q.    And based on all these assumptions, it's

11   your opinion that the fair market value of the 25

12   defaulted loans that haven't been foreclosed is a

13   percentage of par value of between 48.72 and 53.99?

14       A.    No.  Percentage of the principal balance,

15   which is a price to par.  The percent of the principal

16   balance is between 48.72 and 53.99 percent of the

17   principal balance.  So the price to par is subtracting

18   that number from 100.  Par is 100.

19       Q.    The value, in your opinion, is between

20   48.72 percent and 53.99 percent of par?

21       A.    No.  The value is between 46.01 and

22   51.28 percent of par.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 124 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 342

1     Q.    Where is that on the chart?

2     A.    It's on page 6.

3     Q.    Oh, okay.  Why is there a range?

4     A.    I'm not the investor.  I'm assuming that

5     the investor is going to want a return that ranges

6     between 20.5 and 34.33 percent return on investment.

7     Q.    And you're assuming that based on what?

8     A.    Experience.

9     Q.    Experience with what?

10    A.    Investments.

11    Q.    In defaulted mortgage loans?

12    A.    And in general.

13    Q.    Well, do you have experience with

14    investments in defaulted mortgage loans?

15    A.    I do.

16    Q.    That's what you told me about earlier when

17    you were at San Antonio in the 1980s?

18    A.    Correct.

19    Q.    So based on that experience, you believe

20    that that's the range that an investor is going to

21    need to make this acquisition?

22    A.    And my own personal investment experience.

Page 343

1      Q.    Have you ever personally invested in

2   defaulted mortgage loans?

3      A.    No.

4      Q.    The impact on the value of each loan, then,

5   would be that range of percentage applied to the

6   original note amount?

7      A.    Correct.  No, applied to the principal

8   balance.  The percent of the principal balance.

9      Q.    All right.  Well, let's go through a couple

10  of specific loans and have you tell me what you

11  believe the value is based on this analysis so that I

12  can understand it.

13          I believe that the defaulted loans that

14  have not been foreclosed are listed on Table B,

15  correct?

16     A.    Correct.

17     Q.    So the Herrera loan.

18     A.    Okay.

19     Q.    What is your opinion about the value of

20  that loan?

21     A.    The current principal balance is

22  $247,589.79.  If I used this calculator correctly, the

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 344

1    range of the value on that loan would be somewhere

2    between $113,916.06 and $126,964.09, with a principal

3    balance of $247,589.79 today.

4        Q.    So what's the loss?

5        A.    Okay.  The loss is between $133,673.73 and

6    $120,625.75.

7        Q.    And what portion of that loss is attributed

8    to the change in the value of the collateral?

9        A.    I don't understand the question.

10       Q.    Well, you told me what the total loss is

11   for the value of that mortgage loan, correct?

12       A.    That's correct.

13       Q.    And my question is:  What portion of that

14   loss is attributable to a reduction in the value of

15   the collateral?

16       A.    I still don't think I understand the

17   question or can answer it.

18       Q.    You told me before, I asked you what

19   factors impact the value of a mortgage loan.  Do you

20   remember that?

21       A.    Yes.

22       Q.    And you gave me a list of things, and one

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 127 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 345

1    of them was the value of the collateral.  So my

2    question is what portion -- And you also gave me some

3    other factors, like interest rate, default record, et

4    cetera.

5            So my question is:  With respect to the

6    Herrera loan, you have now quantified what you believe

7    the loss is on that loan in terms of reduction in

8    value of the loan, and I'm asking what portion of that

9    loss do you attribute to a change in the collateral

10   value?

11       A.    I don't know.

12       Q.    You don't know?

13       A.    I don't know.  I don't think any investor

14   would know that.  They would only know what happened

15   to the previous loans that had been foreclosed.

16       Q.    Well, wouldn't an investor want to get an

17   appraisal of the collateral?

18       A.    Eventually, yes.  All these properties are

19   occupied, as I understand it.  You can't get an

20   appraisal and adequately appraise the property unless

21   they're vacant and in your hands.

22       Q.    So your testimony is that you cannot get an

DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 346

1    accurate appraisal unless you have possession of the

2    property?

3         A.    Normally, yes.

4         Q.    So you're saying that an investor would

5    have to buy these loans without knowing what the value

6    of the collateral is?

7         A.    I think they might have some idea, but I

8    don't think that's the major thrust of their offer.

9         Q.    Well, do you think it would be prudent for

10   an investor considering purchasing the Herrera loan to

11   get an appraisal of the collateral before it decided

12   to buy it?

13              MR. CARITHERS:  Objection.

14              You can answer.

15              THE WITNESS:  I don't know.

16   BY MR. SCOTT:

17        Q.    So just going back to my question, then,

18   you don't know what portion of the loss in value of

19   the Herrera loan is attributable to a change in value

20   of the collateral?

21        A.    Nor do I know how much of the change in the

22   value is due to what Herrera has done living in the

1    property.  Nor do I know what happened to the house

2    next door to Herrera on the street to Herrera.  Nor

3    would the investor.

4         Q.    Do you know what portion of the reduction

5    in value of the Herrera loan was caused by

6    Countrywide's alleged breach of the underwriting

7    warranty in Section 3.02 of the agreement?

8         A.    All of it.

9         Q.    And why do you say all of it?

10        A.    It's the only thing that's different than

11   standard practices.

12        Q.    What do you mean, "the only thing that's

13   different than standard practices"?

14        A.    These are not standard loans.  I've said

15   that before.  These were not prudent loans.

16        Q.    But you admit that the change in the value

17   of the collateral over time affects the value of the

18   mortgage loan, correct?

19        A.    Right.

20        Q.    And you haven't accounted for that in your

21   analysis, correct?

22             MR. CARITHERS:  Objection.

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 130 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 348

1          THE WITNESS:  It's a chicken and egg.

2     BY MR. SCOTT:

3          Q.   Well, you have not accounted for a change

4     in the value of the collateral in your analysis,

5     correct?

6          A.   I've assumed that the collateral value will

7     not change from what it is today.

8          Q.   And you don't know what the value of the

9     collateral is today?

10         A.   No.

11         Q.   Do you know what effect the change in the

12    value of the collateral in any of the properties on

13    Table B has had on the value of these mortgage loans?

14         A.   No.  Nor do I know what the performance of

15    these mortgage loans and ones like them have done to

16    the collateral value of this loan and the surrounding

17    neighborhood.

18         Q.   I want to talk about some of the documents

19    that were in your binder that we had copied yesterday.

20         MR. SCOTT:  Counsel, I have a set for you.

21         MR. CARITHERS:  Okay.  The whole set will

22    be an exhibit?

Page 378

1        A.    Correct.

2        Q.    Do you have any statistics on default rates

3    for reduced documentation loans nationally?

4        A.    No.

5        Q.    Do you have any statistics on default rates

6    for reduced documentation loans in Maryland?

7        A.    No.  Might I clarify?  The MBA, which is my

8    source, and they're the largest source of delinquency

9    information, tracks what is outlined -- Let me see if

10   I can find that.

11            They track fixed rate prime, ARM prime,

12   fixed rate subprime, and ARM subprime.

13       Q.    There is an allegation in the complaint in

14   this matter about the finance of the sale of one of

15   the REO properties by Countrywide Bank.  Are you

16   familiar with that allegation?

17       A.    Vaguely.

18       Q.    Do you have any opinions about that?

19            MR. CARITHERS:  Objection.

20            THE WITNESS:  No.

21   BY MR. SCOTT:

22       Q.    Have you ever been qualified by a court to

Case 8:09-cv-00176-RWT   Document 138-5   Filed 02/09/11   Page 132 of 132
DEPOSITION OF TERRY R. MENDENHALL, VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 20, 2010

Page 379

1    testify as an expert?

2         A.    No.

3         Q.    There's some discussion in your report on

4    page 8.  I'm referring to your August 13th report,

5    Exhibit 5.

6         A.    Okay.

7         Q.    About exceptions to underwriting standards.

8         A.    Correct.

9         Q.    Do you know which of the loans that are at

10   issue in this case involved exceptions to underwriting

11   standards?

12        A.    No.  And I say here:  "It is not clear in

13   the underwriting files which loans were subject to

14   exceptions or the basis for any exceptions made."

15        Q.    So you don't know whether there were any

16   exceptions made on any of the loans?

17        A.    I do not.

18        Q.    On page 9 of your report, Exhibit 5, there

19   is a discussion of the risk layering matrix.

20        A.    Yes.

21        Q.    And you say that you compared three loans

22   against that matrix, right?