**Terry Mendenhall**
**Consulting**
**3715 Castle Crest**
**San Antonio, TX 78230**

August 13, 2010

Michael Carithers, Esq.
Liles Parker
4400 MacArthur Blvd., N.W. Unit 203
Washington, D.C. 20007

> Re: EXPERT REPORT SUPPLEMENT– LOAN UNDERWRITING
> AND SERVICING PRACTICES of Countrywide Home Loans Inc.
> United States District Court, Maryland, Southern Division, Case No.
> 8:09-CV-00179-RWT
> HarVest Bank of Maryland vs. Countrywide Home Loans Inc.

Dear Mr. Carithers:

This report has been prepared to supplement the original Expert Report dated October 30, 2009 for the above-referenced case. Since the date of my original report and the Rebuttal report of February 5, 2010, I have also reviewed the following:

1. Servicing Past Due reports prepared by HarVest Bank for Countrywide Home Loans assets purchased dated March 31, 2010 and March 31, 2009.
2. Loan Losses spreadsheet prepared by HarVest Bank on 7/5/10 with interest loss projections to December 31, 2010.
3. "37 Borrowers" losses spreadsheet dated 8/1/10, with interest loss projections to that same date.
4. Countrywide Home Loans Inc. underwriting guidelines from the Conventional Technical Manual in effect for 2005 and 2006.
5. Countrywide Home Loans Inc. Platinum underwriting guidelines for Correspondent Lending in effect for 2006.
6. Executive Summaries of wholesale loan packages purchased servicing-released by Countrywide Home Loans Inc. from the following:
   a. American Mortgage Network: 7/31/06
   b. American Home: 2/24/06
   c. American Home: 3/16/06
   d. Decision One: 12/27/06

EXHIBIT 8

> e. Decision One: 12/15/06
> f. Decision One: 12/22/06
> g. First Bank: 10/16/06
> h. First National Bank of Arizona: 12/13/06
> i. Wilmington Finance: 12/29/06
> j. Greenpoint Mortgage: 9/27/06
> k. Greenpoint Mortgage: 2/22/07

7. Transcript depositions of the following:
   a. Hollerbach – 3/19/2010
   b. Ingerslev – 2/2/2010
   c. Weisman – 4/7/2010
   d. Gadsby – 4/13/2010
   e. Darraugh – 2/3/2010
   f. Porter – 4/6/2010

8. Code Lookups Outline for Countrywide Home Loans identifying Documentation Types and definitions.

9. United States District Court Western District of Washington at Seattle Complaint of the Federal Home Loan Bank of Seattle v. Countrywide Securities Corp., Countrywide Financial Corp., Merrill Lynch Mortgage Investors Inc., and Merrill Lynch Capital Inc.

10. Origination credit files for Main, Diakite, and Gooding.

11. AS400 servicing log notes of Countrywide for 11 liquidated loans owned by HarVest Bank.

12. "Suspense Logs From Ruby" which were incomplete (Bates #'s: CHL 054466 thru 054516).

13. Selected pages of "Random Audit Results" graphs (Bates #'s": CHL 155900 thru 158738).

14. Countrywide Internal Audit Department Review of Loan Origination, Acquisition and Purchase Process, Sept. 21, 2005.

<u>Portfolio Default Results</u>

As pointed out in my original report dated October 30, 2009, the default results on the portfolio of loans sold to HarVest Bank by Countrywide have been severe and not at all typical to national or regional results for residential mortgage loans, even in this difficult economy. As stated in my original report, subsequent to the purchase of the loans by HarVest Bank, loans began to default at unusually high levels. As of March 31, 2009, 21 (32.3%) of the remaining 65 loans still owned by HarVest Bank were delinquent 30 days or more, in bankruptcy, foreclosure, REO, or a post foreclosure deficiency state. Five loans had already been foreclosed and those properties disposed of by Countrywide at significant losses to HarVest Bank. For the first quarter of 2009, the Mortgage Bankers Association reported that nationwide 'the combined percentage of loans in foreclosure and at least one

payment past due was 12.07%.[1]" In Maryland, at the end of 2008, the delinquency rate for prime mortgages was 6.7%.[2]

Further, in the Rebuttal to EXPERT REPORTS of Countrywide – LOAN UNDERWRITING AND SERVICING PRACTICES OF Countrywide Home Loans Inc. dated February 5, 2010 I updated the analysis and added the following facts and comparisons. "The latest MBA press release on national delinquencies outlines, 'Once again, the states of Florida, California, Arizona, and Nevada have a disproportionate share of the mortgage problems.[3]" Maryland, Virginia, and Washington D.C. are not mentioned with other disproportionate states for results.

In an article I obtained by the Federal Reserve Bank of Richmond, an economics team at the Bank states in the Summary of Findings Highlights that, Mortgage delinquencies and foreclosures continue to increase in Maryland and the District of Columbia, although mortgages in both areas are generally performing better than the national average.[4] This was for the Third Quarter 2009.

As of November 2009 the U.S. Bureau of Labor Statistics provides a 9.4% unemployment rate for the U.S. Maryland's unemployment rate was 7.3%, Virginia's was 6.4%, and D.C.'s was 11.8% for the same period. The D.C. area is only the city limits, not the SMSA, including just over 200,000 workers.[5]

Economists at the Office of Federal Housing Enterprise Oversight (OFHEO) have calculated the Housing Price Index (HPI) since 1981. "The HPI is a broad measure of movement of single-family house prices. The HPI is a weighted, repeat-sales index, meaning that it measures average price changes in repeat sales or refinancing on the same properties. The information is obtained by reviewing repeat mortgage transactions on single-family properties whose mortgages have been purchased or securitized by Fannie Mae or Freddie Mac since January 1975."

As of the 3rd Quarter 2009, the average home in the U.S. has appreciated

---

[1] "Delinquencies Continue to Climb in the Latest MBA National Delinquency Survey," Mortgage Bankers Association Press Release, 5/28/2009, Carol Kemp.

[2] "Maryland Mortgage Delinquencies", BaltimoreSun.com, Jamie Smith Hopkins, 3/2009.

[3] Mortgage Bankers Association of America, Press Release – 11/19/09, "Delinquencies Continue to Climb in Latest MBA National Delinquency Survey."

[4] Federal Reserve Bank of Richmond Mortgage Performance Summary, quarterly update, "Housing Market and Mortgage Performance in Maryland and the District of Columbia, 3rd Quarter, 2009."

[5] Data from the Current Population Survey (CPS) – a monthly survey of households conducted by the Bureau of Census for the Bureau of Labor Statistics, which provides a comprehensive body of data on the labor force, employment, unemployment, and persons not in the labor force.

98.75% since 1991, 4.55% in last 5 years, and negative 3.76% in the last year. The state summary provides that Washington D.C. appreciated 224.81% since 1991, 25.96% in the last 5 years, and negative .95% in the last year. Virginia appreciated 116.42% since 1991, 11.34% in the last 5 years, and negative 3.67% last year. Maryland appreciated 125.65% since 1991, 9.90% in the last 5 years, and negative 5.43% in the last year.[1]

With delinquency data, unemployment, and home appreciation, the geographic vicinity of the subject loans has fared much better than the overall U.S. and many other states.

Recent updates to delinquency tracking of the portfolio reveal that as of March 31, 2010, 37 (64.9%) of the remaining 57 loans that are still owned by HarVest Bank were delinquent 30 days or more, in bankruptcy, foreclosure, REO, or a post foreclosure deficiency state. Of the bad loans, 12 loans had already been foreclosed and those properties disposed of by Countrywide at significant losses to HarVest Bank and two have recently been foreclosed. Defaulted delinquent loans, not yet foreclosed total 25, or 43.8% of the total still owned by HarVest Bank by the end of the First Quarter 2010. Of the original 98 loans purchased by HarVest Bank and sold by Countrywide, 37.8% have defaulted since purchase and an additional 12.2% have resulted in foreclosure and losses for HarVest Bank.

Here is a list of all of the defaulted borrowers:

| | | |
|---|---|---|
| Karimi | Herrera | Ahmed |
| Stern | Song | Reyes |
| Melgar | Brickley | Perera |
| Herr | Kang | Hwuyhua |
| Reyes | Malate | Douglas |
| Okonkwo | Watson | Hussain |
| Yi | Lee | Guzman |
| Rizvi | Cala | Hironyakes |
| Mangieri | Carberg | Villatoro |
| Rodrigues | Espinal | Flores |
| Dam | Medina | Main |
| Chhabra | Sic-Rodrigues | Diakite |
| | | Gooding |

I have provided an underwriting analysis of each of these loans, except for Main, Diakite, and Gooding, which will appear later in this report. The default of the Gooding loan was only recently revealed to HarVest Bank, because it had been serviced by another servicer and unreported by Countrywide to HarVest Bank. It

---

[1] Federal Housing Finance Agency, OFHEO Housing Price Index Report, Q3 2009.

did not show up on any previous delinquency reports from Countrywide, until the servicer had foreclosed on the property and requested settlement from Countrywide. This is yet another example of Countrywide negligence in not tracking a loan sold to an investor as part of a contract covered by representations and warranties to that investor.

Updated information available from the Mortgage Bankers Association reveals that "the delinquency rate for mortgage loans on one-to-four-unit residential properties fell to a seasonally adjusted rate of 9.47% of all loans outstanding as of the end of the fourth quarter of 2009, down 17 basis points from the third quarter of 2009.[1] The delinquency rate for mortgage loans on one-to-four-unit residential properties increased to a seasonally adjusted rate of 10.06% of all the loans outstanding as of the end of the first quarter of 2010, an increase of 59 basis points from the fourth quarter of 2009.[2]" All of the data from MBA includes FHA, VA, Conventional prime fixed, prime ARM loans, subprime fixed loans, and subprime ARM loans. The highest delinquency rate among all loan types was 29.09% for subprime ARM loans at the end of the first quarter of 2010. The rate on the HarVest Bank delinquent defaulted loans of 43.8% is 1.51 times as high as the delinquency rate nationwide for subprime ARM loans reported by the Mortgage Bankers Association and 4.35 times as high as the delinquency rate nationwide for all types of loans reported nationwide.

Clearly, there is a problem with this portfolio of loans purchased from Countrywide that is much more significant than nationwide statistics reveal. I outlined in the Rebuttal Report of February 5, 2010, that this was NOT due to worse economic conditions in Maryland than the U.S. as a whole, because that is NOT the case. In the research provided, Maryland had performed better than the rest of the nation as a whole. Indeed, an April 2010 monthly update by the Federal Reserve Bank of Richmond shows that the Unemployment Rate for Maryland was 7.7% in February 2010 and the United States was 9.7%. Real Personal Income had declined nationwide by 2.13% year over year, yet Maryland had increased .21%. Nationwide, all mortgage delinquencies were 5.09% in the 4th quarter of 2009, and Maryland experience was 5.36%.[3] As I outlined both in my original report and the rebuttal report, poor underwriting and poor product design by Countrywide left the firm exposed to misrepresentation and potential fraud by borrowers related to non-verification of assets and liabilities, as well as other issues outlined in my reports. This was not prudent, and as evidenced by the results, exposed Countrywide and its loan purchasing clients, like HarVest Bank, to significant losses that are disproportionate to anything experienced and

---

[1] Mortgage Bankers Association of America, Press Release – 2/19/10, "Delinquencies, Foreclosure Starts Fall in Latest MBA National Delinquency Survey."

[2] Mortgage Bankers Association of America, Press Release – 5/19/2010.

[3] Federal Reserve Bank of Richmond, "Snapshot: A Monthly Update of the Fifth District Economy – Maryland", April 2010

reported by the mortgage industry. The poor performance of these loans is due to the imprudent underwriting practices and procedures employed with these loans. Addendum 1 of this report, which is adopted by this reference, appraises the un-liquidated portfolio of HarVest Bank loan assets serviced by Countrywide. The current value of these assets, which is substantially below par value, is a result of these imprudent underwriting practices. The significantly worse results of the subject loans, when compared to industry measures, are NOT due to any other factors beyond Countrywide's control, in my opinion.

Loan Servicing

Countrywide continues to service the loans owned by HarVest Bank in a poor manner. For the loans and borrowers that are currently reported as delinquent, in default, or foreclosed as of August 1, 2010, Countrywide reports show that they have deleted only one name (Ullola) and added only three (Herrera, Main, Diakite) since March 31, 2009. As of August 1, 2010 the defaulted loans have been delinquent an average of 541 days (1.5 years), without foreclosure or resolution, as outlined in Addendum 1 of this report. The final dispositions to date have taken an average of 508 days and spent 317 days in default prior to foreclosure. Resolution options are foreclosure, collection in full with reinstatement, short sale, or workout with the borrower, which could include modification of the loan terms such as reduction in interest rate, principal balance, and/or monthly payment. The estimated costs to HarVest Bank of Countrywide's poor servicing practices and delays are covered in detail in the Addendum I to my report of October 30, 2009. The delayed actions of Countrywide have increased HarVest's Bank's losses to an even greater extent.

Underwriting Guidelines of Countrywide

I reviewed the underwriting guidelines of Countrywide, encompassed in the Conventional Technical Manual and Platinum Guidelines for Correspondent Lenders. Countrywide policies have established prudent guidelines in many situations. However, operationally and in the specific guidelines for "low doc" products, these rules were ignored. Nowhere did I find instructions for this deviation with "low doc" loans in writing, outlined in the underwriting guidelines. Countrywide knew what was required but ignored prudent practices for the "low doc" loans, as evidenced in the loan underwriting files. To ignore the proven general underwriting guidance and standards of past lending for the "low doc" loans and operate outside the general guidelines was not prudent.

I pointed out numerous inconsistencies and obvious suspicions about income and professions with many of the borrowers in my underwriting profiles of the defaulted loans. Again, the manual outlines that establishing the borrower's ability and willingness (my emphasis) to pay needs to be a main emphasis for

this type of lending. I saw no evidence in my underwriting analysis of individual loans, that underwriters had required additional documentation or verification on loans, which ultimately defaulted, that had glaring flaws in the information provided by the borrower. Obviously, Countrywide underwriting personnel are not in compliance with their own philosophies and guidance. This is not reasonable or prudent and is not consistent with standard mortgage industry practices.

I have outlined in detail in my report the underwriting failures of Countrywide. I have reviewed Countrywide's guidelines for underwriting included in the Conventional Technical Manual. In the Introduction 0.0 (Bates #CHL055827), the purpose is stated by Countrywide, "To provide internal customers with guidance and support in requirements for underwriting 1-4 unit conventional residential loans."

In Introduction 0.1 (CHL055831), dated 7/22/05, the "Management Philosophy" is stated. "Countrywide is committed to originating loans that help borrowers achieve their dreams of homeownership. Part of our responsibility as an ethical lender is to ensure that if we make the loan, it helps the borrower meet his or her goals. This objective must be met by offering consumers responsible products with measured corporate risk and return profiles. Countrywide manages this by employing the following product offering guiding principles." The outline goes on to provide that products must 'benefit all parties', "benefit the consumers who choose them", and Countrywide "offered products should not cause high risk, abusive or discriminatory practices", and "not expose the company to potential negative customer, market, or regulatory reputation." Further, "whether someone is a Prime borrower or a SubPrime borrower, our focus must be on the borrower's demonstrated <u>desire and ability</u> (my emphasis) to repay his or her obligations." Later, the guidelines state that "the following guidelines must be considered when reviewing an application for approval or denial – capacity to pay, credit, common sense, customer intent, current situation and collateral." This high sounding general philosophy is a long way from the lack of judgment provided by Countrywide underwriters in approving the poor quality loans that were sold by Countrywide to HarVest Bank. Note that it is stated that all loans must demonstrate the <u>ability and willingness</u> to repay the obligation, without qualifiers for any particular loan program guideline.

In the Introduction 0.2.1, dated 10/9/06 (CHL055834), there is a definition of "Investment Quality Underwriting Criteria" in this section titled "Introduction - Countrywide's Underwriting Philosophy." The Criteria begins with, "It is Countrywide's policy to originate and purchase investment quality loans. An investment quality loan is one that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual and Loan Program Guides." Further, under the topic of Data Accuracy (CHL055835), the

7

manual admonishes underwriters, using AUS (automated underwriting systems) to "review the file carefully to determine that:

- All income, assets, and liabilities have been <u>accurately</u> (my emphasis) recorded and disclosed by the borrower,
- The information in the credit report accurately represents the borrower's credit history; and
- There is no information outside of the data submitted to the AUS that would have an effect on the underwriting decision."

Again, this statement outlines that regardless of program, there is a responsibility for data accuracy and truthful representations of the borrower's financial information.

Section 0.2.1 also covers Exceptions, Risk Layering, and Compensating Factors. "Loans considered to fall outside of published program/product guideline eligibility standards may be considered on an exception basis." The section outlines the procedures to handle exceptions. I found examples of poor decisions in my underwriting analysis that were not well founded or documented. It is not clear in the underwriting files, which loans were subject to exceptions, or the basis for any exceptions made. Overuse of exceptions can change the risk expectations of a portfolio of loans in my opinion and experience. Later in Introduction 0.2.10 dated 10/25/2006 (CHL055842), the Conventional Technical Manual provides an Exception Guidance Update. It starts by stating, "Requests for certain types of underwriting exceptions have grown recently. Below is a description of the most frequently requested exceptions; and credit guidelines to be followed when evaluating these requests. **This is not to be viewed as a change to credit policy** (CW emphasis). Furthermore, the flexibilities outlined below should be used judiciously in order to avoid a high concentration of these exceptions; and additional layered risks should be minimized." Clearly, Countrywide felt they had a problem with exceptions that had to be managed better.

Under Risk Layering in 0.2.1(CHL055836), the beginning sentence states, "The underwriting decision must be based on a conclusion reached by weighing the positive components of the loan against the risks. Decisions cannot be made by looking only at a single risk factor or by placing the most weight on a single factor." There is a matrix chart with examples of different types of risks. This clearly outlines that loans with a high back end ratio (debt-to-income), self employed, 10%, 20% or more increase in mortgage balance from previous mortgages, and high LTV's (loan-to-value) and CLTV's (combined loan-to-value) ratio all produce higher risk. Risk layering is when more than one element of risk is presented and not adequately offset to eliminate or significantly reduce the risk. All the risks combined, without adequate offsets, compound the risk of the loan. I found numerous cases of questionable stated income and assets, high

debt-to-income ratios, poorly underwritten self-employed borrowers, and high CLTV's, without any expressed concern on the part of the underwriter, or identification as possible risk layering. In my opinion, Countrywide underwriters ignored the whole concept of layering of risk for the subject loans.

As mentioned above, there a is Risk Layering matrix on CHL55836 that continues on CHL055837, and identifies "specific risk elements for Conforming and Non-Conforming programs that need to be assessed during the credit analysis process and provides examples of varying risk levels." While the matrix does not, in my opinion, provide a complete and accurate opinion of credit risk, I used the chart to look at three loans in the HarVest Bank defaulted loan portfolio. I found that Countrywide ignored the rules of the matrix in these three loans.

The first is the loan to Herrera. It has 4 specific risk elements identified on the matrix. The first is that the "back end ratio" is at least 62%, according to my calculations[1], even though it was a "no ratio" loan, another risk element identified as "Significantly Increases Risk" on the matrix (the maximum back end ratio is 45%). The loan application says that the loan is a 6-month LIBOR, 5/25 interest only ARM, which is identified on the matrix as "Increases Risk." I found no documentation of any redeeming offsets or acceptable mitigation for these risk elements. In addition, Ms. Herrera is self-employed, stating income without verification; also on the matrix. None of the issues were identified as risk layering issues in the loan file, nor outlined with adequate, acceptable offsets or mitigations.

The second loan I tested against the matrix is Melgar. It is identified as a NINA (no income; no assets verified) loan in Countrywide servicing and investor reports. This documentation category is indicated as, "Significantly Increases Risk." According to my calculations, the "back end ratio" is 48.6%, which also puts it in the "Significantly Increases Risk" category. Ms. Melgar has a recorded credit score of 673, but a low credit score of 639 with a "serious delinquency" and "public record" on the credit report, with 4 revolving debts 30 days past due and one past 60 days, along with a CLTV of 94.7%, indicating very little down payment investment by the borrower. The matrix provides that at a 95% CLTV and a 650 credit score, the loan would be labeled as "Significantly Increases Risk." At 95% CLTV and a 680 credit score, it would be labeled as "Increases Risk." The loan application identifies the loan as an interest only loan and a 5/25 ARM. All I/O (interest only) loans are put in either of the two higher risk categories (Increases, or Significantly Increases Risk). This also is a loan to a self-employed person stating income, without verification, which is another risk element identified in the matrix as "Increases Risk." None of the risk layering issues were identified in the loan file, or outlined with adequate offsets.

---

[1] The stated income of the borrower is $7,200 and the total of monthly debt obligations and the monthly housing obligation is $4,460.

The third loan I looked at with the matrix is Hirunyhakes.  It is identified as a SIVA2, which means "stated income, some verified assets." This is a high-risk loan by documentation category ("Significantly Increases Risk"). The loan application identifies that the loan is an interest only LIBOR 6 month ARM. This fits at least one of the higher risk categories. The back end ratio is 52%, according to my calculations. This puts the loan clearly into the "Significantly Increases Risk" category. The recorded credit score is 677 and the CLTV is 100%. That puts it just well into the "Increases Risk" category and almost to the "Significantly Increases Risk" category. Again, this borrower is self-employed and stating income, which is a risk element identified in the matrix as "Increases Risk." None of the risk layering issues were identified in the loan file, or outlined with adequate offsets.

In section Introduction 0.2.3 dated 6/5/2006 (CHL055883), Countrywide's Underwriting Philosophy, Low Doc and Stated Income Guiding Principles, the Policy is first provided. "It is Countrywide Financial Corporation's (CFC) policy to offer fair and reasonable loan terms to all applicants that are based on the applicant's income, assets, property value, and credit history. It is CFC's practice to determine that the applicant has the <u>ability and willingness</u> (my emphasis) to repay the loan.  CFC offers a number of programs that give applicants the option of stating their income rather than documenting it. It is not the intention of stated income programs to represent income information inaccurately."

"Limited income verification **does not** (CW emphasis) eliminate the need to analyze and evaluate the borrower's <u>ability and willingness</u> (my emphasis) to repay the mortgage debt. The analysis must include a judgment about the reasonableness of the income stated on the application in relation to the borrower's occupation and credit information. The purpose of stated income programs is to provide expedited processing for qualified loans and credit worthy borrowers."

"Stated income programs:

- Are designed for borrowers with a strong asset base and adequate income to support the payments.
- Are not intended to represent the borrower's income inaccurately for qualification purposes.
- Are not a 'No Qualifier' loan.
- Are not intended for those borrowers who do not have adequate income to qualify for a full documentation loan."

Further, under <u>Guidance for Underwriting Low Documentation and Stated income Loans</u> (CHL055883), the manual states that " Inconsistencies in the applicant's

profile or stated income related to type of work, training, education and asset/liability structure should be reasons to require additional documentation or verification." Also, that "income must be deemed reasonable and consistent with the applicant's profession and must be a true and accurate reflection of the borrower's income."

Section1.5.11, dated 10/03/2005 (CHL056004) outlines Documentation Types and Requirements, Documentation for Self-Employed Borrowers, stating that, "All files for self-employed borrowers have the following requirements:

- Files, regardless of the type of business, must contain two years of individual tax returns.
- All tax returns must have all schedules attached, and be complete in all respects, and
- Any additional documentation (e.g., profit and loss statement, balance sheet, etc.) must be signed and dated by the borrower."

Under Section 2.3.4, dated 11/29/04 (CHL056275), it is outlined in the overview that "The underwriter must perform a cash flow analysis to evaluate the self-employed borrowers ability to service debt. By completing the Cash Flow Analysis (Countrywide form 2039) the underwriter will determine the self-employed borrowers monthly average income that is to be used for qualifying. The Cash Flow Analysis combines the elements of two traditional methods of calculating cash flow, the Schedule Analysis Method and the Adjusted Gross Income Method into a single format. The form may also be used to underwrite loans for seasonal farm workers, commissioned employees, people with non-reimbursed expenses, people with rental properties, etc." I saw no evidence of this type of analysis for any self-employed borrower in my underwriting analysis.

Under Section 1.5.4, dated 6/26/06 (CHL056045) separate guidelines are provided for self-employed borrowers for Reduced and Stated Income/Stated Assets (SISA) Documentation. Instructions are provided to obtain employment verification, but not income. And that "No income may be disclosed. Employment must be disclosed on the 1003 (loan application), and verified. The borrower must have been in the same business, at the same location, for a minimum of 2 years. Self-employment must be verified." The income for both self-employed and salaried borrowers "must be disclosed on the 1003, but is not verified. However, the stated income must be deemed reasonable and consistent with the borrower's profession or occupation."

Had Countrywide followed their general rules for all these items (as in Section 2.3.4), they would have made better loans. Counter measures were taken in "low doc" loans against many of the general rules, which make it possible to increase risk substantially by overriding stated policies. These guidelines overrule

Countrywide's general policies to control risk and therefore make it possible to increase risk. Exceptions add increased risk and must be measured in any viable residential lending organization in my opinion. My underwriting analysis noted numerous inconsistencies, especially with stated income that was not consistent with the borrower's profession or occupation.  No analysis of the cash flow of the business, the source of the self-employed borrower's stated income was ever attempted. There was no evidence that any financial information or other important information about the business was collected to establish the viability of the business and its ability to pay the income stated by the self-employed borrower. Of the 37 defaulted loans, 15 were to self-employed borrowers. This abandonment of underwriting requirements for self-employed borrowers was imprudent.

The Conventional Technical Manual in Introduction 0.6 dated 7/22/2005 (CHL055923), provides a very interesting and foreshadowing Introduction to Loan Fraud. In the Overview, the section states the following:

- "The dictionary defines fraud as the intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right. Also, the act of deceiving or misrepresenting.
- When a fraudulent loan is submitted to Countrywide, we are at risk no matter when the fraud is detected. Regardless of whether the fraud was committed for profit or just for someone to be able to purchase a home, it is fraud. The investor to whom we sell a fraudulent loan can require that we repurchase the loan even if fraud occurred months or even years earlier. In the majority of cases, Countrywide suffers a monetary loss since the perpetrators of the fraud have disappeared or, if caught, rarely have the financial ability to reimburse the company.
- Each Production Division provides guidance on quality verification and fraud detection. CMD, FSL and WLD require the completion of a Quality Verification and Documentation Questionnaire (QVDQ) for every loan prior to closing.
- If you suspect that a file you are underwriting might be fraudulent, advise your supervisor immediately. Do not disclose to the borrower or any other party to the transaction that you suspect fraud (you may be wrong in your suspicion). If you are questioned, advise the borrower that you are clarifying inconsistencies in the file."

Clearly, Countrywide is involved in risk management, is aware of the possibility of fraud, and understands their financial responsibility, when fraud occurs. It is hard to imagine that someone related to the underwriting of the loans sold to HarVest Bank did not harbor any suspicions about the truthfulness of borrowers in their presentation of stated income and asset information, as well as the other inconsistencies I have noted in the loan underwriting analysis I performed. The creation of products used by Countrywide, which invited misrepresentation and

fraud, was negligent and imprudent, as I have outlined in my report.

I have also reviewed the Countrywide Platinum Underwriting Guidelines used for Correspondent Lending Originations. It appears that these Guidelines are integrated with and a subset of the philosophies and guiding principals outlined in the excerpts from the Conventional Technical Manual listed above. Some interesting statements I found are as follows:

1.  In general, underwriters are expected to know markets and "carefully review appraisals to ensure that the value and marketability of the collateral property are valid and supported (CHL048398). Underwriters must reduce the value or LTV ratio when determining that the property is in a soft market area." If Countrywide had used more discipline in this area, they would have been more cautious about values and CLTV's that approached 100% on many of the subject loans.

2.  "Generally, mortgage insurance is required on all first mortgage loans with an LTV greater that 80% (CHL048419)." Had Countrywide used mortgage insurance more than purchase money second mortgages with LTV's up to 100% on the subject loans, they would have better protected HarVest Bank assets."

3.  "For all Conforming and Non-Conforming loans (which include Expanded Criteria and Specialty ARMs), Countrywide has adopted FHLMC and FNMA requirements, guidelines, and recommendations pertaining to the underwriting process." This is included in section 6.1 Borrower Qualification Overview (CHL048433), yet later it is stated that, "To the extent that any conflicts exist between the provisions set forth in the FHLMC and FNMA guidelines and Countrywide's policies as described in this chapter, the policies described in this chapter will prevail." Now a conflict exists, but it is unclear where that occurs and how it should be documented.

4.  Investment Quality is defined on this same page as, "Investment quality is established by measuring the borrower's creditworthiness (credit and capacity) combined with the available collateral (or security). Underwriters must completely (my emphasis) evaluate the components of Capacity, Credit reputation, and Collateral value, also called the 'three C's' of underwriting, before approving or declining a loan." I saw very little evidence of adherence to this guidance when reviewing these loans.

5.  Same page again, "Determining Capacity; to determine the borrower's eligibility, or capacity, the borrower's income, assets, liabilities, ad net worth must be **verified** (my emphasis). When evaluating the borrowers, their willingness to repay a debt, or credit

reputation, is often more difficult to determine, since it depends on the borrower's motivation as related to the property." If you do not verify income, it is most difficult to determine capacity, especially if the borrower has misrepresented their income. Debt-to-income ratio targets, using overstated income, become useless benchmarks, in my opinion.

6.   Again in Section 6.1 Borrower Qualification, Credit Worthiness of Borrowers, Self-Employed Borrowers (CHL048438), the Platinum Guidelines state that, "Because of the uncertainty of any future income, self-employed borrowers pose an additional layer of risk to a loan's investment quality. Underwriting for self-employed borrowers generally require more detailed analysis and documentation." Later, under Section 6.7 Verification of Employment and Income, in the Introduction (CHL048488), "The credit risk is greater with self-employed borrowers than with salaried borrowers, since the main source of income for self-employed borrowers is the business." Under Income History, it states, "For self-employed individuals, the underwriter must develop a history of stable and durable income for the previous 2 years. A written income analysis should be included in the loan file." Under Analyzing the Business, it states that, "the business must be analyzed to ensure that it will not affect the borrower's personal income or assets negatively. Perform a careful analysis of the borrower's education, training, experience, demand, and location and nature of the business." I did not find evidence of any of these requirements being met in my separate underwriting of defaulted loans that were made to self-employed borrowers.

7.   For Reduced Documentation, under 6.7 Verification of Employment and Income (CHL048481), it states that "Reduced Documentation allows borrowers with primary income sources that are difficult to verify (self-employed or passive sources, such as trust), with the opportunity to qualify for a loan using limited employment and income documentation requirements. The Reduced Documentation program, however, is not a 'no income qualifier' nor is it intended to qualify marginal borrowers." The Documentation Types are listed on page 8 (CHL048483) as "in addition to Full, Alternative, and Reduced Documentation, No Ratio, No Income No Asset (NINA), Stated Income Stated Asset, CLUES Fast & Easy, and Streamlined." Later, in Section 8.4B under Program Guidelines for CLUES Fast & Easy (CHL048557), it says, "Stated income and assets are allowed and must be deemed reasonable and consistent with the borrower's occupation." I found no evidence that established stated income and assets were that reasonable and consistent with the borrower's occupation within any of the credit

application files for defaulted loans that I reviewed. In fact, I was highly suspicious that many of the borrowers had misrepresented their income and assets.

<u>Underwriting Analysis – Specific Borrowers</u>

Main

Ms. Main purchased a home in Perry Hall, MD in 2006 for $563,940 with a mortgage for $417,000 and a down payment of $146,940 plus closing costs. After making a $25,000 earnest money deposit and paying closing costs, the "cash from the borrower" on the closing statement was $135,093. The loan-to-value ratio was 73.9%. The appraised value was $594,000. Ms. Main and her husband, Charles Main, were in the process of legally separating at the time of the loan application. The majority of the down payment funds came from the Separation and Property Settlement Agreement, a signed copy of which was in the file. The husband refinanced the mortgage on their existing residence to obtain the funds to provide Ms. Main for the purchase of her new home. There is a copy of the HUD-1 Settlement statement for that transaction in the file. The settlement amount is indicated on the loan application as an asset. Other liquid funds of the borrower were verified that totaled $31,000 as well as $32,000 in retirement assets. We don't know if Ms. Main is responsible for the debt on the home her husband apparently still lives in and refinanced to provide cash in the settlement. The agreement says that she is not responsible. However, it was not adjudicated in a court of law. We do not know if the new lender of the home will hold the husband alone responsible for the debt, in the case of default, or includes her. There is no evidence that they divorced. It was imprudent if Countrywide did not consider these factors in their evaluation and decision. I found no evidence that they considered this issue.

Ms. Main is a manager for Atlantic Mutual Insurance for the last 4.6 years. She has been in the same line of work for 15 years. Her monthly income from employment is listed as $12,125 on the application. Income was verified in two ways. First, there are W-2 Annual Earnings statements for 2004 and 2005, with income listed as $96,546 in 2004 and $91,896 in 2005. Next there are two recent paychecks, the most recent of which (5/31/06) lists an incentive amount already paid in 2006 of $66,700 and regular pay year to date of $35,458. Projecting the regular pay would provide annual earnings of $85,100 (7,083/mo). The application uses the earned bonus amount divided by 12 to include a monthly income of $5558. That's how the total monthly income of $12,125 is calculated. Annual income projection from that number is $145,500. Yet Ms. Main's history of earnings for 2004 and 2005 provides an average of $94,221. That's an increase of $51,279. We don't know if the incentive was a one-time payment, unusually large, based on a change in jobs, or whether it will continue, by the documentation in the file. The only thing we know is her earnings history. By that

15

measure, and without any statement from the employer to indicate otherwise, it is imprudent to inflate her historical earnings by $4,273 per month.

If you average the three years together, the amount is $111,314, or $9276 per month. That would change her debt to income ratios from 22.9%/26.5% to 31.4%/36%. The housing expense ratio is high by historical standards, but probably acceptable with the level of down payment. The loan documentation label for this loan by Countrywide is "full documentation." The borrower's credit score was 729, which is higher than average. As previously discussed in my original report, analysis of consumer and other similar short term debt credit behavior, as articulated in a basic credit score, is a tool that should not be overemphasized when underwriting mortgage loans. As of 8/1/10, the loan has been in default since 11/1/09.

### Diakite

Fatimata Diakite refinanced a primary residence home for $418,000 in 2006. It was purchased in 2005 for $410,000 and had an existing lien, prior to the refinance, of $413,524, so there was no borrower equity in the property when the loan was made. It was imprudent to make a loan with no borrower equity just one year after the home had been purchased. The appraised value was $465,000, indicating an 89.9% loan-to-value ratio.  There are two signed loan applications in the file. One indicates the property has been sold and the other indicates it has been rented. If the property had been sold, it was not prudent to make the loan. Mortgages are long term financing for homes. Most prudent lenders would not make a long-term mortgage on a home, if they knew the loan would pay off from a sale very quickly. If the property is rented, I found no analysis of the rent and expenses of the property, or a lease in file. This was negligent, if this is in fact investment property. Further, the borrower stated that the home was their primary residence, which is a material misstatement for investment property. It was negligent for Countrywide not to resolve the issue of whether the property was sold or rented.

The borrower is a Program Assistant for World Bank Group for 7 years and states income to be $9,667 per month. There is a verbal verification in the file indicating that the lender had called the place of employment to verify that the borrower worked there, and had been hired in 2000. There is also a form, signed by the employer, indicating the same. The income was not verified. It was imprudent not to verify income. Countrywide's underwriting guidelines establish a requirement on "low doc" loans to establish that the "stated income of the borrower is reasonable and consistent with the borrower's occupation." I saw no evidence of that within the underwriting documents I reviewed. It was negligent and imprudent to not follow the guidelines in effect for this loan.

There is a signed verification in the file for a balance of $58,398 in a savings account. The credit report indicates that the borrower had a bankruptcy in 2001. There is a court discharge document in file dated 7/9/01. With a recent bankruptcy, most prudent lenders would have required a pledge of some or all of the savings account as additional collateral, or a lower loan amount, so that the borrower would have been required to pay down the loan balance with the refinance with some of their savings. The credit score is 706. As previously discussed, analysis of consumer and other short term debt credit behavior, as articulated in a basic credit score, is a tool that should not be overemphasized when underwriting residential mortgage loans. The debt-to-income ratios are 32.6%/38.3%. Both are higher than average. The loan documentation label for this loan by Countrywide was "stated income."

It is a misrepresentation if the income or assets were incorrectly stated on the signed loan application. Countrywide's failure to verify income was negligent, not prudent, and not in accord with customary and standard mortgage industry practices. As of 8/1/10, the loan has been in default since 12/1/09.

Gooding

Esther Gooding purchased a townhome in 2006 for $366,000, using a first mortgage of $292,000 and a second mortgage of $72,000 for 100% of the sales price. It is not prudent to make a loan with no borrower equity investment in the property using a second mortgage. The appraised value of the home is $370,000.

Ms. Gooding is a Registered Nurse and works for Howard County General Hospital for 4 months. She states that she has worked for 6 years as an RN. She states that her income is $8,000 per month. In my experience, this is high for someone in a profession like nursing only 6 years and 4 months. There is a written verification of employment in file with no income verified. It verifies that she has worked at Howard County General Hospital since 1/27/06. The loan application is dated 6/23/06. There is another verbal verification in file that outlines a call was made to Progressive Nursing Staffers and that the person who answered the phone stated that Ms. Gooding has worked there as an RN since 2/10/2000. There is nothing in file to establish whether the salary she states is reasonable for her profession and the time period she has been in that business or whether she holds down two jobs; one at Howard County General Hospital and one with Progressive Nursing Staffers. It was negligent for Countrywide to not reconcile the job and sources of income. It is not prudent to make a loan without verifying income. Countrywide's underwriting guidelines establish a requirement on "low doc" loans to establish that the "stated income of the borrower is reasonable and consistent with the borrower's occupation." I saw no evidence of that within the underwriting documents I reviewed. It was negligent and imprudent to not follow the guidelines in effect for this loan.

The balance sheet for Ms. Gooding lists only retirement accounts as assets. There are no liquid assets, real estate, or automobiles listed. The retirement assets listed total $17,646. The liabilities total $36,186, and the net worth totals $18,540. With these numbers, the net worth should total ($18,540) using those numbers. This miscalculation was negligent. In the file, there are copies of statements for retirement assets totaling at least $50,000 that was not transferred to the loan application. This was negligent.

It could be considered a misrepresentation if the income or assets were incorrectly stated on the signed loan application. Countrywide's failure to verify income was negligent, not prudent, and not in accord with customary and standard mortgage industry practices. The credit score is 729; higher than average. As previously discussed, analysis of consumer and other short term debt credit behavior, as articulated in a basic credit score, is a tool that should not be overemphasized when underwriting residential mortgage loans. The debt to income ratios are 30.7%/42.75%. The backend ratio is high. However, the ratios are based on stated income, which I have questioned. The loan was foreclosed upon and the property sold by the lender, another servicer, on 4/26/10, resulting in a significant loss to HarVest Bank.

<u>Capital Markets Purchase of Loans</u>

Many of the defaulted loans sold by Countrywide to HarVest Bank were originated through wholesale capital markets by the purchase of loans from other servicers, and not through the Retail or Correspondent Lending Channels of Countrywide. This does not change any of my opinions on the negligence, lack of prudence on the part of Countrywide, or the requirements to follow generally accepted standards of the mortgage industry, nor Countrywide's responsibility to the written representations and warranties made to HarVest Bank in the sale. The underwriting faults noted in my reports for specific loans represent negligent and imprudent practices no matter what lender was performing the underwriting. Further, underwriting standards should not change no matter what channel or method the loan is acquired through. They are all merely different methods by which to originate loans.

It is generally accepted in the industry that the origination of loans includes the underwriting of the loans. Mr. Gadsby, in his deposition dated April 13, 2010 admits that some or all of the loans that were purchased in capital markets were re-underwritten by Countrywide to meet their standards, as part of a due diligence process associated with the purchase. This occurred after an underwriting guidelines comparison is made prior to the purchase to understand how the seller underwrote loans compared to Countrywide. In my experience and opinion, the mortgage banker has a duty to provide for prudent underwriting of

the loans it sells, whether the mortgage banker, or another lender it purchases loans from, performs the underwriting. By purchasing and reselling loans from the capital markets with the underwriting faults noted in my reports, Countrywide breached that duty.

In the Conventional Technical Manual, Introduction: 0.1, Introduction – Countrywide's Management Philosophy (CHL055831), it is stated that, "Whether someone is a Prime borrower or a Subprime borrower, our focus must be on the borrower's demonstrated desire to repay his or her obligations. Also in the Conventional Technical Manual, Introduction: 0.2.1, Introduction – Countrywide's Underwriting Philosophy (CHL055834), it is stated that, "It is Countrywide's policy to originate AND purchase (my emphasis) investment quality loans. An investment quality loan is one that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual (CTM) and Loan Program Guides (LPGs)." Mr. Gadsby provided a description, above, of the underwriting process for loans purchased in the capital markets. Those purchases should have complied with this guidance.

I have already provided numerous examples of problems created by lack of prudence, negligence, and failure to follow established underwriting for investment quality in accordance to long-term mortgage industry standards. Many of the loans do NOT establish the ability of the borrower to provide timely payment of the debt by following standard practices. Most of the loans provide for very little borrower equity in the transaction and lack verification of income and assets; prudent principles on which the mortgage industry has relied for many years. In addition, serious issues of suspected misrepresentation and fraud were evident in the defaulted loan underwriting documentation.

<u>Origination Practices for Loans Purchased in Capital Markets</u>

When Countrywide sells its assets to another party, it provides certain representations and warranties in that sale to the investor. For this transaction, those representations and warranties are provided in the Mortgage Purchase and Servicing Agreement between Countrywide Home Loans, Inc. and HarVest Bank of Maryland, dated March 23, 2006, Article III, section 3.02, paragraph (p), titled, Origination and Collection Practices. "The origination and collection practices used by Countrywide with respect to **each** (my emphasis) Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business." This responsibility was outlined clearly in my Rebuttal report dated February 10, 2010

As mentioned above, origination of loans can occur in a variety of ways for large residential lenders and mortgage bankers like Countrywide. Loans can be

acquired through the normal retail outlet facilities and handled 100% by Countrywide's retail mortgage banking employees. Loans can be acquired through a Correspondent Lending relationship that Countrywide has with other lenders, who use their employees to underwrite loans to Countrywide standards, and Countrywide agrees to fund the loans. Also, loans can be acquired by bulk purchase from other lenders who initially closed and serviced the loans. All these loan production channels are origination practices, in my opinion. Based on the underwriting faults found for capital markets loans in these reports, the representation and warranties of Countrywide were not met, as to such loans.

### Countrywide Represented Safe Loan Criteria

In John Hollerbach's deposition of March 19, 2010, he reports a discussion where Stuart McGehee, an employee of Countrywide, outlined the criteria to create a safe portfolio of residential mortgage loan assets. The criteria were loans with credit scores of 700 or more and loan-to-value ratios of 80% or less. This is a misstatement by McGehee. I have clearly outlined all the reasons in my reports. There are many factors that need to be weighed in evaluating residential mortgage loans. As I stated above, page 20 and 21 of my report dated October 30, 2009 provides a good outline. Also, in my underwriting analysis of each individual loan I reiterated that analysis of consumer and other short-term debt credit behavior, as articulated in a basic credit score, is a tool that should not be overemphasized when underwriting residential mortgage loans. Countrywide's own underwriting guidelines attest to the complexity of residential loan underwriting.

### Summary and Conclusions

On page 20 and 21 of my report dated October 30,2009, I outlined prudent and customary long-term practices that should be followed in the underwriting of residential mortgage loans. Countrywide had a duty to HarVest Bank to follow these time tested practices and did not, as evidenced by the poor quality of these loans in my individual loan analysis and the performance results to date. Countrywide practices and actions were negligent and not prudent.

My conclusions are the same as in my original report. Countrywide was negligent, lacked prudence, and failed to follow industry standards in their origination and servicing practices, as evidenced in the subject loans purchased by HarVest Bank.

Sincerely,

Terry Mendenhall

20

Harvest Bank v Countrywide
Supplemental Report
Addendum 1
Loss Valuation Analysis
8/13/10

At this point, there have been 12 liquidated properties from the original portfolio. Another 25 loans in the portfolio have defaulted and are presumed to be proceeding to foreclosure with serious delinquency results of the borrowers. The defaulted loans list has not changed much since 3/31/09. Only one loan, Ulola, is on that list and not on the current list. Gooding, Main and Diakite have been added since 3/31/09. Therefore, I have every reason to believe that the remaining list of defaulted loans will proceed to foreclosure, or some other form of disposition, such as short sale or lender principal reduction. The defaulted borrowers have most likely not changed their circumstances.

I have been engaged to determine the fair market value (FMV) of the 25 un-liquidated defaulted loans that HarVest Bank still owns. In order to establish value, it is important to update losses to date on all the liquidated loans and record any changes to the remaining defaulted loans

An update on 7/5/10 and 8/1/10 from the original data was compiled by HarVest Bank to provide results of the original 7 defaulted/foreclosed loans, now expanded to 12 loans that have been foreclosed, the property acquired by Countrywide, and the property also disposed of through a sale of the real estate owned (REO), or the property disposed of through some other method of disposition. The original 7 defaulted loans were analyzed for results in Addendum 1 of my original report of 10/30/09.

The data collected by HarVest Bank isolated the principal balance at foreclosure, expenses of foreclosure, expenses of the REO sale, expenses for the properties other than foreclosure and REO sale, and interest loss on the loan asset from the date of default to the date of the REO sale. Below is the expanded data for the 12 liquidated properties:

## Table A

**Foreclosed Properties**

Updated to 8/1/10

| Borrower | Default Date | FC Date | # Days | Principal Bal | Time & Costs Total Expenses (Incl loss of Int to REO sale)** | REO Sold Date | # Days fm FC | REO Sale Net*** | Economic Loss | % of Pr Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| Herr | 10/1/07 | 4/8/08 | 187 | $227,949 | $67,538 | 8/26/08 | 138 | $149,118 | $(146,369) | -52.86% |
| Mangieri | 2/1/07 | 9/17/07 | 226 | $392,000 | $137,799 | 8/20/08 | 333 | $257,391 | $(272,408) | -61.17% |
| Melgar | 5/2/08 | 1/7/09 | 245 | $173,600 | $29,504 | 6/9/09 | 162 | $121,178 | $(81,925) | -42.11% |
| Reyes | 5/1/07 | 8/20/08 | 469 | $427,499 | $118,501 | 6/9/09 | 199 | $319,289 | $(226,711) | -44.68% |
| Rizvi | 11/2/08 | 12/17/07 | 45 | $568,000 | $95,646 | 3/17/09 | 90 | $388,885 | $(274,761) | -49.41% |
| Stern | 5/1/07 | 10/24/07 | 203 | $999,981 | $227,750 | 4/17/08 | 203 | $903,501 | $(324,230) | -27.27% |
| Yi | 9/1/07 | 8/6/08 | 335 | $517,000 | $191,665 | 4/20/09 | 254 | $501,276 | $(207,389) | -30.13% |
| Karami | 1/2/08 | 7/15/09 | 553 | $718,160 | $173,926 | 2/4/10 | 199 | $607,708 | $(284,378) | -39.60% |
| Okonkwo | 4/1/08 | 1/20/09 | 289 | $252,000 | $82,502 | 10/27/09 | 277 | $199,946 | $(134,556) | -53.40% |
| Rodrigues | 8/2/08 | 7/27/09 | 355 | $288,000 | $32,583 | ss 7/27/09 | 0 | $224,214 | $(96,369) | -33.46% |
| Chhabra | 4/1/08 | 8/14/09 | 493 | $327,900 | $127,802 | 4/29/10 | 255 | $319,569 | $(136,133) | -41.52% |
| Gooding | 10/1/08 | 11/15/09* | 404 | $292,400 | $77,332 | 4/26/10 | 161 | $289,071 | $(80,661) | -27.59% |
| Total | | | 3804 | $5,184,489 | $1,362,547 | | 2291 | $4,281,146 | $(2,265,890) | -43.71% |
| Averages | | | 317 | $432,041 | $113,546 | | 191 | $356,762 | $(188,824) | -43.71% |

Assumptions:

360 day year
30 day
months

* Estimated f/C date

** From HB Report 7/5/10;

*** From "37 Borrowers Report"

As outlined, the economic loss on all the loans and properties is ($2,265,890), or and average loss of (43.71%) of the original principal balance of the loans. That means the value of the loan asset purchased by HarVest Bank that have defaulted and gone through resolution is 56.3% of par value.  One of the properties was sold at foreclosure and one was a short sale. So the alternative liquidation tactics represent 16.7% of sales.  Both of these sales reduced the time period from foreclosure to sale. I have no reason to believe at this point that Countrywide will change their performance in the future.

The overall loss of (43.71%) on the 12 properties is slightly higher than the results of the 7 sales included in the 10/30/09 analysis, which was (40.34%). In

2

addition to the foreclosed and fully liquidated loans, as I mentioned, there are 25 defaulted loans in the portfolio at various stages of collection. Following is a table of these loans.

## Table B

| Borrower | CHL # | Note Amount | Note Rate | Paid to Date | Default Date | Days since Default | Current Bal | |
|---|---|---|---|---|---|---|---|---|
| | | | | | **Defaulted Loans\*** (not F/C) 8/1/10 | | | |
| Herrara | | $247,590.00 | 6.63% | 6/1/2009 | 7/1/2009 | 390 | $247,589.79 | |
| Song | | $419,999.99 | 6.00% | 9/1/2009 | 10/1/2009 | 300 | $422,142.81 | |
| Brickley | | $97,451.01 | 7.38% | 12/1/2007 | 1/1/2008 | 930 | $95,988.94 | |
| Kang | | $479,920.00 | 6.75% | 12/1/2008 | 1/1/2008 | 930 | $466,402.17 | |
| Malate | | $500,000.00 | 6.88% | 1/1/2008 | 2/1/2008 | 900 | $499,856.62 | |
| Watson | | $439,920.00 | 6.25% | 8/1/2009 | 9/1/2009 | 330 | $452,349.26 | |
| Lee | | $655,500.00 | 6.75% | 4/1/2008 | 5/1/2008 | 810 | $655,098.26 | |
| Cala | | $404,762.42 | 7.25% | 8/1/2008 | 9/1/2008 | 690 | $400,559.03 | |
| Carberg | | $259,922.81 | 7.13% | 7/1/2009 | 8/1/2009 | 360 | $266,016.97 | |
| Espinal | | $384,000.00 | 7.38% | 7/1/2009 | 8/1/2009 | 360 | $384,000.00 | |
| Medina Slc-Rodriguez | | $213,000.00 | 6.88% | 6/1/2009 | 7/1/2009 | 390 | $212,999.95 | |
| | | $254,400.00 | 6.75% | 2/1/2009 | 3/1/2009 | 510 | $254,400.00 | |
| Ahmed | | $244,807.57 | 7.25% | 5/1/2009 | 6/1/2009 | 420 | $244,997.68 | |
| Reyes | | $154,400.00 | 7.75% | 11/1/2008 | 12/1/2008 | 600 | $154,400.00 | |
| Perrera | | $300,400.00 | 6.63% | 6/1/2009 | 7/1/2009 | 390 | $300,000.00 | |
| Hwuyhua | | $638,852.00 | 6.50% | 5/1/2009 | 6/1/2009 | 420 | $638,852.00 | |
| Douglas | | $227,920.00 | 6.75% | 10/1/2008 | 11/1/2008 | 630 | $227,919.84 | |
| Hussain | | $272,000.00 | 5.88% | 1/1/2009 | 2/1/2009 | 540 | $272,000.00 | |
| Guzman | | $310,000.00 | 8.38% | 12/1/2008 | 1/1/2009 | 570 | $309,681.38 | |
| Hirunyakes | | $342,863.80 | 8.38% | 8/1/2009 | 9/1/2009 | 330 | $334,558.20 | |
| Villatoro | | $300,800.00 | 7.09% | 10/1/2008 | 11/1/2008 | 630 | $300,800.00 | |
| Flores | | $479,199.50 | 6.50% | 11/1/2008 | 12/1/2008 | 600 | $479,198.98 | |
| Main | | $418,000.00 | 6.25% | 10/1/2009 | 11/1/2009 | 270 | $404,249.00 | |
| Diakite | | $417,000.00 | 6.63% | 11/1/2009 | 12/1/2009 | 240 | $417,000.00 | |
| 24 | | | | | | | | |
| | Subtotal | $8,462,709.10 | | | | 12540 | $8,441,060.88 | |
| | | $352,612.88 | average | | | 523 | average | |
| Dam | | $792,000.00 | 6.38% | 10/1/2007 | 11/1/2007 | 990 | $791,990.82 | F/C in process |
| 25 | Total | $9,254,709.10 | | | | 13530 | $9,233,051.70 | |
| | | $370,188.36 | average | | | 541 | average | |

\*From "37 Borrowers Report"

The defaulted loans in Table B reveal more serious problems than those presented in the REO sales to date. The most glaring issue is one of time. In Table A one can see that the average number of days from default to foreclosure for the REO's was 317 days.  In Table B, the average days from default to the date of the report, 8/1/10, is 541 days. This is an increase of 224 days without a foreclosure/lender acquisition result.

## FAIR MARKET VALUE

The portfolio of 25 defaulted loans had original promissory note amounts of $9,254,709.10. The current principal balance is $9,233,051.70. According to InvestorWord.com, fair market value is, "The price that an interested but not desperate buyer would be willing to pay and an interested but not desperate seller would be willing to accept on the open market assuming a reasonable period of time for an agreement to arise."

I have approached this evaluation, as I believe any prudent investor would, to develop an opinion of fair market value. The first step is to make some assumptions for the purpose of the exercise. The first assumption is that the current defaulted loans will all be acquired by the new lender/investor. Of the total, 83.3% will be taken to foreclosure and liquidation, 16.7% will be otherwise liquidated, and the results will match the performance of all the properties disposed of to date. I mentioned previously that the defaulted loans have already been in that state for the better part of a year longer than the REO's sold took from default to foreclosure. None of the defaulted loans collateral properties have yet been foreclosed. The loss experience to date on the REO's provided a 43.71% loss of principal to HarVest Bank after all expenses.

Other major assumptions are that there is no change in the economy, no changes for the interest rates on the loans, and no further deterioration in property values. All of these variables are dynamic, but the investor must take the risk of changes either direction, once the assets are purchased. I project an average asset life of 5 years to disposition of all assets, with assets paying off evenly throughout that time period. Since most losses, some expenses, and some income will occur over the five year period, it is necessary to present value those estimates for comparison to other one time items and to develop a price to par the investor should be willing to pay for the assets and to obtain a fair investment return.

I anticipate that an investor would acquire the loans, set them up on some type of loan servicing and accounting system, and work them all through to an economically favorable return. Servicing loans that are all in default is highly specialized. Therefore, I have estimated a higher than normal servicing fee and property management fee for any rented properties at 1% per year. In my

4

opinion, it would cost the investor about 5% (of principal balance) in legal fees and expenses to negotiate the transaction, set up the loans on a system, and train personnel to deal with the assets before effective asset management could begin. Also, with all the broad assumptions and risks, the investor would build in a 5% contingency for unknown events that could occur, in my opinion. Many times, this type of contingency for unknown events will be built into the rate of return, but I thought it most important to show the calculation and amount separately from what the investor builds in as a minimum return.

Also, the loans are projected to go into foreclosure, or otherwise be disposed of ultimately, over a five-year period. During that time, some of the loans may have temporary workouts that provide some level of income from the borrower, or some of the properties could be rented post foreclosure until an ultimate sale. Therefore, I project that an average principal balance of the loans (50% of today's level) will generate at least 6.88% (the current weighted average coupon rate on the loans) until all are ultimately liquidated in a sale.

An investor in such a transaction would expect a high return on investment (ROI). In my opinion, the investor would require a 7.5% to 10% return on average assets as a gross profit margin minimum for this investment. Keep in mind that these are all troubled assets that are not performing.

Here is an outline:

## Table C.

FMV Determination

Defaulted Loans Projected Loss Calculation

8/1/10

| | | | | |
|---|---|---|---|---|
| Original Note Amount: | | $9,254,709.10 | 25 loans | |
| Current Principal Bal | | $9,233,051.70 | | |
| | | $4,616,525.85 | Average Principal Balance | |
| Projected Loss: | | $(4,045,233.34) | over 5 years Based on actual REO losses | |
| | | -43.71% | to original principal balance | |
| Upfront costs: | | $(461,652.59) | Legal & Setup - 5% of Pr Bal | |
| Svcg/Prop Mgt fees: | | $(145,849.90) | PV of annuity @ 6% 4.2124X 1.0%/yr * X 5 years X Avg Bal | |
| Contingency: | | $(461,652.59) | 5% of Pr Bal | |
| Gross Profit Expected: | | at 10% ROAA | at 7.5% ROAA | |
| | | $(1,458,499.01) | $(972,332.67) | PV of Annuity @ 6% 4.2124 X Return Target X Avg Bal |
| Income (int. & rents) | | $1,588,084.89 | $1,588,084.89 | Avg Bal X 6.88% WAC X 5 yrs |
| Total Net | | $(4,984,802.53) | $(4,498,636.19) | |

5

| | | |
|---|---|---|
| Percent of Pr. Bal | -53.99% | -48.72% |
| | | |
| Price to Par | 46.01% | 51.28% |
| Amount Paid | $4,248,249.17 | $4,734,415.51 |
| ROI | 34.33% | 20.54% |

Assumptions:

    Performance of all current defaulted loans will equal liquidated loans to date

    5 year life of investment; all properties disposed of by 5 years with even amort.

    ROI range:20 to 35%

    No changes in the economy

    No changes in WAC of loans; interest rates

    No further deterioration in property values
PV of annuity discount rate =
6%

So, after considering all costs and income, the investor would purchase the assets, and the current owner should sell the assets at somewhere between 46% and 51.3% of the current principal balance.

**Therefore, the FMV for these assets is estimated to be between $4,248,249 and $4,734,416. This price range for FMV is as of 8/1/10, and would be subject to change, based on changes in one or more of the assumptions.**

**Terry Mendenhall**
**Consulting**
