# EXPERT REPORT OF
# CHARLES R. GOLDSTEIN

## Assignment

1. I have been retained by Ballard Spahr LLP to assist Bank of America in the case of Harvest Bank of Maryland v. Countrywide Home Loans, Inc. (Case No. 09-00176). I have responded to the "supplemental" expert report (the "Report") (**Exhibit A**), filed on August 13, 2010, of Terry Mendenhall as to the damages associated with loans purchased by Harvest Bank of Maryland ("Harvest Bank") from Countrywide Home Loans, Inc. ("CHL").

2. For my analysis, I considered CHL's underwriting files, the Mortgage Loan Purchase and Servicing Agreement, Mr. Mendenhall's expert reports, supporting exhibits, deposition and documents referenced within the Report as well as certain industry information. I have also relied on general accounting standards and principles, and my professional training and work experience to support my conclusions.

## Summary

3. I have concluded that there is insufficient basis to support Mr. Mendenhall's opinion offered as to the damages associated with the 37 loans that are the subject of this case (the "Loan Portfolio"). The analysis included within Mr. Mendenhall's Report does not meet the requirements set forth by professional standards, principally due to the lack of support for his assumptions and disregard for the value of the underlying collateral.

## Background

4. CHL primarily originates and purchases mortgage loans and home equity lines of credit for investment purposes. CHL merged with Bank of America through an acquisition in 2008. Harvest Bank of Maryland operates as a subsidiary of Harvest Bancorp, Inc. and offers banking products and services to businesses, employees, and retail and commercial clients. In 2006 and 2007 Harvest Bank purchased loans from CHL and on December 29, 2008 filed this case against CHL.

5. In October 2009, Harvest Bank served its expert disclosures on CHL which included the original report from Terry Mendenhall, an expert witness on residential mortgage loan servicing and underwriting. After Harvest Bank served its original expert report, a supplemental Report was served which included opinions as to the damages suffered by Harvest Bank as a result of Harvest Bank's purchase of the Loan Portfolio. In response to Mr. Mendenhall's Report, I have been retained by CHL as an expert and offer my own opinion as to the validity of certain aspects of Mr. Mendenhall's Report.

EXHIBIT 10

**Professional Standards**

6.  Mr. Mendenhall's Report is not discernibly based on any recognized standards or methods. He does not state within his Report conformance with any of the professional standards promulgated by any professional organizations.

7.  Such organizations could include the American Institute of Certified Public Accountants (AICPA) which is a professional trade organization responsible with establishing quality assurance standards for Certified Public Accountants and professionals involved in the audit, tax, valuation and litigation consulting professions. The AICPA established Rule 102 *Integrity and Objectivity* and Rule 201 *General Standards* for which professionals, including litigation consulting practitioners, should comply. A copy of these standards, as presented in the AICPA's *Litigation Services and Applicable Professional Standards*, is furnished in **Exhibit B**. Rule 102 and 201 specify, "The expert's function is to assist the trier of fact in understanding complex or unfamiliar concepts after having applied reliable principles and methods to sufficient relevant data."

**Application of Reliable Principles and Methods**

8.  Mr. Mendenhall's Report does not apply material facts and reason that are vital to producing an accurate calculation of damages. For example, in his analysis Mr. Mendenhall does not consider the value of the underlying collateral which has a direct impact on the results of the loss calculation. In addition, he applies the loss percentage from the 12 previously foreclosed properties within the Loan Portfolio to the 25 loans in his damages calculation. This is not appropriate because the remaining 25 properties securing the Loan Portfolio have unique attributes and should be analyzed on an individual basis.

    a.  The impact of the improper methodology is demonstrated with the transaction that occurred on October 15, 2010. In this transaction a property securing one of the 25 loans in default within the Loan Portfolio was sold for $460,000 (**Exhibit C**), 1.4% less than the value of the current principal balance of the loan. This is a significantly smaller deterioration in value than the 43.7% assumed by Mr. Mendenhall and illustrates the impact of excluding reasonable and material data from the calculation.

    b.  The financial formulas applied within Mr. Mendenhall's damages calculation are not supported and follow no identifiable methodology. The service charges and expected gross profit components that are part of his calculation could not be recalculated based on the limited information and descriptions presented within his Report. The calculation's lack of testability diminishes the reliability of Mr. Mendenhall's conclusions.

    c.  Mr. Mendenhall fails to consider future payments of principal and interest on the loans which would reduce the calculated loss on the loans.

d. The projected loss component of Mr. Mendenhall's calculation is not discounted for the time value of money. Discounting cash flows is a generally accepted financial practice for determining the value of future cash flows.

9. Based on the aforementioned examples, it is my opinion that Mr. Mendenhall's damages calculation does not present an accurate application of reason and financial methods as required under professional standards.

**Sufficient Facts and Data**

10. As referenced above in "Professional Standards", and stated in the AICPA's rule 201, "The expert needs to base his or her conclusions and judgments on sufficient relevant data." Mr. Mendenhall's Report does not contain sufficient facts or data to support his calculations and conclusions. Several examples are presented below:

e. Mr. Mendenhall assumes a 5.0% reduction in the current principal balance of the loans due to upfront costs an investor would incur by purchasing the loans. In his Report he states, "…it would cost the investor about 5.0% (of principal balance) in legal fees and expenses to negotiate the transaction, set up the loans on a system and train personnel to deal with the assets before effective asset management could begin." The 5.0% reduction is not accompanied by any supporting facts or data and therefore does not adhere to requirements set forth by professional standards. A properly supported assumption should cite specific underlying data points such as historical rates or industry reports that include the amounts of legal and other fees generally associated with purchasing loans.

f. Mr. Mendenhall assumes a 1.0% service charge associated with rental of the properties securing the loans. He describes this reduction as, "…servicing loans that are all in default is highly specialized. Therefore, I have estimated a higher than normal servicing fee and property management fee for any rented properties at 1.0% per year." Similar to the upfront costs, the 1.0% reduction is not accompanied by sufficient facts or data and therefore does not adhere to requirements set forth by professional standards. A properly supported assumption should cite specific underlying data points such as market rates or historical costs of previously managed properties.

g. Mr. Mendenhall assumes a 5.0% contingency for which, "…[an] investor would build…for unknown events that could occur". The 5.0% reduction is not accompanied by sufficient facts or data and therefore does not adhere to requirements set forth by professional standards. A properly supported assumption would provide further clarification as to the types of events that could occur and the impact such events would have on the calculation of damages.

h. Mr. Mendenhall assumes that an investor would require a 7.5% or 10.0% return on investment for purchasing the loans as of August 1, 2010. He states in his Report, "…the investor would require a 7.5% to 10.0% return on average assets as a gross profit margin minimum for this investment." These estimates of return are

not accompanied by sufficient facts or data and therefore do not adhere to requirements set forth by professional standards. A properly supported assumption for returns on investment should cite specific underlying data points such as current yields of similar assets and loans to determine what return an investor would expect given the asset's risk profile.

i. Mr. Mendenhall assumes there will be no changes in the macro environment. In his Report he states, "Other major assumptions are that there is no change in the economy, no changes for the interest rates on the loans, and no further deterioration in property values." These estimates are not accompanied by sufficient facts or data and therefore do not adhere to requirements set forth by professional standards. A properly supported assumption should cite specific underlying data points such as economic studies and forecasts to determine the expected economic and housing market growth rates.

j. Mr. Mendenhall assumes the average asset life will be 5 years to disposition but provides no basis as to why he selected this term. This estimate is not accompanied by sufficient facts or data and therefore does not adhere to requirements set forth by professional standards. A properly supported assumption should provide adequate basis for the payoff term selected.

**Product of Reliable Principles and Methods**

11. As demonstrated above, Mr. Mendenhall's Report is not discernibly based on any recognized standard or methodology. He does not state within his Report conformance with any professional standard promulgated by the AICPA or any other professional organizations.

12. In addition, based on my evaluation of his curriculum vitae, found in **Exhibit D**, Mr. Mendenhall lacks certain credentials and qualifications that would allow him to provide reliable expert testimony with respect to damage calculations. Mr. Mendenhall has no experience providing damage calculations and holds no relevant certification or training within this area.

**Causation**

13. The United States Governmental Accountability Office ("GAO") conducted a study (**Exhibit E**) in August 2010 to, "…examine how loan and borrower characteristics and economic conditions influenced the likelihood of default and foreclosure of nonprime [subprime and Alt-A] loans…" As part of their analysis the GAO considered numerous factors that would cause loan defaults and foreclosures. These included but are not limited to: house price appreciation, loan amounts, combined loan-to-value ratios, borrower credit scores, employment growth, interest rates, geography, and loan documentation levels.

14. As stated by the GAO, "...house price changes, loan amount, the ratio of the amount of the loan to the value of the home, and borrower credit score were among the variables that influenced the likelihood of default on nonprime loans originated from 2004 through 2006" and "In addition, loans that lacked full documentation of borrower income and assets were associated with increased default probabilities, and the influence of borrowers' reported income varied with the level of documentation." Mr. Mendenhall's analysis alleges the loan underwriting was the sole cause leading to foreclosure of the 12 properties and, subsequently, to the loss associated with all 37 properties within the Loan Portfolio. In my opinion, a complete analysis as to future losses would include consideration to systemic factors such as the economy, housing prices and employment levels and other factors included in the GAO study.

15. Mr. Mendenhall did not specify which portion of his calculated loss is attributable to each of these variables.[1] Basing the total loss on the alleged underwriting does not preclude these loans from performing because even poorly underwritten loans can perform.

**Conclusion**

16. Mr. Mendenhall's calculation of damages and opinions expressed within his Report do not meet the requirements of any professional standard. His calculations and conclusions are inadequately supported and therefore cannot be relied upon. In addition, his Report and calculations were not prepared in accordance with professional standards and principles which ensure quality and consistency of work products within litigation consulting. His application of facts and assumptions is flawed because he does not consider key facts and causes that have a material impact on his calculation. Therefore, I conclude that Mr. Mendenhall's Report cannot be relied upon for the purpose of quantifying damages in relation to the Loan Portfolio at issue in this case.

**Qualifications of Expert and Other Cases in Which the Witness Has Testified at Trial or Been Deposed**

17. My C.V. is attached as **Exhibit F.**

**Data and Other Information Considered in Forming Opinions Expressed Herein**

18. In arriving at the preliminary opinions outlined above, I have based my opinions on my expertise in accounting, valuations, and my assessment of industry research and various documents produced in this matter. A listing of these documents is attached as **Exhibit G.** I reserve the right to supplement this opinion should additional information become available.

---

[1] It is unclear whether Mr. Mendenhall's Report is a continuation of his opinion from Addendum 1 of the original report dated October 30, 2009 or whether Harvest Bank is no longer pursuing claims referenced in the original report. The October 30, 2009 Addendum 1 does not provide additional facts or data that would support Mr. Mendenhall's damages calculation, nor does it establish causation between the loan origination/servicing processes and the damages calculation.

**Compensation to be paid for Consultation and Testimony**

19. My hourly rate is $560.  I am also reimbursed for reasonable expenses.  My fees are not contingent on the outcome of these proceedings.

**Exhibits to be used in Support of Opinion**

20. **Exhibits A** through **G** are attached hereto.  I reserve the right to provide additional exhibits as and when they become available.

**Possible Revisions and Supplements to this Report**

21. I reserve the right to supplement, amend, or modify my opinions based on information that I have received or may receive in the future, including any opinions expressed by Ballard Spahr's experts.

Charles R. Goldstein

_____
Signature

_____1/12/2011_____
Date

# EXHIBIT A

# Report of Terry Mendenhall dated October 30, 2009

## (attached to Defendant's Motion to Exclude Expert Testimony as Exhibit 8)

# Exhibit B

**CONSULTING SERVICES
SPECIAL REPORT 03-1**



AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

# *Litigation Services and Applicable Professional Standards*

*Member Innovation Team*

*Copyright © 2003 by*
*American Institute of Certified Public Accountants, Inc.*
*New York, NY 10036-8775*

*All rights reserved. For information about the procedure for requesting permission to make copies of any part of*
*this work, please call the AICPA Copyright Permissions Hotline at (201) 938-3245. A Permissions Request Form*
*for e-mailing requests is available at www.aicpa.org by clicking on the copyright notice on any page. Otherwise,*
*requests should be written and mailed to the Permissions Department, AICPA, Harborside Financial Center,*
*201 Plaza Three, Jersey City, NJ 07311-3881.*

*1 2 3 4 5 6 7 8 9 0  MI  0 9 8 7 6 5 4 3*

**NOTICE TO READERS**

This special report is designed as educational and reference material for American Institute of Certified Public Accountants (AICPA) members and others who provide consulting services as defined in the Statement on Standards for Consulting Services issued by the AICPA. It does not establish standards; other approaches, methodologies, procedures, and presentations may be appropriate because of the widely varying nature of consulting services as well as specific or unique facts about the client and engagement.

The principal authors of this special report are the members of the AICPA Litigation Services and Professional Standards Task Force:

> Michael G. Ueltzen, *Chair*
> Ronald L. Durkin
> Vincent J. Love
> Roger B. Shlonsky
> Dr. Laura Jane Tindall
> Alan D. Westheimer

Members of the 2000-2001 and 2001-2002 AICPA Litigation and Dispute Resolution Services Subcommittees provided information and guidance for this special report and advised the authors and staff. The subcommittee members are listed below.

> Ronald L. Durkin, *Chair 2001*     C. P. Schumann
> Book T. Evans, Jr.                 Laura Jane Tindall
> Sandra K. Johnigan, *Chair 2002*   Michael G. Ueltzen
> L. Elliott Leary                   Charles L. Wilkins
> Sharyn Maggio                      Ann E. Wilson
> Grant W. Newton                    Diane L. Womack
> D. Paul Regan

---

Anat Kendal, *Director*
*Financial Planning*

James Feldman, *Business Valuation and Litigation Services Manager*
*Financial Planning*

Margaret A. Jannucci, *Project Manager*
*Financial Planning*

# CONTENTS

INTRODUCTION ........................................................................................................... 1

    Purpose of the Special Report ........................................................................ 1
    Definition of Litigation Services .................................................................... 1
    Roles of the Practitioner ................................................................................. 1
    Scope of Services ........................................................................................... 1
    Other Engagements of the Practitioner .......................................................... 2
    Consulting Services Provided by the CPA ..................................................... 2

PROFESSIONAL STANDARDS APPLICABLE TO LITIGATION SERVICES ............................... 2

    The AICPA Code of Professional Conduct .................................................... 2
    Rule 201, *General Standards* ....................................................................... 3
    Consulting Standards ..................................................................................... 6

RELATIONSHIP OF ATTESTATION AND OTHER PROFESSIONAL STANDARDS
    TO LITIGATION SERVICES ....................................................................... 8

    Comparison to Other Services ....................................................................... 8
    Reporting Standards ..................................................................................... 10

OTHER GUIDANCE ................................................................................................... 11

    Federal and State Court Rules ...................................................................... 11
    AICPA Special Reports and Practice Aids ................................................... 12

CONCLUSION ........................................................................................................... 12

APPENDIX A?  Typical Litigation Services ................................................................. 13

APPENDIX B?  Decision Tree to Determine the Application of Professional Standards ...................... 15

APPENDIX C?  Working Papers and Documentation .................................................... 16

APPENDIX D?  Comparison of AICPA Professional Standards and Federal Rule of Evidence 702 ..... 18

APPENDIX E?  Testimony Pyramid ............................................................................. 19

APPENDIX F?  AICPA Special Reports and Practice Aids ............................................ 20

APPENDIX G?  Bankruptcy and Reorganization Services ............................................. 21

APPENDIX H?  Professional Standards Case Studies .................................................... 24

## LITIGATION SERVICES AND APPLICABLE PROFESSIONAL STANDARDS

## INTRODUCTION

### Purpose of the Special Report

**1.**   The purpose of this Special Report is to provide practitioners with additional guidance on the existing professional standards and the related responsibilities that affect the litigation services practitioner (the practitioner). This Special Report supersedes Consulting Services Special Report 93-1, *Application of Professional Standards in the Performance of Litigation Services.*

### Definition of Litigation Services

**2.**   Litigation services are consulting services that ordinarily involve pending or potential formal legal or regulatory proceedings before a trier of fact in connection with the resolution of a dispute between two or more parties. A trier of fact may be a court, jury, regulatory body, or government authority or their agents; a grand jury; an arbitrator; or the mediator of a dispute.

### Roles of the Practitioner

**3.**   The practitioner may be retained in a number of roles. These include the following:

    *a*.   *Expert witness.* A person designated to render an opinion before a trier of fact is an expert witness. If the practitioner is designated as an expert witness, all work the practitioner has performed related to the litigation is potentially discoverable.

    *b*.   *Consultant.* A person who is retained to advise about the facts, issues, and strategy of the matter is a consultant. The consultant does not testify about an expert opinion before a trier of fact, unless the consultant's role is changed to that of an expert witness at a later date. The consultant's work generally is protected from discovery by the attorney work-product privilege, which emanates by extension from the attorney-client privilege. CPA-client privilege is non-existent except in certain situations involving practice before the IRS. When engaged by a litigant, as opposed to the litigant's counsel, the consultant should confirm that the attorney's work product privilege remains intact.

    *c*.   *Other.* This can be a person who is retained in a number of different roles, including a trier of fact, special master, court-appointed expert, referee, arbitrator, or mediator.

The roles of the expert and consultant are different. The term *practitioner* is used when the CPA may be serving either as an expert or consultant. The terms *expert* and *consultant* are used in those instances to clarify the separate roles of the practitioner.

### Scope of Services

**4.**   Litigation services may include fact-finding (including assistance in the discovery and analysis of data), damage calculations, business valuation, document management, expert testimony, and other professional services required by the client or counsel. Examples of typical litigation services engagements are provided in Appendix A, "Typical Litigation Services."

### Other Engagements of the Practitioner

**5.**   Litigation services do not usually, but may, include the following engagements:

- Attest
- Audit
- Review
- Compilation

Separate professional standards apply to each of the above engagements.

A decision tree of the applicability of the various services is included as Appendix B, "Decision Tree to Determine the Application of Professional Standards."

### Consulting Services Provided by the CPA

**6.**   As the practitioner providing litigation services, the certified public accountant (CPA) may be involved as an expert; consultant; or provider of other services including acting as a trier of fact, special master, court-appointed expert, referee, arbitrator, or mediator. The types of services or functions are varied and depend upon the practitioner's expertise. Such services may include the computation of economic damages, analysis of professional standards, valuation, fraud prevention, detection, and investigation, work in the bankruptcy court system, tax analyses, and more. The functions that can be performed include identifying issues, locating other experts, fact finding, analysis, assisting and managing discovery, etc. The scope and breadth of the services and functions provided by the practitioner may be varied. Refer to Appendix A.

## PROFESSIONAL STANDARDS APPLICABLE TO LITIGATION SERVICES

**7.**   Litigation services are consulting services provided by CPAs and their employees, and, therefore, adherence to the Statement on Standards for Consulting Services (SSCS) is required. The CPA engaged in litigation services must also comply with the general standards of the accounting profession contained in the American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct, as well as relevant standards established by the state boards of accountancy or other licensing agencies and by other professional organizations to which the practitioner may belong. The appropriate AICPA standards that apply are discussed elsewhere in this report.

### The AICPA Code of Professional Conduct

**8.**   The AICPA *Code of Professional Conduct and Bylaw*s applies to all services rendered by AICPA members. The following sections of the Code of Professional Conduct have particular applicability to the practice of litigation services:

- Rule 102, *Integrity and Objectivity* (AICPA, *Professional Standards*, vol. 2, ET sec. 102.01)
- Rule 201, *General Standards* (AICPA, *Professional Standards*, vol. 2, ET sec. 201.01)
- Rule 202, *Compliance With Standards* (AICPA, *Professional Standards*, vol. 2, ET sec. 202.01)
- Rule 301, *Confidential Client Information* (AICPA, *Professional Standards*, vol. 2, ET sec. 301.01)

- Rule 302, *Contingent Fees* (AICPA, *Professional Standards*, vol. 2, ET sec. 302.01)
- Rule 501, *Acts Discreditable* (AICPA, *Professional Standards*, vol. 2, ET sec. 501.01)

In some instances, the following also apply:

- Rule 101, *Independence* (AICPA, *Professional Standards*, vol. 2, ET sec. 101.01)
- Rule 203, *Accounting Principles* (AICPA, *Professional Standards*, vol. 2, ET sec. 203.01)

An understanding and appreciation of the importance of all rules contained in the Code will assist practitioners in their efforts to provide opinions that are relevant and reliable, and that assist the trier of fact.

**9.   *Rule 101,* Independence**. Independence, as set forth in the AICPA Code of Professional Conduct, is ordinarily not required when performing litigation service engagements. As a result of the Sarbanes–Oxley Act of 2002, the practitioner should be aware that, in some instances, if the practitioner provides audit services, statutes may preclude the provision of litigation services.

**10.**   Lack of independence from the client may be used to question the expert's credibility and objectivity. The expert should carefully consider the potential difficulties inherent in serving as an expert witness for a party. If the practitioner lacks independence, or could appear to lack independence in relation to that party, the practitioner should discuss these issues with the client before accepting an engagement. In addition, independence notwithstanding, the practitioner's working paper files relating to other engagements for the same client may be subject to the discovery process.

**11.   *Rule 102,* Integrity and Objectivity**. To maintain integrity is to adhere to an ethical code and be free from corrupting influences and motives. Service and public trust should not be subordinated to personal gain and advantage.

**12.**   The roles of practitioners differ from attorneys in the litigation process, which is an adversarial proceeding in which the best case for each party is put before the trier of fact. The litigating attorney is the client's advocate.

**13.**   The expert does not serve as an advocate for the client's position and, therefore, should not subordinate his or her judgment to the client. The expert is engaged as someone who has specialized knowledge, skills, training, and experience in a particular area and presents conclusions and judgments with integrity and objectivity. The expert's function is to assist the trier of fact in understanding complex or unfamiliar concepts after having applied reliable principles and methods to sufficient relevant data.

**Rule 201, *General Standards***

**14.**   Rule 201, *General Standards*, of the AICPA Code of Professional Conduct applies to litigation services as well as to all other services rendered by CPAs to their clients. The general standards cover professional competence, due professional care, planning and supervision, and sufficient relevant data.

**15.   *Professional Competence*.** Practitioners should undertake only those litigation services that they reasonably can expect to complete with professional competence. Consequently, practitioners may be unprepared to meet client needs adequately in every area and in every phase of litigation engagements. To comply with this standard in providing litigation services, practitioners may need the assistance of other individuals with the required education and experience.

**16.**  Professional competence includes, among other things, identifying client needs, applying an analytical approach, and being knowledgeable about the technical areas involved in the litigation engagement.

**17.**  As a result of *Daubert v. Merrill Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and *Kumho Tire Company, Ltd. v. Patrick Carmichael*, 526 U.S. 137 (1999), the practitioner should consider that the reliability and relevance of the expected testimony is likely to be subjected to careful judicial scrutiny before it will be allowed to be presented at trial. When deciding whether to accept a litigation services engagement, the practitioner should consider whether it is likely that he or she has the knowledge and skills necessary to provide a reasonable basis to present relevant and reliable testimony on the issues to be presented in the particular case.

**18.**  *Due Professional Care.* A practitioner exercises due professional care in the performance of professional services. Due care requires diligence and critical analysis of all work performed. It also requires that all work be completed in accordance with the provisions of the applicable professional standards of the AICPA, including the Code of Professional Conduct.

**19.**  In a litigation engagement, practitioners are often the only professionals capable of quantifying the impact of the events that led to the dispute. Their work product is therefore important in the litigation process. Each party to the proceedings may retain professionals to quantify and analyze the economic impact of events. Practitioners need to be able to evaluate and challenge the assumptions and calculations of other professionals as well as defend their own assumptions and calculations under rigorous cross-examination.

**20.**  *Planning and Supervision.* A practitioner adequately plans and supervises the performance of professional services. Planning is essential in a litigation engagement. Planning consists of developing engagement objectives and translating them into the activities necessary for the CPA to form an opinion. Planning guides the conduct, supervision, control, and completion of the engagement.

**21.**  The facts and circumstances of each litigation engagement are unique. Planning is essential to ensure the quality of the performance of professional services in each engagement. Planning includes obtaining information from the counsel of the client. Plans continually change in a litigation engagement and usually are not written because the litigation process is dynamic.

**22.**  As with any professional services, the supervision of assistants helps to ensure quality performance. The extent of the supervision will vary according to the number of assistants, their experience, and the complexity of the engagement. Ultimately, the practitioner, as the potential expert witness or consultant, is responsible for the work performed.

**23.**  *Sufficient Relevant Data.* A practitioner attempts to obtain relevant data that is sufficient to provide a reasonable basis for conclusions or recommendations for any professional services performed. In litigation, data are usually obtained through discovery, including depositions, interrogatories, and document production motions. In addition, the data-gathering process may include a review of relevant documents, research and analysis, and interviews. The nature and extent of the data will vary with each engagement and may include the practitioner's computations and analysis and other information-supporting conclusions.

**24.**  The expert needs to base his or her conclusions and judgments on sufficient relevant data. The expert should rely on the attorney to comply with the applicable rules of evidence.

   *a.*  *Legal evidence.* The courts have established rules for the determination of admissible evidence and expert testimony.

The expert can generally rely on documents that have been authenticated by the parties to the proceeding, or that are acceptable to the court under the various rules of evidence. Each legal jurisdiction may have different rules governing what the expert may and must rely on. It is important to communicate to the attorney what evidence is necessary to properly support the expert's conclusions and judgments. Different rules of evidence may apply in different jurisdictions, and the practitioner is not expected to be a legal expert.

b. *Assumptions.* Experts can base opinion testimony on either facts or assumptions. Experts may base assumptions on facts, presumptions from facts, or assumptions provided by the client, other experts, or counsel. For example, some analyses require the use of assumptions about what would have happened if certain behavior or activities had been different. Counsel may provide the expert assumptions that may be proven from other evidence. In any case, the expert should identify the source of the information. The practitioner should consider analyzing key assumptions to determine whether they are reasonable. In several recent cases, experts had their testimony excluded because their opinions were based on assumptions that were deemed not reasonable. Ultimately, the trier of fact will determine the reasonableness of the assumptions.

c. *Documentation.* The practitioner should prepare and maintain documentation, the form and content of which should be designed to meet the circumstances of the particular engagement. Results of research and working paper documentation (including electronic mail, spreadsheets, and correspondence) are the principal records of the procedures applied, information obtained, and the conclusions reached by the practitioner in the engagement. The quantity, type, and content of documentation are determined by several factors, including the practitioner's professional judgment, the nature of the engagement and the directives of counsel.

The expert should understand that his or her conclusions and judgments are subject to discovery and cross-examination by the opposing counsel and evaluation by the trier of fact. The expert may have to defend these conclusions and judgments and in so doing maintain objectivity and integrity. Documentation that is fundamental to the expert's conclusions and judgments should be retained.

The practitioner should adopt a policy on the retention of records in litigation matters; the existence of subpoenas or agreements between litigant parties may affect the practitioner's retention policy.

Examples of the elements to be considered by the practitioner are included as Appendix C, "Working Papers and Documentation."

**25.   *Rule 202,* Compliance With Standards.** This Rule requires all CPAs to comply with standards promulgated by bodies designated by the AICPA Council. For practitioners, that body is the Consulting Services Executive Committee. This committee issued SSCS No. 1, *Consulting Services: Definition and Standards* (AICPA, *Professional Standards*, vol. 2, CS sec. 100), and all practitioners are required to adhere to its standards.

**26.   *Rule 203,* Accounting Principles.** To the extent that generally accepted accounting principles (GAAP) are applicable in a litigation services engagement, the practitioner shall apply the appropriate accounting principles.

**27.   *Rule 301,* Confidential Client Information.** The practitioner may not disclose confidential client information without the client's consent. Due to the ethical obligation to preserve client confidences, practitioners may be confronted with the risk of breaching client confidentiality.

**28.**   The expert brings to the courtroom prior experience and knowledge of clients and their practices, operations, and trade secrets. Although such experiences may enable the expert to

render expert opinions, confidential client information obtained in prior engagements for nonparty clients must be protected. Thus, the expert has the dual responsibility to be both truthful and honest while preserving past and present nonparty client confidences. If the expert relies on specific information obtained in an unrelated prior engagement and uses that information as the basis for his or her opinion, the trier of fact may require the expert to disclose the source. If the expert refuses, the trier of fact may preclude the testimony because discovery could not be taken as the basis of the expert's opinion. So, the expert should consider such a circumstance and either obtain the consent of the nonparty client to reveal its confidences or abandon any effort to use such information as the basis of his or her opinions.

**29.**   The practitioner should evaluate any prior or existing relationship with the parties to a litigation matter before accepting the engagement. Assuming there is no conflict, the practitioner is free to be retained. There may be circumstances in which the very fact of a prior relationship may be confidential; the practitioner may be forced to reject an engagement without giving the attorney a specific reason because he or she may not disclose information gained from another client. The practitioner is required to adhere to the profession's confidentiality standards and to confidentiality agreements executed during the course of an engagement. During the course of an engagement, there is the potential for an unknown party to become an opposing party, so continuing sensitivity to newly arising conflicts is necessary, particularly in engagements that are lengthy or involve many parties.

## Consulting Standards

**30.**   In addition to the general standards, specific consulting standards apply to the consulting process and are established by the SSCS under Rule 202, *Compliance With Standards*, of the AICPA Code of Professional Conduct. These standards include serving the client's interest, entering into an understanding with the client, and communicating with the client.

**31.**   The general standards are related to the quality of the performance of any professional service. The consulting standards apply specifically to the consulting process to guide practitioners in their relationships with consulting clients.

**32.**   ***Defining the Client.*** Each of the consulting standards refers to the client. The practitioner needs to have an understanding of who the client is to comply with the consulting standards. ET sec. 92.03 of the AICPA Code of Professional Conduct (AICPA, *Professional Standards*, vol. 2, ET sec. 92.03) defines the client as:

> [A]ny person or entity, other than the member's employer, that engages a member or a member's firm to perform professional services or a person or entity with respect to which professional services are performed.

**33.**   The client in a litigation services engagement may be the attorney, the attorney's client (litigant), or both. It is important to define who the client is in a litigation services engagement depending on the issue(s), given the requirements of the SSCS that the practitioner (*a*) define the client, (*b*) serve the client interest, (*c*) establish an understanding with the client and, (*d*) communicate with the client.[1] For example:

> *a.*   In determining conflicts and client interests, the litigant is generally deemed to be the client, although relationships with the attorneys for each party should be considered.

---

[1] For further discussion of conflicts, see the AICPA Consulting Services Special Report 93-2, *Conflicts of Interest in Litigation Services Engagements* (New York: AICPA, 1993).

b. The party with whom the practitioner obtains an understanding is dependent upon an assessment of the facts and circumstances of the engagement. This often leads to an understanding with either the attorney, or the litigant, or both. In addition, if the practitioner is to protect his or her status as a consultant to counsel, the practitioner should consider discussing with counsel how the understanding should be secured in order to protect any privilege that may be asserted.

c. The practitioner's responsibility to communicate with the client is generally viewed to extend only to the attorney. The SSCS are not intended to cause the practitioner to pierce the attorney-client relationship. In many litigation services engagements, the practitioner's contact with the litigant is minimal or nonexistent. To clarify the communication responsibility, the practitioner may determine that it is appropriate to advise the attorney that any communication with the attorney will be deemed communication with the litigant. The practitioner may also consider having the attorney's client cosign the engagement letter.

d. The SSCS calls for the practitioner to communicate significant engagement findings and events to the client. As noted above, the professional standards do not intend this to cause the practitioner to interfere with the unique attorney-client relationship. Therefore, the expert's communication with the client, unless otherwise required by the terms of the engagement, should be with the attorney. This is even more important when acting in a consulting capacity if there is usually a desire to maintain a privilege between the attorney-consultant communications.

**34.** *Client Interest.* Rule 102 of the AICPA Code of Professional Conduct states:

In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.

**35.** Under this standard, the practitioner in litigation engagements is required to maintain professional integrity and objectivity and to meet technical and ethical standards in performing services.

**36.** *Understanding With the Client.* The practitioner should establish a written or an oral understanding with the client, who may be the attorney representing the litigant, about the responsibilities of the parties and the nature of the services to be performed. The understanding (written or oral) could encompass the following:

a. The attorney's client
b. The attorney for the retaining litigant
c. The title of the litigation including the litigants' names and the court
d. A description of the nature of the litigation services to be provided or a statement that the services will be as the attorney may direct
e. The expert witness or the willingness of the person who will be the expert witness, if necessary
f. The absence of conflicts of interest
g. Restrictions on the use of the practitioner's work
h. The practitioner's right to withdraw from and terminate the engagement in certain circumstances
i. Administration and fee matters, including a description of fees, the fact that these are not contingent upon the successful resolution of the matter, and billing arrangements
j. A description of the practitioner's records retention policy

**37.**   If circumstances require a significant change during the engagement, the understanding, whether written or oral, should be modified accordingly.

**38.**   ***Communication With the Client.***   In compliance with Rule 102 of the AICPA's Code of Professional Conduct and Interpretations thereof, the practitioner informs the client of any conflicts of interest. A conflict of interest may occur if a *significant* relationship could be viewed as impairing the practitioner's objectivity in the performance of a professional service. The practitioner should carefully evaluate each engagement request with sensitivity to the possibility of such conflicts.

**39.**   A conflict of interest might arise in the performance of litigation services if the practitioner has a relationship with one of the parties to the dispute, the court, attorneys, or witnesses, and thus may not be an impartial expert. The responsibility of the practitioner is to decline litigation engagements that involve a conflict of interest; otherwise, the practitioner might disclose confidential client information in the litigation process through discovery or testimony.

**40.**   When the conflict is uncertain, the practitioner should disclose the possible conflict of interest, which allows the prospective client or counsel to consider the potential impact on the litigation.[2] Nothing in the professional standards requires a practitioner to accept any engagement, so the practitioner can, without stating specific reasons, refuse an engagement for any reason. On the other hand, a practitioner who wishes to accept an engagement, but is concerned about possible conflicts, should evaluate those possibilities before acceptance.

**41.**   In addition to assessing possible conflicts of interest, practitioners consider whether it is otherwise in their best interest to accept the engagement. The goals and objectives of their practice might conflict with the performance of services in the proposed engagement. Although there may be no conflict with the attorneys or parties to the litigation, the issues in dispute may be areas that the practitioners are uncomfortable about pursuing or that may conflict with their philosophy, practice, or business interest.

**42.**   Consistent with the SSCS, before accepting or during the engagement, the practitioner should communicate to the client any serious reservations concerning the scope or benefits of the engagement. During the performance of the engagement, communications, ordinarily oral, should include significant engagement findings and events.

## RELATIONSHIP OF ATTESTATION AND OTHER PROFESSIONAL STANDARDS TO LITIGATION SERVICES

### Comparison to Other Services

**43.**   Litigation services do not usually, but may, include the following engagements:

    *a*.   Attest
    *b*.   Audit
    *c*.   Review
    *d*.   Compilation

Separate professional standards apply to each of the above engagements.

---

[2] *Ibid.*

**44.** Litigation services are professional services rendered by a practitioner in accordance with the AICPA's SSCS. Litigation services differ in several ways from services provided in attestation engagements. In attestation engagements, the CPA assesses the fairness of the written assertions of others, which may be in the form of financial statements, parts of such statements, or information not of a financial nature. In litigation engagements, the practitioner typically renders an expert opinion or provides other consulting services based upon expert judgment, experience, education, training, and analysis in compliance with applicable professional standards. The foundation of and audience for this opinion are different from those addressed by the attestation standards.

**45.** In attestation engagements, the opinion expressed is that of the CPA firm. In litigation engagements, the practitioner is the person expressing an opinion, which is subject to extensive cross-examination of the bases and reasons. The litigation services practitioner is not exempt from professional standards but must comply with standards different from those that apply to attestation services. An understanding of the standards is essential to evaluate the performance of the practitioner. A decision tree to help practitioners determine which professional standards to comply with in an engagement is provided in Appendix B.

**46.** Attestation standards do not apply to litigation engagements when the practitioner does not issue a report expressing an opinion about the assertion of another party.[3] As part of a litigation services engagement, the practitioner may be asked to critique the written report of the opposing party's expert. This consulting service in and of itself does not constitute an attestation service. The practitioner is not subject to generally accepted auditing standards (GAAS), Statements on Standards for Attestation Engagements (SSAEs), or Statements on Standards for Accounting and Review Services (SSARSs) (unless specifically retained to provide such a service) when serving as a trier of fact or an expert witness, or developing a work product that is protected by the attorney work product privilege that is not intended to be used for any other purposes.[4]

**47.** When the Statements on Auditing Standards (SASs), SSAEs, or the SSARSs do not apply to litigation engagements, the work should be performed in compliance with the SSCS, as well as all the applicable provisions of the Code of Professional Conduct.

**48.** Other standards may be applicable to litigation services engagements under certain circumstances. For instance, the practitioner may be requested to perform certain litigation services that require compliance with attestation standards. To decide what standards to follow, the practitioner has to evaluate carefully the steps that will be taken to complete the engagement. The AICPA's SSAEs usually do not apply to litigation services engagements. They do apply, however, when the practitioner, as a part of a litigation services engagement, is engaged specifically to perform a service governed by those standards.[5]

---

[3] Chapter 1, "Attest Engagements," of Statement on Standards for Attestation Engagements (SSAE) No. 10, *Attestation Standards: Revision and Recodification* (AICPA, *Professional Standards,* vol. 1, AT sec. 101), according to Interpretation No. 3, "Applicability of Attestation Standards to Litigation Services" (AICPA, *Professional Standards*, vol. 1, AT sec. 9101.34–.42), applies to litigation service engagements only when the practitioner is engaged to issue or does issue an examination, a review, or an agreed-upon procedures report on subject matter, or an assertion about the subject matter, that is the responsibility of another party.

[4] See Interpretation No. 3 of SSAE No. 10 (AT sec. 9101.34–.42), and Interpretation No. 20, "Applicability of Statements on Standards for Accounting and Review Services to Litigation Services," of Statement on Standards for Accounting and Review Services (SSARS) No. 1, *Compilation and Review of Financial Statements* (AICPA, *Professional Standards,* vol. 2, AR sec. 9100.76–.79).

[5] See SSAE No. 10 (AT sec. 101.109–.112).

**49.**    A difficult circumstance could exist if, during the course of a litigation services engagement, the CPA firm is required to perform an audit or review of financial records to support a litigation opinion or is retained to perform an audit or review of financial records to support a litigation opinion, or is retained to perform professional services that come under the SSAEs.

**50.**    Normally, SSARSs do not apply to litigation services; however, these standards are applicable whenever the practitioner performs or is engaged to perform a compilation or a review engagement as part of an overall litigation services engagement. Therefore, unless services must be performed in accordance with the SSARSs, they do not apply and the consulting standards will govern the conduct of the engagement.

**51.**    The identification of the applicable standards may be difficult in some circumstances. At the outset of the engagement, it may not be clear whether the practitioner's work product is subject to the other professional standards. If engaged, the practitioner should therefore attempt to foresee the outcome of the engagement and decide whether the other professional standards apply.

**Reporting Standards**

**52.**    No specific reporting standards apply to consulting engagements, including litigation services engagements. However, the SSCS requires that the results of a consulting engagement be communicated to the client without specifying the nature of the communication. Whether the practitioner needs to provide a conclusion and written report at the end of the engagement depends upon the agreement between the client and the practitioner.

**53.**    If a written report is provided, it must be worded carefully to avoid representing that the work was performed in conformance with the other professional standards if it was not. Accordingly, terms such as *examination*, *audit*, *review*, or *compiled* should be used carefully because they imply the use of other professional standards.

As discussed above, the practitioner generally fulfills the reporting requirements of the SSCS by communicating significant engagement (*a*) findings, (*b*) reservations, (*c*) events, and (*d*) conflicts. During the course of the engagement, these communications are with counsel for the litigant, unless the specifics of the engagement call for another arrangement. The timing of the reporting is also dependent upon the particular facts and circumstances of the engagement. This may be on a scheduled basis or on an "as-needed" basis, again at the discretion and judgment of the participants.

Any communication with persons of the opposing party, its counsel, or other representatives are generally determined by the counsel with whom the practitioner is working because any contact with the opposing party is normally prohibited. Usually, if the practitioner is to have contact with any representatives of the opposing party to the litigation, it is to occur only after arrangements have been made by the counsel to whom the practitioner is providing assistance. Any reports, working papers, or work product to be prepared or provided to the opposing parties should be scheduled, arranged, and coordinated with counsel that the practitioner is assisting. These communications, reports, and productions are dependent on the arrangements made in the particular cases by counsel and the authority under which the dispute is proceeding.

**54.**    Certain litigation proceedings involve no direct oral testimony. In such cases, the practitioner may be asked to issue testimony in writing. Furthermore, given the diversity of litigation engagements, a standard reporting format for most engagements is impractical and unrealistic. In federal litigation, as well as in some state courts, there are prescribed formats for

written expert reports. A discussion of Rule 26 of the Federal Rules of Civil Procedure can be found in Consulting Service Practice Aid 96-3, *Communicating in Litigation Services: Reports.*

## OTHER GUIDANCE

### Federal and State Court Rules

**55.**   Practitioners are called upon to assist triers of fact and clients in their deliberations by helping them understand complex or unfamiliar concepts. The practitioner in a litigation services engagement uses knowledge, skills, education, training, and experience to comply with professional standards. Since state and federal court standards may be different, at least to a degree, the practitioner must be aware that his or her services should meet professional standards as well as the applicable dispute resolution forum rules.

**56.**   The U.S. Supreme Court has established the rule that the federal trial judge is the gatekeeper for the admissibility of expert scientific testimony and may look to several factors to ensure the testimony's reliability and relevancy to the matter at issue.

**57.**   Additionally, the Supreme Court has concluded that the same concepts apply not just to experts providing scientific testimony, but also to all other experts providing testimony in federal courts, including financial experts (*Kumho Tire Company, Ltd. v. Patrick Carmichael*, 526 US 137 [1999]). Many state courts have established restrictions with regard to the admissibility of expert testimony that are consistent with the federal rulings.

**58.**   The Federal Rules of Evidence provide the basis upon which a federal trial judge can disallow opinion testimony by lay witnesses, determine whether testimony by experts meets the minimum standards, and identify the bases of opinion testimony by experts. Rules relevant to CPAs providing litigation services include the following:

Rule 701, "Opinion Testimony by Lay Witnesses," states:

> If the witness is not testifying as an expert, the witness testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 702, "Testimony by Experts," states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 703, "Bases of Opinion Testimony by Experts," states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the

hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. The proponent of the opinion or inference shall not disclose facts or data that are otherwise inadmissible to the jury unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

A comparison of AICPA Standards and Federal Rule of Evidence 702 is included herein as Appendix D, "Comparison of AICPA Professional Standards and Federal Rule of Evidence 702." A pyramid that reflects a testimony pyramid for an admissible opinion is included as Appendix E, "Testimony Pyramid."

### AICPA Special Reports and Practice Aids

**59.**   Other guidance in the form of nonauthoritative Special Reports and Practice Aids that are intended to provide guidance to the practitioner have been developed through the AICPA. Other materials included in this Special Report, which are intended to provide guidance to the practitioner include Appendix F, "AICPA Special Reports and Practice Aids;" Appendix G, "Bankruptcy and Reorganization Services;" and Appendix H, "Professional Standards Case Studies."

## CONCLUSION

**60.**   Litigation services encompass a wide range of professional services that a practitioner may provide to clients. A partial list of engagement situations and the products, services, and functions associated with litigation services is provided in Appendix A. The practitioner should understand the professional standards that apply in a litigation services engagement. ET secs. 102, 201, 202, 301, 302, 501, and, in some cases, ET secs. 101 and 203 of the Code of Professional Conduct, as well as the SSCS apply to all services rendered by a practitioner. Additionally, the practitioner may accept and perform litigation assignments that require compliance with SASs, SSAEs, or the SSARSs.

## APPENDIX A

## TYPICAL LITIGATION SERVICES

*Practitioners* provide various types of services or functions. Some of the more common include the following:

- Computation of economic damages:
  — Lost profits
  — Lost value
  — Extra costs
  — Lost cash flow
  — Mitigation
  — Restitution

- Punitive damage studies

- Professional standards analysis

- Valuation of the following:
  — Business
  — Pensions
  — Intangibles

- Fraud, prevention, detection, and investigation

- Bankruptcy consultant, trustee, and examiner

- Tax analysis, including the following:
  — Tax basis
  — Cost allocation
  — Treatment of specific transactions

- Marital dissolution assessment and analysis

- Contract cost and claims analysis

- Historical results analysis

- Special accountings, tracing, reconstructions, and cash-flow analyses

- Antitrust analysis, including the following:
  — Price fixing
  — Market share
  — Market definition
  — Predatory conduct
  — Dumping
  — Price discrimination

- Business interruption and other insurance claims assessment and analysis

- Attest services, if specifically engaged to perform them in connection with litigation services

Any of the following functions may be performed:

- Issue identification

- Locating other experts

- Fact finding, including the following:
  — Asset searches
  — Market studies
  — System reviews
  — Interviewing of witnesses
  — Due diligence
  — Research

- Analysis
  — Investigative accounting
  — Computer modeling
  — Statistical
  — Actuarial

- Discovery assistance

- Document management

- Settlement assistance

- Expert testimony

- Trial and deposition assistance

- Posttrial support (such as bookkeeping services and funds administration)

- Negotiations

- Arbitration

- Mediation

- Training

- Case evaluation

## APPENDIX B

## DECISION TREE TO DETERMINE THE APPLICATION OF PROFESSIONAL STANDARDS

Practitioners can use the decision tree provided below to determine which professional standards apply in a litigation services engagement. The case studies in Appendix H, "Professional Standards Case Studies," illustrate the application of the decision tree to particular engagements.



\* Interpretation No. 3, "Applicability of Attestation Standards to Litigation Services," of Statement on Standards for Attestation Engagements No. 10 (AT sec. 9101.35).

# APPENDIX C

# WORKING PAPERS AND DOCUMENTATION

In most instances, the expert may be required to disclose all documents considered or relied upon in reaching his or her opinions. The form and content of working papers and the related documentation may also be subject to discovery depending upon the role of the practitioner.

The AICPA's Statement on Auditing Standards (SAS) No. 96, *Audit Documentation* (AICPA, *Professional Standards*, vol. 1, AU sec. 339), issued on May 15, 2002, is a SAS that requires auditors to prepare and maintain working papers. The requirements of SAS No. 96 normally do not apply to litigation services. This is supported by an Interpretation No. 3 titled "Applicability of Attestation Standards to Litigation Services" in AT sec. 9101, *Attest Engagements: Attest Engagements Interpretations of Section 101* (AICPA, *Professional Standards*, vol. 2, AT sec. 9101.34), of the Statement on Standards for Attestation Services. This Interpretation provides that:

> Attestation Standards "does not apply to litigation services that involve pending or potential formal legal or regulatory proceedings before a 'trier-of-fact' in connection with the resolution between two or more parties…"

## Form and Content of Working Papers

Working papers may assist the practitioner to form an opinion, as an aid to testimony, as well as to support consulting advice. Much of the following discussion is directed toward the working papers of the expert based on an assumption that the working papers will be subject to discovery. While the working papers of a consultant in litigation may not be subject to discovery, the consultant might consider many of the following suggestions in anticipation of a potential changed role to expert and resultant working paper discovery.

Working papers generated during the litigation process may differ substantially from audit and attestation engagement working papers, and do not follow a prescribed format. Working papers should be prepared under the assumption that they will be scrutinized and, therefore, should be prepared with consideration given to the following:

1. Working papers should contain information that is needed or relevant to the practitioner's analysis and/or final opinion, findings, or testimony. Working papers should not include extraneous information. Generally, unless prohibited by order or agreement, litigation working papers, like all working papers, should not include superseded schedules or other information not relied upon or considered as a basis for the opinion.
2. The practitioner should be able to explain the purpose of particular working papers, the working paper format, procedures performed, sources of information, and interrelationships within the working papers.
3. Some consultants label or stamp working papers as prepared in connection with litigation or under the direction of counsel and subject to the attorney-client privilege and/or attorney work-product rule. If the consultant changes roles to an expert and the working papers become subject to discovery, the asserted privileges may no longer be effective.
4. Annotations and markings, including highlighting, become part of the working papers.

5.   During working paper preparation, a practitioner often is not yet familiar with all-important case facts. Remarks placed in working papers should be carefully considered, since such preliminary conclusions may become superseded by more appropriate findings.

6.   Litigation tasks and objectives often change during the course of the engagement. Models and theories developed early in the process may not be those upon which the expert is called to opine. It is generally acceptable for the content of working papers to evolve during the process of the practitioner's analysis.

7.   Documents subject to protective orders should be distinguished from other working papers and documents.

**APPENDIX D**

**COMPARISON OF AICPA PROFESSIONAL STANDARDS AND
FEDERAL RULE OF EVIDENCE 702**

| AICPA Professional Standards | Federal Rules of Evidence Rule 702 |
|---|---|
| **CPA Scope of Expertise**<br><br>• Accounting, auditing, tax, consulting, and other services | **Scope**<br><br>• Scientific knowledge<br><br>• Technical knowledge<br><br>• Specialized knowledge |
| **CPA Qualifications**<br>• Education<br><br>• Examination<br><br>• Experience<br><br>• Ethics—AICPA Code of Professional Conduct | **Qualifications**<br>• Education<br><br>• Knowledge<br><br>• Experience<br><br>• Training<br><br>• Skill |
| **AICPA Code of Professional Conduct**<br><br>Rule 102, *Integrity and Objectivity*<br><br>Rule 201, *General Standards*<br><br>    *a.* Professional competence<br><br>    *b.* Due professional care<br><br>    *c.* Planning and supervision<br><br>    *d.* Sufficient relevant data<br><br>Rule 202, *Compliance With Standards* | **Basis of Testimony**<br><br><br>• Product of reliable principles and methods<br><br>• Applied the principles and methods reliably to the facts of the case<br><br>• Sufficient facts or data |

## APPENDIX E

## TESTIMONY PYRAMID

Consistent with AICPA professional standards, Rule 702 of the Federal Rules of Evidence requires that expert testimony be based upon sufficient facts or data, be the product of reliable principles and methods, and that the principles and methods be reliably applied to the facts of the case. Graphically presented, the testimony pyramid might be as follows:



## APPENDIX F

## AICPA SPECIAL REPORTS AND PRACTICE AIDS

Consulting Services Special Report 93-2, *Conflicts of Interest in Litigation Services Engagements*

Consulting Services Special Report 93-3, *Comparing Attest and Consulting Services: A Guide for the Practitioner*

Consulting Services Practice Aid 93-4, *Providing Litigation Services*

Consulting Services Practice Aid 95-2, *Communicating Understandings in Litigation Services: Engagement Letters*

Consulting Services Practice Aid 96-3, *Communicating in Litigation Services: Reports*

Consulting Services Practice Aid 97-1, *Fraud Investigations in Litigation and Dispute Resolution Services*

Consulting Services Practice Aid 98-1, *Providing Bankruptcy and Reorganization Services*

Consulting Services Practice Aid 98-2, *Calculation of Damages From Personal Injury, Wrongful Death, and Employment Discrimination*

Consulting Services Practice Aid 99-1, *Alternative Dispute Resolution Services*

Consulting Services Practice Aid 99-2, *Valuing Intellectual Property and Calculating Infringement Damages*

Consulting Services Practice Aid 02-1, *Business Valuation in Bankruptcy*

# APPENDIX G

## BANKRUPTCY AND REORGANIZATION SERVICES

### BANKRUPTCY AND REORGANIZATION SERVICES DEFINED

CPAs frequently provide accounting and financial advisory services, as well as unique bankruptcy services, such as acting as trustee-examiners and providing claims processing, to financially troubled companies that are considering or are in the process of reorganizing. The reorganization may be a formal proceeding in a bankruptcy court (for example, a Chapter 11 case) or an out-of-court restructuring. Such services may also be provided to creditors and other parties-in-interest of the restructuring company. Common characteristics of troubled companies that seek to restructure include underperformance, poor cash flow, overleveraging, weak management, extensive litigation involvement (for example, product liability cases and labor disputes), loss of market share, and so forth.

The delivery of reorganization services to such companies may include—

- Preparing or reviewing valuations of the debtor's business.
- Analyzing the profitability of the debtor's business.
- Preparing or reviewing the monthly operating reports required by the bankruptcy court.
- Reviewing disbursements and other transactions for possible preference payments and fraudulent conveyances.
- Preparing or reviewing the financial projections of the debtor.
- Performing financial advisory services associated with mergers, divestitures, capital adequacy, debt capacity, and so forth.
- Consulting on strategic alternatives and developing business plans.
- Providing assistance in developing or reviewing plans of reorganization or disclosure statements.[6]

Reorganization services are dynamic. Often the scope of the engagement is revised as the restructuring progresses and as negotiation strategies develop. Companies frequently begin a reorganization outside of bankruptcy, but when they cannot reach agreement with all the necessary parties, the reorganization is completed as a bankruptcy proceeding.

Out-of-court restructurings are generally undertaken with the aid of bankruptcy counsel and financial advisers. Each negotiating party, such as a borrower or a lender, enters the discussions with full knowledge of its rights should a bankruptcy filing result from the failure to reach a consensus on the restructuring.

### BANKRUPTCY AND RESTRUCTURING SERVICES AS LITIGATION SERVICES

Bankruptcy services provided by CPAs generally are accepted as a form of litigation services. This acceptance is due to the many fundamental and practical similarities between bankruptcy services and the consulting services associated with other forms of litigation. Bankruptcy law, as

---

[6] The words *review* and *reviewing* are not intended to have the same meaning as they do in the AICPA's SSARSs.

promulgated by the Bankruptcy Code and case law, is applied by bankruptcy judges and lawyers to resolve disputes between a debtor and its creditors (for example, distribution of the debtor's assets). Bankruptcy cases frequently include actions related to claims for preferential payments and fraudulent conveyances; negligence of officers, directors, or professionals engaged by the debtors; or other allegations common to commercial litigation. The bankruptcy court has the power and authority to value legal claims and resolve such common litigation as product liability, patent infringement, and breach of contract. The decisions of bankruptcy judges can be appealed as can the decisions of other courts.

From a practical standpoint, negotiation among the parties in bankruptcy cases is as important as it is in civil and criminal litigation (for example, settlement of commercial litigation and plea bargains in criminal trials). When the parties are unable to resolve the disputes themselves, the trier of fact determines the outcome.

There are similarities between the judicial process applied to bankruptcy and that used for other litigation (for example, discovery, expert testimony, and rules of evidence). It is reasonable to conclude, therefore, that bankruptcy services are a form of litigation services consistent with the type of services contemplated by the AICPA in developing Interpretation No. 3, "Applicability of Attestation Standards to Litigation Services," of Statement on Standards for Attestation Engagements (SSAE) No. 10, *Attestation Standards: Revision and Recodification* (AICPA, *Professional Standards*, vol. 1, AT sec. 9101.34–.42).

Out-of-court restructuring holds the potential for litigation. Therefore, the settlement process is generally conducted with the same scrutiny, due diligence, and intense challenge as that of a formal court-administered process. Furthermore, bankruptcy services provided by CPAs are typically not three-party attest services (the three parties in attest services are the asserter, the attester, and the third party). Instead, affected parties have the opportunity to question, challenge, and provide input to the bankruptcy findings and process.

## WHEN OTHER PROFESSIONAL STANDARDS APPLY TO BANKRUPTCY AND REORGANIZATION SERVICES

CPAs regularly provide both consulting and attest services in connection with bankruptcy or restructuring. The CPA must evaluate the nature of the services carefully to determine if any are exempt from the Statements on Standards for Attestation Engagements (SSAEs) and the Statements on Standards for Accounting and Review Services (SSARSs). For the litigation services' exemption to apply, the service must be performed in connection with the litigation and the parties to the proceeding must have an opportunity to analyze and challenge the work of the CPA. Furthermore, the CPA must—

- Assess the services to be performed.
- Understand the intended use of the CPA's work product.
- Identify the parties that may rely on the work product.
- Decide whether the attestation standards apply.

It is quite possible that in a particular reorganization engagement, certain services will not be subject to attestation standards, but others will. If the attestation standards do not apply, the CPA should consider disclosing on the face of the documents, or in a separate report, the extent of service rendered and the responsibility assumed by the CPA, if any. Such disclosures may help the reader to understand the extent of the CPA's role and the intended use of the work product.

Both the SSAEs and SSARSs are applicable to litigation services and bankruptcy engagements when the practitioner—

> *a*. Expresses a written conclusion about the reliability of a written assertion by another party, and the conclusion and assertion are for the use of others who, under the rules of the proceedings, cannot analyze and challenge the work.
>
> *b*. In connection with litigation services, is specifically engaged to perform a service in accordance with the SSAEs or SSARSs.

Further, an essential part of many bankruptcies and restructurings is the development of prospective financial information (PFI). PFI often is used to negotiate with creditors or committees of creditors representing a group or class of creditors. PFI also may be included in disclosure statements to inform creditors and other parties of the financial condition of the company according to certain restructuring and operating instructions.

Parties-in-interest generally can challenge PFI and its assumptions during negotiations or during bankruptcy court hearings on the plan's feasibility and adequacy of disclosure. In situations in which the users of the PFI cannot challenge the CPA's work, the attestation standards may apply. Such situations may arise, for example, when exchange offers are made to creditors or shareholders with whom the company has not negotiated or who are not members of a creditor group represented by a committee.

The attestation standards (in Chapter 3, "Financial Forecasts and Projections," of SSAE No. 10 [AICPA, *Professional Standards*, vol. 1, AT sec. 301.02]) generally provide that an examination, compilation, or agreed-upon procedures engagement should be performed whenever an accountant submits PFI to clients or others. However, AT section 301.05 does provide an exemption from the attestation standards when an engagement involves prospective financial statements used solely in connection with litigation support services. This exemption is provided because, among other things, the accountant's work in such proceedings is ordinarily subject to detailed analysis and challenge by each party to the dispute.

When attestation standards do not apply, CPAs may wish to state the extent of their association with any work product and the responsibility they have assumed. It may be appropriate for CPAs to explain both their association and their responsibility, if any, through a transmittal letter or a statement affixed to documents distributed to third parties. The following wording is suggested:

> The accompanying schedules (projected *financial information*; debt capacity analysis; liquidation analysis) were assembled for your analysis of the proposed restructuring and recapitalization of ABC Company. The aforementioned schedules were not examined or reviewed by independent accountants in accordance with standards promulgated by the AICPA. This information is limited to the sole use of the parties involved (management; creditors' committee; bank syndicate) and is not to be provided to other parties.

## APPENDIX H

## PROFESSIONAL STANDARDS CASE STUDIES

### CASE STUDY I: FORENSIC ACCOUNTING

Mark Helm, CPA, has been requested by ABC Company to ascertain the extent of fraud allegedly perpetrated by one of the company's employees. The results of the investigation will be used to negotiate a settlement with PENN Bonding Company. Helm has been asked to perform the procedures that he considers necessary, and it is expected that he will issue a formal report.

The following questions and answers illustrate the process of determining which professional standards must be complied with in the engagement.

*Question*:        What form of service is being requested?

*Answer*:        The answer to the question can be determined by applying the decision tree in Appendix B, as follows:

| *Step* | *Criteria* | *Decision* |
|---|---|---|
| 1. | Does the engagement meet the definition of litigation services? | Yes. Forensic accounting is a litigation service. |
| 2. | Does the litigation services engagement encompass only those consulting services identified under the SSCS? | Yes. The practitioner is to perform a consulting service. |
| 3. | Does the litigation services engagement also contain elements that require adherence to the SSARSs, SSAEs, or SASs? | No. See below. |

Exemption from the SSARSs, SSAEs, and SASs requires a *no* answer to question *a* or a *yes* answer to any questions from *b* through *e*.

| | | |
|---|---|---|
| *a*. | Will the practitioner issue a written communication that expresses a conclusion about the reliability of a written assertion that is the responsibility of another party? | No. |
| *b*. | Will the service comprise being an expert witness? | No. |
| *c*. | Will the service comprise being a trier of fact or acting on behalf of one? | No. |

| Step | Criteria | Decision |
|------|----------|----------|

| | *d.* Is the practitioner's work, under the rules of the proceedings, subject to detailed analysis and challenge by each party to the dispute? | Yes.[7] |
| | *e.* Is the practitioner engaged by an attorney to do work that will be protected by the attorney's work product privilege, and is such work not intended to be used for other purposes? | No. |

4.     Determine the nature of the elements not covered by the SSCS, SSARSs, SSAEs, or SASs, and adhere to appropriate standards or refer to available guidance.

5.     Complete the engagement.

*Question*:     Would the answer be different if no formal report was requested and the results were to be supported only by Helm's working papers?

*Answer*:     No. The answer would be the same. The written report is not a criterion for distinguishing engagements.

*Question*:     If Helm constructs the engagement as an agreed-upon procedures engagement, is he governed by SAS No. 35, *Special Reports Applying Agreed Upon Procedures to Specified Elements, Accounts, Items of a Financial Statement* (AICPA, *Professional Standards*, vol. 1, AU sec. 622), on agreed-upon procedures or by the attestation standards?

*Answer*:     Neither. The answer would be the same. Agreed-upon procedures can be used in a consulting engagement and the practitioner can look to SAS No. 35 for guidance but should not indicate, imply, or construe the engagement as falling under the attestation standards or the auditing standards (including SAS No. 35).

---

[7] It is reasonable to presume that the adverse party will evaluate and challenge the company's position.

## CASE STUDY II: POTENTIAL LEGAL PROCEEDINGS

Barbara Matson, CPA, has been requested by XYZ Company, which is a defendant in a legal suit, to evaluate a damages study presented by the plaintiff Contractors, Inc. Matson has been requested to provide a report of her findings and an opinion regarding the reasonableness of the study. The following questions and answers illustrate the process of determining the professional standards with which Matson must comply in performing the engagement.

*Question*:     What form of service is being requested?

*Answer*:     The answer to the question can be determined by applying the decision tree in Appendix B, as follows:

| Step | Criteria | Decision |
|------|----------|----------|
| 1. | Does the engagement meet the definition of litigation services? | Yes. The case involves a client with potential formal legal or regulatory proceedings before a trier of fact. |
| 2. | Does the litigation services engagement encompass only the consulting services identified under the SSCS? | No. As stated in Statement on Standards for Attestation Engagements, *Attestation Standards* (AICPA, *Professional Standards*, vol. 1, AT sec. 100.75), "The evaluation of statements contained in a written assertion of another party when performing a management advisory service does not in and of itself constitute the performance of an attest service." |
| 3. | Does the litigation services engagement also contain elements that require adherence to the SSARSs, SSAEs, or SASs? | No. See below. |

Exemption from the SSARSs, SSAEs, and SASs requires a *no* answer to question *a* or a *yes* answer to any questions from *b* through *e*.

| | | |
|------|----------|----------|
| *a*. | Will the practitioner issue a written communication that expresses a conclusion about the reliability of a written assertion that is the responsibility of another party? | No. See response to question 2 above. |
| *b*. | Will the service comprise being an expert witness? | No. |

| Step | Criteria | Decision |
|------|----------|----------|
| | *c*. Will the service comprise being a trier of fact or acting on behalf of one? | No. |
| | *d*. Is the practitioner's work, under the rules of the proceedings, subject to detailed analysis and challenge by each party to the dispute? | No. |
| | *e*. Is the practitioner engaged by an attorney to do work that will be protected by the attorney's work product privilege, and is such work not intended to be used for other purposes? | No. |
| 4. | Determine the nature of the elements not covered by the SSCS, SSARSs, SSAEs, or SASs and adhere to appropriate standards or refer to available guidance. | |
| 5. | Complete the engagement. | |

*Question*:  Under what circumstances would this become an attestation engagement?

*Answer*:  If Matson was engaged to report to both parties as to the reliability of the damage study.

## CASE STUDY III: EXPERT WITNESS

John Lake, CPA, has been requested by the law firm of Smith & Miller to be an expert witness and provide a report critiquing a damage study prepared for the law firm by Ray Dante, another expert witness. The following questions and answers illustrate the process of determining which professional standards Lake must comply with in performing the engagement.

*Question*:     What form of service is being requested?

*Answer*:        The answer to the question can be determined by applying the decision tree in Appendix B, as follows:

| Step | Criteria | Decision |
|------|----------|----------|
| 1. | Does the engagement meet the definition of litigation services? | Yes. The practitioner is engaged to be an expert witness. |
| 2. | Does the litigation services engagement encompass only those consulting services identified under the SSCS? | Yes. The practitioner is to perform a consulting service. |
| 3. | Does the litigation services engagement also contain elements that require adherence to the SSARSs, SSAEs, or SASs? | No. See below. |

Exemption from the SSARSs, SSAEs, and SASs requires a *no* answer for question *a* or a *yes* answer to any question from *b* through *e*.

| | | |
|------|----------|----------|
| *a*. | Will the practitioner issue a written communication that expresses a conclusion about the reliability of a written assertion of another party? | No. As stated in Statement on Standards for Attestation Engagements, *Attestation Standards* (AICPA, *Professional Standards,* vol. 1, AT sec. 100.75), "The evaluation of statements contained in a written assertion of another party when performing a management advisory service does not in and of itself consitute the performance of an attest service." |
| *b*. | Will the service comprise being an expert witness? | Yes. |
| *c*. | Will the service comprise being a trier of fact or acting on behalf of one? | No. |

| *Step* | *Criteria* | *Decision* |
|---|---|---|
| *d.* | Is the practitioner's work, under the rules of the proceedings, subject to detailed analysis and challenge by each party to the dispute? | No. |
| *e.* | Is the practitioner engaged by an attorney to do work that will be protected by the attorney's work product privilege, and is such work not intended to be used for other purposes? | Yes. |

4.      Determine the nature of the elements not covered by the SSCSs, SSARSs, SSAEs, or SASs, and adhere to appropriate standards or refer to available guidance.

5.      Complete the engagement.

*Question*:      Would the answer be different if John's conclusions were to be expressed in testimony to the court in a form that adheres to the SSAEs or SSARSs?

*Answer*:      Yes, if Smith & Miller had requested Lake to issue a report in accordance with the SSAEs or SSARSs or if Lake had decided to do so.

## CASE STUDY IV: CLAIM EVALUATION

Judith Sauter, CPA, has been requested by Pawling Insurance Company to evaluate a claim by an insured for a business interruption that is in litigation. Sauter is requested to perform the procedures she considers necessary to evaluate the claim, supporting her conclusions in her working papers. The following questions and answers illustrate the process of determining which professional standards Sauter must comply with in performing the engagements.

*Question*:       What form of service is being requested?

*Answer*:       The answer to the question can be determined by applying the decision tree in Appendix B, as follows:

| *Step* | *Criteria* | *Decision* |
|---|---|---|
| 1. | Does the engagement meet the definition of litigation services? | Yes. The practitioners is engaged to do work related to a claim in litigation. |
| 2. | Does the litigation engagement encompass only those consulting services identified under the SSCSs? | Yes. The engagement is a consulting service as contemplated by the SSCSs. |
| 3. | Does the litigation services engagement also contain elements that require adherence to the SSARSs, SSAEs, or SASs? | No. See below. |

Exemption from the SSARSs, SSAEs, and SASs requires a *no* answer to question *a* or a *yes* answer to any question from *b* through *e*.

| | | |
|---|---|---|
| *a*. | Will the practitioner issue a written communication that expresses a conclusion about the reliability of a written assertion of another party? | No. The workpapers are not a written report on a third party assertion but are the practitioner's own assertions. |
| *b*. | Will the service comprise being an expert witness? | No. |
| *c*. | Will the service comprise being a trier of fact or acting on behalf of one? | No. |

| Step | Criteria | Decision |
|------|----------|----------|
| *d*. | Is the practitioner's work under the rules of the proceedings, subject to detailed analysis and challenge by each party to the dispute? | No. |
| *e*. | Is the practitioner engaged by an attorney to do work that will be protected by the attorney's work product privilege, and is such work not intended to be used for other purposes? | No. |

4.     Determine the nature of the element not covered by the SSCSs, SSARSs, SSAEs, or SASs and adhere to appropriate standards or refer to available guidance.

5.     Complete the engagement.

*Question*:    Would the answer be different if a formal report was requested?

*Answer*:    No. As stated in Statement on Standards for Attestation Engagements, *Attestation Standards* (AICPA, *Professional Standards,* vol. 1, AT sec. 100.75):

> The evaluation of statements contained in a written assertion of another party when performing a management advisory service does not in and of itself constitute the performance of an attest service.

## CASE STUDY V: BUSINESS VALUATION AND AUDIT

Paul Davis, CPA, has been requested by Bob Trep, managing partner of Able Law Services, a law firm in a partnership dissolution and whose partners are in litigation with one another, to perform a business valuation and to audit the practice's financial statements as of the date of the dissolution in accordance with the SSAEs. The following questions and answers illustrate the process of determining which professional standards Davis must comply with in performing the engagement.

*Question*:     What form of service is being requested?

*Answer*:      The answer to the question can be determined by applying the decision tree in Appendix B, as follows:

| *Step* | *Criteria* | *Decision* |
|---|---|---|
| 1. | Does the engagement meet the definition of litigation services? | Yes. The practitioner is performing a business valuation and the client situation involves pending formal legal or regulatory proceedings before a trier of fact. |
| 2. | Does the litigation services engagement encompass only those consulting services identified under the SSCS? | No. The practitioner is to perform an attestation service. |
| 3. | Does the litigation services engagement also contain elements that require adherence to the SSARSs, SSAEs, or SASs? | Yes. See below. |

Exemption from the SSARSs, SSAEs, and SASs require a *no* answer for question *a* or a *yes* answer to any question from *b* through *e*.

| | | |
|---|---|---|
| *a*. | Will the practitioners issue a written communication that expresses a conclusion about the reliability of a written assertion of another party? | Yes. |
| *b*. | Will the service comprise being an expert witness? | No. |
| *c*. | Will the service comprise being a trier of fact or acting on behalf of one? | No. |

| *Step* | *Criteria* | *Decision* |
|---|---|---|
| *d*. | Is the practitioner's work under the rules of the proceedings, subject to detailed analysis and challenge by each party to the dispute? | No. |
| *e*. | Is the practitioner engaged by an attorney to do work that will be protected by the attorney's work product privilege, and is such work not intended to be used for other purposes? | No. |

4.    Determine the nature of the elements not covered by the SSCS, SSARSs, SSAEs, or SASs and adhere to appropriate standards or refer to available guidance.

5.    Complete the engagement.

*Question*:    Would adherence to the SSAEs be required if Paul was not specifically engaged to perform the service in accordance with the SSAEs?

*Answer*:    No, if Paul's written communication, which expresses a conclusion about the reliability of the financial statements, is, under the proceedings, subject to detailed analysis and challenge by each party to the dispute.

# AICPA Consulting Engagement Practice Aids

You may obtain any of these publications by calling our Professional Member Satisfaction Department at **1-888-777-7077**. A Professional Member Satisfaction Representative will assist you with your product ordering, and thank you for looking to AICPA for your Consulting Services needs.  If you have any CS Membership questions and would like to speak to the Membership Sections Coordinator, you can call our Membership Sections hotline at **212-596-6211**.

| *Title* | *Series* | *Product* |
|---|---|---|
| **Small Business Consulting Practice Aid Series** | | |
| Assessing Franchise Opportunities | No. 13 | 055361 |
| Assisting Professional Clients in Pricing Services Using Budgeting Techniques | No. 14 | 055376 |
| Developing and Improving Client's Recruitment, Selection and Orientation | No. 92-2 | 055133 |
| Assisting a Financially Troubled Business | No. 92-8 | 055140 |
| Assisting Clients to Establish an Outside Advisory Board | No. 93-2 | 055141 |
| Conducting a Valuation of a Closely Held Business | No. 93-3 | 055148 |
| Assisting Clients in Controlling Costs and Expenses | No. 93-7 | 055149 |
| Assisting Clients in Developing Credit and Collection Policies | No. 94-3 | 055154 |
| Providing Cash Management Consulting Services | No. 96-4 | 055002 |

### Consulting Services Practice Administration

*This series of practice administration aids addresses the administrative matters related to providing CS for clients within the environment of a CPA practice. They are of particular interest and value to anyone with management responsibility for a CS practice. The aids are also useful to those who provide consulting services as a CPA, whether as a sole practitioner, partner or a staff person in a single or multiple practice CPA firm.*

| | | |
|---|---|---|
| Starting and Developing an MAS Practice | No. 4 | 055925 |
| Communicating With Clients About MAS Engagement Understandings | No. 5 | 055930 |
| Developing a Consulting Services Control and Management Program | No. 93-5 | 055143 |
| Communicating the Results of Consulting Services Engagements | No. 96-2 | 055911 |

### Technical Consulting Practice Aid Series

| | | |
|---|---|---|
| Automating Small and Medium-Sized Businesses in Selected Industries | No. 92-5 | 055136 |
| Preparing Financial Models | No. 92-6 | 055137 |
| Providing Litigation Services | No. 93-4 | 055145 |
| Analyzing Financial Ratios | No. 94-4 | 055155 |
| Communicating Understandings in Litigation Services: Engagement Letters | No. 95-2 | 055163 |
| Communicating in Litigation Services: Reports, A Nonauthoritative Guide | No. 96-3 | 055000 |
| Fraud Investigations in Litigation and Dispute Resolution Services, A Nonauthoritative Guide | No. 97-1 | 055001 |
| Providing Bankruptcy and Reorganization Services | No. 98-1 | 055162 |
| Calculations of Damages From Personal Injury, Wrongful Death, and Employment Discrimination | No. 98-2 | 055293 |
| Alternative Dispute Resolution Services | No. 99-1 | 055294 |
| Valuing Intellectual Property and Calculating Infringement Damages | No. 99-2 | 055295 |
| Business Valuation in Bankruptcy | No. 02-1 | 055296 |

| *Title* | *Series* | *Product* |
|---|---|---|

### Industry Consulting Practice Aid Series

*This series of practice aids will help you provide consulting services to clients in specific industries.*

| | | |
|---|---|---|
| Nursing Homes | No. 94-2 | 055153 |

### Special Reports

| | | |
|---|---|---|
| Conflicts of Interest in Litigation Services Engagements | No. 93-2 | 048563 |
| Comparing Attest and Consulting Services: A Guide for the Practitioner | No. 93-3 | 048564 |

### Software

| | | |
|---|---|---|
| Consulting Engagement Letters and Checklists | | 055011 |

# Exhibit C

| Maryland Department of Assessments and Taxation<br>Real Property Data Search  (v w 3.1)<br>HOWARD COUNTY | **Go Back**<br>**View Map**<br>**New Search** |
|---|---|

**Account Identifier:**     District - 02 Account Number - 270293

## Owner Information

| | | | |
|---|---|---|---|
| **Owner Name:** | LEE MI P<br>LEE YOUNG T/E | **Use:**<br>**Principal Residence:** | RESIDENTIAL<br>YES |
| **Mailing Address:** | 2428 MCKENZIE RD<br>ELLICOTT CITY MD 21042-1766 | **Deed Reference:** | 1) /12766/ 37<br>2) |

## Location & Structure Information

| **Premises Address** | **Legal Description** |
|---|---|
| 2428 W MCKENZIE RD<br>ELLICOTT CITY 21042 | LOT 15 .673A S 1 REV<br>2428 MCKENZIE RD<br>MCKENZIE MEADOWS |

| **Map** | **Grid** | **Parcel** | **Sub District** | **Subdivision** | **Section** | **Block** | **Lot** | **Assessment Area** | **Plat No:** | 4561 |
|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 9 | 665 | | | | | 15 | 1 | **Plat Ref:** | |

| **Special Tax Areas** | **Town**<br>**Ad Valorem**<br>**Tax Class** | A/V, METRO FIRE TAX |
|---|---|---|

| **Primary Structure Built** | **Enclosed Area** | **Property Land Area** | **County Use** |
|---|---|---|---|
| 1983 | 2,860 SF | 29,315.00 SF | |

| **Stories** | **Basement** | **Type** | **Exterior** |
|---|---|---|---|
| 2 | NO | SPLIT LEVEL | FRAME |

## Value Information

| | **Base Value** | **Value** | **Phase-in Assessments** | |
|---|---|---|---|---|
| | | As Of<br>01/01/2010 | As Of<br>07/01/2010 | As Of<br>07/01/2011 |
| **Land** | 307,850 | 208,700 | | |
| **Improvements:** | 283,560 | 179,700 | | |
| **Total:** | 591,410 | 388,400 | 388,400 | 388,400 |
| **Preferential Land:** | 0 | 0 | 0 | 0 |

## Transfer Information

| **Seller:** | KANG ROSA | **Date:** | 10/15/2010 | **Price:** | $460,000 |
|---|---|---|---|---|---|
| **Type:** | IMPROVED ARMS-LENGTH | **Deed1:** | /12766/ 37 | **Deed2:** | |
| **Seller:** | CHRISTIAN TIMOTHY R | **Date:** | 05/22/2006 | **Price:** | $599,900 |
| **Type:** | IMPROVED ARMS-LENGTH | **Deed1:** | /10018/ 76 | **Deed2:** | |
| **Seller:** | ANGELL STEVE | **Date:** | 08/18/1997 | **Price:** | $226,500 |
| **Type:** | IMPROVED ARMS-LENGTH | **Deed1:** | / 4039/ 408 | **Deed2:** | |

## Exemption Information

| Partial Exempt Assessments | Class | 07/01/2010 | 07/01/2011 |
|---|---|---|---|
| County | 000 | 0 | 0 |
| State | 000 | 0 | 0 |
| Municipal | 000 | 0 | 0 |

| Tax Exempt: | NO | | Special Tax Recapture: | |
|---|---|---|---|---|
| Exempt Class: | | | * NONE * | |

# Exhibit D

# Terry Mendenhall

3715 Castle Crest
San Antonio, TX 78230
Phone: 210-492-4166
Email: tmendenhall@satx.rr.com

---

## Banking & Financial Services Executive

**Senior-level** management experience as a key team member of top firms, offering proven **leadership** for outstanding results in **banking, financial services, mortgage lending, MBS, and real estate**, including **start-up, growth, turnaround, acquisition, work-outs, troubled debt,** and **close down** situations in a variety of markets. Provide particular expertise in the **integration, development, and delivery** of consumer financial products to consumers (insurance, banking, investments, other services) through **teambuilding** and leadership. Experienced in regular presentations of business plans, analysis, and results to Boards of Directors, CEO's, supervisory personnel, and legal counsel.

---

### KEY CAPABILITIES

- **Business Development &CRM:** Leader of increased and successful product volume production and customer relationship management in five leading firms during career. Previous organizations were community-based, regional, national, and global, all of very different sizes in 4 distinct geographic locations and 5 different markets.
- **Growth and Profitability:** Considerable experience in designing and implementing profitable sources of revenue, development of successful, secure, and low risk business models, line product management responsibility for profitability, budgeting and expenses, growth, productivity increases, losses, customer retention, consumer direct marketing, sales management, teambuilding, rewards and recognition, and motivation.
- **Systems, Project Management, and Operations:** Multi-site and multi-channel continuous improvement operations, call center management, E-commerce, voice response, systems selection, development, and conversions, business project sponsor/manager, business negotiations, contracting, vendor management, and outsourced relationships and performance accountability.
- **Consumer Banking and Residential Lending:** Product pricing, asset/liability management, senior credit officer, risk management, loss reserves, disposition of assets, regulatory compliance, supervision, CRA lending, first mortgage and home equity loan origination, secondary marketing, mortgage-backed securities, operations, administration, servicing, as well as retail residential real estate sales and brokerage.



EXHIBIT

MENDENHALL

## PROFESSIONAL CHRONOLOGY

### Owner – Terry Mendenhall Consulting                    2004 to present

Provides expertise to banks, thrifts, mortgage companies, and credit unions in residential lending and real estate. Strategic and operational planning, troubled real estate and debt management, business model studies, performance evaluations, business integration projects, systems acquisition projects, and marketing research studies are among the services offered by the firm. Speaker, trainer, and presenter at various financial institution functions; published articles on real estate and residential lending issues for banks and credit unions. Serves as expert witness and consultant for litigation of lender liability, credit scoring/reporting, mortgage terms, underwriting, valuations, mortgage securities, and contractual issues of borrowers and lenders.

### Vice President, Manager, Home Loan Services
*USAA Federal Savings Bank*                San Antonio, TX          1990 - 2003

USAA FSB is a subsidiary of USAA, AAA rated, Fortune 500, worldwide, diversified, $65B, financial services firm, serving 4.9 million members of the military community and their families. Sample achievements as primary leader of home loan operation:

* Increased annual first mortgage volume production from 4000 to 51,000 loans ($8B); servicing 165,000 loans ($21B) for government-sponsored entities.
* Improved annual home equity loan volume production from 2000 to 20,000 loans ($560M); servicing 50,000 loans ($1.3B) on balance sheet.
* Grew loan volume, successfully operating in significantly outsourced environment for origination and servicing, then led transition to in-house origination and equity servicing and improved profitability, pricing, and customer service.
* Created retail real estate services product with annual brokerage sales of $4B (25,000 properties).
* Attained pretax profitability of $47M in 2002 with outstanding loan credit quality.
* Developed unique partnership and outsourcing arrangements with mortgage originator/servicers, real estate relocation firms, and other vendors. Provided exceptional productivity levels – among highest in industry.
* Designed unique contracts with investors/agencies for funding of loans, revenue sharing, and risk management.
* Achieved #1 Customer Satisfaction Rating for USAA mortgage program in 2002 survey of nation's largest mortgage lenders by J.D. Powers and Associates.

### Executive Vice President, Home Loan Division
*SASA* (ultimately acquired by B of A)        San Antonio, TX        1983 - 1990

### Vice President, Secondary Marketing
*Gibraltar Savings*                        Houston, TX            1981 – 1983

### Senior Vice President, Chief Lending Officer
*Fidelity Federal Savings*                Jacksonville, FL        1972 – 1981

### Loan Officer and Assistant Manager
**Western Federal Savings**                Denver, CO             1970 - 1972

## Education and Professional Development

- Consumer Bankers Association's **Graduate School of Retail Bank Management**, University of Virginia, Charlottesville, VA. (1998 with honors).
- Executive Education – Darden Graduate School of Business, University of Virginia, Charlottesville, VA. (1997).
- M.B.A. study, University of North Florida, Jacksonville, FL.
- Graduate Key, Institute of Financial Education's Graduate School, Indiana University School of Business, Bloomington, IN.
- B.S. Management, Florida State University, Tallahassee, FL.

## Community Activities

- United Way (2001 – 2004); member of Agency Funding Steering Committee (Council Chair); Agency Stewardship Review Team (1998 - 2000).
- Communities In Schools, San Antonio; Board Chair (1989 – 1991); Board Member (1986 – 1996).
- Texas Lyceum (1985 – 2002).
- Rotary International (39 years); Past Service: Club President, Board Member, District Treasurer, District Governor Representative, District Rotary Foundation Scholarship Committee Chair.
- Any Baby Can, SA; Board of Directors (2005 to 2010); ABC Texas, Inc.; Board of Directors (2009).
- Sons of the American Revolution – San Antonio, TX chapter member.

## Industry Activities

- Employee Relocation Council's **(ERC)** Real Estate Coalition – Board Member (2000 - 2002).
- Real Estate Settlement Providers Council **(RESPRO)** – Board Member (2000 - 2001).
- **Fannie Mae** Regional Advisory Board Member (1997).
- **Freddie Mac** National Advisory Board Member (1986 – 1988); member of task force to study privatization option.
- **Author** of over 20 articles for various publications on residential real estate and lending issues for financial institutions (1986 – 2006).
- Regular **presenter and trainer** at Board meetings, employee training, industry conferences.
- Texas Association of Professionals Federal **Credit Union Board Member** (2005 to present).
- Contract with **TASA Group** as expert witness for litigation; consultant to corporations and lawyers.

**References**
Furnished upon request

## Terry Mendenhall

Mr. Mendenhall is a banking and financial services executive/consultant with over 40 years experience in mortgage lending and real estate. He has led the residential lending operation for various sized banking organizations in different markets with very different customers. During his career, he has worked for community-based, statewide, and national financial services firms. Asset sizes of the firms ranged from $50 million to $65 billion. Mr. Mendenhall has written published articles and served as a speaker at numerous industry meetings involving residential lending and real estate over many years. He has worked with financial institutions nationwide on numerous challenges.

For 13 years, he served as V.P., manager of home lending at USAA in San Antonio, TX. USAA is a AAA rated, Fortune 500, worldwide, diversified, financial services firm, serving over 6 million members of the military community and their families. As the chief residential lending manager/officer, he led the home loan operation through an impressive growth, nearly doubling the number of both new first mortgage and home equity loans, on average, every year during his tenure with extremely good credit quality. In addition, his operation achieved a number one Customer Satisfaction Rating for the 2002 survey of the nation's largest mortgage lenders by J.D. Powers and Associates. He also developed a unique residential real estate brokerage business for USAA with annual sales of over $4 billion (25,000 properties). Pretax profitability of $47 million was attained in the final year of his leadership of the home loan services operation for over 50,000 loans closed. The operation he managed included over 400 employees.

Prior to joining USAA, he was executive vice president of SASA, which was ultimately acquired by Bank of America. He was the chief residential lending officer and manager of the mortgage banking division.

Mr. Mendenhall is a 1998 graduate, with honors, of the Consumer Bankers Association's Graduate School of Retail Bank Management, University of Virginia, Charlottesville, VA. He also holds a B.S. in Management from Florida State University.

Mr. Mendenhall has always had great success at starting or improving residential lending operations through building a strong team, as well as expanding products, markets, and funding sources, producing increased volume and improved customer service, resulting in profitable and highly productive operations. He has extensive experience in leveraging and integrating residential lending with the financial institution's brand, consumer marketing, business channels, and retail delivery into an overall stronger customer relationship. He also has considerable experience with mortgage outsourcing, credit underwriting, telemarketing, secondary marketing, MBS, operations management, sales management, loan workouts, and residential property evaluations, sales, and leasing.

Mr. Mendenhall has served on the Freddie Mac national advisory board and the Fannie Mae regional advisory board. He has also served on the Employee Relocation Council's (ERC) Real Estate Coalition Board of Directors and the Real Estate Settlement Providers Council (RESPRO) Board of Directors. He has served on the senior credit committee of

four different financial institutions. He has also been an expert witness in litigation of mortgage lending matters for the last several years on several cases, both at the state and federal court levels. He is currently on the Board of a San Antonio financial institution, active in Rotary International, and formerly on the Board of Any Baby Can in San Antonio. He is a member of the San Antonio, TX chapter of the Sons of the American Revolution, whose members have direct lineage to U.S. Revolutionary War soldiers.

Terry Mendenhall Consulting, located in San Antonio, Texas, offers expertise to banks, thrifts, mortgage companies, credit unions, and lawyers in residential lending and real estate. Strategic and operational planning, benchmarking, troubled debt management, asset valuations, business model studies, performance evaluations, business integration projects, systems acquisition projects, expert witness reports, and marketing research studies are among the services offered by the firm.



**Terry Mendenhall
Consulting**
3715 Castle Crest
San Antonio, TX 78230
210-492-4166
210-913-7448 (mobile)
tmendenhall@satx.rr.com

# Exhibit E

United States Government Accountability Office

# GAO

Report to the Joint Economic
Committee, United States Congress

August 2010

# NONPRIME MORTGAGES

# Analysis of Loan Performance, Factors Associated with Defaults, and Data Sources



**GAO**

Accountability * Integrity * Reliability



## GAO
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-10-805, a report to the Joint Economic Committee, United States Congress

# NONPRIME MORTGAGES

## Analysis of Loan Performance, Factors Associated with Defaults, and Data Sources

## Why GAO Did This Study

The surge in mortgage foreclosures that began in late 2006 and continues today was initially driven by deterioration in the performance of nonprime (subprime and Alt-A) loans. Nonprime mortgage originations increased dramatically from 2000 through 2006, rising from about 12 percent ($125 billion) of all mortgage originations to about 34 percent ($1 trillion). The nonprime market contracted sharply in mid-2007, partly in response to increasing defaults and foreclosures for these loans.

This report (1) provides information on the performance of nonprime loans through December 31, 2009; (2) examines how loan and borrower characteristics and economic conditions influenced the likelihood of default (including foreclosure) of nonprime loans; and (3) describes the features and limitations of primary sources of data on nonprime loan performance and borrower characteristics, and discusses federal government efforts to improve the availability or use of such data. To do this work, GAO analyzed a proprietary database of securitized nonprime loans and Home Mortgage Disclosure Act data, and reviewed information on mortgage data sources maintained by private firms and the federal government.

## What GAO Recommends

GAO makes no recommendations in this report.

View GAO-10-805 or key components. To view the e-supplement online, click GAO-10-806SP. For more information, contact William B. Shear at (202) 512-8678 or shearw@gao.gov.

## What GAO Found

The number of active nonprime loans originated from 2000 through 2007 that were seriously delinquent (90 or more days late or in the foreclosure process) increased from 1.1 million at the end of 2008 to 1.4 million at the end of 2009. Serious delinquency rates were higher for certain adjustable-rate products common in the subprime and Alt-A market segments than they were for fixed-rate products. The number of nonprime loans that were 90 or more days late grew throughout 2009, accounting for most of the overall growth in the number of serious delinquencies. By comparison, the number of active loans in the foreclosure process grew in the first half of the year, and then began to decline somewhat. Additionally, 475,000 nonprime mortgages completed the foreclosure process during 2009. The persistently weak performance of nonprime loans suggests that problems in the nonprime market will not be resolved quickly, and underscores the importance of federal efforts to assist distressed borrowers and prevent a recurrence of the aggressive lending practices that helped precipitate the foreclosure crisis.

In addition to performance differences between mortgage products, GAO found across product types that house price changes, loan amount, the ratio of the amount of the loan to the value of the home, and borrower credit score were among the variables that influenced the likelihood of default on nonprime loans originated from 2004 through 2006. In addition, loans that lacked full documentation of borrower income and assets were associated with increased default probabilities, and the influence of borrowers' reported income varied with the level of documentation. GAO found that borrower race and ethnicity were associated with the probability of default, particularly for loans used to purchase rather than to refinance a home. However, these associations should be interpreted with caution because GAO lacks data on factors that may influence default rates and that may also be associated with race and ethnicity, such as borrower wealth and first-time homebuyer status.

Existing sources of data on nonprime mortgages contain a range of information to support different uses. While these data sources offer some similar elements, they vary in their coverage of loan, property, and borrower attributes. The data sources generally lack information on certain attributes that could help inform policy decisions or regulatory efforts to mitigate risk. For example, first-time homebuyers are not identified in any of the data sources, limiting the ability of analysts to compare the marginal effect of prior homeownership experience on default probabilities. In addition, most of the data sources do not cover the entire nonprime mortgage market. Ongoing federal efforts have the potential to provide data that may not have some of the constraints of the existing sources. For example, officials from the Board of Governors of the Federal Reserve System and Freddie Mac are collaborating on a pilot project to develop a publicly available National Mortgage Database, which would compile data on a representative sample of outstanding mortgages and provide more comprehensive data than are currently available.

_____
**United States Government Accountability Office**

# Contents

| **Letter** | | **1** |
| --- | --- | --- |
| | Background | 5 |
| | Nonprime Loan Performance Deteriorated through the End of 2009 and Varied by Market Segment, Product Type, Cohort Year, and Location | 9 |
| | House Price Changes and Certain Loan and Borrower Characteristics Were Associated with Default Rates | 16 |
| | Available Nonprime Mortgage Data Sources Provide Useful Information but Have Constraints That May Be Addressed, in Part, by Ongoing Efforts | 32 |
| | Observations | 40 |
| **Appendix I** | **Description of the Econometric Analysis of Nonprime Mortgage Default Probabilities** | **42** |
| **Appendix II** | **Matching CoreLogic LoanPerformance and Home Mortgage Disclosure Act Records** | **61** |
| **Appendix III** | **GAO Contact and Staff Acknowledgments** | **67** |
| **Tables** | | |
| | Table 1: Variables Used in the Logistic Regression Models | 44 |
| | Table 2: Mean Values for Short-term Hybrid ARMs | 47 |
| | Table 3: Mean Values for Longer-term ARMs | 49 |
| | Table 4: Mean Values for Fixed-rate Mortgages | 51 |
| | Table 5: Estimation Results for Short-term Hybrid ARMs for Owner-Occupants | 53 |
| | Table 6: Estimation Results for Short-term Hybrid ARMs for Investors | 55 |
| | Table 7: Estimation Results for Longer-term ARMs for Owner-Occupants | 57 |
| | Table 8: Estimation Results for Fixed-rate Mortgages for Owner-Occupants | 59 |
| | Table 9: Results of the Matching Process (CoreLogic LP Loan Records to HMDA Loan Records) | 65 |

Table 10: Median Initial Interest Rates, by Loan Origination Year,
Mortgage Product Type, and Match Status                                    66

# Figures

Figure 1: Percentage of Subprime and Alt-A Loans Originated from
2000 through 2007, by Product Type                                          6
Figure 2: Status of Nonprime Loans Originated from 2000 through
2007 as of December 31, 2009                                               10
Figure 3: Active Nonprime Loans by Performance Category as of
December 31, 2009                                                          11
Figure 4: Number of Seriously Delinquent Nonprime Loans,
December 31, 2008, through December 31, 2009                               12
Figure 5: Serious Delinquency Rates for Subprime Loans as of
December 31, 2009, and Year-over-Year Changes in
Serious Delinquency (Dec. 31, 2008-Dec. 31, 2009)                         14
Figure 6: Serious Delinquency Rates for Alt-A Loans as of
December 31, 2009, and Year-over-Year Changes in
Serious Delinquency (Dec. 31, 2008-Dec. 31, 2009)                         14
Figure 7: Cumulative Percentage of Subprime and Alt-A Loans That
Completed the Foreclosure Process by Cohort Year, 2004
through 2007                                                               15
Figure 8: Estimated Probability of Nonprime Mortgages Defaulting
within 24 Months under Different House Price
Appreciation Assumptions in the First 2 Years of the Loan,
2004 through 2006 Loans                                                    19
Figure 9: Estimated Probability of Nonprime Mortgages Defaulting
within 24 Months under Different Loan Amount, CLTV
Ratio, and Credit Score Assumptions, 2004 through 2006
Loans                                                                      22
Figure 10: Estimated Probability of Nonprime Mortgages
Defaulting within 24 Months under Different Reported
Income Assumptions for Borrowers with and without Full
Documentation, 2004 through 2006 Loans                                     26
Figure 11: Default Rates for Nonprime Mortgages 24 Months after
First Payment, by Race and Ethnicity, Not Controlling for
Other Variables, 2004 through 2006 Loans                                   28
Figure 12: Estimated Probability of Nonprime Mortgages
Defaulting within 24 Months, by Borrower Race and
Ethnicity, 2004 through 2006 Loans                                         29
Figure 13: Examples of Available Data in Selected Mortgage Data
Sources                                                                    35

## Abbreviations

| | |
|---|---|
| ABS | asset-backed securities |
| ARM | adjustable-rate mortgage |
| BLS | Bureau of Labor Statistics |
| CLTV | combined loan-to-value |
| CoreLogic LP | CoreLogic LoanPerformance |
| DTI | debt-service-to-income |
| FFIEC | Federal Financial Institutions Examination Council |
| FHA | Federal Housing Administration |
| FHFA | Federal Housing Finance Agency |
| HMDA | Home Mortgage Disclosure Act |
| HPA | house price appreciation |
| HPI | house price index |
| HUD | Department of Housing and Urban Development |
| LLS | Loan Level Servicing |
| LPS | Lender Processing Services |
| LTV | loan-to-value |
| MBS | mortgage-backed securities |
| NMDB | National Mortgage Database |
| SFDW | Single Family Data Warehouse |

*Nonprime Mortgages: Data on Loan Performance by Cohort Year, Product Type, and Location, an E-Supplement to GAO-10-805 (GAO-10-806SP)*

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

August 24, 2010

The Honorable Carolyn B. Maloney
Chair
The Honorable Charles E. Schumer
Vice Chairman
Joint Economic Committee
United States Congress

The surge in mortgage foreclosures that began in late 2006 and continues today was initially driven by deterioration in the performance of nonprime (subprime and Alt-A) loans.[1] Nonprime mortgage originations increased dramatically from 2000 through 2006, rising from about 12 percent ($125 billion) of all mortgage originations to about 34 percent ($1 trillion).[2] The nonprime market contracted sharply in mid-2007, partly in response to increasing default and foreclosure rates for these mortgages. As economic conditions deteriorated in 2008 and 2009, growing numbers of borrowers—including those with both nonprime and prime loans—entered foreclosure, exacerbating stresses in the mortgage and housing markets.

Researchers and policymakers have sought to understand the causes of the foreclosure crisis and develop policy responses to reduce foreclosures and prevent similar crises in the future. However, data limitations have complicated efforts to analyze the nonprime mortgage market, in part because no one database provides complete information on the features and performance of nonprime loans and the characteristics of borrowers. Furthermore, questions have been raised about whether timely access to more comprehensive information on the nonprime mortgage market could have helped federal banking regulators anticipate the foreclosure crisis or respond to it more quickly and effectively.

To inform congressional oversight and decision making about efforts to address problems in the mortgage market, you requested that we examine

---

[1]The subprime segment of the nonprime loan market generally serves borrowers with blemished or limited credit histories, while the Alt-A market segment serves borrowers whose credit histories are close to prime, but the loans have one or more high-risk features.

[2]GAO, *Characteristics and Performance of Nonprime Mortgages*, GAO-09-848R (Washington, D.C.: July 28, 2009).

the evolution and condition of the nonprime market segment. In prior reports, we discussed certain characteristics of nonprime loans and borrowers; the performance of nonprime mortgages as of March 31, 2009, and June 30, 2009; the extent of negative equity among nonprime borrowers in selected metropolitan areas and nationwide as of June 30, 2009; and the proportion of nonprime borrowers with negative equity and seriously delinquent loans, by state, from 2006 through 2009.[3] This report (1) provides information on the performance of nonprime loans through December 31, 2009; (2) examines how loan and borrower characteristics and economic conditions influenced the likelihood of default and foreclosure of nonprime loans; and (3) describes the features and limitations of primary sources of data on nonprime loan performance and borrower characteristics, and discusses federal government efforts to improve the availability or use of such data. An electronic supplement to this report provides additional information on the performance of nonprime mortgages by annual loan cohort, product type, Census division, state, and congressional district as of December 31, 2009.[4]

To examine the recent performance of nonprime mortgages, we used data from CoreLogic LoanPerformance's (CoreLogic LP) Asset-Backed Securities Database for nonprime loans originated from 2000 through 2007 (the last year in which substantial numbers of nonprime mortgages were made). The CoreLogic LP database contains loan-level data on a large majority of nonagency securitized mortgages in subprime and Alt-A pools.[5]

---

[3]GAO, *State-Level Information on Negative Home Equity and Loan Performance in the Nonprime Mortgage Market*, GAO-10-633R (Washington, D.C.: May 14, 2010); *Loan Performance and Negative Home Equity in the Nonprime Mortgage Market*, GAO-10-146R (Washington, D.C.: Dec. 16, 2009); and GAO-09-848R.

[4]See GAO, *Nonprime Mortgages: Data on Loan Performance by Cohort Year, Product Type, and Location, an E-Supplement to GAO-10-805*, GAO-10-806SP (Washington, D.C.: Aug. 24, 2010). For a discussion of our methodology for estimating performance by congressional district, see GAO-09-848R.

[5]Nonagency mortgage-backed securities (MBS), also known as private-label MBSs, are backed by nonconforming conventional mortgages securitized primarily by investment banks. Nonconforming mortgages are those that do not meet the purchase requirements of Fannie Mae or Freddie Mac because they are too large or do not meet their underwriting criteria. About 75 percent of subprime and Alt-A mortgages originated from 2001 through 2007 were securitized. For the period of January 2001 through July 2007, the CoreLogic LP database contains information covering, in dollar terms, an estimated 87 percent of securitized subprime loans and 98 percent of securitized Alt-A loans. Researchers have found some evidence that nonprime mortgages that were not securitized (mortgages that lenders held in their portfolios) may have less risky characteristics than those that were securitized. See Christopher L. Foote and others, "Reducing Foreclosures," Federal Reserve Bank of Boston Public Policy Discussion Paper No. 09-2 (April 2009).

For the purposes of our analysis, we defined a subprime loan as a loan in a subprime pool and an Alt-A loan as a loan in an Alt-A pool.[6] We focused our analysis on first-lien purchase and refinance mortgages for one- to four-family residential units. For the nonprime market as a whole, and for the subprime and Alt-A market segments, we calculated the number and percentage of nonprime mortgages that were in different performance categories—for example, current (up to date on payments); delinquent (30 to 89 days behind); in default (90 or more days behind); in the foreclosure process; or having completed the foreclosure process—at the end of each quarter from December 31, 2008, through December 31, 2009, the most recent quarterly data that we could analyze within the time frame of our review.[7] We classified mortgages in default or in the foreclosure process as "seriously delinquent." We also examined mortgage performance as of December 31, 2009, by loan cohort; product type; and geographic areas, including Census divisions, states, and congressional districts.[8] These latter analyses are reported in detail in the electronic supplement to this report.[9]

To analyze the influence of loan and borrower characteristics and economic conditions on the performance of nonprime loans, we developed a statistical model to estimate the relationship between relevant variables and the probability of loan default or foreclosure within 24 months after the borrower's first payment. We define a loan as being in default or foreclosure if it was delinquent by at least 90 days, in the foreclosure process (including loans identified as in real-estate-owned status), paid off after being 90-days delinquent or in foreclosure, or already terminated with evidence of a loss. We analyzed nonprime loans originated from 2004 to 2006, using records from the CoreLogic LP database that we matched to records in the Home Mortgage Disclosure Act (HMDA)

---

[6]The CoreLogic LP database has a loan-level indicator for loan class (subprime or Alt-A), but it is not well populated. Therefore, we used the pool-level classification. According to mortgage researchers, some of the loans in subprime pools may not be subprime loans, and some of the loans in Alt-A pools may not be Alt-A loans.

[7]Unless otherwise noted, we treated delinquent loans, loans in default, and loans in the foreclosure process as mutually exclusive categories. We considered a loan to have completed the foreclosure process if it was in real-estate-owned status as of a particular date, or was paid off after being either 90 or more days delinquent, in the foreclosure process, or in real-estate-owned status.

[8]A loan cohort is a group of loans that originated in the same year.

[9]GAO-10-806SP.

database compiled by the Federal Financial Institutions Examination Council (FFIEC) from information reported by lenders.[10] Combining the information in these two data sources yielded a data set with loan-level information on loan characteristics (mortgage type and key mortgage terms); loan performance (payment status at particular times); and certain borrower characteristics (such as borrower race, ethnicity, reported income, and credit score).[11] In addition, we used the Federal Housing Finance Agency's (FHFA) house price indexes (HPI) for metropolitan areas to incorporate data on house price appreciation.[12] We also used employment data from the Bureau of Labor Statistics (BLS) and Census tract-level data from the 2000 Census to control for various economic conditions and neighborhood characteristics. Appendix I contains additional information on the methodology for this statistical model.

To identify sources of data on nonprime loans and borrowers, we reviewed research literature on mortgage markets and interviewed knowledgeable private sector and federal agency officials. For data sources that are national in scope, provide loan-level information on nonprime loans, and are widely available for free or a fee, we reviewed database documentation and related research and interviewed agency and company officials to determine the scope and features of each data source. We also collected and reviewed similar documentation for data on loans insured by the Department of Housing and Urban Development's (HUD) Federal Housing Administration (FHA) because borrowers served by FHA earlier in the decade had some similar characteristics to subprime borrowers. We also used our review of documentation and research and

---

[10]The period of 2004 through 2006 covers the peak years of nonprime mortgage lending, and the performance window includes periods of both house price appreciation and depreciation. Additionally, we focused on this period because data limitations complicated our efforts to produce robust matches between the CoreLogic LP and HMDA databases for loans originated in other years.

[11]Although the HMDA data provide information on borrowers' race, ethnicity, and reported income, they contain limited information about loan characteristics and no information about performance. HMDA data are estimated to capture about 80 percent of the mortgages funded each year and cover all major market segments, including nonprime loans. HMDA data should therefore capture most of the loans in the CoreLogic LP database, which provides extensive information about loan characteristics and performance.

[12]More than 90 percent of loans in the CoreLogic LP database was for properties located in metropolitan areas covered by FHFA's HPIs. We excluded loans for properties outside of these areas.

interviews to identify limitations in data availability and federal government efforts to address them or to improve the use of such data.

We tested the reliability of the data used in this report by reviewing documentation on the process that the data providers use to collect and ensure the reliability and integrity of their data, and by conducting reasonableness checks on data elements to identify any missing, erroneous, or outlying data. We also interviewed CoreLogic LP representatives to discuss the interpretation of various data fields. We concluded that the data we used were sufficiently reliable for our purposes.

We conducted this engagement in Washington, D.C., and Chicago, Illinois, from December 2009 through August 2010 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

The nonprime mortgage market has two segments:

- *Subprime:* Generally serves borrowers with blemished or limited credit histories, and the loans feature higher interest rates and fees than prime loans.

- *Alt-A:* Generally serves borrowers whose credit histories are close to prime, but the loans have one or more high-risk features, such as limited documentation of income or assets or the option of making monthly payments that are lower than would be required for a fully amortizing loan.

Of the 14.5 million nonprime loans originated from 2000 through 2007, 9.4 million (65 percent) were subprime loans and 5.1 million (35 percent) were Alt-A loans.

In both of these market segments, two types of loans are common: fixed-rate mortgages, which have unchanging interest rates, and adjustable-rate mortgages (ARM), which have interest rates that can adjust periodically on the basis of changes in a specified index. Specific types of ARMs are prevalent in each market segment. "Short-term hybrid ARMs" accounted for 70 percent of subprime mortgage originations from 2000 through 2007

(see fig. 1). These loans have a fixed interest rate for an initial period (2 or 3 years) but then "reset" to an adjustable rate for the remaining term of the loan. In the Alt-A segment, "payment-option ARMs" are a common adjustable-rate product, accounting for 17 percent of Alt-A mortgage originations from 2000 through 2007. For an initial period of typically 5 years, or until the loan balance reaches a specified cap, this product provides the borrower with multiple payment options each month, including minimum payments that are lower than what would be needed to cover any of the principal or all of the accrued interest. After the initial period, payments are "recast" to include an amount that will fully amortize the outstanding balance over the remaining loan term.

**Figure 1: Percentage of Subprime and Alt-A Loans Originated from 2000 through 2007, by Product Type**



Subprime loans (9.4 million)

Alt-A loans (5.1 million)

Source: GAO analysis of CoreLogic LP data.

Several payment categories describe the performance of mortgages, including nonprime mortgages:

- *Current:* The borrower is meeting scheduled payments.

- *Delinquent:* The borrower is 30 to 89 days behind in scheduled payments.

- *Default:* The borrower is 90 days or more delinquent.[13] At this point, foreclosure proceedings against the borrower become a strong possibility.

- *In the foreclosure process:* The borrower has been delinquent for more than 90 days, and the lender has elected to foreclose in what is often a lengthy process. The loan is considered active during the foreclosure process.

- *Completed the foreclosure process:* The borrower's loan terminates and foreclosure proceedings end with one of several possible outcomes. For example, the borrower may sell the property or the lender may repossess the home.

- *Prepaid:* The borrower has paid off the entire loan balance before it is due. Prepayment often occurs as a result of the borrower selling the home or refinancing into a new mortgage.

In this report, we describe mortgages in default or in the foreclosure process as "seriously delinquent."

As we have stated in previous reports, a combination of falling house prices, aggressive lending practices, and weak economic conditions have contributed to the increase in troubled mortgages. For example, in 2009, we noted that falling house prices had left a substantial proportion of nonprime borrowers in a negative equity position—that is, their mortgage balances exceeded the current value of their homes—limiting their ability to sell or refinance their homes in the event they could not stay current on their mortgage payments.[14] Additionally, we reported that an easing of underwriting standards and wider use of certain loan features associated with poorer loan performance contributed to increases in mortgage delinquencies and foreclosures.[15] These features included mortgages with higher loan-to-value (LTV) ratios (the amount of the loan divided by the value of the home at loan origination), adjustable interest rates, limited or no documentation of borrower income or assets, and deferred payment of

---

[13]There is no uniform definition of default across the lending industry. For the purposes of this report, we use the definition provided unless otherwise noted.

[14]GAO-10-146R.

[15]GAO, *Information on Recent Default and Foreclosure Trends for Home Mortgages and Associated Economic and Market Developments*, GAO-08-78R (Washington, D.C.: Oct. 16, 2007).

principal or interest. Also, in some cases, mortgage originators engaged in questionable sales practices that resulted in loans with onerous terms and conditions that made repayment more difficult for some borrowers. Furthermore, rising unemployment has contributed to mortgage defaults and foreclosures because job loss directly affects a borrower's ability to make mortgage payments.

The foreclosure crisis has imposed significant costs on borrowers, neighborhoods, and taxpayers. For example, vacant and foreclosed properties have contributed to neighborhood blight and reduced property values in many communities. Additionally, foreclosures affecting minority populations and the high incidence of subprime lending to members of these groups have heightened concerns that these groups have received disparate treatment in mortgage lending. In light of these costs and concerns, Congress and federal agencies have taken a number of steps to address and prevent a recurrence of ongoing problems in the mortgage market. These efforts include programs to modify or refinance the loans of distressed borrowers and legislation to strengthen mortgage-lending standards and prevent mortgage originators from steering borrowers into high-risk or high-cost mortgages.

# Nonprime Loan Performance Deteriorated through the End of 2009 and Varied by Market Segment, Product Type, Cohort Year, and Location

## The Worsening Performance of Nonprime Loans Was Reflected in Increases in Serious Delinquencies

As of December 31, 2009, 63 percent of the 14.50 million nonprime loans originated from 2000 through 2007 (the last year in which substantial numbers of nonprime mortgages were made) was no longer active. Fifty percent of the nonprime loans originated during this period had prepaid, and 13 percent had completed foreclosure (see fig. 2).[16]

---

[16]As we have previously noted, the data we used for our analysis do not cover the entire nonprime market but do cover the large majority of nonagency securitized mortgages within that market.

**Figure 2: Status of Nonprime Loans Originated from 2000 through 2007 as of December 31, 2009**



Source: GAO analysis of CoreLogic LP data.

Note: The percentages in this figure were calculated from unrounded numbers.

Among the 4.59 million nonprime loans that remained active as of the end of 2009, about 16 percent was in default (90 or more days late) and about 14 percent was in the foreclosure process, for a total serious delinquency rate of 30 percent (see fig. 3).[17] About 12 percent was in a less serious stage of delinquency (30 to 89 days late), and the remaining 58.5 percent was current.

---

[17]By comparison, as of the first quarter of 2007, active nonprime loans originated from 2000 through 2005 had a serious delinquency rate of 7 percent. Although defaults and foreclosures also increased in other market segments, the serious delinquency rate for the mortgage market as a whole was substantially lower. According to the Mortgage Bankers Association, the serious delinquency rate for the broader mortgage market was approximately 2 percent as of the first quarter of 2007 and 10 percent at the end of 2009.

**Figure 3: Active Nonprime Loans by Performance Category as of December 31, 2009**



Source: GAO analysis of CoreLogic LP data.

Note: The percentages in this figure were calculated from unrounded numbers.

The performance of nonprime mortgages originated from 2000 through 2007 deteriorated from the end of 2008 through the end of 2009. At the end of 2009, 1.38 million active nonprime loans were seriously delinquent, compared with 1.10 million at the end of 2008.[18] Over the 12-month period, the serious delinquency rate rose from 21 percent to 30 percent. About three-quarters of the year-over-year change in the number of serious delinquencies was due to an increase in defaults, while the remainder was due to an increase in loans in the foreclosure process. As shown in figure 4, the number of active nonprime loans in default grew each quarter, with the largest increases occurring in the third and fourth quarters of 2009. By comparison, the number of active nonprime loans in the foreclosure process grew in the first two quarters of the year, held almost steady in the third quarter, and declined in the last quarter of 2009. The decline in the number of loans in the foreclosure process may be attributable to decisions by lenders not to begin foreclosure proceedings on defaulted loans.

---

[18]Active loans can move in and out of serious delinquency status over time. For example, if a borrower makes one or more payments on a loan that has been in default (more than 90 days past due), its status could improve to delinquent (30 to 89 days past due) or current.

**Figure 4: Number of Seriously Delinquent Nonprime Loans, December 31, 2008, through December 31, 2009**



Seriously delinquent loans

Legend:
- Loans in default
- Loans in the foreclosure process
- Total seriously delinquent loans (loans in default + loans in the foreclosure process)

Source: GAO analysis of CoreLogic LP data.

In addition, among all nonprime loans originated from 2000 through 2007, the cumulative percentage that had completed the foreclosure process increased from 10 percent at the end of 2008 to 13 percent at the end of 2009. About 475,000 nonprime loans completed foreclosure in 2009, or roughly 119,000 per quarter. Most (63 percent) of the 759,000 decline in the number of active loans in 2009 was attributable to loans completing foreclosure, rather than to prepayments.

## Loan Performance Varied by Market Segment, Product Type, Cohort Year, and Location

In 2009, the performance of nonprime loans differed between the subprime and Alt-A market segments and, within each segment, among product types (fixed-rate mortgages versus ARMs). Nonprime loan performance also varied by the year of loan origination (cohort year) and by location.

### Loan Performance by Market Segment and Product Type

In general, the subprime market segment performed worse than the Alt-A segment in 2009.

- Of the 2.76 million subprime loans that were active at the end of 2008, 10 percent (267,000) completed foreclosure in 2009. By comparison, 8 percent (208,000) of the 2.59 million Alt-A loans that were active at the end of 2008 completed foreclosure in 2009.

- Cumulatively, 15 percent (1.41 million) of subprime loans originated from 2000 through 2007 had completed foreclosure as of December 31, 2009, compared with 9 percent (474,000) of Alt-A loans.

- Among active loans at the end of 2009, 36 percent (858,000) of subprime loans were seriously delinquent, compared with 23 percent (517,000) of Alt-A loans.

However, Alt-A loans accounted for 55 percent (152,000) of the 277,000 year-over-year increase in the number of seriously delinquent loans.

Within the subprime and Alt-A market segments, loan performance varied by product type. As we stated in a previous report, serious delinquency rates were higher for certain adjustable-rate products common in the subprime and Alt-A market segments than they were for fixed-rate products or the market as a whole.[19] Although many nonprime borrowers with adjustable-rate loans fell behind on their mortgages before their payments increased, the higher serious delinquency rates for these products may partly reflect the difficulties some borrowers had in making their payments when their interest rates reset to higher levels or when their monthly payments recast to fully amortizing amounts. In the subprime market segment, the serious delinquency rate for short-term hybrid ARMs was 48 percent at the end of 2009, compared with 21 percent for fixed-rate mortgages and 36 percent for all active subprime loans (see fig. 5). The serious delinquency rate increased by 11 percentage points for short-term hybrid ARMs in 2009, compared with 8 percentage points for fixed-rate mortgages and 10 percentage points for all active subprime loans. However, the year-over-year increase in the number of fixed-rate mortgages that were seriously delinquent (over 62,000) was greater than the corresponding increase among short-term hybrid ARMs (over 47,000), even though short-term hybrid ARMs were more prevalent than fixed-rate mortgages among subprime loans.

[19]GAO-09-848R.

**Figure 5: Serious Delinquency Rates for Subprime Loans as of December 31, 2009, and Year-over-Year Changes in Serious Delinquency (Dec. 31, 2008-Dec. 31, 2009)**

| | Serious delinquency rate as of December 31, 2009 | Change in serious delinquency from year-end 2008 to year-end 2009 | |
|---|---|---|---|
| | | By percentage point | By number of loans |
| Total subprime market | 36% | +10 | +126,308 |
| Short-term hybrid ARMs | 48 | +11 | +47,413 |
| Fixed-rate loans | 21 | +8 | +62,328 |

Source: GAO analysis of CoreLogic LP data.

In the Alt-A segment, the serious delinquency rate at the end of 2009 was higher for payment-option ARMs (38 percent) than for fixed-rate mortgages (15 percent) and active Alt-A mortgages as a whole (23 percent) (see fig. 6). The serious delinquency rate increased by 14 percentage points for payment-option ARMs in 2009, compared with 7 percentage points for fixed-rate mortgages and 9 percentage points for all active Alt-A mortgages. Although the serious delinquency rate grew faster for payment-option ARMs than for fixed-rate mortgages, the year-over-year increase in the number of seriously delinquent loans was greater for fixed-rate mortgages (about 63,000) than for payment-option ARMs (over 36,000), reflecting the preponderance of fixed-rate mortgages in the Alt-A market segment.

**Figure 6: Serious Delinquency Rates for Alt-A Loans as of December 31, 2009, and Year-over-Year Changes in Serious Delinquency (Dec. 31, 2008-Dec. 31, 2009)**

| | Serious delinquency rate as of December 31, 2009 | Change in serious delinquency from year-end 2008 to year-end 2009 | |
|---|---|---|---|
| | | By percentage point | By number of loans |
| Total Alt-A market | 23% | +9 | +152,168 |
| Payment-option ARMs | 38 | +14 | +36,216 |
| Fixed-rate loans | 15 | +7 | +62,948 |

Source: GAO analysis of CoreLogic LP data.

## Loan Performance by Cohort Year

Nonprime mortgages originated from 2004 through 2007 accounted for most of the distressed loans at the end of 2009. Of the active subprime loans originated from 2000 through 2007, 94 percent of those that were seriously delinquent as of December 31, 2009, were from those four cohorts. In addition, loans from these cohorts made up 77 percent of the subprime loans that had completed the foreclosure process. This pattern was more pronounced in the Alt-A market, where 98 percent of the loans that were seriously delinquent as of December 31, 2009, were from the

2004 through 2007 cohorts. Similarly, 95 percent of the Alt-A loans that had completed the foreclosure process were from those cohorts.

Also, within each market segment, the percentage of mortgages completing the foreclosure process generally increased for each successive loan cohort (see fig. 7). Within 3 years of loan origination, 5 percent of subprime loans originated in 2004 had completed the foreclosure process, compared with 8 percent of the 2005 cohort and 16 percent each of the 2006 and 2007 cohorts. Among Alt-A loans, 1 percent of the 2004 cohort had completed the foreclosure process within 3 years of origination, compared with 2 percent of the 2005 cohort, 8 percent of the 2006 cohort, and 13 percent of the 2007 cohort.

**Figure 7: Cumulative Percentage of Subprime and Alt-A Loans That Completed the Foreclosure Process by Cohort Year, 2004 through 2007**



Source: GAO analysis of CoreLogic LP data.

This trend is partly attributable to a decline in the appreciation of or an absolute decline in house prices in much of the country beginning in 2005 and worsening in subsequent years. This situation made it more difficult for some borrowers to sell or refinance their homes to avoid default or foreclosure. In addition, borrowers who purchased homes but came to owe more than the properties were worth, had incentives to stop making

mortgage payments to minimize their financial losses. The deterioration in loan performance for the successive cohorts may also reflect an increase in riskier loan and borrower characteristics over time, such as limited documentation of borrower income and higher ratios of debt to household income.

**Loan Performance by Location**

The proportion of active nonprime loans that were seriously delinquent as of December 31, 2009, varied across the states. Four states—Florida, Illinois, Nevada, and New Jersey—had serious delinquency rates above 35 percent at the end of 2009. Seven states had serious delinquency rates between 30 and 35 percent; 9 states had serious delinquency rates between 25 and 30 percent; and 19 states had serious delinquency rates between 20 and 25 percent. The remaining 12 states had serious delinquency rates of less than 20 percent, including Wyoming's rate of 15 percent, which was the lowest in the country. Detailed data on the performance of nonprime loans by cohort year and location, as well as by market segment and product type, are available in the electronic supplement to this report.[20]

# House Price Changes and Certain Loan and Borrower Characteristics Were Associated with Default Rates

House price changes and loan and borrower characteristics, such as loan amount, combined LTV (CLTV) ratio, and borrower credit score, were among the variables that we found influenced the likelihood of default on nonprime loans originated from 2004 through 2006, the peak years of nonprime mortgage lending.[21] In addition, nonprime loans that lacked full documentation of borrower income and assets were associated with increased default probabilities, and the influence of borrowers' reported income varied by product type, loan purpose, and the level of documentation. For purchase loans in particular, borrower race and ethnicity were associated with the probability of default. However, these associations should be interpreted with caution because we lack data on factors—such as borrower wealth, first-time homebuyer status, and employment status—that may influence default rates and that may also be associated with race and ethnicity.

---

[20]GAO-10-806SP.

[21]The CLTV ratio is the amount of the first mortgage and any second liens divided by the value of the home at loan origination.

| Description of our Statistical Model | Prior research has shown that various loan, borrower, and economic variables influence the performance of a mortgage.[22] We developed a statistical model to examine the relationship between such variables and the probability of a loan defaulting within 24 months after the borrower's first payment. We focused on the probability of a loan defaulting within 24 months as our measure of performance because a large proportion of nonprime borrowers had hybrid ARMs and prepaid their loans (e.g., by refinancing) within 2 years. For the purposes of this analysis, we defined a loan as being in default if it was delinquent by at least 90 days, in the foreclosure process (including loans identified as in real-estate-owned status), paid off after being 90 days delinquent or in foreclosure, or already terminated with evidence of a loss.[23] |
|---|---|

We developed the statistical model using data on nonprime mortgages originated from 2004 through 2006. To include more information on borrower demographics (i.e., race, ethnicity, and reported income) than is available in the CoreLogic LP data, we matched CoreLogic LP records to HMDA records.[24] Although we matched about three-quarters of the CoreLogic LP loans, and the loans that we could match were similar in important respects to the loans that we could not match, our estimation results may not be fully representative of the securitized portion of the nonprime market or the nonprime market as a whole. (See app. II for additional information on our matching methodology.)

We produced separate estimates for the three most prevalent nonprime loan products: (1) short-term hybrid ARMs, representing 51 percent of nonprime loans originated during this period; (2) longer-term ARMs—

---

[22]In a prior report, we examined the relationship between these types of variables and the likelihood of default to assess the implications of proposed legislation intended to strengthen consumer protections for mortgage borrowers. See GAO, *Home Mortgages: Provisions in a 2007 Mortgage Reform Bill (H.R. 3915) Would Strengthen Borrower Protections, but Views on Their Long-term Impact Differ*, GAO-09-741 (Washington, D.C.: July 31, 2009).

[23]Earlier in this report, we used the term "in default" to refer only to loans that were delinquent by at least 90 days. For efficiency of language, henceforth we use the broader definition stated in this section of the report.

[24]In GAO-09-741, we used a similar model to estimate mortgage defaults. However, the results presented in that prior report and this report are not directly comparable, in part because we did not match the CoreLogic LP data to HMDA data in the prior report. Therefore, we did not include information on borrowers' race, ethnicity, or reported income. Also, for that study, we estimated default probabilities for loans originated from 2000 through 2006.

those with interest rates that were fixed for 5, 7, or 10 years before adjusting (11 percent of originations); and (3) fixed-rate mortgages (27 percent of originations). For each product type, we produced separate estimates for purchase and refinance loans and for loans to owner-occupants and investors.[25] Twenty-four months after the first loan payment, default rates were highest for short-term hybrid ARMs and, across product types, were generally higher for purchase loans than refinance loans. Appendix I provides additional information about our model and estimation results.

## Across Product Types, Changes in House Prices Influenced Default Probabilities

Consistent with prior research, we found that lower rates of house price appreciation or declines in house prices were strongly associated with a higher likelihood of default for each product type and loan purpose.[26] To illustrate the role of this variable, we estimated the default probability assuming house price changes that resembled the actual patterns in certain metropolitan areas, all else being equal.[27] For example, for short-term hybrid ARMs used for home purchases, house price appreciation of 25 percent in the 1st year of the loan and then 20 percent in the 2nd year was associated with about a 5 percent estimated default probability, all else being equal (see fig. 8).[28] Assuming instead that house prices stayed about level in the 1st year of the loan and then dropped by about 10 percent in the 2nd year, the estimated default probability for short-term hybrid ARM purchase loans increased by about 26 percentage points, to 31 percent.

[25]We present the results for purchase and refinance loans to owner-occupants in the body of this report and results for loans to investors in appendix I.

[26]Michelle A. Danis and Anthony Pennington-Cross, "The Delinquency of Subprime Mortgages," *Journal of Economics and Business*, vol. 60 (2008); Andrew Haughwout, Richard Peach, and Joseph Tracy, "Juvenile Delinquent Mortgages: Bad Credit or Bad Economy?," *Journal of Urban Economics*, vol. 64 (2008); Shane M. Sherlund, "The Past, Present, and Future of Subprime Mortgages," *Finance and Economic Discussion Series*, no. 2008-63, Federal Reserve Board (November 2008); and Yuliya S. Demyanyk, "Quick Exits of Subprime Mortgages," *Federal Reserve Bank of St. Louis Review*, vol. 91, no. 2 (2009).

[27]When we use the phrase "all else being equal" in describing the marginal effect of changes in a particular variable, we mean that we estimated default probabilities using two different values for that variable, setting the values for all other variables to their means for the respective product type and loan purpose.

[28]We used FHFA's metropolitan HPIs, which are broad measures of the movement of single-family house prices in 384 metropolitan areas. The HPIs are published by FHFA using home price data provided by Fannie Mae and Freddie Mac on the basis of sales and refinancings of the same properties at different points in time.

These two scenarios approximate the actual house price changes in Los Angeles beginning in early 2004 and mid-2005, respectively, and are emblematic of a number of markets in which a period of substantial house price growth was followed by a period of decline. Assuming that house prices rose by a modest 2 percent per year—approximating the pattern in a number of midwestern markets—the estimated default probability was about 22 percent. As shown in figure 8, the influence of house prices changes on estimated default probabilities was greater for short-term hybrid ARMs than for other mortgage products.

**Figure 8: Estimated Probability of Nonprime Mortgages Defaulting within 24 Months under Different House Price Appreciation Assumptions in the First 2 Years of the Loan, 2004 through 2006 Loans**





Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: This figure compares the estimated probability of default assuming the house price change values shown in the 1st and 2nd year of the loan, all else being equal. The results presented are for owner-occupants. The estimated default probabilities that we present do not necessarily reflect the ultimate performance of any product type.

House price changes may also reflect broader economic trends, thereby affecting the precision of estimated impacts of other broad economic variables, such as employment growth, on mortgage defaults. In our model, we included a variable for state-level employment growth and noted that the variable was positively correlated with the variable for

house price changes.[29] With that in mind, we found that for purchase and refinance loans of all product types, lower rates of employment growth were associated with somewhat higher estimated default probabilities. For example, for short-term hybrid ARM purchase loans, moving from a 4 percent employment growth rate over 24 months to a zero percent employment growth rate was associated with about a 1 percentage point increase in estimated default probabilities. For each of the other product types and loan purposes, the corresponding change was between 1 and 2 percentage points.

## Loan Amount, CLTV Ratio, and Credit Score Also Were Associated with the Likelihood of Default for All Product Types

In general, we found that higher loan amounts, higher CLTV ratios, and lower credit scores also were strongly associated with higher likelihoods of default.[30] For example:

- *Loan amount:* For each product type and loan purpose, we estimated the default probability assuming a loan amount near the 25th percentile for that product and purpose and compared this with the estimated default probability assuming a loan amount near the 75th percentile for that product and purpose. For short-term hybrid ARMs used for home purchases, moving from a loan amount of $125,000 to $300,000 was associated with a 6 percentage point increase in estimated default probability, all else being equal (see fig. 9). A similar pattern held across product types, with a larger effect for purchase loans than refinance loans.

- *CLTV ratio:* For each product type and loan purpose, we estimated the default probability assuming a CLTV ratio close to the 25th percentile for that product and purpose and compared this with the estimated default probability assuming a CLTV ratio close to the 75th percentile for that product and purpose. For short-term hybrid ARMs used for home purchases, moving from a CLTV ratio between 80 and 90 percent to a

[29]That is, house prices and employment growth tended to move in the same direction. Specifically, the correlation coefficient between our measures for house price changes and employment growth in the first 24 months of the loan was 0.66. (The Pearson's correlation coefficient is a statistical measure of association, ranging in value from negative 1 to positive 1, with negative 1 indicating a perfect negative correlation, 0 an absence of correlation, and positive 1 a perfect positive correlation.)

[30]Other research has found similar associations. See Danis and Pennington-Cross, "The Delinquency of Subprime Mortgages"; Haughwout, Peach, and Tracy, "Juvenile Delinquent Mortgages: Bad Credit or Bad Economy?"; Sherlund, "The Past, Present, and Future of Subprime Mortgages"; and Demyanyk, "Quick Exits of Subprime Mortgages."

CLTV ratio of 100 percent or more was associated with a 10 percentage point increase in estimated default probability, all else being equal (see fig. 9). For short-term hybrid ARMs used for refinancing, moving from a CLTV ratio of less than 80 percent to a CLTV ratio of 90 percent was associated with a 7 percentage point increase in estimated default probability. For the other product types, the effects of increasing the CLTV ratio were smaller for both purchase and refinance loans.

- *Borrower credit score:* For each product type and loan purpose, we estimated the default probability assuming a borrower credit score near the 75th percentile for that product and purpose and compared this with the estimated default probability assuming a loan amount near the 25th percentile for that product and purpose. For short-term hybrid ARMs used for home purchases, moving from the higher credit score to the lower one was associated with a 10 percentage point increase in estimated default probability, all else being equal (see fig. 9). For the other product types (whether for home purchase or refinancing), the effects were smaller.

**Figure 9: Estimated Probability of Nonprime Mortgages Defaulting within 24 Months under Different Loan Amount, CLTV Ratio, and Credit Score Assumptions, 2004 through 2006 Loans**



Purchase loan

Refinance loan

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: For each variable presented, the figure compares the estimated probability of default assuming values near the 25th and 75th percentile for the respective product type and loan purpose, all else being equal. The results presented in this figure are for loans to owner-occupants.

We also found that the difference between the loan's initial interest rate and the relevant interest rate index (interest rate spread) had a significant influence on estimated default probabilities, which is generally consistent with other economic research showing a positive relationship between higher interest rates and default probabilities for nonprime mortgages.[31] Across product types and loan purposes, the interest rate spread had a statistically significant influence on estimated default probabilities. For example, for short-term hybrid ARMs, moving from a spread of 3.0 percent (near the 25th percentile for that product) to a spread of 4.5 percent (near the 75th percentile) was associated with about a 4 percentage point increase in default probability for purchase and refinance loans, all other things being equal.

We also estimated the effect of the debt-service-to-income (DTI) ratio at origination and found that for all product types, this variable did not have a strong influence on the probability of default within 24 months.[32] This relatively weak association, based on the DTI ratio at origination, could differ from the impact of changes to the DTI ratio after origination due, in part, to changes in borrower income or indebtedness. For example, a mortgage that is affordable to the borrower at origination may become less so if the borrower experiences a decline in income or takes on additional nonmortgage debt.[33]

---

[31]In our statistical model, we split the initial interest rate into two variables, representing the relevant interest rate index and the interest rate spread, and found that both variables had a positive association with default probabilities. Other research examining the influence of those two interest rate components together also found a positive association with default probabilities. See Demyanyk, "Quick Exits of Subprime Mortgages."

[32]The DTI ratio represents the percentage of a borrower's income that goes toward all recurring debt payments, including the mortgage payments. The higher the ratio, the greater the risk that the borrower will have cash-flow problems and will miss mortgage payments.

[33]For a further discussion of this hypothesis, see Foote and others, "Reducing Foreclosures."

## Level of Income Documentation Influenced Default Probabilities, and Associations between Income and Defaults Varied by Product Type, Loan Purpose, and Documentation Level

Loans originated with limited documentation of borrowers' income or assets became prevalent in the nonprime mortgage market, particularly in the Alt-A market segment. We found that documentation of borrower income and assets influenced the probability of default of nonprime loans originated from 2004 through 2006. For purchase and refinance loans of all product types, limited documentation of income and assets was associated with a 1 to 3 percentage point increase in the estimated probability of default, all other things being equal. Our results are generally consistent with prior research showing an association between a lack of documentation and higher default probabilities.[34]

Because our data indicated that borrowers with full documentation loans had different reported risk characteristics (e.g., credit score, CLTV ratio, and reported income) than borrowers with limited documentation loans, we more closely explored the relationship between documentation level and default for short-term hybrid ARMs (the most common nonprime product) taking these differences into account. On average, short-term hybrid ARM purchase loans with limited documentation went to borrowers with higher credit scores, higher reported incomes, and somewhat lower CLTV ratios, compared with borrowers who had full documentation loans.[35] To account for these differences, we estimated default probabilities separately for borrowers with full and limited documentation loans, using the mean credit score, reported income, and CLTV ratio values specific to each group.[36] Using this method, the *expected* default probability for the limited documentation group was 3 percentage

---

[34]Anthony Pennington-Cross and Giang Ho, "The Termination of Subprime Hybrid and Fixed Rate Mortgages," *Federal Reserve Bank of St. Louis Working Paper Series*, no. 2006-042A (July 2006); Danis and Pennington-Cross, "The Delinquency of Subprime Mortgages"; and Haughwout, Peach, and Tracy, "Juvenile Delinquent Mortgages: Bad Credit or Bad Economy?."

[35]This pattern reflects the fact that loans with limited documentation of income were typically associated with the Alt-A market, which serves borrowers with credit histories better than those of subprime borrowers.

[36]To produce these estimates we used a statistical model similar to the one used to produce the other estimates in this report, except that the model excluded the documentation variable. We estimated default probabilities separately for loans with and without full documentation using the documentation-level-specific means for credit score, reported income, and CLTV ratio and the mean values for all loans for all other variables. The mean loan amount was higher for loans with limited documentation (about $265,000) than for loans with full documentation (about $200,000). To control for the tendency of the higher loan amount to increase the default risk for loans with limited documentation, we used the mean loan amount for all loans (about $230,000) in this example.

points *lower* than for the full documentation group, reflecting their better reported risk characteristics. However, *in reality*, borrowers with limited documentation loans had a 5 percentage point *higher* default rate than borrowers with full documentation loans. The differences between the estimated and actual default probabilities for these borrowers suggest that the reported risk characteristics—particularly income—may be misstated, or that other unobserved factors may be associated with the use of the limited documentation feature. For example, mortgage originators or borrowers may have used the limited documentation feature in some cases to overstate the financial resources of borrowers and qualify them for larger, potentially unaffordable loans. In addition, borrowers who used the feature could have experienced decreases in their income after loan origination, thereby making it more difficult for them to stay current on their payments.

We also found that the influence of borrowers' reported income varied by product type and loan purpose and, in some cases, depended on whether the loan had full documentation. For example, for short-term hybrid ARMs used for home purchases and refinancing, moving from $60,000 to $100,000 in reported income was associated with an 1 percentage point decrease in the estimated default probability for loans with full documentation, all else being equal (see fig. 10). However, for loans with limited documentation, the same change in reported income was associated with a slight increase (0.2 percentage points) in estimated default probability for purchase loans and a small decrease (0.5 percentage points) for refinance loans. For fixed-rate mortgages used for purchase and refinancing, moving from $60,000 to $100,000 in reported income was associated with small decreases in estimated default probabilities for both full and limited documentation loans, although the decreases were slightly smaller for loans with limited documentation. For longer-term ARMs, moving from the lower to the higher income level generally did not affect the estimated default probabilities for purchase or refinance loans, regardless of the level of documentation.

**Figure 10: Estimated Probability of Nonprime Mortgages Defaulting within 24 Months under Different Reported Income Assumptions for Borrowers with and without Full Documentation, 2004 through 2006 Loans**



| | Documentation of borrower income and assets | Income assumption (in thousands) | Estimated probability of default | |
|---|---|---|---|---|
| **Short-term hybrid ARMs** | Full | $60 | | 16.0% |
| | | $100 | | 15.0% |
| | Limited | 60 | | 20.6 |
| | | 100 | | 20.8 |
| | Full | 60 | | 11.3 |
| | | 100 | | 10.0 |
| | Limited | 60 | | 14.7 |
| | | 100 | | 14.2 |
| **Longer-term ARMs** | Full | 60 | | 3.1 |
| | | 100 | | 3.0 |
| | Limited | 60 | | 5.8 |
| | | 100 | | 5.9 |
| | Full | 60 | | 2.4 |
| | | 100 | | 2.4 |
| | Limited | 60 | | 4.8 |
| | | 100 | | 4.9 |
| **Fixed-rate mortgages** | Full | 60 | | 3.6 |
| | | 100 | | 3.3 |
| | Limited | 60 | | 6.2 |
| | | 100 | | 6.0 |
| | Full | 60 | | 3.8 |
| | | 100 | | 3.3 |
| | Limited | 60 | | 5.9 |
| | | 100 | | 5.8 |



Purchase loan

Refinance loan

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: This figure compares the estimated probability of default assuming different levels of reported income, with all other variables for each product type and loan purpose being equal. The results presented in this figure are for owner-occupants.

## Associations between Race and Ethnicity and the Likelihood of Default Varied by Product Type and Loan Purpose, but Other Unobserved Variables May Help to Explain these Associations

Some researchers and market observers have noted that the foreclosure crisis has hit minority borrowers particularly hard. We found that, for certain product types and loan purposes, reported race and ethnicity were associated with the probability of default for nonprime mortgages. Not controlling for other variables, black or African-American borrowers had higher 24-month default rates across product types than white borrowers, especially for purchase loans.[37] For example, for short-term hybrid ARMs, black or African-American borrowers had about a 12 percentage point higher default rate than white borrowers for purchase loans and about a 2 percentage point higher default rate for refinance loans (see fig. 11). Additionally, Hispanic or Latino borrowers (of all races) generally had higher default rates than (non-Hispanic) white borrowers. For example, Hispanic or Latino borrowers had about an 8 percentage point higher default rate than white borrowers for short-term hybrid ARM purchase loans and about a 2 percentage point higher default rate for refinance loans. For fixed-rate refinance loans, however, Hispanic borrowers had essentially the same default rate as white borrowers.

---

[37]In this report, we use the race and ethnicity categories defined in the HMDA data. When we refer to white borrowers, we exclude borrowers who identified their ethnicity as Hispanic or Latino. When we refer to black or African-American borrowers, we include borrowers of all ethnicities. When we refer to Hispanic or Latino borrowers, we include borrowers of all races.

**Figure 11: Default Rates for Nonprime Mortgages 24 Months after First Payment, by Race and Ethnicity, Not Controlling for Other Variables, 2004 through 2006 Loans**




Purchase loan
Refinance loan

Source: GAO analysis of CoreLogic LP and HMDA data.

Note: The White category excludes people who identified their ethnicity as Hispanic or Latino. The Black or African-American category includes people of all ethnicities. The Hispanic or Latino category includes people of all races. The results presented in this figure are for owner-occupants.

Various factors may help to explain some of the observed differences in the default rates between racial and ethnic groups. Across product types, black or African-American borrowers had lower average credit scores and reported incomes than white and Hispanic or Latino borrowers. Also, black or African-American borrowers generally were more likely than white borrowers to have CLTV ratios of 90 percent or more. For short-term hybrid ARMs and longer-term ARMs, black or African-American and Hispanic or Latino borrowers were less likely to have loans that originated in 2004, when house price appreciation was still strong in many parts of the country. In addition, Hispanic or Latino borrowers had a higher incidence of limited documentation loans and were concentrated in California, where house price declines in a number of areas were particularly severe.

Controlling for these variations, we found that the differences in estimated default probabilities by racial and ethnic group were still significant but considerably smaller than the actual observed differences (i.e., the differences without the statistical controls in place). Taking short-term hybrid ARMs used for home purchases as an example, when we estimated default probabilities by racial and ethnic group holding the other variables in our model to the mean values for each group, we found that the estimated default probability for black or African-American borrowers was about 7 percentage points higher than for white borrowers, compared

with the observed 12 percentage point difference that we have previously discussed (see fig. 12).[38] Using the same assumptions, the corresponding default probability for Hispanic or Latino borrowers was about 4 percentage points higher than for white borrowers. For short-term hybrid ARMs used for refinancing, black or African-American borrowers had only about a 1 percentage point higher estimated default probability than white borrowers, while Hispanic or Latino borrowers had about the same estimated default probability as white borrowers.

**Figure 12: Estimated Probability of Nonprime Mortgages Defaulting within 24 Months, by Borrower Race and Ethnicity, 2004 through 2006 Loans**



| | Estimated probability of default, by borrower race and ethnicity | | |
|---|---|---|---|
| | White | Black or African-American | Hispanic or Latino |
| Short-term hybrid ARMs | 15.5% | 22.6% | 19.7% |
| | 11.7 | 12.8 | 11.9 |
| Longer-term ARMs | 3.1 | 7.3 | 11.8 |
| | 3.0 | 5.9 | 6.3 |
| Fixed-rate mortgages | 3.6 | 10.0 | 6.7 |
| | 4.0 | 6.4 | 3.7 |

   Purchase loan
   Refinance loan

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: The White category excludes people who identified their ethnicity as Hispanic or Latino. The Black or African-American category includes people of all ethnicities. The Hispanic or Latino category includes people of all races. The results presented in this figure are for owner-occupants. We estimated the default probability for each group of borrowers setting all variables to their mean values for the respective group.

Inferences drawn from these statistical results should be viewed with caution because we lack data for variables that may help to explain the remaining differences in estimated default probabilities between borrowers of different racial and ethnic groups. Unobserved factors that may influence the likelihood of default may also be associated with race and ethnicity. For example:

---

[38]To produce these estimates, we used a statistical model similar to the one we used to produce the other estimates in this report, except that the model excluded the race and ethnicity variables. We estimated default probabilities separately for white, black or African-American, and Hispanic or Latino borrowers using the mean values for all variables for the respective group.

- *First-time homebuyer:* We could not determine which nonprime borrowers were first-time homebuyers, but other evidence suggests that members of minority groups are disproportionately first-time homebuyers.[39] To the extent that black or African-American and Hispanic or Latino borrowers with purchase loans were disproportionately first-time homebuyers, their higher estimated default probabilities may partly reflect limited experience with the risks and costs of homeownership. As shown in figure 12, we found that the differences in estimated default rates between racial and ethnic groups were much smaller for nonprime refinance loans—which, by definition, exclude first-time homebuyers—than they were for purchase loans.

- *Employment status:* We did not have data on the employment status of nonprime borrowers, but unemployment rates are generally higher for black or African-American and Hispanic or Latino workers than for white workers.[40] The higher estimated default probabilities that we found for black or African-American and Hispanic or Latino borrowers may reflect that nonprime borrowers from minority groups were disproportionately affected by unemployment in recent years.

- *Wealth:* Although we obtained data on reported income by matching CoreLogic LP and HMDA records, we did not have information on nonprime borrowers' savings or other assets, which may affect their ability to keep up with their mortgage payments if faced with job loss or other unexpected changes in income or expenses. However, according to the *Survey of Consumer Finances,* nonwhite and Hispanic families generally are less likely to save or hold financial assets than non-Hispanic white families.[41] Furthermore, the median value of assets for nonwhite and

---

[39]For example, among owner-occupants, about 60 percent of black homeowners and 55 percent of Hispanic homeowners were first-time buyers, compared with 40 percent of all homeowners in 2007, according to the *American Housing Survey.* See U.S. Census Bureau, Current Housing Reports series H150/07, *American Housing Survey for the United States: 2007* (Washington, D.C.: 2008), p. 158.

[40]In 2006, for example, the average unemployment rate was 8.9 percent for the black or African-American civilian population, 5.2 percent for the Hispanic population, and 4.0 percent for the white population, according to BLS.

[41]For example, in 2007, 51 percent of nonwhite and Hispanic families reported that they had saved in the preceding year and 87 percent reported owning any financial assets; the corresponding percentages for non-Hispanic white families were 59 percent and 98 percent, respectively. See Brian K. Bucks and others, "Changes in U.S. Family Finances from 2004 to 2007: Evidence from the Survey of Consumer Finances," *Federal Reserve Bulletin* (February 2009).

Hispanic families having financial assets is dramatically less than for non-Hispanic white families.[42]

- *Origination channel or lender steering to higher-cost or riskier loans:*
  We did not have data on whether the nonprime loans were originated by
  mortgage brokers (intermediaries between borrowers and lenders) or
  directly by a lender's retail branch, or how the loans were marketed to the
  borrowers. Some evidence suggests that broker-originated loans were
  associated with higher default rates and that, at least in some markets,
  minority families were more likely to access the mortgage market through
  brokers rather than through retail lenders.[43] In addition, some researchers
  and market observers have raised concerns that some nonprime loan
  originators used questionable marketing tactics in lower-income and
  minority neighborhoods.[44] Such practices may have led borrowers to take
  out higher-cost or riskier loans than necessary, which may have increased
  their probability of default.

---

[42]In 2007, the median assets for nonwhite and Hispanic families having any assets was
$9,000, compared with $44,000 for non-Hispanic white families, according to the *Survey of
Consumer Finances*.

[43]William P. Alexander and others, "Some Loans Are More Equal than Others: Third-Party
Originations and Defaults in the Subprime Mortgage Industry," *Real Estate Economics*,
vol. 30 (2002); and Carolina Reid and Elizabeth Laderman, "The Untold Costs of Subprime
Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in
California," (a paper presented at the Institute for Assets and Social Policy, Brandeis
University, April 2009).

[44]William C. Apgar and Allegra Calder, "The Dual Mortgage Market: The Persistence of
Discrimination in Mortgage Lending," in *The Geography of Opportunity: Race and
Housing Choice in Metropolitan America*, ed. Xavier deSousa Briggs (Washington, D.C.:
Brookings Institution Press, 2005).

# Available Nonprime Mortgage Data Sources Provide Useful Information but Have Constraints That May Be Addressed, in Part, by Ongoing Efforts

## Several Private and Public Sector Data Sources Cover Nonprime Loans

Mortgage market participants, financial regulators, investors, and public policy analysts use mortgage data for a variety of purposes. Some of the broad uses of such data include monitoring and modeling the performance of mortgages and mortgage-backed securities, assessing the soundness of financial institutions with mortgage-related holdings, and examining fair lending and consumer protection issues. For example, in a 2009 report, we used loan-level mortgage data to assess the implications of proposed mortgage reform legislation on consumer protections and on the availability of mortgage credit.[45] Existing sources of data on nonprime mortgages contain a range of information to support these different uses. Loan-level data with broad national coverage of the nonprime market segment are available from several sources: four mortgage databases (three maintained by private firms and one by the federal government) and two major credit reporting agencies.[46] For comparison, we also reviewed information on a HUD database of FHA-insured mortgages, because the borrower populations served by FHA and the nonprime market earlier in the decade had some similarities (e.g., relatively low credit scores) and the database is rich in detail.

- *CoreLogic LP Asset-Backed Securities (ABS) Database*: A private sector database of nonprime loans that contains information on nonagency

---

[45]GAO-09-741.

[46]As we have previously noted, we focused on data sources that are widely available. As a result, we did not include proprietary data maintained by lending institutions and other mortgage market participants in our scope.

securitized mortgages in subprime and Alt-A pools.[47] The data are supplied by a number of different parties, including loan servicers; broker-dealers; and security issuers, trustees, and administrators.

- *CoreLogic LP Loan Level Servicing (LLS) database:* A private sector database of prime, nonprime, and government-guaranteed mortgages that contains data supplied by participating loan servicers.[48] The mortgages include loans in agency and nonagency securitizations and loans held in lenders' portfolios.[49]

- *Lender Processing Services (LPS) Loan Level Data:* Similar to the LLS database, this private sector database contains data supplied by participating loan servicers on prime, nonprime, and government-guaranteed mortgages, including loans in agency and nonagency securitization and loans held in lenders' portfolios.

- *Consumer credit file data:* Two national credit reporting agencies—both private firms—provide anonymous data from consumer credit files that include information on prime, nonprime, and government-guaranteed mortgages.

- *FFIEC HMDA data:* A federal government database that contains information reported by lenders on about 80 percent of all mortgages funded each year, including nonprime loans.

- *HUD Single Family Data Warehouse (SFDW):* A federal government database with information on mortgages insured by FHA.[50]

---

[47]As we have previously explained, nonagency securitized loans are nonconforming conventional mortgages securitized primarily by investment banks. Nonconforming mortgages are those that do not meet the purchase requirements of Fannie Mae or Freddie Mac because they are too large or do not meet their underwriting criteria.

[48]The prime market segment serves borrowers with strong credit histories and provides the most attractive interest rates and mortgage terms. The government-guaranteed market segment primarily serves borrowers who may have difficulty in qualifying for prime mortgages but features interest rates competitive with prime loans in return for payment of insurance premiums or guarantee fees. FHA and the Department of Veterans Affairs operate the two main federal programs that insure or guarantee mortgages.

[49]Agency securitized loans are conforming conventional mortgages that meet the requirements for purchase and securitization by Fannie Mae or Freddie Mac.

[50]HUD provides aggregated and some loan-level data on its Web site (see http://www.hud.gov/offices/hsg/hsgrroom.cfm (accessed July 6, 2010) and https://entp.hud.gov/sfnw/public/ (accessed July 6, 2010)).

Among the data sources that include nonprime mortgages, the private databases and extracts of credit file data can be licensed or purchased for a fee. Recent HMDA data can be acquired at no charge. Some of these data may be subject to use restrictions determined by the provider. The private companies and credit reporting agencies update data on a daily or monthly basis and provide the updated data to users within 1 month or upon request. HMDA data are updated annually with a lag of 9 months.[51]

While these data sources currently offer some similar data elements, the sources vary in their coverage of loan, property, and borrower attributes.[52] In part, this variation reflects the different primary purposes of the data sets. For example, the HMDA database is intended to provide the public with loan data that can assist in identifying potential risks for discriminatory patterns to help enforce antidiscrimination laws and evaluate bank community reinvestment initiatives. Accordingly, the HMDA data provide relatively detailed information about mortgage borrowers but no information about the performance of the loans. By contrast, the CoreLogic LP and LPS databases offer performance data to support the benchmarking and analysis of loans or mortgage-backed securities. Figure 13 presents some of the available data elements, with a focus on data that may assist in evaluating the probability of mortgage default and differences in mortgage outcomes across demographic groups.[53] All of the nonprime data sources report on loan amount. The sources vary in their coverage of other loan attributes, such as mortgage type and performance status. All of the nonprime data sources report the property location at the ZIP code or Census-tract level, while coverage of other property attributes, such as property type and appraised value, varies. In the category of borrower attributes, all but one of the nonprime data sources provide borrower credit score at loan origination and owner-occupancy status. Among the nonprime data sources, only the HMDA data and credit reporting agency data provide additional demographic information on borrowers.

---

[51]For example, HMDA data on mortgages made in 2009 are not available until September 2010. HMDA data can be ordered through the FFIEC Web site (see http://www.ffiec.gov/hmda/ (accessed July 6, 2010)).

[52]The data sources may have different definitions for certain data elements. Some data fields in the HMDA database may be unavailable to the public to protect borrowers' privacy, and some data fields in nonprime data sources may not be well populated.

[53]Information in figure 13 is current as of July 2010. The availability of different data elements may change over time. The data elements shown in the figure are those available to data users outside of the companies or agencies that maintain the data.

**Figure 13: Examples of Available Data in Selected Mortgage Data Sources**

| | CoreLogic LP | | LPS | Equifax and Experian[a] | FFIEC | HUD |
|---|---|---|---|---|---|---|
| | **ABS** (Nonagency securitized mortgages in subprime and Alt-A pools) | **LLS** (Prime, nonprime, and government-guaranteed mortgages serviced by participating servicers) | **Loan Level Data** (Prime, nonprime, and government-guaranteed mortgages serviced by participating servicers) | **Credit file information** (Prime, nonprime, and government-guaranteed mortgages as reported to credit reporting agencies by lenders and loan servicers) | **HMDA** (Prime, nonprime, and government-guaranteed mortgages originated by lenders required to report) | **SFDW** (FHA-insured mortgages) |
| **Loan attributes** | | | | | | |
| Loan amount | X | X | X | X | X | X |
| Loan start date[b] | X | X | X | X | X | X |
| Loan purpose (i.e., purchase or refinance) | X | X | X | | X | X |
| Loan status (e.g., delinquent, in foreclosure) | X | X | X | X | | X |
| Outstanding loan balance | X | X | X | X | | X |
| Initial interest rate | X | X | X | | | X |
| Loan-to-value ratio at loan origination | X | X | X | | | X |
| Product type (e.g., fixed or adjustable rate) | X | X | X | | | X |
| Debt service-to-income ratio | X | X | | | | X |
| **Property attributes** | | | | | | |
| Lowest level geographic indicator | ZIP code | ZIP code | ZIP code | ZIP code | Census tract | ZIP code |
| Property type (e.g., single unit, multiunit) | X | X | X | | X | X |
| Appraised value at origination or sale price | X | X | X | | | X |
| **Borrower attributes** | | | | | | |
| Credit score at loan origination | X | X | X | | | X |
| Investor or owner-occupant | X | X | X | | X | X |
| Age or date of birth | | | | X | | X |
| Race and ethnicity | | | | | X | X |
| Reported income | | | | Estimates of income are available | X | X |
| Sex | | | | | X | X |
| First-time homebuyer | | | | May be imputed from borrower's credit account history | | X |

Source: GAO analysis of information provided by CoreLogic LP, LPS, Experian, Equifax, FFIEC, and HUD.

[a]For all data elements, an "X" indicates that both credit reporting agencies provide the information, and a blank cell indicates that neither agency provides the information. Analysts may be able to calculate values for some data elements without an "X," such as LTV and DTI ratios, depending on the availability of supplemental or estimated information.

[b]Loan start date represents either the loan origination date or, for the credit reporting agencies, the date that the credit account was opened. The specificity of the loan start date varies by data source. The publicly available HMDA data provide the year only, and the credit reporting agencies and one other source provide at least the month and year. The remaining two nonprime data sources provide the day, month, and year; but for some loans, the origination date is imputed from the date of the first loan payment.

Several other sources of mortgage data provide useful information about the mortgage market, including nonprime loans, but do not provide loan-level detail or, in some cases, lack broad national data coverage. For example, the Mortgage Bankers Association's National Delinquency Survey provides quarterly summary statistics on the performance of the overall mortgage market and different market segments, including subprime loans. RealtyTrac offers data on the number of properties in some stage of the foreclosure process but not data on all active loans. Additionally, federal banking regulators and the government-sponsored enterprises produce free or comparatively low-cost data that are typically aggregated and only cover mortgages within their regulatory jurisdiction.

## Limitations in Data Sources Constrain Analysis of Some Aspects of Nonprime Mortgages

Although the selected data sources that include nonprime mortgages contain important loan, property, and borrower characteristics, the sources have a number of constraints. First, the data sources generally lack information on certain attributes that could help inform policy decisions or regulatory efforts to mitigate risk, including the following:

- *Loan attributes:* Although three of the five nonprime data sources provide information on the initial interest rates of the mortgages (and, in some cases, how those interest rates can change over the life of the loan), they do not provide information on other mortgage costs, such as points and fees paid at loan closing.[54] For example, one study that found no evidence of adverse pricing of subprime loans by race, ethnicity, or gender noted that an important caveat to the analysis was the lack of data on points and fees.[55] Consequently, data users have limited ability to evaluate the

[54]The HMDA data, however, do provide information on the spread between the annual percentage rate—a measure of credit cost to the borrower that takes account of the interest rate, points, and certain lender charges—and the rate on Treasury securities of comparable maturity for loans with prices above designated thresholds. A point is a loan charge, usually paid at loan closing, expressed as a percentage of the loan amount (1 point is 1 percent of the loan balance).

[55]The study examined pricing in terms of interest rates for subprime loans originated from 2004 through 2006. See Andrew Haughwout, Christopher Mayer, and Joseph Tracy, "Subprime Mortgage Pricing: The Impact of Race, Ethnicity, and Gender on the Cost of Borrowing," Federal Reserve Bank of New York Staff Paper No. 368 (April 2009).

influence of loan costs on default probabilities or to examine fair lending concerns regarding loan pricing. In addition, while the CoreLogic LP LLS and LPS Loan Level Data databases indicate whether a mortgage was originated by a broker or directly by a lender's retail branch, the other data sources do not. As we have previously noted, some research has suggested associations between origination channel and mortgage performance.

- *Borrower attributes:* A number of borrower characteristics that may be associated with default risk generally does not appear in the nonprime data sources we reviewed. For example, first-time homebuyers are not directly identified in any of the nonprime data sources, limiting the ability of analysts to compare the marginal effect of prior homeownership experience on default probabilities. (By comparison, SFDW identifies first-time homebuyers with FHA-insured mortgages and contains data on loan performance.) In addition, none of the nonprime data sources contain information on borrower wealth (savings and other assets), a factor that could affect a borrower's ability to continue making mortgage payments in times of economic stress. With the exception of the credit reporting agencies, the data sources also do not always directly provide information on the amount of borrowers' other mortgage debt (second liens), which may constrain accurate assessment of the relationship between home equity and default.[56] Similarly, data on nonmortgage credit obligations are unavailable, except from the credit reporting agencies, which may limit researchers' understanding of how borrowers' total debt burden affects the mortgages they obtain and their ability to meet mortgage obligations. Also, the data sources lack information on borrower life events that may influence the probability of mortgage default, such as job loss or divorce.

A second type of constraint is that analysts may not be able to generalize their results to the entire nonprime market because certain data sources do not cover all segments of the market and some mortgage originators, securitizers, or servicers do not contribute information. For example, the CoreLogic LP ABS database contains information on a large majority of nonprime mortgages that were securitized but not those that lenders hold

---

[56]CoreLogic LP offers a separate data product that provides information on other mortgage debt. HMDA data contain records on first and junior liens but do not identify whether two or more loans are related to the same property. However, using a record-matching process, it is possible to identify pairs of loans used to finance the same property. See GAO, *Federal Housing Administration: Decline in the Agency's Market Share Was Associated with Product and Process Developments of Other Mortgage Market Participants,* GAO-07-645 (Washington, D.C.: June 29, 2007).

in their portfolios. As we have previously noted, researchers have found that nonprime mortgages that were not securitized may have less risky characteristics than those that were securitized. Private sector databases that contain information on both securitized and nonsecuritized mortgages (CoreLogic LP LLS and LPS Loan Level Data) cover the majority of the market but do not provide complete market coverage because not all servicers contribute information to the databases. Similarly, because mortgage originators located outside of metropolitan areas are not required to report their loan information, the HMDA data do not capture many mortgages made in rural areas. By contrast, the credit reporting agencies have broader market coverage but lack data on key mortgage attributes, such as loan type and purpose.

The third constraint we identified is that the existing nonprime data sources cannot readily be combined to create a single database with a more comprehensive set of variables. Merging data sources enables researchers to more thoroughly analyze lending patterns and factors influencing loan performance. However, due to competition and privacy concerns, the selected data sources either elect not to provide or are restricted from providing certain key fields that could be used to merge databases, such as the property address. For example, to match loan records in the CoreLogic LP ABS database and HMDA data, we relied in part on loan origination date fields that are not publicly released due to privacy concerns.[57] Even with the origination date fields, we could not match all of the CoreLogic LP records to HMDA records.

Finally, a user of existing data sources may have the ability to track some specific loans over time but may not easily track a specific borrower or property. Tracking a specific borrower or property over time would

---

[57]We requested and obtained the date fields from FFIEC, which compiles and publishes the HMDA data, to conduct studies requested by Congress. Under GAO's disclosure regulations, set forth at 4 C.F.R. Part 81, we do not provide members of the public with records that originate in another agency obtained in connection with our work. Instead, we refer members of the public requesting information to the agency that originated the record. 4 C.F.R. § 81.5(a). Additionally, under our regulations, we do not disclose to the public records containing confidential financial information, *see* 4 C.F.R. § 81.6(e), nor do we disclose records containing private or personal information, which, if disclosed to the public, would amount to a clearly unwarranted invasion of the privacy of a person, *see* 4 C.F.R. § 81.6(f).

provide insights into mortgage outcomes throughout a homeownership experience, even if a borrower refinances into a new mortgage.[58]

## Ongoing Federal Efforts May Address Some Constraints in Mortgage Data Sources

Ongoing federal efforts could provide data on the entire mortgage market that potentially would not have some of the constraints that we identified in the existing sources of mortgage data. First, officials from the Board of Governors of the Federal Reserve System (Federal Reserve Board) and Freddie Mac are collaborating on a pilot project to develop a publicly available National Mortgage Database (NMDB). The officials are exploring the feasibility of developing a federally funded, loan-level, and representative database of first-lien mortgages designed to address mortgage-related policy, finance, and business concerns. NMDB would compile data on a representative sample of outstanding mortgages from a national credit reporting agency, supplement those data by matching records to existing mortgage databases (such as the HMDA data), and obtain data unavailable in any existing databases through a survey of borrowers. Since NMDB would include data from a variety of sources, it would provide more comprehensive data on the first-lien mortgage market than are currently available. If implemented, the combined database would contain loan-level information on (1) mortgage terms; (2) mortgage performance from origination to termination; (3) borrowers' other credit circumstances over the life of the loan; (4) borrower demographics; and (5) other borrower attributes, such as key life events and shopping behavior.

Second, the Dodd-Frank Wall Street Reform and Consumer Protection Act provides for additional compilation of HMDA data, such as borrower age and credit score, loan origination channel, and—as the Bureau of Consumer Financial Protection deems appropriate—a unique identifier for the loan originator and a universal loan identifier.[59] Additionally, the act includes the creation of a publicly available Default and Foreclosure database that would include Census tract-level information on the number and percentage of mortgages delinquent for more than 30 and 90 days,

---

[58]Some firms offer databases that draw on public records and may be used to track properties or borrowers over time. For example, researchers used historical registry of deeds records for the entire state of Massachusetts to track homeownership experiences of subprime borrowers. See Kristopher Gerardi, Adam Hale Shapiro, and Paul S. Willen, "Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures," Federal Reserve Bank of Boston Working Paper No. 07-15 (May 2008).

[59]Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010).

real-estate-owned properties, mortgages in the foreclosure process, mortgages with negative equity, and other information. If implemented, the universal loan identifier could facilitate matching among mortgage databases, and the HMDA data would become more comprehensive.

# Observations

The growth of the nonprime market earlier in this decade was accompanied by a shift toward increasingly risky mortgage products. Nonprime loans provided homeownership and refinancing opportunities that may have benefited many households. However, many nonprime loans had features or were underwritten to standards that made them vulnerable to default and foreclosure, particularly in recent years when house prices began to stagnate and decline and economic conditions eroded more broadly. As a result, millions of nonprime borrowers have lost their homes or are in danger of doing so. These issues have particular salience for minority borrowers, who have experienced particularly high default rates.

The persistently weak performance of nonprime mortgages suggests that loan performance problems in the nonprime market will not be resolved quickly, and underscores the importance of federal efforts to assist distressed borrowers and prevent a recurrence of the aggressive lending practices that helped precipitate the foreclosure crisis. As lawmakers seek to reform mortgage lending practices, they will need to consider how their efforts may affect consumer protections, the availability of mortgage credit, and progress toward the goal of sustainable homeownership.

Data on the performance of nonprime loans and on the borrowing and lending practices associated with them can help analysts and policymakers assess the potential effects of proposed reforms and evaluate the results of their implementation. Although extensive data are available on nonprime loans, no one data source is comprehensive. Existing data sources can be combined with effort, but even then certain data that could inform understanding of the nonprime market—such as total mortgage costs and first-time homebuyer status—are not readily available. Having access to a more comprehensive set of data might have enhanced the ability of researchers, regulators, and investors to monitor lending practices, evaluate mortgage performance, and assess the mortgage outcomes for different groups of borrowers. Ongoing federal efforts, including the NMDB pilot project, may improve the quality and availability of mortgage market data going forward.

As agreed with your offices, unless you publicly announce its contents earlier, we plan no further distribution of this report until 30 days from the report date. At that time, we will send copies of this report to the appropriate congressional committees and other interested parties. In addition, the report will be made available at no charge on GAO's Web site at http://www.gao.gov.

If you or your staffs have any questions about this report, please contact me at (202) 512-8678 or shearw@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Key contributors to this report are listed in appendix III.

William B. Shear
Director, Financial Markets
    and Community Investment

# Appendix I: Description of the Econometric Analysis of Nonprime Mortgage Default Probabilities

This appendix describes the econometric model we developed to examine the relationship between variables representing loan attributes, borrower characteristics, and economic conditions and the probability of a nonprime loan entering default within 24 months after the first loan payment. Certain loan attributes and borrower characteristics have been associated with a higher risk of mortgage default. For example, lower down payments, lower borrower credit scores, and limited documentation of borrowers' income and assets have been cited as increasing the risk of default. Economic conditions, such as house price changes, have also been associated with default risk.

Since minority borrowers have accounted for a larger share of the nonprime mortgage market than the mortgage market as a whole, associations between race and ethnicity and nonprime mortgage performance also are of interest. However, data limitations have complicated efforts to analyze the demographic characteristics of nonprime borrowers, such as race, ethnicity, and income. Existing data sets either provide detailed information about nonprime loans but limited information about the borrowers (e.g., CoreLogic LoanPerformance (CoreLogic LP) data) or provide more extensive information about borrowers but not about loan performance over time (e.g., Home Mortgage Disclosure Act (HMDA) data). To include information on the demographic characteristics of nonprime borrowers in our model, we matched records in the CoreLogic LP data to HMDA records. For securitized first-lien nonprime loans originated from 2004 through 2006, we achieved a match rate of approximately 73 percent, representing about 6.9 million records. (App. II contains a more detailed discussion of our methodology.)

Of all the CoreLogic LP records that we matched to HMDA records, we used those for which the associated property was located in an area covered by the Federal Housing Finance Agency's (FHFA) house price indexes (HPI) for metropolitan areas, approximately 92 percent of loans.[1] Based on each associated property's state and Census tract, we also incorporated employment data from the Bureau of Labor Statistics (BLS) and data from the 2000 Census to control for various economic conditions and neighborhood characteristics. For each loan, we determined the performance status 24 months after the month of the first payment. We

---

[1] We used the FHFA metropolitan HPIs, which are broad measures of the movement of single-family house prices in 384 metropolitan areas. The HPIs are published by FHFA using home price data provided by Fannie Mae and Freddie Mac on the basis of sales and refinancings of the same properties at different points in time.

defined a loan as being in default if it was delinquent by at least 90 days, in the foreclosure process (including loans identified as in real-estate-owned status), paid off after being 90-days delinquent or in foreclosure, or already terminated with evidence of a loss.

We separately analyzed the three most prevalent types of nonprime loans: short-term hybrid adjustable-rate mortgages (ARM) (ARMs with initial 2- or 3-year fixed-rate periods followed by frequent interest rate adjustments); fixed-rate mortgages; and other longer-term ARMs (ARMs with initial 5-, 7-, or 10-year fixed-rate periods). For each product type, we estimated default probabilities for purchase money loans separately from loans for refinance, and for each product type and loan purpose, we examined separately loans made to owner-occupants and investors. Our primary reason for examining performance by product type, loan purpose, and occupancy status is that borrower incentives and motivations may vary for loans with different characteristics and purposes. For example, because of their early, frequent, and upward interest rate adjustments, short-term hybrid ARMs provide a stronger incentive for a borrower to exit earlier from a mortgage as compared with fixed-rate mortgages or longer-term ARMs. Also, an investor may not react the same way as an owner-occupant may react when facing similar economic circumstances.

We estimated separate default models for each mortgage product type, although the general underlying structure of the models was similar. We used a logistic regression model to explain the probability of loan default, based on the observed pattern of actual defaults and the values of variables representing loan attributes, borrower characteristics, and economic conditions (see table 1). Some variables describe conditions at the time of mortgage origination, such as the loan-to-value (LTV) ratio, the borrower's credit score, and the borrower's reported income. Other factors influencing loan performance vary over time in ways that can be observed, or at least approximated. For example, greater house price appreciation (HPA) contributes to greater housing equity, thus reducing the probability that a borrower, if facing financial distress, views defaulting on a loan as a better option than prepaying. More generally, greater house price appreciation creates equity that may induce a borrower to prepay, which eliminates any default risk that would remain if the loan were active. Some potentially significant determinants of mortgage default, such as job loss or illness, are not available for inclusion in our model. In addition, we lack data on certain factors—such as borrower wealth and first-time homebuyer status—that could be especially relevant to explaining actual loan performance.

**Table 1: Variables Used in the Logistic Regression Models**

| Variable | Variable description |
|---|---|
| Mortgage default (dependent variable) | One if the mortgage was in default by 24 months after the month of first payment, 0 otherwise. We defined a loan as in default if it was delinquent by at least 90 days, in the foreclosure process (including loans identified as in real-estate-owned status), paid off after being 90-days delinquent or in foreclosure, or with evidence of a loss. |
| Loan origination period indicator | A series of 0-1 categorical variables indicating whether the loan originated in the first or second half of 2004, 2005, or 2006. The omitted category was early 2005. |
| Loan amount | Defined as a continuous variable representing the original loan amount. |
| House price appreciation | Defined using FHFA's metropolitan house price indexes and split into time periods measuring (1) appreciation during the 1st year of the loan and (2) the difference in appreciation between the 1st and 2nd years of the loan. We assigned each loan to a metropolitan area using the property ZIP code information in the CoreLogic LP database and data that relate ZIP codes to Core-based Statistical Areas. |
| Combined loan-to-value (CLTV) ratio | This represents the amount of the mortgage and any known associated second lien, divided by the house value. Because the CoreLogic LP data do not capture all second liens, the reported CLTV ratios are likely understated for some loans. This complicates interpretation of CLTV in continuous form, since many loans with a value of exactly 80 may have "true" CLTV values of 90 or 100. Therefore, we defined a series of 0-1 categorical variables indicating the specific CLTV value or range, as follows: less than 80, equal to 80, more than 80 and less than 90, equal to 90, more than 90 and less than 100, and greater than or equal to 100. The omitted category was "equal to 80." |
| Debt-service-to-income (DTI) ratio | This represents the borrower's total monthly debt service payments, divided by monthly gross income. Since this information is not available for many loans, we constructed a set of 0-1 categorical variables indicating the DTI range, as follows: less than 35 percent, 35 to 41 percent, greater than 41 percent, and missing. The omitted category was "35 to 41 percent." |
| FICO score | FICO score (at loan origination) represents a measure of the borrower's credit history. Defined as a single continuous variable for fixed-rate mortgages and as a set of continuous variables split into low, middle, and high ranges for the two types of adjustable-rate mortgages. Specifically, for short-term hybrid ARMs, the low FICO range was either 600 or the FICO score itself if the FICO score was below 600; the middle range varied between 0 and 60, with a minimum of 0 if the FICO score was 600 or less, a maximum of 60 if the FICO score was above 660, and between 0 and 60 if the FICO score was between 600 and 660; and the high range was 0 for FICO scores of 660 or less and the difference between the FICO score and 660 for FICO scores above 660. Because Alt-A borrowers generally had higher credit scores, the range boundaries for longer-term ARMs were 680 and 740, rather than 600 and 660. |
| High cost spread | This variable incorporates information about the loan's high cost status as reported in the HMDA data. For fixed-rate and longer-term adjustable rate mortgages, we defined this to be a 0-1 variable in which the value of 1 indicates whether the loan's annual percentage rate as calculated by the loan's originator exceeded a benchmark rate by at least 3 percentage points, and 0 otherwise. For short-term hybrid ARMs, we defined a series of 0-1 categorical variables based on the magnitude of this reported spread. The categories are as follows: missing (an indication that the spread is presumed to be less than 3 percent); the spread is greater than or equal to 3 percent but is less than 4 percent; greater than or equal to 4 and less than 5 percent; greater than or equal to 5 and less than 6 percent; and greater than or equal to 6 percent. The omitted category was "is greater than or equal to 3 percent but is less than 4 percent." |

| Variable | Variable description |
|---|---|
| Initial interest rate | Defined as a pair of continuous variables that split a loan's original interest rate into two parts: a relevant Treasury rate at the time of origination, and the difference between the loan's initial interest and that Treasury rate. For short-term hybrid ARMs, we used the 2-year Treasury constant maturity rate; for fixed-rate mortgages, we used the 10-year Treasury constant maturity rate; and for longer-term ARMs, we used the 5-year Treasury constant maturity rate. |
| ARM initial fixed-rate period | For longer-term ARMs, we defined a set of categorical variables describing the number of years for which the initial interest rate is fixed. The categories are 5 years, 7 years, and 10 years. The omitted category was 5 years. |
| Documentation of borrower income and assets | One if full documentation, 0 otherwise. |
| Income if full documentation, and income if limited documentation | Defined as a pair of continuous variables permitting the possibility that the effects of reported income (from HMDA) differ depending on whether the loan had full documentation of income or had limited documentation of income. |
| Race | Defined as a series of 0-1 categorical variables based on the borrower's reported race. The categories are as follows: Black (1 if black or African-American, 0 otherwise); Asian (1 if Asian, 0 otherwise); White (1 if white, 0 otherwise); and Other (1 if other reported category, 0 otherwise). We excluded observations for which borrower race was not available. The omitted category is White. |
| Ethnicity | One if Hispanic or Latino, 0 otherwise. We excluded observations for which borrower ethnicity was not available. |
| Change in employment growth | We cannot observe borrowers' employment status. As an indicator of economic conditions in the borrower's community, we used a state measure of employment growth over the 24-month performance window. These data are from BLS. |
| Census neighborhood characteristics[a] | We defined a series of 0-1 indicators representing high and low levels of education, unearned income (e.g., interest or dividends), new versus old housing, and housing vacancy rates that may provide information about housing and borrower characteristics in the Census tract where the property is located. Specifically, the indicators were as follows:<br>• 1 if property is in a tract with a high incidence of less than high school education, 0 otherwise<br>• 1 if property is in a tract with a high incidence of greater than college education, 0 otherwise<br>• 1 if property is in a tract with a low incidence of unearned income, 0 otherwise<br>• 1 if property is in a tract with a high incidence of unearned income, 0 otherwise<br>• 1 if property is in a tract with a high incidence of very old housing, 0 otherwise<br>• 1 if property is in a tract with a high incidence of vacant housing, 0 otherwise |
| State | Defined as a series of 0-1 categorical variables based on the property's state. The omitted category is Texas. |
| Regulator | We defined a series of 0-1 indicators representing the regulatory agencies with oversight over the practices of the lending institutions reporting HMDA data. Specifically, the indicators were the Office of the Comptroller of the Currency, Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and Department of Housing and Urban Development. We excluded loans made by institutions overseen by the National Credit Union Administration. The omitted category was the Federal Reserve System. |

Source: GAO.

[a]For each of the Census neighborhood characteristics variables, we used information on the distribution of values across all Census tracts for the relevant Census data element. We defined cutoffs for a high or low incidence based on, approximately, the top or bottom 10 percent of the distribution for each data element.

**Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities**

Tables 2 through 4 provide information on the number of loans and mean values for each of the product types for which we estimated default probabilities. Short-term hybrid ARMs were the most prevalent type of mortgage, and purchase loans were more prevalent than refinance loans, except among fixed-rate mortgages. Default rates were highest for short-term hybrid ARMs and generally higher for purchase loans than for refinance loans, except for fixed-rate and longer-term ARM loans to investors.

**Table 2: Mean Values for Short-term Hybrid ARMs**

| | Purchase loans | | Refinance loans | |
|---|---|---|---|---|
| | Owner-occupants | Investors | Owner-occupants | Investors |
| Number of observations | 1,189,791 | 115,587 | 1,187,804 | 80,565 |
| Mortgage in default by 24 months | 0.227 | 0.233 | 0.157 | 0.203 |
| Loan amount (thousands) | 228.851 | 170.519 | 236.064 | 177.615 |
| HPA: First year of the loan | 1.084 | 1.087 | 1.089 | 1.076 |
| HPA: Difference between 1st and 2nd year of the loan | 0.081 | 0.075 | 0.085 | 0.071 |
| Change in employment growth | 1.026 | 1.026 | 1.025 | 1.023 |
| DTI ratio missing | 0.256 | 0.200 | 0.248 | 0.207 |
| DTI ratio less than 35 percent | 0.143 | 0.296 | 0.196 | 0.305 |
| DTI ratio 35 percent to 41 percent | 0.155 | 0.168 | 0.150 | 0.146 |
| DTI ratio greater than 41 percent | 0.446 | 0.335 | 0.406 | 0.343 |
| FICO score | 639.527 | 673.047 | 597.178 | 632.890 |
| FICO score, low range | 593.282 | 597.380 | 576.197 | 589.052 |
| FICO score, middle range | 32.969 | 45.423 | 16.970 | 31.269 |
| FICO score, high range | 13.276 | 30.245 | 4.011 | 12.570 |
| CLTV ratio less than 80 | 0.034 | 0.056 | 0.346 | 0.368 |
| CLTV ratio equal to 80 | 0.138 | 0.112 | 0.133 | 0.189 |
| CLTV ratio between 80 and 90 | 0.035 | 0.111 | 0.193 | 0.194 |
| CLTV ratio equal to 90 | 0.079 | 0.414 | 0.141 | 0.212 |
| CLTV ratio between 90 and 100 | 0.151 | 0.234 | 0.101 | 0.035 |
| CLTV ratio greater than or equal to 100 | 0.563 | 0.073 | 0.087 | 0.002 |
| Full documentation | 0.549 | 0.461 | 0.652 | 0.491 |
| Reported income (thousands) | 85.556 | 113.446 | 79.432 | 108.972 |
| Reported income among borrowers with full documentation loans (thousands) | 74.882 | 99.807 | 73.537 | 93.247 |
| Reported income among borrowers with limited documentation loans (thousands) | 98.558 | 125.119 | 90.479 | 124.118 |
| High cost spread, less than 3 percent | 0.196 | 0.225 | 0.190 | 0.189 |
| High cost spread, between 3 and 4 percent | 0.155 | 0.155 | 0.172 | 0.148 |
| High cost spread, between 4 and 5 percent | 0.216 | 0.186 | 0.205 | 0.178 |
| High cost spread, between 5 and 6 percent | 0.244 | 0.207 | 0.233 | 0.220 |
| High cost spread, 6 percent or more | 0.189 | 0.226 | 0.200 | 0.265 |
| 2-year Treasury constant maturity rate | 3.784 | 3.664 | 3.658 | 3.682 |
| Spread over 2-year Treasury constant maturity rate | 3.765 | 4.479 | 4.019 | 4.502 |
| High incidence of less than high school education | 0.093 | 0.146 | 0.095 | 0.176 |
| High incidence of more than college education | 0.040 | 0.034 | 0.046 | 0.033 |

**Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities**

| | Purchase loans | | Refinance loans | |
|---|---|---|---|---|
| | Owner-occupants | Investors | Owner-occupants | Investors |
| Low incidence of wealth | 0.090 | 0.225 | 0.089 | 0.243 |
| High incidence of wealth | 0.051 | 0.037 | 0.063 | 0.029 |
| High incidence of old housing | 0.062 | 0.176 | 0.071 | 0.191 |
| High incidence of vacant units | 0.044 | 0.096 | 0.042 | 0.085 |
| Asian | 0.048 | 0.047 | 0.030 | 0.032 |
| Black or African-American | 0.206 | 0.301 | 0.196 | 0.343 |
| Other race | 0.022 | 0.015 | 0.021 | 0.018 |
| Hispanic or Latino | 0.279 | 0.157 | 0.191 | 0.152 |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities

**Table 3: Mean Values for Longer-term ARMs**

|  | Purchase loans | | Refinance loans | |
|---|---|---|---|---|
|  | Owner-occupants | Investors | Owner-occupants | Investors |
| Number of observations | 227,066 | 52,070 | 127,675 | 26,171 |
| Mortgage in default by 24 months | 0.115 | 0.099 | 0.093 | 0.101 |
| Loan amount (thousands) | 341.356 | 223.645 | 386.097 | 260.090 |
| HPA: First year of the loan | 1.073 | 1.092 | 1.063 | 1.065 |
| HPA: Difference between 1st and 2nd year of the loan | 0.098 | 0.099 | 0.098 | 0.094 |
| Change in employment growth | 1.025 | 1.029 | 1.020 | 1.023 |
| DTI ratio missing | 0.334 | 0.322 | 0.297 | 0.335 |
| DTI ratio less than 35 percent | 0.190 | 0.294 | 0.245 | 0.304 |
| DTI ratio 35 percent to 41 percent | 0.201 | 0.170 | 0.194 | 0.160 |
| DTI ratio greater than 41 percent | 0.275 | 0.214 | 0.264 | 0.202 |
| FICO score | 711.103 | 726.171 | 689.428 | 710.290 |
| FICO score, low range | 672.704 | 677.005 | 663.126 | 673.242 |
| FICO score, middle range | 30.268 | 37.721 | 21.195 | 29.878 |
| FICO score, high range | 8.130 | 11.445 | 5.107 | 7.170 |
| CLTV ratio less than 80 | 0.081 | 0.156 | 0.458 | 0.612 |
| CLTV ratio equal to 80 | 0.190 | 0.241 | 0.162 | 0.210 |
| CLTV ratio between 80 and 90 | 0.028 | 0.068 | 0.114 | 0.065 |
| CLTV ratio equal to 90 | 0.064 | 0.192 | 0.074 | 0.077 |
| CLTV ratio between 90 and 100 | 0.161 | 0.174 | 0.110 | 0.029 |
| CLTV ratio greater than or equal to 100 | 0.476 | 0.169 | 0.081 | 0.007 |
| Full documentation | 0.383 | 0.390 | 0.426 | 0.312 |
| Reported income (thousands) | 129.498 | 184.110 | 132.477 | 187.598 |
| Reported income among borrowers with full documentation loans (thousands) | 109.492 | 158.083 | 111.412 | 157.090 |
| Reported income among borrowers with limited documentation loans (thousands) | 141.927 | 200.770 | 148.103 | 201.410 |
| High cost spread indicator | 0.143 | 0.222 | 0.206 | 0.197 |
| 5-year Treasury constant maturity rate | 4.225 | 4.217 | 4.240 | 4.219 |
| Spread over 5-year Treasury constant maturity rate | 2.079 | 2.698 | 2.107 | 2.460 |
| High incidence of less than high school education | 0.057 | 0.075 | 0.059 | 0.106 |
| High incidence of more than college education | 0.127 | 0.079 | 0.140 | 0.096 |
| Low incidence of wealth | 0.043 | 0.090 | 0.040 | 0.116 |
| High incidence of wealth | 0.129 | 0.080 | 0.161 | 0.084 |
| High incidence of old housing | 0.050 | 0.070 | 0.049 | 0.096 |
| High incidence of vacant units | 0.051 | 0.093 | 0.046 | 0.075 |

**Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities**

| | Purchase loans | | Refinance loans | |
|---|---|---|---|---|
| | Owner-occupants | Investors | Owner-occupants | Investors |
| Asian | 0.076 | 0.063 | 0.059 | 0.056 |
| Black or African-American | 0.089 | 0.107 | 0.092 | 0.132 |
| Other race | 0.023 | 0.014 | 0.022 | 0.015 |
| Hispanic or Latino | 0.206 | 0.117 | 0.166 | 0.122 |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

**Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities**

**Table 4: Mean Values for Fixed-rate Mortgages**

|  | Purchase loans | | Refinance loans | |
| --- | --- | --- | --- | --- |
|  | Owner-occupants | Investors | Owner-occupants | Investors |
| Number of observations | 350,486 | 104,889 | 621,968 | 96,326 |
| Mortgage in default by 24 months | 0.092 | 0.077 | 0.074 | 0.070 |
| Loan amount (thousands) | 230.568 | 151.556 | 233.057 | 161.606 |
| HPA: First year of the loan | 1.071 | 1.088 | 1.081 | 1.085 |
| HPA: Difference between 1st and 2nd year of the loan | 0.063 | 0.063 | 0.079 | 0.066 |
| Change in employment growth | 1.024 | 1.027 | 1.022 | 1.025 |
| DTI ratio missing | 0.538 | 0.576 | 0.410 | 0.535 |
| DTI ratio less than 35 percent | 0.129 | 0.181 | 0.188 | 0.211 |
| DTI ratio 35 percent to 41 percent | 0.115 | 0.098 | 0.125 | 0.091 |
| DTI ratio greater than 41 percent | 0.218 | 0.146 | 0.278 | 0.162 |
| FICO score | 691.031 | 721.308 | 643.810 | 694.148 |
| CLTV ratio less than 80 | 0.111 | 0.165 | 0.500 | 0.639 |
| CLTV ratio equal to 80 | 0.180 | 0.244 | 0.128 | 0.188 |
| CLTV ratio between 80 and 90 | 0.035 | 0.065 | 0.151 | 0.083 |
| CLTV ratio equal to 90 | 0.068 | 0.266 | 0.082 | 0.073 |
| CLTV ratio between 90 and 100 | 0.170 | 0.136 | 0.084 | 0.014 |
| CLTV ratio greater than or equal to 100 | 0.435 | 0.124 | 0.055 | 0.002 |
| Full documentation | 0.506 | 0.507 | 0.649 | 0.466 |
| Reported income (thousands) | 99.991 | 144.007 | 87.518 | 137.163 |
| Reported income among borrowers with full documentation loans (thousands) | 85.711 | 125.619 | 77.873 | 114.861 |
| Reported income among borrowers with limited documentation loans (thousands) | 114.641 | 162.941 | 105.313 | 156.605 |
| High cost spread indicator | 0.257 | 0.381 | 0.361 | 0.319 |
| 10-year Treasury constant maturity rate | 4.498 | 4.451 | 4.477 | 4.440 |
| Spread over 10-year Treasury constant maturity rate | 2.546 | 2.775 | 2.725 | 2.640 |
| High incidence of less than high school education | 0.057 | 0.095 | 0.087 | 0.133 |
| High incidence of more than college education | 0.081 | 0.058 | 0.063 | 0.060 |
| Low incidence of wealth | 0.059 | 0.127 | 0.084 | 0.175 |
| High incidence of wealth | 0.097 | 0.055 | 0.083 | 0.049 |
| High incidence of old housing | 0.064 | 0.143 | 0.065 | 0.151 |
| High incidence of vacant units | 0.044 | 0.085 | 0.045 | 0.071 |
| Asian | 0.052 | 0.059 | 0.030 | 0.042 |
| Black or African-American | 0.126 | 0.143 | 0.167 | 0.192 |
| Other race | 0.016 | 0.012 | 0.020 | 0.016 |
| Hispanic or Latino | 0.176 | 0.103 | 0.166 | 0.113 |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

The results of our analysis are presented in tables 5 through 8. We ran 12 regressions: separate owner-occupant and investor regressions for purchase and refinance loans of three product types (short-term hybrid ARMs, fixed-rate mortgages, and longer-term ARMs). For short-term hybrid ARMs, the most prevalent product type, we present the results for purchase and refinance loans to owner-occupants (table 5) and investors (table 6). For the other product types, we present the results for purchase and refinance loans to owner-occupants only (tables 7 and 8); the results for investors were substantively similar. We present coefficient estimates as well as a transformation of the coefficients into a form that can be interpreted as the marginal effect of each variable on the estimated probability of default. This marginal effect is the calculation of the change in the estimated probability of default that would result if a variable's standard deviation were added to that variable's mean value, while all other variables are held at their mean values. This permits a comparison of the impact of different variables within and across product types. In general, HPA, loan amount, CLTV ratio, and FICO score had substantial marginal effects across different product types and loan purposes. Specifically, lower HPA, higher loan amount, higher CLTV ratio, and lower FICO scores were associated with higher likelihoods of default. The observed effects for DTI ratio were smaller. Documentation of borrower income and assets and a loan's interest rate spread over the applicable Treasury rate had substantial marginal effects. Limited documentation and higher interest rate spreads were associated with higher default probabilities.

Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities

**Table 5: Estimation Results for Short-term Hybrid ARMs for Owner-Occupants**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| Number of observations: | | | | | | |
| Purchase loans – 1,189,791 | | | | | | |
| Refinance loans – 1,187,804 | | | | | | |
| Intercept | 10.904 | *** | | 10.207 | *** | |
| Loan amount | 0.002 | *** | 5.11 | 0.002 | *** | 3.24 |
| HPA: First year of the loan | (7.974) | *** | (8.51) | (6.752) | *** | (5.31) |
| HPA: Difference between 1st and 2nd year of the loan | 2.850 | *** | 3.45 | 2.328 | *** | 1.92 |
| Change in employment growth | (2.246) | *** | (0.81) | (3.994) | *** | (1.03) |
| DTI ratio missing | 0.023 | *** | 0.15 | 0.024 | ** | 0.11 |
| DTI ratio less than 35 percent | (0.028) | *** | (0.14) | (0.025) | ** | (0.10) |
| DTI ratio greater than 41 percent | 0.079 | *** | 0.59 | 0.066 | *** | 0.35 |
| FICO score, low range | (0.006) | *** | (1.39) | (0.005) | *** | (1.55) |
| FICO score, middle range | (0.009) | *** | (3.08) | (0.006) | *** | (1.32) |
| FICO score, high range | (0.006) | *** | (2.18) | (0.007) | *** | (1.04) |
| CLTV ratio less than 80 | (0.962) | *** | (2.42) | (0.498) | *** | (2.28) |
| CLTV ratio between 80 and 90 | (0.519) | *** | (1.36) | 0.028 | *** | 0.12 |
| CLTV ratio equal to 90 | (0.361) | *** | (1.38) | 0.242 | *** | 0.91 |
| CLTV ratio between 90 and 100 | (0.071) | *** | (0.37) | 0.386 | *** | 1.28 |
| CLTV ratio greater than or equal to 100 | 0.249 | *** | 1.88 | 0.804 | *** | 2.59 |
| Full documentation | (0.174) | *** | (1.24) | (0.159) | *** | (0.77) |
| Reported income if full documentation | (0.002) | *** | (1.32) | (0.003) | *** | (1.61) |
| Reported income if limited documentation | 0.0003 | *** | 0.25 | (0.001) | *** | (0.56) |
| High cost spread, less than 3 percent | (0.167) | *** | (0.95) | (0.116) | *** | (0.47) |
| High cost spread, between 4 and 5 percent | 0.106 | *** | 0.65 | 0.066 | *** | 0.28 |
| High cost spread, between 5 and 6 percent | 0.194 | *** | 1.26 | 0.092 | *** | 0.42 |
| High cost spread, 6 percent or more | 0.121 | *** | 0.71 | 0.053 | *** | 0.22 |
| 2-year Treasury constant maturity rate | 0.195 | *** | 2.87 | 0.259 | *** | 2.95 |
| Spread over 2-year Treasury constant maturity rate | 0.160 | *** | 3.02 | 0.251 | *** | 3.93 |

Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| High incidence of less than high school education | (0.015) | | (0.06) | (0.023) | ** | (0.07) |
| High incidence of more than college education | (0.141) | *** | (0.40) | (0.115) | *** | (0.25) |
| Low incidence of wealth | 0.255 | *** | 1.09 | 0.042 | *** | 0.13 |
| High incidence of wealth | (0.247) | *** | (0.78) | (0.142) | *** | (0.36) |
| High incidence of old housing | 0.163 | *** | 0.58 | 0.129 | *** | 0.35 |
| High incidence of vacant units | 0.201 | *** | 0.61 | 0.115 | *** | 0.24 |
| Asian | 0.023 | * | 0.07 | (0.047) | *** | (0.08) |
| Black or African-American | 0.483 | *** | 3.05 | 0.042 | *** | 0.17 |
| Other race | 0.081 | *** | 0.18 | (0.017) | | (0.03) |
| Hispanic or Latino | 0.188 | *** | 1.27 | 0.093 | *** | 0.39 |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: In the "Significance" columns, the symbols *, **, and *** indicate statistical significance at the 10 percent, 5 percent, and 1 percent levels, respectively. A blank cell in these columns indicates that the coefficient for the variable was not statistically significant at these levels.

Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities

**Table 6: Estimation Results for Short-term Hybrid ARMs for Investors**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| Number of observations: Purchase loans - 115,587 Refinance loans - 80,565 | | | | | | |
| Intercept | 12.020 | *** | | 15.119 | *** | |
| Loan amount | 0.003 | *** | 4.79 | 0.001 | *** | 2.23 |
| HPA: First year of the loan | (8.384) | *** | (7.42) | (7.717) | *** | (6.71) |
| HPA: Difference between 2st and 3rd year of the loan | 0.427 | | 0.41 | 1.393 | *** | 1.25 |
| Change in employment growth | (2.965) | *** | (1.00) | (7.628) | *** | (2.35) |
| DTI ratio missing | 0.005 | | 0.02 | 0.015 | | 0.08 |
| DTI ratio less than 35 percent | 0.079 | *** | 0.45 | (0.010) | | (0.06) |
| DTI ratio greater than 41 percent | 0.031 | | 0.18 | 0.018 | | 0.11 |
| FICO score, low range | (0.005) | *** | (0.64) | (0.005) | *** | (1.28) |
| FICO score, middle range | (0.009) | *** | (2.33) | (0.006) | *** | (1.83) |
| FICO score, high range | (0.008) | *** | (3.58) | (0.010) | *** | (2.89) |
| CLTV ratio less than 80 | (0.550) | *** | (1.50) | (0.526) | *** | (2.88) |
| CLTV ratio between 80 and 90 | 0.302 | *** | 1.22 | 0.239 | *** | 1.22 |
| CLTV ratio equal to 90 | 0.547 | *** | 3.67 | 0.513 | *** | 2.81 |
| CLTV ratio between 90 and 100 | 0.568 | *** | 3.24 | 0.676 | *** | 1.62 |
| CLTV ratio greater than or equal to 100 | 0.869 | *** | 3.04 | 0.237 | | 0.14 |
| Full documentation | (0.212) | *** | (1.26) | (0.276) | *** | (1.63) |
| Reported income if full documentation | (0.003) | *** | (2.34) | 0.000 | | 0.24 |
| Reported income if limited documentation | (0.003) | *** | (2.29) | 0.000 | | 0.30 |
| High cost spread, less than 3 percent | (0.215) | *** | (1.08) | (0.054) | | (0.26) |
| High cost spread, between 4 and 5 percent | 0.021 | | 0.10 | 0.083 | ** | 0.40 |
| High cost spread, between 5 and 6 percent | 0.116 | *** | 0.59 | 0.110 | ** | 0.57 |
| High cost spread greater than or equal to 6 percent | (0.041) | | (0.21) | 0.101 | ** | 0.56 |
| 2-year Treasury constant maturity rate | 0.225 | *** | 2.81 | 0.271 | *** | 3.67 |
| Spread over 2-year Treasury constant maturity rate | 0.109 | *** | 1.65 | 0.198 | *** | 3.45 |

**Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| High incidence of less than high school education | 0.048 | * | 0.21 | 0.028 | | 0.13 |
| High incidence of more than college education | (0.389) | *** | (0.85) | (0.229) | *** | (0.51) |
| Low incidence of wealth | 0.504 | *** | 2.81 | 0.147 | *** | 0.80 |
| High incidence of wealth | (0.330) | *** | (0.76) | (0.134) | * | (0.28) |
| High incidence of old housing | 0.302 | *** | 1.48 | 0.127 | *** | 0.63 |
| High incidence of vacant units | 0.275 | *** | 1.03 | 0.098 | *** | 0.34 |
| Asian | (0.122) | ** | (0.32) | (0.065) | | (0.14) |
| Black or African-American | 0.367 | *** | 2.22 | 0.102 | *** | 0.61 |
| Other race | (0.007) | | (0.01) | (0.104) | | (0.17) |
| Hispanic or Latino | (0.160) | *** | (0.71) | (0.071) | ** | (0.31) |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: In the "Significance" columns, the symbols *, **, and *** indicate statistical significance at the 10 percent, 5 percent, and 1 percent levels, respectively. A blank cell in these columns indicates that the coefficient for the variable was not statistically significant at these levels.

Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities

**Table 7: Estimation Results for Longer-term ARMs for Owner-Occupants**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| Number of observations: | | | | | | |
| Purchase loans - 227,066 | | | | | | |
| Refinance loans - 127,675 | | | | | | |
| Intercept | 14.625 | *** | | 17.372 | *** | |
| Loan amount | 0.001 | *** | 1.59 | 0.0009 | *** | 0.90 |
| HPA: First year of the loan | (7.409) | *** | (2.35) | (7.719) | *** | (1.99) |
| HPA: Difference between 1st and 2nd year of the loan | 3.433 | *** | 1.26 | 2.739 | *** | 0.78 |
| Change in employment growth | (7.745) | *** | (0.79) | (9.297) | *** | (0.80) |
| DTI ratio missing | 0.045 | * | 0.09 | 0.059 | * | 0.10 |
| DTI ratio less than 35 percent | (0.070) | *** | (0.12) | (0.142) | *** | (0.21) |
| DTI ratio greater than 41 percent | 0.042 | ** | 0.08 | 0.069 | ** | 0.11 |
| FICO score, low range | (0.006) | *** | (0.43) | (0.007) | *** | (0.62) |
| FICO score, middle range | (0.009) | *** | (0.89) | (0.010) | *** | (0.79) |
| FICO score, high range | (0.011) | *** | (0.69) | (0.012) | *** | (0.54) |
| CLTV ratio less than 80 | (0.856) | *** | (0.92) | (0.757) | *** | (1.13) |
| CLTV ratio between 80 and 90 | (0.564) | *** | (0.39) | 0.218 | *** | 0.25 |
| CLTV ratio equal to 90 | (0.428) | *** | (0.44) | 0.487 | *** | 0.48 |
| CLTV ratio between 90 and 100 | 0.330 | *** | 0.56 | 0.757 | *** | 0.94 |
| CLTV ratio greater than or equal to 100 | 0.706 | *** | 1.81 | 1.143 | *** | 1.29 |
| Full documentation | (0.634) | *** | (1.17) | (0.705) | *** | (1.06) |
| Reported income if full documentation | (0.0005) | ** | (0.16) | 0.0002 | | 0.05 |
| Reported income if limited documentation | 0.0002 | * | 0.11 | 0.001 | *** | 0.25 |
| High cost spread indicator | 0.158 | *** | 0.25 | (0.036) | | (0.05) |
| 5-year Treasury constant maturity rate | 0.205 | *** | 0.52 | 0.199 | *** | 0.41 |
| Spread over 5-year Treasury constant maturity rate | 0.404 | *** | 1.35 | 0.265 | *** | 0.83 |
| High incidence of less than high school education | 0.020 | | 0.02 | (0.041) | | (0.03) |
| High incidence of more than college education | (0.299) | *** | (0.42) | (0.337) | *** | (0.39) |
| Low incidence of wealth | 0.108 | *** | 0.10 | 0.096 | * | 0.07 |
| High incidence of wealth | (0.236) | *** | (0.33) | (0.208) | *** | (0.26) |

**Appendix I: Description of the Econometric Analysis of Nonprime Mortgage Default Probabilities**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| High incidence of old housing | (0.043) | | (0.04) | 0.040 | | 0.03 |
| High incidence of vacant units | 0.237 | *** | 0.23 | 0.184 | *** | 0.14 |
| Asian | 0.214 | *** | 0.25 | 0.094 | ** | 0.08 |
| Black or African-American | 0.496 | *** | 0.66 | 0.092 | ** | 0.10 |
| Other race | 0.075 | * | 0.05 | 0.141 | ** | 0.07 |
| Hispanic or Latino | 0.596 | *** | 1.18 | 0.398 | *** | 0.57 |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: In the "Significance" columns, the symbols *, **, and *** indicate statistical significance at the 10 percent, 5 percent, and 1 percent levels, respectively. A blank cell in these columns indicates that the coefficient for the variable was not statistically significant at these levels.

Appendix I: Description of the Econometric
Analysis of Nonprime Mortgage Default
Probabilities

**Table 8: Estimation Results for Fixed-rate Mortgages for Owner-Occupants**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| Number of observations:<br>Purchase loans – 350,486<br>Refinance loans – 621,968 | | | | | | |
| Intercept | 16.255 | *** | | 15.972 | *** | |
| Loan amount | 0.002 | *** | 1.82 | 0.002 | *** | 1.42 |
| HPA: First year of the loan | (7.574) | *** | (2.05) | (6.240) | *** | (1.85) |
| HPA: Difference between 1st and 2nd year of the loan | 3.161 | *** | 1.05 | 2.504 | *** | 0.81 |
| Change in employment growth | (5.744) | *** | (0.57) | (7.156) | *** | (0.68) |
| DTI ratio missing | 0.039 | * | 0.08 | (0.035) | ** | (0.07) |
| DTI ratio less than 35 percent | (0.002) | | 0.00 | (0.050) | *** | (0.08) |
| DTI ratio greater than 41 percent | 0.135 | *** | 0.25 | 0.084 | *** | 0.16 |
| FICO score | (0.011) | *** | (2.17) | (0.010) | *** | (1.95) |
| CLTV ratio less than 80 | (0.912) | *** | (1.08) | (0.592) | *** | (1.05) |
| CLTV ratio between 80 and 90 | (0.268) | *** | (0.21) | 0.076 | *** | 0.11 |
| CLTV ratio equal to 90 | (0.086) | *** | (0.09) | 0.337 | *** | 0.39 |
| CLTV ratio between 90 and 100 | 0.330 | *** | 0.56 | 0.468 | *** | 0.56 |
| CLTV ratio greater than or equal to 100 | 0.662 | *** | 1.64 | 0.835 | *** | 0.84 |
| Full documentation | (0.444) | *** | (0.86) | (0.306) | *** | (0.56) |
| Reported income if full documentation | (0.003) | *** | (0.66) | (0.003) | *** | (0.75) |
| Reported income if limited documentation | (0.001) | *** | (0.23) | (0.001) | *** | (0.23) |
| High cost spread indicator | 0.176 | *** | 0.34 | 0.014 | | 0.03 |
| 10-year Treasury constant maturity rate | 0.125 | *** | 0.18 | 0.130 | *** | 0.18 |
| Spread over 10-year Treasury constant maturity rate | 0.275 | *** | 1.46 | 0.231 | *** | 1.22 |
| High incidence of less than high school education | 0.058 | ** | 0.06 | (0.013) | | (0.02) |
| High incidence of more than college education | (0.268) | *** | (0.30) | (0.202) | *** | (0.19) |
| Low incidence of wealth | 0.271 | *** | 0.28 | 0.019 | | 0.02 |
| High incidence of wealth | (0.277) | *** | (0.34) | (0.122) | *** | (0.13) |
| High incidence of old housing | 0.207 | *** | 0.22 | 0.117 | *** | 0.12 |

**Appendix I: Description of the Econometric Analysis of Nonprime Mortgage Default Probabilities**

| | Purchase loans | | | Refinance loans | | |
|---|---|---|---|---|---|---|
| | Coefficient | Significance | Marginal effect | Coefficient | Significance | Marginal effect |
| High incidence of vacant units | 0.172 | *** | 0.15 | 0.032 | | 0.03 |
| Asian | 0.002 | | 0.00 | (0.125) | *** | (0.09) |
| Black or African-American | 0.520 | *** | 0.80 | (0.035) | ** | (0.05) |
| Other race | 0.210 | *** | 0.12 | 0.026 | | 0.02 |
| Hispanic or Latino | 0.241 | *** | 0.41 | 0.063 | *** | 0.10 |

Source: GAO analysis of CoreLogic LP, HMDA, FHFA, Census, and BLS data.

Note: In the "Significance" columns, the symbols *, **, and *** indicate statistical significance at the 10 percent, 5 percent, and 1 percent levels, respectively. A blank cell in these columns indicates that the coefficient for the variable was not statistically significant at these levels.

# Appendix II: Matching CoreLogic LoanPerformance and Home Mortgage Disclosure Act Records

## Data Sources

To describe the race, ethnicity, and reported income of nonprime borrowers, we matched loan-level records from two primary data sources—CoreLogic LoanPerformance's (CoreLogic LP) Asset-Backed Securities Database and Home Mortgage Disclosure Act (HMDA) data compiled by the Federal Financial Institutions Examination Council (FFIEC). The CoreLogic LP database provides extensive information about the characteristics and performance of securitized nonprime mortgages. However, it contains relatively little information about borrowers, providing only credit scores and debt-service-to-income ratios.[1] In contrast, HMDA data contain limited information about loan characteristics and nothing about performance, but they do provide information on borrowers' race, ethnicity, and reported income. HMDA data are estimated to capture about 80 percent of the mortgages funded each year and cover all major market segments, including nonprime loans. HMDA data, therefore, should capture most of the loans in the CoreLogic LP database.

While the CoreLogic LP and HMDA data emphasize different kinds of loan and borrower information, they do have some information in common. These common data items—including loan amount, loan purpose, loan origination date, property location, and loan originator—allow the two data sets to be matched on a loan-by-loan basis. Using the methodology that we developed in previous work, we matched records from the CoreLogic LP database for loans that were originated from 2004 through 2006 to HMDA data files for those same years.[2] We focused on loan originations from this period because there were large numbers of nonprime originations in those years.

The CoreLogic LP data set that we used for the matching process contained records for 9,292,684 loans. The data set included records for conventional first-lien purchase and refinance loans to owner-occupants, investors, and owners of second homes. The data excluded records for loans for units in multifamily structures, and for manufactured housing; loans in Guam, Puerto Rico, and the Virgin Islands; and loans with terms other than 15, 30, or 40 years.

---

[1]The debt-service-to-income ratio is the borrower's total monthly debt service payments divided by monthly gross income.

[2]GAO, *Loan Performance and Negative Home Equity in the Nonprime Mortgage Market*, GAO-10-146R (Washington, D.C.: Dec. 16, 2009).

The HMDA data set that we used for the matching process contained records for 24,227,566 loans. As with the CoreLogic LP data, we focused on first-lien purchase and refinance loans. The HMDA data set excluded loans for properties other than one- to four-family residential units. Because the CoreLogic LP database contained only conventional loans in private label securitizations, we also excluded from the HMDA data set loans that involved government programs—such as mortgages guaranteed by the Federal Housing Administration or the Department of Veterans Affairs—and conventional loans that were indicated as sold to Fannie Mae, Freddie Mac, Ginnie Mae, or Farmer Mac.

## Steps Taken to Make the Data Sets Compatible

Matching the loan records from the two data sources required us to make the common data items compatible. We were able to use a straightforward process for the loan amount and purpose that required only rounding the CoreLogic LP loan amount to the nearest $1,000 and aggregating the three CoreLogic LP refinance categories into one category. However, the process was more complicated for origination date and property location.[3] We determined that the name of the loan originator was not particularly useful for making initial matches of loan records because this information was missing for a substantial percentage of the CoreLogic LP records. However, the originator's name was useful in assessing the quality of the matches that we made using other data elements.

---

[3]For privacy reasons, the origination date is omitted from each HMDA record when it is publicly released. We requested and obtained the date fields from FFIEC, which compiles and publishes the HMDA data. Under GAO's disclosure regulations, set forth at 4 C.F.R. Part 81, we do not provide members of the public with records that originate in another agency obtained in connection with our work. Instead, we refer members of the public requesting information to the agency that originated the record. 4 C.F.R. § 81.5(a). Additionally, under our regulations, we do not disclose to the public records containing confidential financial information, *see* 4 C.F.R. § 81.6(e), nor do we disclose records containing private or personal information, which, if disclosed to the public, would amount to a clearly unwarranted invasion of the privacy of a person, *see* 4 C.F.R. § 81.6(f).

## Loan Origination Dates

About 15 percent of the loans in our CoreLogic LP data set had an origination date that was the 1st day of a month.[4] This distribution pattern was inconsistent with the distribution of origination days in HMDA, which showed a much more even pattern throughout the month, with an increase in originations toward the end of each month rather than the beginning of each month. Because of this inconsistency, we relied on the origination month rather than the origination month and day to match loan records.

## Property Location

The CoreLogic LP and HMDA data provided different geographic identifiers for loans, with the CoreLogic LP data providing the ZIP code and the HMDA data providing the Census tract. To facilitate record matching on the basis of property location, we related the Census tract information in the HMDA data to a corresponding ZIP code or ZIP codes in the CoreLogic LP data, using 2000 Census files and ZIP code boundary files from Pitney Bowes Business Insight. Using mapping software, we overlaid Census tract boundaries on ZIP code boundaries to determine the proportion of each Census tract's area that fell within a given ZIP code area. For each Census tract, we kept all ZIP codes that accounted for at least 5 percent of that tract's area. About 60 percent of the Census tracts were associated with only one ZIP code (meeting the 5 percent threshold), and almost all Census tracts (97.5 percent) included no more than four ZIP codes. When a Census tract was associated with only one ZIP code, all HMDA records in that Census tract were candidates to match CoreLogic LP records in that ZIP code. All HMDA records in tracts with more than one ZIP code were candidates to match CoreLogic LP records in those ZIP codes.

## Matching Methodology

We matched loan records in the CoreLogic LP and HMDA data sets as follows. First, for each loan origination year (2004, 2005, and 2006), we made initial matches by identifying CoreLogic LP and HMDA loans with the same property location,[5] origination month, loan amount, and loan purpose. After finding all possible HMDA matches for each CoreLogic LP

---

[4]This pattern reflects CoreLogic LP's practice of imputing the origination month for some loans on the basis of the month in which the first payment is due. In these cases, CoreLogic LP records the origination date as the 1st day of the imputed origination month.

[5]Property location is reported at the Census tract level in HMDA and at the ZIP code level by CoreLogic LP. We used the spatial relationships between Census tracts and ZIP codes to assign each Census tract to those ZIP codes associated with it.

record, we classified these initial matches as either one-to-one matches (CoreLogic LP records with one corresponding HMDA record), one-to-many matches (CoreLogic LP records with more than one corresponding HMDA record), or nonmatches (CoreLogic LP records with no corresponding HMDA record). One-to-one matches accounted for about 55 percent of the loans in our CoreLogic LP data set, one-to-many matches accounted for about 25 percent, and nonmatches accounted for about 15 percent. Our match rates were highest for 2004 originations, about 85 percent, and lowest for 2006 originations, about 82 percent.

The quality of the matches was particularly important because we were examining statistical relationships between borrower characteristics and loan performance. To provide reasonable assurance that the matches were robust, we performed three types of quality checks on our initial one-to-one and one-to-many matches. First, we used information about the loan originator—information that was included in both the CoreLogic LP and HMDA data. The HMDA data clearly identified loan originators—referred to as "HMDA respondents"—using a series of codes that corresponded to a list of standardized originator names. However, in more than 40 percent of the CoreLogic LP records in our data set, the originator name was marked as not available. In other cases, the originator was listed by a generic term, such as "conduit," or was an entity that appeared to be involved in the securitization process but was not necessarily the originator. Originators that were listed were often referred to in a number of ways—for example, "Taylor Bean," "Taylor Bean Whitaker," "Taylor, Bean & Whitaker," "TaylorBean," "TBW," and "TBW Mortgage Corp." all referred to the HMDA respondent "Taylor, Bean & Whitaker." For CoreLogic LP loans with originator information, we standardized the originator names in the CoreLogic LP data, and we used these same originator names for the HMDA data. We compared the standardized originator names in matched records and if the standardized names matched, we classified the match as a robust match, and deleted any other HMDA records that might have matched to that CoreLogic LP record.

Second, for CoreLogic LP loans with no originator name, we examined the relationship between the HMDA loan originator and the issuer of the securities associated with the loan. Many institutions, such as Countrywide and Ameriquest, originated and securitized large numbers of nonprime loans. While some of these institutions identified themselves as the originator of a loan, others typically did not make the originator information available. In these cases, if the CoreLogic LP securitizer matched the HMDA originator, we classified an initial match as a robust match. If the issuer did not originate substantial numbers of nonprime

loans, or also relied on other originators to provide loans for its securitizations, we developed criteria to check for evidence of business relationships between the issuer and various originating institutions. This check had two components. First, if within the CoreLogic LP data set we identified an originator-issuer combination, we defined that combination as a business relationship. Second, we considered combinations of originators from the HMDA data and issuers from the CoreLogic LP data. For an originator-issuer combination to be a business relationship, a combination had to appear at least 250 times in our set of initial one-to-one matches, or meet one of two additional criteria. Specifically, if the combination appeared at least 100 times, the originator must have made 10 percent of the issuer's securitized loans, or if the combination appeared at least 50 times, the issuer had to have securitized 33 percent of the loans made by the originator. We classified initial matches for which such business relationships existed as robust matches.

Additionally, if none of these tests resulted in a robust match, we examined the loan origination day in the CoreLogic LP and HMDA data sets. If the days matched exactly, we classified an initial match as a robust match. Finally, for some one-to-many matches that shared originator, issuer, or business relationship characteristics, we examined the CoreLogic LP and HMDA characterizations of whether the borrower was an owner-occupant. In some cases, we were able to classify an initial match as a robust match if CoreLogic LP and HMDA owner-occupant characteristics matched. Overall, we produced high-quality matches for about 73 percent of the records in our CoreLogic LP data set, including about 75 percent of the loans originated in 2004, about 73 percent of the loans originated in 2005, and about 72 percent of the loans originated in 2006 (see table 9).

**Table 9: Results of the Matching Process (CoreLogic LP Loan Records to HMDA Loan Records)**

| Loan origination year | Number of CoreLogic LP records | Initial matches to HMDA records | | Robust matches to HMDA records | |
|---|---|---|---|---|---|
| | | Number | Percentage | Number | Percentage |
| 2004 | 2,750,030 | 2,292,747 | 83.4% | 2,053,999 | 74.7% |
| 2005 | 3,630,993 | 3,000,004 | 82.6 | 2,640,799 | 72.7 |
| 2006 | 3,029,202 | 2,471,231 | 81.6 | 2,191,156 | 72.3 |
| **Total** | **9,410,225** | **7,763,982** | **82.5%** | **6,885,954** | **73.2%** |

Source: GAO analysis of CoreLogic LP and HMDA data.

A potential concern with constructing a data set using a matching process is that records that do not match may differ systematically from records that do match, thereby making it difficult to make inferences from the matched data. However, we believe that the CoreLogic LP records that we were unable to match to HMDA records were similar in important respects to CoreLogic LP records that we could match. For example, loans in subprime pools represented 61.5 percent of the overall CoreLogic LP sample, and 62.3 percent of matched loans. Purchase loans represented 44.8 percent of the overall CoreLogic LP data set, and 46.0 percent of matched loans. In terms of geography, state shares of unmatched and matched loans were similar. Loans in California represented 23.1 percent of the full CoreLogic LP data set and 22.5 percent of matched records. Furthermore, nonprime borrowers with matched and unmatched records had similar FICO scores. For example, subprime borrowers with matched records had median FICO scores of 617, 620, and 617 for loans originated in 2004, 2005, and 2006, respectively; the corresponding scores for subprime borrowers with unmatched records were 617, 617, and 615. Likewise, Alt-A borrowers with matched records had median FICO scores of 708, 709, and 703 for 2004, 2005, and 2006, respectively; the corresponding scores for Alt-A borrowers with unmatched records were 706, 707, and 702. In addition, as shown in table 10, for each loan origination year and mortgage product type, median initial interest rates were identical or similar for borrowers with matched and unmatched records.

**Table 10: Median Initial Interest Rates, by Loan Origination Year, Mortgage Product Type, and Match Status**

| Mortgage product type | Median initial interest rate, by loan origination year | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | | 2005 | | 2006 | |
| | Matched | Unmatched | Matched | Unmatched | Matched | Unmatched |
| Short-term hybrid ARMs | 7.000 | 6.990 | 7.350 | 7.375 | 8.375 | 8.375 |
| Fixed-rate mortgages | 6.625 | 6.500 | 6.500 | 6.500 | 7.400 | 7.450 |
| Longer-term ARMs | 5.625 | 5.625 | 6.125 | 6.125 | 6.875 | 6.875 |

Source: GAO analysis of CoreLogic LP and HMDA data.

# Appendix III: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | William B. Shear, (202) 512-8678 or shearw@gao.gov |
| **Staff Acknowledgments** | In addition to the individual named above, Steve Westley (Assistant Director), William Bates, Jan Bauer, Stephen Brown, Julianne Dieterich, DuEwa Kamara, John McGrail, John Mingus, Marc Molino, Bob Pollard, and Jennifer Schwartz made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |

Please Print on Recycled Paper

# Exhibit F

# Charles Goldstein
## Managing Director
## Baltimore

**Direct:** +1 410.454.6830          **Mobile:** +1 410.200.0557

**Fax:** +1 410.454.6801          **Email:** charles.goldstein@protiviti.com

## Areas of Expertise
- Corporate Restructuring & Recovery
- Litigation & Financial Investigation

## Industry Expertise
- Energy
- Retail
- Healthcare
- Manufacturing
- Real Estate
- Technology

## Education
- BA, Economics, University of Maryland
- MBA, University of Maryland
- Juris Doctor, University of Maryland
- Certified Public Accountant (CPA)
- Certified Insolvency & Restructuring Advisor (CIRA)
- Certified in Financial Forensics (CFF)

## Professional Memberships
- American Bankruptcy Institute
- American Institute of Certified Public Accountants
- Association of Insolvency & Restructuring Advisors
- Maryland Association of Certified Public Accountants

## Professional Experience

Charles is responsible for leading the company's Litigation, Restructuring, and Investigative practice as well as the Corporate Restructuring and Recovery service line.  He has more than 20 years experience providing financial consulting services and expert testimony in a variety of areas including corporate restructuring, bankruptcy consulting, financial investigations, and complex commercial litigation.

## Principal Areas of Practice

- Provides restructuring, turnaround and crisis management services. He also provides financial advisory and investigative services to debtors, secured and unsecured creditors, trustees, and other interested parties.
- Performs business valuations for use in commercial litigation and bankruptcy matters.
- Directs due diligence and consulting services for both buy and sale side engagements as well as loan collateral analysis for lenders.
- Directs forensic financial investigations where he provides investigative services, damage calculations and expert witness testimony in fraud, bankruptcy, and litigation matters.

## Major Projects

- Serving as CRO for a $150 million software development company. Lead company's loan restructuring efforts.  In addition, advising company regarding its strategic direction, and various operational efficiency and reporting improvements.

- Provided advice to a $4 billion retailer in its capital and operational restructuring efforts. Efforts lead to a new $600 million loan facility.

- Served as CRO for a $400 million national emergency room operator, operating the entity through due diligence process and eventual sale.

- Assisted $6 billion international insurance company in its efforts to minimize losses related to various real estate loan deficiencies.

- Served as CRO for a not-for-profit property development and leasing company.

- Assisted client in consideration of acquisition of furniture manufacturer with production facilities in China.

- Assisted client in its review of a criticized commercial loan portfolio.

- Served as the fiduciary in a variety of Chapter 7 & 11 bankruptcy cases in various jurisdictions, managing the liquidation or reorganization of the debtor's assets, negotiating sales and settlements of multi-million dollar transactions, and resolving claim disputes.





**Charles Goldstein**

**Managing Director**

**Baltimore**

**Direct:** +1 410.454.6830          **Mobile:** +1 410.200.0557

**Fax:** +1 410.454.6801          **Email:** charles.goldstein@protiviti.com

**Testimony**

- Deposition Testimony in re: Stanley Goldberg, et al. v. The State of Maryland (Case No. 02-C-07-126810 RP). Circuit Court for Anne Arundel County, Maryland.  Subject matter: Damages related to ownership of land subject to ground rents (testimony given in 2010).

- Hearing Testimony in re: Universal Marketing, Inc. (Bankruptcy Case No. 09-14504).  Eastern District of Pennsylvania Bankruptcy Court. Subject matter: Substantive consolidation of non-debtor entities (testimony given in 2010).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM).  U.S. Bankruptcy Court, District of Maryland.  Subject matter: Settlement with largest unsecured creditor (testimony given in 2010).

- Deposition & Hearing Testimony in re: Black Crow Media Group L.L.C., et al. (Bankruptcy Case No. 10-00172) U.S. Bankruptcy, Middle District of Florida.  Subject matter: motion to dismiss, motion to approve cash collateral, motion to approve debtor-in-possession financing (testimony given in 2010).

- Hearing Testimony in re: ADFITECH, Inc. (Bankruptcy Case No. 09-17788) U.S. Bankruptcy Court, District of Maryland.  Subject matter: plan confirmation (testimony given in 2010).

- Hearing Testimony in re: Patterson Park Community Development Corporation (Bankruptcy Case No. 09-12545) U.S. Bankruptcy Court, District of Maryland. Subject matter: plan confirmation (testimony given in 2009).

- Hearing & Deposition Testimony in re: Thornburg Mortgage, Inc. et al (Bankruptcy Case No. 09-17787). U.S. Bankruptcy Court, District of Maryland.  Subject matter: motion to appoint a trustee (testimony given in 2009).

- Deposition Testimony in re: Financial Mortgage, Inc. / Vijay K. Taneja, et al. (Bankruptcy Case No. 08-13292).  U.S. Bankruptcy Court, Eastern District of Virginia.  Subject matter: lien positions (testimony given in 2009).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 05-32141).  U.S. Bankruptcy Court, Western District of North Carolina.  Subject matter: claims set-off issues (testimony given in 2008).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM).  U.S. Bankruptcy Court, District of Maryland.  Subject matter: valuation of claim. (testimony given in 2008).

- Deposition Testimony in re:  National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM).  U.S. Bankruptcy Court, District of Maryland.  Subject matter: Contested issues re: Southaven Claims / Case distribution (testimony given in 2007).



Risk & Business Consulting.
Internal Audit.

## Charles Goldstein
### Managing Director
### Baltimore

**Direct:** +1 410.454.6830      **Mobile:** +1 410.200.0557

**Fax:** +1 410.454.6801      **Email:** charles.goldstein@protiviti.com

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Appropriateness of claims settlement (testimony given in 2007).

- Expert Testimony in re: Alliance for Telecommunications Industry Solutions, Inc. vs. Edward A. Hall et al (Civil Case No. 05-cv-0044-0). U.S. District Court, District of Maryland. Subject matter: Damage calculation (testimony given in 2006).

- Hearing Testimony in re: Porter-Hayden Company (Bankruptcy Case No. 02-54152). U.S. Bankruptcy Court, District of Maryland. Subject matter: Confirmation of the Plan of Reorganization for the Debtors (testimony given in 2006).

- Report submitted in re: Federal Trade Commission vs. AmeriDebt, A. Pukke, et al. (Case No. PJM-03-3317). U.S. District Court, District of Maryland. Subject matter: Litigation and consultant to Federal Trade Commission (report submitted in 2005).

- Trial and Deposition Testimony in re: Official Employment-Related Issues Committee of Enron vs. John J. Lavorato, et al (Bankruptcy Case No 03-3721) and Official Employment-Related Issues Committee of Enron vs. John D. Arnold, et al (Bankruptcy Case No. 03-3522). U.S. Bankruptcy Court, Southern District of Texas, Houston Division. Subject matter: Fraudulent transfers and Retention payments (testimony given in 2005).

- Hearing Testimony in re: Phyamerica Physician Group (Bankruptcy Case No. 02-6-7737). U.S. Bankruptcy Court, District of Maryland. Subject matter: Fraudulent transfers (testimony given in 2005)

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Plan of Liquidation for ET Debtors and the Quantum Debtors (testimony given in 2005).

- Hearing Testimony in re: Phyamerica Physician Group (Bankruptcy Case No. 02-6-7737). U.S. Bankruptcy Court, District of Maryland. Subject matter: Value of services provided by the Debtor's billing company (testimony given in 2005).

- Deposition Testimony in re: Just for Feet et al. (Bankruptcy Case No. 99-4110). U.S. Bankruptcy Court, District of Delaware. Subject matter: Complaint against Board of Directors, and officers of the Debtor, and Deloitte and Touche (testimony given in 2005).





**Charles Goldstein**

**Managing Director**

**Baltimore**

**Direct:** +1 410.454.6830          **Mobile:** +1 410.200.0557

**Fax:** +1 410.454.6801      **Email:** charles.goldstein@protiviti.com

**Papers, Publications and Presentations**

- "Use of Financial Advisors in Chapter 11 Bankruptcy Proceedings," April 2010, April 2009, April 2008, October 2005, April 2004, November 2003, April 2003 and November 2002, Robert H. Smith School of Business, University of Maryland.

- "Corporate Restructuring: Pitfalls and Opportunities," October 2009 edition of The Metropolitan Corporate Counsel.

- "Considerations for General Counsel in an Era of Troubled Companies: Tripwires and Ethical Concerns," February 3, 2009, presentation to Association of Corporate Counsel, Chicago Chapter.

- "Challenges of Growing your Practice," June 4, 2008, presentation to the Association of Insolvency and Restructuring Advisors' 24th Annual Bankruptcy and Restructuring Conference.

- "Liquidation and Litigating Trust," May 2, 2008, presentation to the Maryland Bankruptcy Bar Association.

- "Use of Financial Advisors in Chapter 11 Bankruptcy Proceedings," April 2009 and April 2008, presentation at the University of Baltimore.

- "Maximizing Returns: When to Buy and Sell Distressed Debt," September 17, 2007, presentation to the Global Distressed Debt Investor Forum, New York, NY.

- "Financial Statements – Misstatements and Creditor Committee Reporting," June 8, 2007, presentation to the Association of Insolvency and Restructuring Advisors' 23rd Annual Bankruptcy and Restructuring Conference.

- "Fiduciary Duties of the Turn-Around Professional in the Zone of Insolvency," June 10, 2006, presentation to the Association of Insolvency and Restructuring Advisors' 22nd Annual Bankruptcy and Restructuring Conference.

- "Financial Advisor's Toolbox: Forensic Investigations," June, 23, 2004, presentation to the Association of Insolvency and Restructuring Advisors' 20th Annual Bankruptcy and Restructuring Conference.



# Exhibit G

**Documents Reviewed as Part of This Case**

1. Terry Mendenhall's "Supplemental Report"

2. Federal Rules of Evidence, Rule 702. Testimony by Experts

3. *Litigation Services and Applicable Professional Standards*, American Institute of Certified Public Accountants

4. Terry Mendenhall's Curriculum Vitae

5. Maryland Department of Assessments and Taxation Database

6. Terry Mendenhall Deposition, August 19, 2010

7. Terry Mendenhall Deposition, August 20, 2010

8. Mortgage Loan Purchase and Servicing Agreement, March 23, 2006

9. *Nonprime Mortgages, Analysis of Loan Performance, Factors Associated with Defaults, and Data Sources*, United States Government Accountability Office, August 2010